UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JOSHUA MAZYCK,

                          Plaintiff,

                                              9:25-CV-0216
          v.                                  (LEK/MJK)


BROOME COUNTY CORRECTIONAL
FACILITY,

                          Defendant.

_____

Joshua Mazyck, Plaintiff, *pro se*
Joshua T. Terell, Esq., Assistant Broome County Attorney

Mitchell J. Katz, United States Magistrate Judge

To the Honorable Lawrence E. Kahn, Senior U.S. District Judge:

## ORDER and REPORT-RECOMMENDATION

Senior United States District Court Judge Lawrence E. Kahn

referred Defendant's Fed. R. Civ. P. 12(b)(1) and 12(b)(6) motion

("Motion to Dismiss") to the Court for report and recommendation.[1] In

this *pro se* civil rights action, Mazyck asserts claims under 42 U.S.C. §

1983 ("Section 1983") and the Religious Land Use and Institutionalized

_____

[1] The District Court has the authority to refer dispositive motions to this Court
under 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c).

Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc. *See* (Complaint ("Compl."), Dkt. 1). For the following reasons, this Court recommends granting Defendant's Motion to Dismiss and that the Amended Complaint be dismissed *without prejudice* and *without leave to amend*.

## I.    BACKGROUND

### A. Facts

The Complaint asserts allegations of wrongdoing arising out of Mazyck's incarceration at the Broome County Correctional Facility. More specifically, the Complaint alleges as follows:

Mazyck, a practicing Muslim, arrived at the Broome County Correctional Facility on August 21, 2024. *See* (Dkt. 1, Compl., at 4). Since August 22, 2024, Mazyck "washed up" daily "to keep good hygiene." *Id*.

On February 5, 2025, Mazyck examined "the ingredients on the soap bottle that the jail provides" and saw that it contained "[g]elatin." (Dkt. 1, Compl., at 4). Mazyck's religion prohibits association with pork and pork products, as it is a "[m]ajor sin." *Id*. Mazyck filed a grievance with the Broome County Correctional Facility to raise concerns about the soap, but "nothing was done." *Id*.

Liberally construed, the Complaint asserts RLUIPA and free exercise claims against Broome County Sheriff Akshar and Broome County, as the real party in interest. *See* (Dkt. 6, May 14, 2025 Decision and Order, at 2-4) ("May 2025 Order").

### B. Procedural History

On February 18, 2025, Mazyck commenced this action by filing a Complaint and moving for leave to proceed *in forma pauperis* ("*IFP*"). (Dkts. 1, 3). Senior U.S. District Judge Lawrence E. Kahn' May 2025 Order granted Mazyck's request to proceed *in forma pauperis*, reviewed the Complaint under 28 U.S.C. § 1915, and held that the following claims survived *sua sponte* review requiring a response: (1) Mazyck's RLUIPA claim against Broome County; and (2) Mazyck's First Amendment free exercise claim against Broome County. *See* (Dkt. No. 6). Mazyck's RLUIPA and First Amendment free exercise of religion claims against Defendant Akshar were dismissed with prejudice and he was dismissed as a party to this action. *Id.* On June 27, 2025, Mazyck filed an Amended Complaint. (Dkt. 11).

## II.    MOTION TO DISMISS

### A.    Relevant Legal Standard

The standard of review on a Fed. R. Civ. P. 12(b)(1) motion is "substantively identical" to the standard for a Fed. R. Civ. P. 12(b)(6) motion. *Feldheim v. Fin. Recovery Servs., Inc.*, 257 F. Supp. 3d 361, 365 (S.D.N.Y. 2017) (citing *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014)). "In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff." *Gonzalez*, 2014 WL 2475893, at *2 (internal quotation marks omitted). The only substantive difference between the standards of review is that "the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists [in response to a 12(b)(1) motion], whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)." *Gonzalez*, 2014 WL 2475893, at *2; *see also Sobel v. Prudenti*, 25 F.Supp.3d 340, 352 (E.D.N.Y. 2014) ("In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden

of proving by a preponderance of the evidence that it exists.") (internal quotation marks omitted).

"A district court deciding a motion to dismiss may consider factual allegations made by a pro se party in his papers opposing the motion." *Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) (citing *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987)). In fact, "[t]he mandate to read the papers of pro se litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent with the allegations of the [p]laintiff's complaint." *Robles v. Bleau*, No. 07-CV-0464, 2008 WL 4693153 (TJM), at *6 and n.41 (N.D.N.Y. Oct. 22, 2008) (collecting cases); *see also Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (where a *pro se* is faced with a motion to dismiss, a court may consider materials outside of the complaint "to the extent they are consistent with the allegations in the complaint"), *vacated in part on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004); *Gil*, 824 F.2d at 195 (in reviewing district court's dismissal of *pro se* plaintiff's claim, Second Circuit considered plaintiff's affidavit

5

submitted in opposition to motion to dismiss); *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303-04 (2d Cir. 2020) ("hold[ing] that when a plaintiff properly amends her complaint after a defendant has filed a motion to dismiss that is still pending, the district court has the option of either denying the pending motion as moot or evaluating the motion in light of the facts alleged in the amended complaint").

### B.    Overview of the Motion to Dismiss

Defendant argues that Mazyck's claims should be dismissed under Fed. R. Civ. P. 12(b)(1) because his requested accommodation was substantially met, and this action is therefore moot. *See* (Dkt. No. 14-6 at 9-11). Alternatively, Defendant argues that Mazyck's claims should be dismissed under Rule 12(b)(6) because the Complaint fails to state a RLUIPA or First Amendment free exercise claim. *Id.* at 11-13, 16-19.[2]

In opposition, Mazyck argues that dismissal is not warranted because he (1) filed "multiple grievances regarding the soap containing pork;" (2) was told that he could purchase soap that did not contain pork or submit a request to obtain that soap for free, but officials "never

---

[2]  Counsel also argues that Mazyck failed to fully exhaust his administrative remedies before commencing this action, and that any asserted individual capacity claims are barred by the doctrine of qualified immunity. *See* (Dkt. No. 14-6 at 14-15, 19-20).

removed the soap that contained pork[;]" and (3) ultimately "spent over 100 days using th[e] soap with pork in it." *See* (Dkt. No. 20 at 1).

### D.    Analysis

As the Amended Complaint contains only supplemental allegations of wrongdoing, the Court will first address the Motion to Dismiss before reviewing the Amended Complaint under 28 U.S.C. § 1915(e)(2)(B), 28 U.S.C. § 1915A(b), and Fed. R. Civ. P.15(d).

#### 1.  Relevant Legal Standards

##### a. Municipal Liability

Municipal liability is limited under Section 1983 by *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). In *Monell*, the Supreme Court found that municipal liability existed "where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). Therefore, to successfully state a claim for *Monell* liability, a plaintiff must "make factual allegations that support a plausible inference that the [alleged] constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority

or the act of a person with policy making authority for the municipality." *Missel v. Cnty. of Monroe*, 351 Fed. App'x 543, 545 (2d Cir. 2009) (citing *Vives v. City of N.Y.*, 524 F.3d 346, 350 (2d Cir. 2008)). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see also Los Angeles County, Cal. v. Humphries*, 562 U.S. 29, 36 (2010) ("[I]n *Monell* the Court held that 'a municipality cannot be held liable' solely for the acts of others, e.g., 'solely because it employs a tortfeasor.'" (quoting *Monell*, 436 U.S. at 691)).

### b. Free Exercise Claims

The First Amendment to the United States Constitution guarantees the right to free exercise of religion. *See* U.S. Const. amend. I; *see also Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). As is true regarding the First Amendment generally, the free exercise clause applies to incarcerated individuals, subject to appropriate limiting factors. *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (holding that "[p]risoners have long been understood to retain some measure of

the constitutional protection afforded by the First Amendment's Free Exercise Clause" (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

"[A]n inmate does not need to establish a substantial burden in order to prevail on a free exercise claim under § 1983." *Kravitz v. Purcell*, 87 F.4th 111, 125 (2d Cir. 2023). "In the prison context, however, 'the right to free exercise of religion' is balanced against 'the interests of prison officials charged with complex duties arising from administration of the penal system.'" *Kravitz*, 87 F.4th at 127-28 (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)). Thus, "an infringement of the free exercise of religion [may be] permissible … if it is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Benjamin*, 905 F.2d at 574).

"[T]o assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers legitimate penological objectives." *Kravitz*, 87 F.4th at 128

(alterations adopted) (quoting *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988)).

### c. RLUIPA Claims

RLUIPA affords incarcerated individuals certain protections relative to exercising their religious beliefs, and provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution …even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person-
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

Although "RLUIPA does not authorize claims for monetary damages against state officers in . . . their . . . individual capacities[,]" *Holland v. Goord*, 758 F.3d 215, 220-22 (2d Cir. 2014), several courts have held that the statute does not bar claims for money damages against a municipality, *Clark v. City of New York*, 560 F. Supp. 3d 732,

740 (S.D.N.Y. 2021) (collecting cases, including *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 289-90 (5th Cir. 2012)).

## 2. Applicability of Fed. R. Civ. P. 12(b)(6)

Mazyck's pending claims against Broome County are based on allegations that he was provided with pork-based soap, in violation of his religious beliefs.

Several years ago, more than a dozen lawsuits were more or less contemporaneously filed by Muslim inmates at the Rikers Island prison facilities, all of which challenged the handling of food and related items at the prison dining facilities. *See Rose v. Masiey*, No. 05-CV-8828, 2008 WL 706254, at *2 (S.D.N.Y. Mar. 14, 2008) (discussing relevant litigation history). In *Rose*, the District Court denied a motion to dismiss plaintiff's Section 1983 claims based on allegations of prison officials stacking and washing trays that were used to serve Halal and non-Halal meals, washing trays with soap containing pork by-products, using cooking ingredients with pork by-products, and failing to cook Halal meats as required by Halal rules, finding that such allegations could be sufficient to support a First Amendment free exercise claim. *Id.* at *1, *3, *8-9. There, plaintiff's claims were asserted against

supervisory officials, among others, based on allegations that plaintiff received "no 'result' from [his] grievances" and the supervisory officials failed to remedy the matter after being notified about it. *Id*. at *3, *6-7.

This case differs significantly from *Rose* in several respects. First, the Complaint is silent as to whether soap that did not contain pork was also available at the facility at the time Mazyck was provided with pork-based soap. Mazyck, however, acknowledges in one of his opposition filings that pork-free soap was in fact available for commissary purchase even though he was provided with soap containing pork products. S*ee* (Dkt. No. 20, at 1). The law is well-settled that the court may consider clarifications of this nature (as opposed to contradictions) in deciding a motion to dismiss. *See Sommersett v. City of New York*, No. 09-CV-5916, 2011 WL 2565301, at *3 (S.D.N.Y. June 28, 2011) ("[W]here a pro se plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations"); *see also Walker*, 717 F.3d at 122 n.1 ("A district court deciding a motion to dismiss may consider factual allegations made by a pro se party in his papers opposing the motion."). Moreover, the

Complaint does not allege that Mazyck ever sought and was denied access to pork-free soap based on his inability to purchase it. Mazyck's response to the Motion to Dismiss states that after he learned the soap contained pork, he "did not use it and [he] used other indigent soaps as well as had to buy soap until the[y] replaced the soap." *See* (Dkt. 20 at 1). Thus, as a threshold matter, the Court is unable to infer from the allegations in the Complaint that Broome County officials forced Mazyck to utilize a product in violation of his religious beliefs.

Second, although the Complaint alleges that "nothing was done" by facility officials after Mazyck filed a grievance regarding his receipt of soap containing pork products, he acknowledges in one of his opposition filings that after he filed a grievance, an unidentified sergeant told him that he "could buy" soap that did not contain pork or "ask the officer in the Pod to get [him] indigent soap which did not contain pork[,]" and the facility subsequently "removed the soap that contained pork . . . after [plaintiff] filed a notice of intent through the State." *See* (Dkt. No. 20).[3] Moreover, the Complaint is devoid of

---

[3] Because this acknowledgment is against Mazyck's interest, and clarifies the allegations that "nothing was done," the Court will consider the acknowledgment for purposes of deciding the motion to dismiss. *See Sommersett*, 2011 WL 2565301, at *3; *cf. Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 533 n.9 (S.D.N.Y. 2014) ("I

allegations plausibly suggesting that any official intentionally failed to inform Mazyck about the availability of a soap option that did not contain pork products despite knowing that he was a practicing Muslim, and that use of soap containing pork products infringed on his religious beliefs. Thus, even if the facility's default offering of soap containing pork products may have infringed on Mazyck's religious beliefs, the Court has no basis to plausibly infer that the failure to initially inform him about an available alternative option was anything other than negligence, which cannot form the basis of a Section 1983 or RLUIPA claim. *See Wiggins v. Griffin*, 86 F.4th 987, 997 (2d Cir. 2023) ("The First Amendment's command that government not 'prohibit' the free exercise of religion, U.S. Const. amend. I, connotes a conscious act, rather than a merely negligent one … Given this understanding of the First Amendment, isolated acts of negligence cannot violate an individual's free exercise of religion in this context." (internal citations

---

ordinarily would not consider a statement in a pro se plaintiff's memorandum of law that contradicts the complaint, . . . but this statement is against Plaintiff's interest, and in any event, the Town Defendants submit three documents as exhibits, which I may consider on the motion, . . . that confirm the existence of the settlement."). However, for the sake of clarity, the Court also notes that it recommends granting the Motion to Dismiss even without consideration of this admission for the other reasons discussed herein.

omitted)); *see also Hamilton v. Countant*, No. 13-CV-669, 2016 WL 881126, at *4 (S.D.N.Y. Mar. 1, 2016) (holding that "damages claims based solely on the negligent infringement of a prisoner's right to religious freedom are not actionable under either the First Amendment or RLUIPA"); *Powell v. City of New York*, No. 14-CV-9937, 2016 WL 4159897, at *6 (S.D.N.Y. July 14, 2016) (same), *report and recommendation adopted by* 2016 WL 4147203 (S.D.N.Y. Aug. 3, 2016).

Finally, there can be no claim for municipal liability in the absence of an underlying constitutional violation. *See Segal*, 459 F.3d at 219 (noting that once a "district court properly [finds] no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* [is] entirely correct"); *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 567 (S.D.N.Y. 2010) ("[A] prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor."). Here, the Complaint is entirely devoid of allegations plausibly suggesting that any failure to provide Mazyck with pork-free soap was based on an unconstitutional Broome County policy or practice. *See, e.g., Thawney v. City of New York*, No. 17-CV-1881, 2018 WL 4935844, at *7 (S.D.N.Y. Oct. 11, 2018)

("Thawney, however, has not alleged, as he must, that the City's policies regarding the prevention of smuggling of contraband constitute a deliberate choice rather than mere negligence … At most, Thawney's allegations give rise to a plausible inference of negligence or bureaucratic inaction. . . . But that is not enough to provide a basis for liability under *Monell*." (internal citations omitted)).

The Court therefore recommends granting the Motion to Dismiss, and dismissing Mazyck's First Amendment free exercise and RLUIPA claims against Broome County without prejudice pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted.[4]

## III.   SUFFICIENCY OF THE AMENDED COMPLAINT

### A.    Relevant Legal Standard

Because Mazyck is proceeding *in forma pauperis* and is an incarcerated individual suing one or more government employees, his Amended Complaint must be reviewed in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). The legal standard governing the review of a pleading pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28

---

[4]  Considering this recommendation, the Court declines to consider the alternative grounds for dismissal set forth in the Motion to Dismiss.

U.S.C. § 1915A(b) was discussed at length in the May 2025 Order and will not be restated in this Order and Report-Recommendation. *See* (Dkt. 6, May 2025 Order, at 2-4).

The Amended Complaint is based solely on supplemental allegations of wrongdoing that occurred after the filing date of the initial Complaint. Thus, the filing of the Amended Complaint is also governed by Fed. R. Civ. P. 15. *See* Fed. R. Civ. P. 15. Specifically, Rule 15(d) allows a party, "[o]n motion and reasonable notice, . . . to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d).

The standard for a motion to supplement is the same as for a motion to amend a pleading under Fed. R. Civ. P. 15(a). *See Klos v. Haskell*, 835 F. Supp. 710, 715 (W.D.N.Y. 1993), *affirmed* 48 F.3d 81 (2d Cir. 1995). Addition of parties under Rule 21 is also guided by the same liberal standard as a motion to amend under Rule 15. *See Fair Housing Development Fund Corp. v. Burke*, 55 F.R.D. 414, 419 (E.D.N.Y. 1972).

The decision to grant or deny a motion to amend or supplement is committed to the sound discretion of the trial court and the court's

decision is not subject to review on appeal except for abuse of discretion. *See Nettis v. Levitt*, 241 F.3d 186, 192 (2d Cir. 2001); *see also Fielding v. Tollaksen*, 510 F.3d 175, 179 (2d Cir. 2007).

### B.    Overview of the Amended Complaint

The Amended Complaint, which is extremely sparse (and unaccompanied by a proper motion), names Broome County as the only defendant, and asserts claims based on alleged wrongdoing after the filing of the initial Complaint. *See generally* (Am. Compl., Dkt. 11). The following facts are alleged in the Amended Complaint:

Since Mazyck initiated this action, he has "been given the wrong trays purposely[,]" with jail officials "trying to force hard cereal on [his] trays for months" even though a doctor "put [him] on a dental soft diet." *See* (Am. Compl., at 4). As a result, Mazyck has been deprived of daily meals. *Id.*

The Amended Complaint expressly asserts RLUIPA, free exercise, and retaliation claims against Broome County and seeks monetary relief.  *See* (Am. Compl., at 5).

### C.    Analysis

### 1. Propriety of the Amended Complaint

As a general matter, leave to supplement should be given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility[.]" *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *see also Couloute v. Ryncarz*, No. 11-CV-5986, 2012 WL 541089, at *3 (S.D.N.Y. Feb. 17, 2012) (quoting *Monahan*, 214 F.3d at 283); *Albrecht v. Long Island R.R*, 134 F.R.D. 40, 41 (E.D.N.Y. 1991) (noting that a party may supplement to include subsequent occurrences "absent prejudice to the nonmoving party"). However, "[c]ourts regularly deny motions to amend where the moving party seeks to add claims involving collateral matters, based on different factual allegations and distinct legal theories, from the claims already at issue in a case." *Amusement Indus. v. Stern*, No. 07-CV-11586, 2014 WL 4460393, at *13 (S.D.N.Y. Sept. 10, 2014); *see also Mitchell v. Cuomo*, No. 17-CV-0892 (TJM/DJS), 2019 WL 1397195, at *3 (N.D.N.Y. Mar. 28, 2019) (adopting Magistrate Judge Stewart's recommendation to deny motion to supplement where "[t]he proposed First Amendment claims are neither related to nor pertain to

the allegations in the operative pleading, thus providing a basis to deny amendment under Rule 15(d)"); *Beckett v. Inc. Vill. of Freeport*, No. 11-CV-2163, 2014 WL 1330557, at *6 (E.D.N.Y. Mar. 31, 2014) ("Supplemental pleadings are limited to subsequent events related to the claim or defense presented in the original pleading." (internal quotation marks omitted)); *Brooks v. Rock*, No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *3 (N.D.N.Y. Mar. 28, 2014) (denying motion to amend to add allegations of retaliation and failure to protect from alleged conspiracy, where the original facts occurred in 2011 and the proposed new facts occurred in 2013).

Here, Mazyck's Amended Complaint is based entirely on facility officials allegedly providing him with hard cereal despite a medical prescription for soft food. Although Mazyck vaguely alleges that this occurred because he filed the instant action, claims related to improper meals issued after the filing date of the original complaint bear no relationship to his claims related to being provided with pork-based soap. For this reason alone, the Court recommends dismissing the Amended Complaint with leave to refile in a separate action. However,

out of an abundance of solicitude, the Court will also explain why the underlying claims in the Amended Complaint are inadequately pleaded.

## 2. RLUIPA and Free Exercise Claims

The legal standard governing RLUIPA and free exercise claims and municipal liability was discussed at length in Section II.D.1 above and will not be repeated herein.

As noted, Mazyck vaguely alleges that in response to filing the instant action, unidentified officials "purposely" delivered him meal trays containing "hard cereal" even though a doctor "put [him] on a dental soft diet[.]" *See* (Am. Compl., at 4).

As an initial matter, the Court has no basis to plausibly infer from the allegations in the Amended Complaint that depriving Mazyck of access to food prescribed for medical reasons interfered with his ability to practice his religion in any respect.

Furthermore, the Amended Complaint is devoid of allegations plausibly suggesting that (1) any policymaking official was personally involved in depriving Mazyck of soft foods despite knowing that this may have an impact on his ability to practice his religion (in some unexplained way), or (2) depriving Mazyck of soft foods was part of a

policy or practice within Broome County intended to interfere with his ability to practice his religion.

Accordingly, the Court recommends that the RLUIPA and First Amendment free exercise claims asserted in the Amended Complaint against Broome County be dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 3. Retaliation Claim

Courts must approach claims of retaliation "'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation–can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). A plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection

between the protected speech [or conduct] and the adverse action." *Davis*, 320 F.3d at 352 (quoting *Dawes*, 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

"To be an 'adverse action,' retaliatory conduct must be the type that would deter 'a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Hayes v. Dahlke*, 976 F.3d 259, 274 (2d Cir. 2020) (quoting *Davis*, 320 F.3d at 353)). In general, "[c]ourts have found that, while verbal threats may qualify as adverse actions" for purposes of a First Amendment retaliation claim, the threats "must be 'sufficiently specific and direct' to be actionable." *Tutora v. Gessner*, No. 17-CV-9517, 2019 WL 1382812, at *7 (S.D.N.Y. Mar. 27, 2019) (quoting *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *11 (S.D.N.Y. Sept. 28, 2018)).

Here, the Amended Complaint fails to identify when Mazyck received a prescription for soft foods, which official(s) provided him with the wrong meal trays, the specific dates when this occurred, or what, if anything, he communicated in response to this alleged

wrongdoing. Thus, it is not even clear from the allegations in the Amended Complaint that the delivery of hard cereal was intentional.

Moreover, the Amended Complaint fails to explain how any official who delivered Mazyck meal trays may have been aware of the instant action, let alone why a lawsuit against Broome County may have motivated that official to deprive him of soft food.

Finally, and perhaps most importantly, the Amended Complaint is completely devoid of allegations plausibly suggesting that the alleged wrongdoing was based on a Broome County policy or practice or carried out by one or more policymaking officials.

Accordingly, the Court recommends that the retaliation claim asserted in the Amended complaint against Broome County also be dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

## IV.    CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendant's Motion to Dismiss (Dkt. No. 14) be **GRANTED** pursuant to Fed. R. Civ. P. 12(b)(6) and that the

Complaint (Dkt. No. 1) be **DISMISSED WITHOUT PREJUDICE**; and it is further

**RECOMMENDED** that the Amended Complaint (Dkt. No. 11) be **DISMISSED WITHOUT PREJUDICE and WITHOUT LEAVE TO AMEND** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted[5]; and it is further

**ORDERED** that the Clerk provide Mazyck with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary*

---

[5] Based on the lack of a relationship between the claims asserted in the original complaint and the claims asserted in the amended complaint, the Court finds that it would be an abuse of plaintiff's IFP privileges to allow him to further pursue the claims asserted in the amended complaint in this action instead of commencing a new action.

*of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated: October 1, 2025.

_____
Hon. Mitchell J. Katz
U.S. Magistrate Judge

Gonzalez v. Option One Mortg. Corp., Not Reported in F.Supp.3d (2014)

2014 WL 2475893

2014 WL 2475893
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Luis GONZALEZ and Sonia Gonzalez, Plaintiffs,

v.

OPTION ONE MORTGAGE CORPORATION;
American Home Mortgage Servicing, Inc.; Deutsche
Bank National Trust Company, as Trustee for
Soundview Home Loan Trust 2005–OPT3 Asset–
Backed Certificates, Series 2005 OPT3; Benjamin T.
Staskiewicz, Esq.; S. Bruce Fair, Esq.; Valerie Nicole
Kloecker; and Hunt Leibert Jacobson, P.C.; Defendants.

No. 3:12–CV–1470 (CSH).
|
Signed June 3, 2014.

**Attorneys and Law Firms**

Luis Gonzalez, East Windsor, CT, pro se.

Sonia Gonzalez, East Windsor, CT, pro se.

Valerie N. Doble, Hinshaw & Culbertson, LLP, Boston,
MA, Jeffrey M. Knickerbocker, Hunt Leibert Jacobson P.C.,
Hartford, CT, for Defendants.

### *RULING ON DEFENDANTS' MOTIONS TO DISMISS*

HAIGHT, Senior District Judge:

### I. *INTRODUCTION AND FACTUAL BACKGROUND*
**\*1** Pro se plaintiffs Luis Gonzalez and Sonia Gonzalez
("Plaintiffs") bring their self-styled "Human
Rights Complaint" against defendant mortgage companies, bank,
and counsel regarding a mortgage on Plaintiffs' property
located at 54 Abbe Road, East Windsor, Connecticut (the
"East Windsor Property"). As described more fully below,
pending before this Court are three motions by Defendants to
dismiss Plaintiffs' Complaint. *See* Doc. 4, 16, & 22.

In brief, on July 29, 2005, Plaintiff Luis Gonzalez signed
a note (the "Note") promising to pay the lender, Option
One Mortgage Corporation ("Option One"), $258,750.000.
Plaintiffs executed a Mortgage in favor of Option One,
relating to the East Windsor Property, to secure the Note. [1]
Plaintiffs thereafter defaulted on this Mortgage Loan. As a

result, Deutsche Bank National Trust Company ("Deutsche
Bank"), as trustee and holder of the Note, accelerated the
balance due.

[1]     As Defendants suggest in their papers, the Court
        will address the Note and the Mortgage collectively
        as the "Mortgage Loan" in this Ruling. *See, e.g.,*
        Doc. 17, p. 2.

On May 19, 2010, Deutsche Bank, by and through its
counsel, Hunt Leibert Jacobsen, PC, initiated a foreclosure
action against Plaintiffs in Connecticut Superior Court,
Judicial District of Hartford at Hartford, *Deutsche Bank
National Trust Co. v. Gonzalez,* No. HHD–CV–07–6001411–
S. Defendant Deutsche Bank obtained a judgment of strict
foreclosure in that action on July 28, 2011. [2] Doc. 23, Ex.
A. On October 31, 2011, the state court issued an Execution
of Ejectment. *Id.* (Doc. 135.00 on state court docket). A
Certificate of Foreclosure was recorded on November 23,
2011. Doc. 23, Ex. B.

[2]     Deutsche Bank had previously obtained a judgment
        of strict foreclosure in Connecticut Superior Court
        on June 12, 2008 (Case No. HHD–CV–07–
        6001411 S), but then withdrew the action in an
        attempt to settle the case with Plaintiffs. *See* Doc.
        4–2 (Strict Foreclosure, dated 6/12/2008) & Doc.
        4–3 (withdrawal of action by Deutsche Bank,
        dated 7/9/2009). In May of 2010, Deutsche Bank
        reinitiated the action in Connecticut Superior Court
        (Case No. HHD–CV 10–6011071–S) and obtained
        the present judgment of strict foreclosure.

Plaintiffs thereafter commenced an action in state court,
seeking to avoid foreclosure, regarding the Mortgage
Loan on the East Windsor Property against Option One,
American Home Mortgage Servicing, Inc. ("American Home
Mortgage"), Deutsche Bank, the Hunt Leibert Jacobson law
firm, and two individual attorneys in that firm, Benjamin
Staskiewicz, and S. Bruce Fair. *See Gonzalez v. Option
One Mortgage Corp.,* Case No. HHD–CV–11–5035882–S.
In that action, alleging fraud and mistreatment with respect
to the Mortgage Loan, Defendants Hunt Leibert Jacobson,
PC, and Attorneys Benjamin Staskiewicz and S. Bruce Fair
(collectively the "Hunt Leibert Defendants"), filed motions to
strike [Doc. 105] and for judgment [Doc. 107]. *See* Doc. 4–
5 (docket sheet of state action). On March 5, 2012, the court
granted the motion to strike [Doc. 105.86]; and on August
9, 2012, the court granted the motion for judgment in favor
of the Hunt Leibert Defendants [Doc. 107.86]. Option One

2014 WL 2475893

thereafter filed a motion to dismiss [Doc. 144], which was granted on September 10, 2013; and judgment of dismissal as to Option One entered on that date [Doc. 144.87]. The state court ultimately entered a general "Judgment Without Trial" for defendants [Doc. 154.87, dated 9/10/2013].

On October 16, 2012, Plaintiffs brought the present claim in federal court against Defendants Option One, American Home Mortgage, Deutsche Bank, the Hunt Leibert Defendants, and Attorney Valerie Nicole Kloecker (currently known as Valerie N. Doble) (collectively "Defendants").[3] Plaintiffs' Complaint broadly includes, *inter alia,* claims arising pursuant to "United Nations ['] declaration of Indigenous Peoples Autonomy," "mortgage fraud and foreclosure," "conspiracy" of "national banks and loaning services ... to commit fraud" against the Plaintiffs, denial of constitutional rights to "life [,] liberty[,] and the pursuit of happiness," and various "torts." *See* Doc. 1, p. 1 (summarizing claims). It is unclear what specific relief Plaintiffs seek. However, it would appear that, at the very least, they seek to obtain relief from their obligations under the Mortgage Loan at issue and to avoid foreclosure on the East Windsor Property.

[3]     Attorney Valerie N. Doble entered a "special limited appearance" as counsel in this action on behalf of American Home Mortgage, Deutsche Bank, and herself for the sole purpose of moving to dismiss Plaintiffs' action. Doc. 15 (filed 5/2/2013).

**\*2** Pending before the Court are Defendants' three Motions to Dismiss Plaintiff's action pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(5). Doc. 4, 16 & 22.[4] With respect to the Hunt Leibert Defendants, they move to dismiss Plaintiffs' action pursuant to Rules 12(b)(1) and 12(b)(6), arguing, respectively, that the Court has no subject matter jurisdiction over this action and the Complaint fails to state a claim upon with relief can be granted. Doc. 4. Similarly, the other Defendants—American Home Mortgage, Deutsche Bank, Kloecker (currently Doble), and Option One—request the Court to dismiss Plaintiffs' action for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted. In addition, this group of Defendants argues for dismissal due to insufficient service of process pursuant to Fed.R.Civ.P. 4 and 12(b)(5), and thus lack of personal jurisdiction. Because the three motions to dismiss substantively assert overlapping grounds for dismissal, the Court will address and resolve all three motions herein.

[4]     The Hunt Leibert Defendants filed the initial Motion to Dismiss [Doc. 4]. Subsequently, Defendants Homeward Residential, Inc., formerly known as American Home Mortgage Servicing, Inc.; Deutsche Bank, as Trustee for Soundview Home Loan Trust 2005–OPT3, Asset–Backed Certificates, Series 2005 OPT 3; and Valerie Nicole Doble brought the second Motion to Dismiss, [Doc. 16]. Lastly, Defendant Option One moved to dismiss Plaintiffs' action on the same grounds as the second Motion to Dismiss [Doc. 22].

## II. *STANDARDS OF REVIEW*

**A.** *Rule 12(b)(1)—lack of subject matter jurisdiction*
"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.' " *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d. Cir.2003), *cert. denied,* 540 U.S. 1012 (2003). "In deciding both types of motions, the Court 'must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff." *Hailey v. Conn.,* No. 3:10–cv–1787 (VLB), 2011 WL 6209748, at *2 (D.Conn. Dec. 14, 2011) (quoting *In re AIG Advisor Group Sec. Litig.,* 309 F. App'x 495, 497 (2d Cir.2009)).

On a Rule 12(b)(1) motion, however, the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6). *Lerner,* 318 F.3d at 128 (citing *Thompson v. County of Franklin,* 15 F.3d 245, 249 (2d Cir.1994)).

"A case is properly dismissed for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."[5] *O & G Industries, Inc. v. Aon Risk Servs. Northeast, Inc.,* 922 F.Supp.2d 257, 262 (D.Conn.2013) (citing *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000)). *See also Lyndonville Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 700–01 (2d Cir.2000) ("If subject matter jurisdiction is lacking, the action must be dismissed."). "Without jurisdiction the court cannot proceed at all in any cause" because "[j]urisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."

2014 WL 2475893

*Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle,* 7 Wall. 506, 514, 19 L.Ed. 264 (1868)). Unlike personal jurisdiction, "subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court *sua sponte." Lyndonville Sav. Bank & Trust Co.,* 211 F.3d at 700.

5    See Fed.R.Civ.P. 12(b)(1) (permitting a defendant to assert by motion the defense of "lack of subject matter jurisdiction").

**\*3** In resolving a motion to dismiss for lack of subject matter jurisdiction, the court "must determine whether or not the factual predicate for subject matter exists." *Tilley v. Anixter Inc.,* 283 F.Supp.2d 729, 733 (D.Conn.2003) (citation omitted). The court accepts as true all material allegations in the complaint," but refrains from "drawing from the pleadings inferences favorable to the party asserting [subject matter jurisdiction]," *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). *See also Norton v. Larney,* 266 U.S. 511, 515 (1925) ("It is quite true that the jurisdiction of a federal court must affirmatively and distinctly appear and cannot be helped by presumptions or by argumentative inferences drawn from the pleadings.").

Put simply, on a Rule 12(b)(1) motion to dismiss, the plaintiff must establish by a preponderance of the evidence that the court has subject matter jurisdiction over the complaint. Moreover, the plaintiff may present proof of jurisdictional facts by affidavit or other competent evidence for the court to resolve such a motion. *See, e.g., Zappia Middle East Constr. Co. Ltd. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000) ("On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing."); *Giammatteo v. Newton,* 452 F. App'x 24, 27 (2d Cir.2011) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may refer to and rely on competent evidence outside the pleadings."); *Rzayeva v. United States,* 492 F.Supp.2d 60, 69 (D.Conn.2007) ("In making a determination of a motion to dismiss under Rule 12(b)(1), a court is not limited to the face of the complaint, but may consider evidence, including affidavits submitted by the parties.") (citation and internal quotation marks omitted).

Pursuant to Article III of the Constitution, a federal court has limited jurisdiction. It may only exercise subject matter jurisdiction where either: (1) the plaintiff sets forth a colorable claim arising under the Constitution or federal statute, creating "federal question" jurisdiction, 28 U.S.C. § 1331; or (2) there is complete diversity of citizenship between plaintiff and all defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs, 28 U.S.C. § 1332(a)(1). *Strawbridge v. Curtiss,* 3 Cranch 267, 1806 WL 1213, at \*1 (February Term 1806). *See also Da Silva v. Kinsho Int'l Corp.,* 229 F.3d 358, 363 (2d Cir.2000) (delineating two categories of subject matter jurisdiction). 6 In order to survive a Rule 12(b)(1) motion for lack of subject matter jurisdiction, the plaintiff must therefore prove either the presence of a federal question or complete diversity of citizenship with all defendants and a minimum of $ 75,000 in controversy. 7

6    See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); 28 U.S.C. § 1332(a)(1) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—(1) citizens of different States").

7    Even in the absence of a Rule 12(b)(1) motion, a federal court must determine with certainty that it has subject matter jurisdiction over a case pending before it and, if necessary, must do so *sua sponte. Joseph v. Leavitt,* 465 F.3d 87, 89 (2d Cir.2006), *cert. denied,* 549 U.S. 1282 (2007).

**B. *Rule 12(b)(6)—failure to state a claim***
**\*4** "To survive a [Rule 12(b)(6) ] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. The Second Circuit has consistently adhered to the United States Supreme Court's seminal "plausibility" standard set forth in *Iqbal.* 8 *See, e.g., Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir.2014); *Krys v. Pigott,* Nos. 12–3575(L), 12–3586(C), —— F.3d ——, 2014 WL 1394940, at \*9 (2d Cir. April 11, 2014); *In re Terrorist Attacks on September 11, 2001,* 714 F.3d 118, 122 (2d Cir.2013); *O'Callaghan v. New*

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 30 of 238

Gonzalez v. Option One Mortg. Corp., Not Reported in F.Supp.3d (2014)

2014 WL 2475893

*York Stock Exchange,* No. 13–3370–cv, —— F. App'x ——, 2014 WL 1422395, at *1 (2d Cir. April 15, 2014).

8    "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678. Thus, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly,* 550 U.S. at 557 (internal quotation marks and brackets omitted).

"[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.' "[9] *Halebian v. Berv,* 644 F.3d 122, 130 (2d Cir.2011) (internal citation omitted). In ruling on a Rule 12(b)(6) motion, the court's duty is "to assess the legal feasibility of the complaint, [but] not to assay the weight of the evidence which might be offered in support thereof ." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 113 (2d Cir.2010) (citation and internal quotation marks omitted). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974), *abrogated on other grounds, Harlow v. Fitzgerald,* 457 U.S. 800 (1982). In fact, "it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer,* 416 U.S. at 236. *Accord Nielsen,* 746 F.3d at 62–63 ("The plausibility standard is not akin to a probability requirement ...." so that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.") (quoting *Twombly,* 550 U.S. 544) (internal quotations omitted).

9    Rule 8, Fed.R.Civ.P., specifies that a complaint must "contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The pleading standard set forth in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

"In addressing the sufficiency of a complaint [the court must] accept as true all factual allegations and draw from them all reasonable inferences; but [the court is] not required to

credit conclusory allegations or legal conclusions couched as factual ... allegations." *Nielsen,* 746 F.3d at 62 (quoting *Rothstein v. UBS AG,* 708 F.3d 82, 94 (2d Cir.2013)). Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Nielsen,* 2014 WL 552805, at *2 (quoting *Iqbal,* 556 U.S. at 678).

**\*5** With respect to *pro se* litigants, "[w]hile *pro se* complaints must contain sufficient factual allegations to meet the plausibility standard," the Second Circuit "look[s] for such allegations by affording the litigant 'special solicitude, interpreting the complaint to raise the strongest claims that it suggests.' " *O'Callaghan,* 2014 WL 1422395, at *1 (citing *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) and citing and quoting *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011)). Because "most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements, [courts] must construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency than [it] would when reviewing a complaint submitted by counsel." *Taylor v. Vermont Dep't of Educ.,* 313 F.3d 768, 776 (2d Cir.2002) (citation and internal quotations omitted).

"[P]ro se litigants ... cannot be expected to know all of the legal theories on which they might ultimately recover," and, therefore, "[i]t is enough that they allege that they were injured, and that their allegations can conceivably give rise to a viable claim." *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005). Nonetheless, the Court need not engage in "rank speculations" to manufacture a federal claim for *pro se* plaintiffs, *Ford v. New Britain Trans. Co.,* No. 3:03cv150 (MRK), 2005 WL 1785269, at *1 (D .Conn. July 26, 2005), *aff'd,* 239 F. App'x 670 (2d Cir.2007); and thus, a court may dismiss a complaint if it appears beyond doubt that no set of facts could be proven that would establish an entitlement to relief. *Weixel v. Bd. of Educ. of New York,* 287 F.3d 138, 145–46 (2d Cir.2002).

C. *Rule 12(b)(5)—insufficient service of process*
"Under Rule 12(b)(5), a party may file a motion to dismiss due to insufficiency of service of process." *Carney v. Beracha,* No. 3:12–CV–00180 (SRU), —— F.Supp.2d ——, 2014 WL 533727, at *2 (D.Conn. Feb. 10, 2014) (quoting *Rzayeva v. United States,* 492 F .Supp.2d 60, 74 (D.Conn.2007)). *See also Greene v. Wright,* 389 F.Supp.2d 416, 426 n. 2 (D.Conn.2005). "A motion to dismiss pursuant to Rule 12(b)(5) must be granted if the plaintiff fails to serve a copy of the summons and complaint on the defendants pursuant to Rule 4

Case 9:25-cv-00216-LEK-MJK   Document 23   Filed 10/01/25   Page 31 of 238

Gonzalez v. Option One Mortg. Corp., Not Reported in F.Supp.3d (2014)

2014 WL 2475893

of the Federal Rules, which sets forth the federal requirements for service." [10] *Rzayeva,* 492 F. Supp 2d at 74 (citing *Cole v. Aetna Life & Cas.,* 70 F.Supp.2d 106, 110 (D.Conn.1999)). "Once validity of service has been challenged, it becomes the plaintiff's burden to prove that service of process was adequate ." *Id.* (internal quotation marks omitted). [11]

[10]   Rule 4(c)(1), Fed.R.Civ.P., provides that "[i]n [g]eneral," "[a] summons must be served with a copy of the complaint;" "[t]he plaintiff is responsible for having the summons and complaint served within the time allowed by Rule 4(m);" and the plaintiff "must furnish the necessary copies to the person who makes service." Moreover, the person who makes service may be "[a]ny person who is at least 18 years old and not a party" to the action. *Id.* (c)(2).

[11]   The Court also notes that "[s]ufficiency of service is a precondition for the court's exercise of jurisdiction over a party and, therefore, constitutes an interrelated ground on which to dismiss a case for lack of personal jurisdiction pursuant to Rule 12(b)(2)." *Carliell v. Am. Inv. Exchange, LLC,* No. 3:12–cv–1700 (JCH), 2013 WL 4782133, at *2 (D.Conn. Sept. 5, 2013). *See also Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 104 (1987); *Davis v. Mara,* 587 F.Supp.2d 422, 424 (D.Conn.2008).

## III. *DISCUSSION*

### A. *Rule 12(b)(1)—Lack of Subject Matter Jurisdiction*

#### 1. *No Diversity of Citizenship*

In the case at bar, all Defendants move this Court to dismiss Plaintiff's Complaint on the grounds that Plaintiffs have not and cannot meet their burden to demonstrate subject matter jurisdiction. Doc. 4, 16, & 22. As stated *supra,* the basic statutory grants of subject matter jurisdiction are embodied in 28 U.S.C. §§ 1331 and 1332. *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 513 (2006). A federal court may thus exert subject matter jurisdiction over claims in which (1) there is complete "diversity of citizenship" between each plaintiff and all defendants and a minimum of $75,000 in controversy, 28 U.S.C. § 1332(a), and/or if (2) there is a "federal question" in that a colorable claim arises under the "Constitution, laws or treaties of the United States," 28 U.S.C. § 1331. [12]

[12]   The Court also notes that a federal court may exercise subject matter jurisdiction over a claim brought against the federal government, but the federal government is not a party to this action. *See* 28 U.S.C. § 1346.

**\*6** First, in the pending Motions to Dismiss, Defendants point out that there is no diversity of citizenship in this action. Not only did Plaintiffs fail to allege sufficient facts to prove the parties' citizenship, but were Plaintiffs to attempt to do so, diversity would still not be present. Defendants represent that Plaintiffs and Defendants Hunt Leibert Jacobson, P.C., Benjamin T. Staskiewicz, and S. Bruce Fair are, and most importantly were at the commencement of the action, citizens of Connecticut. [13]

[13]   "In an action in which jurisdiction is premised on diversity of citizenship, diversity must exist at the time the action is commenced." *Universal Licensing Corp. v. Paola del Lungo S.p.A.,* 293 F.3d 579, 581 (2d Cir.2002). *See also Durant, Nichols, Houston, Hodgson & Cortese–Costa P.C. v. Dupont,* 565 F.3d 56, 63 (2d Cir.2009) (to determine diversity jurisdiction "it must be determined whether at the time the present action was commenced there was diversity jurisdiction").

Plaintiffs state in their Complaint that they are "[d]omicile[d] at indigenous lands America Connecticut Republic" and are "undisputed owner[s] of 54 Abbe Road, East Windsor, Connecticut Republic." Doc. 1, p. 2. For diversity purposes, an individual's citizenship is determined by his or her *domicile,* as opposed to residence, *Palazzo v. Corio,* 232 F.3d 38, 42 (2d Cir.2000); and "[i]n general, the domicile of an individual is his true, fixed and permanent home and place of habitation"—*i.e,* "the place to which, whenever he is absent, he has the intention of returning." *Martinez v. Bynum,* 461 U.S. 321, 331 (1983). Because Plaintiffs were, in their words, "domiciled" in Connecticut at the commencement of their action, they are citizens of Connecticut.

With respect to corporate Defendant Hunt Leibert Jacobson, P.C., pursuant to 28 U.S.C. § 1332(c)(1), "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." *See also Wachovia Bank v. Schmidt,* 546 U.S. 303, 306 (2006). The Court takes judicial notice that Hunt Leibert Jacobson, P.C. is a professional corporation with its principal and sole place of business located at 50 Weston Street, Hartford, Connecticut. Thus, based on its principal place of

Gonzalez v. Option One Mortg. Corp., Not Reported in F.Supp.3d (2014)

2014 WL 2475893

business, Hunt Leibert Jacobson is a citizen of Connecticut, as well as a citizen of its state(s) of incorporation. [14]

[14]    Hunt Leibert Jacobson has not identified its state(s) of incorporation for the Court. However, the other Defendants in the action have represented, without dispute, that Hunt Leibert Jacobson is a citizen of Connecticut. Doc. 17, p. 6; Doc. 23, p. 6.

With respect to Defendants Benjamin T. Staskiewicz, and S. Bruce Fair, individual attorneys, Defendants represent that they are, and were upon the filing date of Plaintiffs' action, "domiciled" in Connecticut. Doc. 17, p. 6; Doc. 23, p. 6. As set forth *supra,* they are thus citizens of Connecticut.

Where the citizenship of Plaintiffs and one or more Defendants is the same, there can be no subject matter jurisdiction based on diversity of citizenship, 18 U.S.C. § 1332(a). *See, e.g., St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply,* 409 F.3d 73, 80 (2d Cir.2005) ("Diversity is not complete if any plaintiff is a citizen of the same state as any defendant.") (citing *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 373– 74 (1978)). Reading *pro se* Plaintiffs' language liberally, Plaintiffs alleged that they were domiciled in Connecticut when they filed their Complaint. Accepting the factual allegations in the Complaint as true, Plaintiffs have failed to establish diversity of citizenship. Moreover, in the present circumstances, any opportunity to replead, if given, would be futile: Plaintiffs would be unable demonstrate diversity of citizenship because Plaintiffs and two or more Defendants were citizens of Connecticut at the inception of Plaintiff's action. In the absence of complete diversity between Plaintiffs and Defendants, there is no subject matter jurisdiction based on diversity of citizenship. [15]

[15]    The Court need not address the jurisdictional amount in controversy necessary for diversity because Plaintiffs and certain Defendants are citizens of the same state, Connecticut. Given the value of the property at issue in the Mortgage Loan, however, it is likely that, as Plaintiffs contend, "the amount in controversy exceeds $75,000." *See* Doc. 1, p. 1.

**2. *No Federal Question Implicated***

**\*7** Second, Defendants assert, that there is no "federal question" jurisdiction. *See, e.g.,* Doc. 17, p. 6.; Doc. 23, p. 6. Specifically, Defendants argue that although Plaintiffs refer

to various federal statutes, including the Federal Tort Claims Act, 42 U.S.C. § 1983, and 28 U.S.C. § 1343(a)(3), "review of the Complaint demonstrates that Plaintiffs' reference to these federal statutes is made solely for purpose of obtaining jurisdiction, as the Complaint does not set forth a viable cause of action against Homeward, Deutsche Bank as Trustee or Attorney Doble under the United States Constitution or other federal law." Doc. 17, p. 6. Therefore, Defendants reason, "Plaintiffs' reference to these federal statutes is made solely for purpose[s] of obtaining jurisdiction." Doc. 23, p. 6. As Defendants conclude, when a complaint states a cause of action under federal law that is "clearly ... immaterial and made solely for the purpose of obtaining jurisdiction" or is "wholly insubstantial and frivolous," there is no federal question jurisdiction. *Id.* (quoting *Lyndonville Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 701 (2d Cir.2000)).

In deciding a Rule 12(b)(1) motion, the Court "must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff." *In re AIG Advisor Group Sec. Litig.,* 309 F. App'x at 497 (quoting *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997)). The Court has carefully and liberally reviewed both Plaintiffs' Complaint [Doc. 1] and "Complaint Revised" or "Affidavit Substantiating Plaintiffs' Complaint Standing" [Doc. 25], which was submitted in response to Defendants' motions to dismiss. Accepting all factual allegations in the Complaint and proposed "Complaint Revised" as true, and drawing inferences from those allegations in the light most favorable to the Plaintiffs, neither document sets forth any comprehensible federal claim. [16] Granted, Plaintiffs reference federal statutes, including 42 U.S.C. § 1983, and the Constitution. [17] However, despite exercising the utmost leniency in construing the Complaint, as this Court is required to do when plaintiffs are *pro se, Platsky v. C.I.A.,* 953 F.2d 26, 28 (2d Cir.1991), Plaintiffs have failed to set forth any relevant facts giving rise to either federal statutory or constitutional claims. The Court thus finds no basis upon which to exercise federal question jurisdiction.

[16]    In reviewing the Complaint for any plausible claims under *Iqbal,* the Court has refrained from impugning Plaintiffs' motives for citing federal statutes (*e.g.,* to simply create federal subject matter jurisdiction).

[17]    For example, Plaintiffs alleged that "NEGLIGENCE of a federal employee ... is

2014 WL 2475893

authorized by [the] FEDERAL TORTS CLAIMS ACT of 1946," citing 28 U.S.C. §§ 1346(b) and 2674). This statement is both incorrect and inapposite to their mortgage-based claim. Also, Plaintiffs quote Article 4, section 4 of the Constitution, the Guaranty Clause, which guarantees a republican form of government. *See* U.S. Const., Art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence."). Not only has no State been invaded or subjected to domestic violence, "complaints based on that clause have been held to present political questions that are nonjusticiable." *Baker v. Carr,* 369 U.S. 186, 209 (1962). *See also, e.g., Kirk v. Boehm,* 216 F.Supp. 952, 953(D.C.Pa.1963) (dismissing claims under Article IV, section 4 because "plaintiff's complaint raises a nonjusticiable political question and must be dismissed."), *aff'd,* 376 U.S. 512 (1964), *reh'g denied,* 377 U.S. 920 (1964).

Although courts hold *pro se* complaints "to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe,* 449 U.S. 5, 9 (1980), *pro se* litigants must establish subject matter jurisdiction to avoid dismissal. *See, e.g., Burke v. State of Connecticut Judge Patchen,* No. 3:08mc118(WIG), 2008 WL 1883923, at *2 (D.Conn. April 28, 2008) (dismissing *pro se* complaint for lack of subject matter jurisdiction). Because Plaintiffs have not demonstrated any viable basis upon which this Court may exercise subject matter jurisdiction, this Court has no choice but to dismiss this case.

### 3. *Rooker–Feldman Doctrine*

**\*8** Even if there had been diversity of citizenship or a federal question present, the Court would still lack subject matter jurisdiction over this matter pursuant to the Rooker–Feldman doctrine. "The Rooker-Feldman doctrine provides that, in most circumstances, the lower federal courts do not have subject matter jurisdiction to review final judgments of state courts." *Grim v. Baker,* No. 13–1189–cv, —— F. App'x ——, 2014 WL 349977, at *1 (2d Cir. Feb. 3, 2014) (citing *D.C. Court of Appeals v. Feldman,* 460 U.S. 462, 482–83 (1983) ("a United States District Court has no authority to review final judgments of a state court in judicial

proceedings"); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 414–16 (1923) ("no court of the United States other than [the Supreme Court] could entertain a proceeding to reverse or modify [a state court's] judgment for errors")). "The Supreme Court has clarified that the doctrine is confined to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Grim,* 2014 WL 349977, at *1 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005) (internal quotation marks omitted)).

As the Second Circuit has articulated, "Rooker–Feldman directs federal courts to abstain from considering claims when four requirements are met: (1) the plaintiff lost in state court, (2) the plaintiff complains of injuries caused by the state court judgment, (3) the plaintiff invites district court review of that judgment, and (4) the state court judgment was entered before the plaintiff's federal suit commenced." *McKithen v. Brown,* 626 F.3d 143, 154 (2d Cir.2010). *Accord Remy v. New York State Dep't of Taxation and Finance,* 507 F. App'x 16, 18 (2d Cir.2013). Moreover, "the applicability of the Rooker–Feldman doctrine turns not on the similarity between a party's state-court and federal-court claims ... but rather on the causal relationship between the state-court judgment and the injury of which the party complains in federal court." *McKithen,* 481 F.3d at 97–98.

"Even where a plaintiff alleges that a state court judgment was procured by fraud, Rooker–Feldman will divest the federal court of jurisdiction." *Astoria Federal Sav. & Loan Ass'n v. Arcamone,* No. 3:12–cv–230 (WWE), 2012 WL 4355550, at *2 (D.Conn. Sept. 18, 2012) (citing *Done v. Wells Fargo Bank, N.A.,* No. 08–CV–3040 (JFB)(ETB), 2009 WL 2959619, *3 n. 6 (E.D.N.Y. Sept. 14, 2009)). *See also Smith v. Wayne Weinberger P.C.,* 994 F.Supp. 418, 423 (E.D.N.Y.1998) ("The fact that the plaintiff alleges that the State Court judgment was procured by fraud does not remove his claims from the ambit of Rooker–Feldman.").

In particular, with respect to state court judgments of foreclosure, "Courts in this Circuit have consistently held that any attack on a judgment of foreclosure is clearly barred by the Rooker–Feldman doctrine." *Gunn v. Ambac Assur. Corp.,* No. 11 Civ. 5497(PAC)(JLC), 2012 WL 2401649, at * 12 (S.D.N.Y. June 26, 2012)(collecting cases), *report and recommendation adopted,* 2012 WL 3188849 (S.D.N.Y. Aug. 6, 2012). *See also Swiatkowski v. Bank of America, NT & SA,* 103 F. App'x 431, 432 (2d

Gonzalez v. Option One Mortg. Corp., Not Reported in F.Supp.3d (2014)

2014 WL 2475893

Cir.2004) (affirming district court's "holding that under the Rooker–Feldman doctrine, the [district] court lacked subject matter jurisdiction: even reading the complaint liberally, ... [plaintiffs'] lawsuit was effectively seeking to re-litigate a judgment of foreclosure entered against them by the state court"); *Billie v. Aurigremma,* No. 3:13–cv–1432 (JBA), 2013 WL 6331358, at *2 (D.Conn. Dec. 5, 2013) ("any claims contesting the validity of the state court foreclosure judgment are precluded by the Rooker–Feldman doctrine"); *Aluria v. Jurgelas,* No. 3:12–cv–1443 (WWE), 2013 WL 2286051, at *1 (D.Conn. May 23, 2013) ("Plaintiff's action invites this court to review and reject the judgment rendered in the foreclosure action prior to plaintiff's commencement of this action;" and "[t]hus, plaintiff[']'s challenge to a judgment of foreclosure issued by the state superior court satisfies the Rooker–Feldman factors, and the Court lacks subject matter jurisdiction to resolve plaintiff's request for relief."); *Astoria Federal Sav. & Loan Ass'n,* 2012 WL 4355550, at *2 (where plaintiff sought "an injunction to prevent the subject property from being 'stolen' from him" and "an order to void the [state court's] foreclosure orders," his "challenge to a judgment of foreclosure issued by the state superior court satisfie[d] the Rooker–Feldman factors, and the Court lack[ed] subject matter jurisdiction to resolve plaintiff's request for relief"); *Vossbrink v. Accredited Home Lenders, Inc.,* No. 3:11–cv–1312 (WWE), 2012 WL 2952374, at *1 (D.Conn. July 19, 2012) ("Here, plaintiff's motion for issuance of a temporary restraining order or preliminary injunction challenges a judgment of foreclosure issued by the state superior court;" "[t]hus, the Rooker–Feldman factors apply and the Court lacks subject matter jurisdiction to resolve plaintiff's request for relief."); *Smith v. Wayne Weinberger P.C.,* 994 F.Supp. 418, 423 (E.D.N.Y.1998) (in action where plaintiff alleged that state court default judgment in a foreclosure proceeding was procured by fraud, court dismissed the plaintiff's action as "in contravention of Rooker–Feldman" because the conversion claims were "merely a thinly-veiled effort to invalidate the State Court's foreclosure judgment").

**\*9** In the case at bar, all four Rooker–Feldman factors are present. First, the Plaintiffs clearly lost in state court. Plaintiffs initially lost when attempting to defend against foreclosure in the Connecticut state action of *Deutsche Bank National Trust Co. v. Gonzalez,* HHD–CV10–6011071–S (Conn.Super.Ct.2010). *See* Doc. 17–1, p. 2–5 (docket sheet reflecting, *inter alia,* "Judgment of Strict Foreclosure" with respect to Plaintiffs' East Windsor property, 7/18/2011; and "Execution of Ejectment Issued," 10/31/2011).

Plaintiffs thereafter lost again when they sued in Connecticut Superior Court, Judicial District of Hartford, to obtain relief from their mortgage obligations and to avoid foreclosure of the East Windsor Property. *See Gonzalez v. Option One Mortgage,* HHD–CV11–5035882–S (Conn.Super.Ct.2011); *see also* Doc. 17–1, p. 13–16. In that second action, upon motion by the Hunt–Leibert Defendants, the state court struck Plaintiffs' complaint in its entirety and entered judgment in their favor on August 9, 2012. *See, e.g.,* Doc. 17–1, p. 15 (docket sheet of state court action, reflecting, *inter alia,* Order [Doc. 107.86] entering "Judgment pursuant to Practice Book § 10–44 disposing of this matter ... in favor of Defendants, Hunt Leibert Jacobson, PC; Benjamin T. Staskiewicz, Esq.; and S. Bruce Fair, Esq.," dated 8/9/2012). The court subsequently entered a general judgment without trial in favor of the remaining defendants on September 10, 2013. [18]

[18]      As in the present federal action, the defendants in the state court action included Option One Mortgage Corporation; American Home Mortgage Servicing, Inc.; Deutsche Bank National Trust Company; Benjamin T. Staskiewicz, Esq.; S. Bruce Fair, Esq.; and Hunt Leibert Jacobson, PC. Attorney Doble was defense counsel for Deutsche Bank in that action.

Second, in the case at bar, the Plaintiffs complain of the injuries caused by the state court judgments. Specifically, Plaintiffs allege that they will be deprived of their property at 54 Abbe Road, East Windsor, Connecticut, as "victim[s] of predatory lending, deceptive practices, unfair trade and sales" by Defendants and the state court's entry of a judgment of strict foreclosure. Doc. 1, p. 3. In their Complaint, they thus "request the following relief remedy and tort: Discharge of the account, loan." *Id.,* p. 5.

Third, in challenging the state court's judgments, including foreclosure, the Plaintiffs invite this Court to review and reject those judgments, which were clearly unfavorable to them. In federal court, Plaintiffs present the same issues—the validity of the Mortgage Loan and opposition to foreclosure on the East Windsor Property—that they raised, or could have raised, in their state court actions. Where "the issues raised in a plaintiff's complaint are inextricably intertwined with a state court judgment" so that "the federal claim would succeed only if the state court wrongly decided the issue," the Rooker–Feldman factors are present. [19] *See, e.g., Barnett v. Conn. Light & Power Co.,* 900 F.Supp.2d 224, 241 (D.Conn.2012)

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 35 of 238

Gonzalez v. Option One Mortg. Corp., Not Reported in F.Supp.3d (2014)

2014 WL 2475893

(quoting *Dockery v. Cullen & Dykman,* 90 F.Supp.2d 233, 236 (E.D.N.Y.2000), *aff'd,* 2 F. App'x 78 (2d Cir.2001)); *Rene v. Citibank,* N.A., 32 F.Supp.2d 539, 543 (E.D.N.Y.1999) (same).

[19] "In the Rooker–Feldman doctrine, the Supreme Court's use of 'inextricably intertwined' means, at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding (as either the plaintiff or defendant in that proceeding), subsequent litigation of the claim will be barred under the Rooker–Feldman doctrine if it would be barred under the principles of preclusion." *Weiss v. Weiss,* 375 F.Supp.2d 10, 18 (D.Conn.2005) (citation and internal quotation marks omitted). "Stated another way, a federal claim is 'inextricably intertwined' with the state-court judgment if the relief sought may be granted only on the federal court's finding that the state court determined the issues before it erroneously." *Weiss,* 375 F.Supp.2d at 18 (quoting *Pennzoil Co. v. Texaco Inc.,* 481 U.S. 1, 25 (1987) (plurality opinion)).

**\*10** With respect to the fourth Rooker–Feldman factor, entry of the state court judgment prior to Plaintiffs' initiation of the federal lawsuit, Plaintiffs commenced their action in federal court on October 16, 2012. The state court judgment of foreclosure preceded their federal action. *See Deutsche Bank National Trust Co. v. Gonzalez,* HHD–CV 10–6011071–S (Conn.Super.Ct.2010) ( "Judgment of Strict Foreclosure," 7/28/2011, and "Execution of Ejectment Issued," 10/31/2011).[20] The state court clarified that the foreclosure judgment was final when later denying a motion to open judgment by Luis Gonzalez's present co-plaintiff and wife, Sonia Urdinola (a/k/a Gonzalez).[21] The docket in that action also reflects that Deutsche Bank provided the requisite affidavit of debt and foreclosure worksheet [Doc. 124, 125] to enable the court to make the necessary calculations of debt and issue an Execution of Ejectment [Doc. 135]. Under Connecticut law, "a judgment of foreclosure constitutes an appealable final judgment when the court has determined the method of foreclosure and the amount of the debt." *Moran v. Morneau,* 129 Conn.App. 349, 356 (2011) (quoting *Danzig v. PDPA, Inc.,* 125 Conn.App. 254, 261 (2010), *cert. denied,* 300 Conn. 920 (2011)).

[20] The Court notes that Plaintiffs' later attempt to avoid foreclosure in Connecticut Superior Court,

Judicial District of Hartford, was also unsuccessful. *See Gonzalez v. Option One Mortgage,* HHD–CV11–5035882–S (Conn.Super.Ct.2011).

[21] In *Deutsche Bank v. Gonzalez,* in denying plaintiff Sonia Urdinola's motion to open judgment of strict foreclosure, the state court clarified that it considered the judgment final, as follows:

> *The court entered a judgment of strict foreclosure in this matter on July 18, 2011, and title vested in the plaintiff on September 29, 2011.* The defendant, Sonia Urdinola, entered her appearance in the case on March 3, 2014, and filed a motion to open judgment arguing that the judgment should be opened because the plaintiff did not file a "Certification of Compliance with Foreclosure Procedures" with the clerk, because the plaintiff lacks standing as the real party in interest to bring this action, and she also supplies information showing that she and the the [sic] defendant, Luis Gonzales, have health problems. Due to the fact that the motion is so late, the court, ordinarily, has no jurisdiction to grant it. General Statutes § 49–15; *Thompson Gardens West Condominium Ass'n, Inc. v. Masto,* 140 Conn.App. 271, (2013). There are exceptions in cases where the court obviously lacked subject matter jurisdiction, *Argent Mortgage Co., LLC v. Huertas,* 288 Conn. 568, 576 (2008), or where the equities are so strong that "the principle of protection of finality of judgments must give way to the principle of fairness and equity." (Citation omitted; internal quotation marks omitted.) *Citibank v. Lindland,* 131 Conn.App. 653, 661, (2011), *aff'd in part and rev'd in part on other grounds,* 310 Conn. 147 (2013). This is not such a case. First, there is no "Certification of Compliance with Foreclosure Procedures" that must be filed in this action.... Second, the issue of standing was already raised in this case.... The issue was resolved in favor of the plaintiff on March 28, 2011. Doc. No. 114.86. There is no justification to relitigate the point. *See Urban Redevelopment Commission v. Katsetos,* 86 Conn.App. 236, 243 (2004), *cert. denied,* 272 Conn. 919 (2005). And, current health problems are not justification to open a judgment entered over two and a half years ago. All other of defendant's arguments

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 36 of 238

Gonzalez v. Option One Mortg. Corp., Not Reported in F.Supp.3d (2014)

2014 WL 2475893

have no merit. Accordingly, the motion is
dismissed.

Doc. 145.00 (Order, dated 3/20/2014) (emphasis
added) (parallel citations omitted).

Moreover, the second state court action, brought by Plaintiffs
against all Defendants herein, excluding Doble, gave rise to
a second state court judgment which is inextricably linked
with the issues presented to this Court. That second action was
dismissed and judgment entered in favor of the Hunt Leibert
Defendants on August 9, 2012, that is, prior to the October
16, 2012 filing of Plaintiffs' federal action. Although that state
action remained pending against other defendants in October
of 2012, there had already been a final judgment of dismissal
as to the Hunt Leibert Defendants, an interlocutory ruling that
was not appealed by Plaintiffs within the requisite time to
appeal.[22]

[22]    Plaintiffs neither appealed the decision to dismiss
        the action against the Hunt Leibert Defendants nor
        preserved the right to appeal by filing a notice
        of intent to appeal, pursuant to Conn. R.App.
        P. § 61–5. Doc. 4–1, p. 2. Section 61–5(a)(2)
        provides in pertinent part that a notice of intent
        to appeal must be filed "when the deferred appeal
        is to be taken from a judgment that disposes of
        only part of a complaint ....[which] disposes of all
        causes of action in that pleading brought by or
        against a particular party or parties." Under such
        circumstances, the appeal must be filed "within the
        appeal period provided by statute, or, if there is no
        applicable statutory appeal period, within twenty
        days after issuance of notice of the judgment ..." *Id.*
        Because Plaintiffs failed to file the required notice
        to appeal, the judgment as to the Hunt Leibert
        Defendants is final.

In general, "Rooker–Feldman has no application to federal-
court suits proceeding in parallel with ongoing state-court
litigation." *Green v. Mattingly,* 585 F.3d 97, 101 (2d
Cir.2009). However, the Second Circuit has held that the
Rooker–Feldman doctrine applies not only to final orders,
such as the entry of strict foreclosure, but also to interlocutory
decisions, such as the dismissal of the case against the Hunt
Leibert Defendants. *Id.* (noting that the "doctrine applied
both to final state court judgments and to interlocutory
state court orders"); *Doctor's Associates, Inc. v. Distajo,* 107
F.3d 126, 138 (2d Cir.1997) ("It cannot be the meaning of
Rooker–Feldman that, while the inferior federal courts are
barred from reviewing final decisions of state courts, they

are free to review interlocutory orders.") (citation omitted);
*Gentner v. Shulman,* 55 F.3d 87, 89 (2d Cir.1995) ("Under
[the Rooker–Feldman] doctrine, federal district courts lack
jurisdiction to review state court decisions whether final or
interlocutory in nature"); *Media Group, Inc. v. Tuppatsch,*
298 F.Supp.2d 235, 248 n. 12 (D.Conn.2003) ("Second
Circuit has held that the Rooker–Feldman doctrine applies
to interlocutory orders"); *Shelley v. Brandveen,* No. 06–CV–
1289 (NGG)(AKT), 2012 WL 3903472, at *3 (E.D.N.Y. Sept.
6, 2012) ("The jurisdictional bar, called the 'Rooker–Feldman
doctrine,' applies not only to final judgments, but also to
interlocutory orders.").

**\*11** In sum, as to the foreclosure action, the state court
ruled that the judgment of strict foreclosure in favor of
Deutsche Bank was final. Attempts to reopen that judgment
have been denied. Furthermore, with respect to Plaintiffs'
subsequent action in state court to avoid foreclosure, although
the interlocutory dismissal pertained only to the Hunt Leibert
Defendants, the issues in that state action were inextricably
intertwined with the issues now presented in the federal
action. Because the Rooker–Feldman applies to both final
and interlocutory orders, this Court lacks subject matter
jurisdiction over Plaintiffs' federal action.

Furthermore, even though Plaintiffs allege that the state
court judgments resulted from fraud, Rooker–Feldman still
bars their federal claims.[23] *See, e.g., Astoria Federal Sav.
& Loan Ass'n,* 2012 WL 4355550, at *2 ("Even where a
plaintiff alleges that a state court judgment was procured
by fraud, Rooker–Feldman will divest the federal court
of jurisdiction.") (citing *Done,* 2009 WL 2959619, *3 n.
6). Thus, "even if the state court judgment was wrongly
procured, it is effective and conclusive until it is modified
or reversed in the appropriate State appellate or collateral
proceeding." *Simpson v. Putnam County Nat'l Bank of
Carmel,* 20 F.Supp.2d 630, 633 (S.D.N.Y.1998) (citation
omitted).

[23]    In their Complaint [Doc. 1], Plaintiffs allege
        "[m]ortgage fraud" related to "foreclosure" and
        "conspiracy to commit fraud" by "banks and
        loaning services." Doc. 1, p. 4 ("Claim 1"). They
        also "allege [ ] judicial misconduct [by the state
        court judges], violation of code of conduct, conflict
        of interest whereas the court and its officials in
        individual and full capacity." *Id.,* p. 5.

2014 WL 2475893

Because Plaintiffs seek review and reversal of prior unfavorable state court judgements in a later federal action, this Court lacks subject matter jurisdiction pursuant to the Rooker–Feldman doctrine. *See, e.g., Aluria,* 2013 WL 2286051, at *1 ("Plaintiff's action invites this court to review and reject the judgment rendered in the foreclosure action prior to plaintiff's commencement of this action:" and "[t]hus, plaintiff[']s challenge to a judgment of foreclosure issued by the state superior court satisfies the Rooker–Feldman factors, and the Court lacks subject matter jurisdiction to resolve plaintiff's request for relief."). Construing the language of the Complaint in its broadest terms, there is a clear relationship between the state court judgments and the injury Plaintiffs seek to redress in federal court. Plaintiffs lost in the foreclosure action and lost against the Hunt Leibert Defendants in Plaintiff's state action to attempt to avoid foreclosure. Plaintiffs may not now re-litigate the validity of the Mortgage Loan in federal court.

### B. *Rule 12(b)(6)—Failure to State a Claim upon Which Relief May Be Granted*

Having found that this Court lacks subject matter jurisdiction, the Court need not address, much less rule on, whether the Complaint states any viable claims for purposes of Rules 8 and 12(b)(6), Fed.R.Civ.P. [24] However, as an alternative basis for dismissal (*i .e.,* if subject matter jurisdiction were deemed to exist), the Court finds that the allegations in the Complaint fail to set forth any claims upon which relief could be granted. [25] *See Gherardi v. New York,* 161 F. App'x 60, 61 (2d Cir.2005) ("An alternative holding may be considered conclusive in a subsequent proceeding where, as here, the litigants had the incentive and opportunity to address the issue, and the issue was carefully considered by the court.").

[24]  Rule 8(a)(2) mandates that "a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Rule 12(b)(6) permits a party to assert by motion the defense of "failure to state a claim upon which relief can be granted." *Id .* 12(b)(6).

[25]  For example, with respect to Rooker–Feldman, to the extent that Plaintiffs have attempted to assert any causes of action that are independent of the prior state court judgments, those allegations fail to state any claim for which relief could be granted.

*12  Because the Plaintiffs are *pro se* litigants, the Court must "construe the complaint liberally, accepting all [well-pleaded] factual allegations in the complaint as true, and drawing all reasonable inferences in [their] favor." *Chase Grp. Alliance LLC v. N.Y.C. Dep't of Fin.,* 620 F.3d 146, 150 (2d Cir.2010) (internal quotations and citation omitted). However, even reading the present Complaint liberally and in the manner most favorable to Plaintiffs, the Court is unable to discern sufficient factual matter, if accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). In other words, Plaintiffs have failed to provide any "factual content that [would] allow[ ] the court to draw the reasonable inference that the defendant[s][are] liable for [any] misconduct alleged," *Iqbal,* 556 U.S. at 678.

In the case at bar, the Complaint attempts to list certain causes of action (*e.g.,* "Negligence;" "breach of fiduciary duty;" and violations of "United Nations declaration of Indigenous People[']s Autonomy," "Truth in Lending Regulation," and "the Bank Secrecy Act"), but does not include underlying facts to make out the elements of any particular claim. As I have stated on a previous occasion in an unrelated case, "it is impossible to extract [the] claims from the 'mass of verbiage' contained in the present Complaint." *Callan v. Paulson,* No. 3:08–cv–01625 (CSH), 2009 WL 1011344, at *4 (D.Conn. April 15, 2009).

Although a *pro se* complaint must be liberally construed to raise the strongest arguments they suggest, *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007), "pro se parties are not excused from abiding by the Federal Rules of Civil Procedure," *Wilks v. Elizabeth Arden, Inc.,* 507 F.Supp.2d 179, 185 (D.Conn.2007). *Pro se* litigants "generally are required to inform themselves regarding procedural rules and to comply with them." *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995). In particular, *pro se* litigants are obligated to comply with the minimal standards of notice pleading under Rule 8, Fed.R.Civ.P. *See, e.g., Nielsen,* 746 F.3d at 63 ("Where, as here, the complaint was filed pro se, it must be construed liberally to raise the strongest arguments it suggests. Nonetheless, a pro se complaint must state a plausible claim for relief.") (quoting *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir.2013)); *Collins v. Blumenthal,* 581 F.Supp.2d 289, 291 (D.Conn.2008) ("[T]he rule in favor of liberal construction cannot save pro se litigants who do not present cognizable arguments."); *Vitale v. First Fid. Leasing Grp, Inc.,* 187 F.R.D. 445, 448 (D.Conn.1999) ("Although pleadings filed by pro se litigants are held to less stringent

Case 9:25-cv-00216-LEK-MJK   Document 23   Filed 10/01/25   Page 38 of 238

Gonzalez v. Option One Mortg. Corp., Not Reported in F.Supp.3d (2014)

2014 WL 2475893

standards than formal pleadings drafted by lawyers, ... all litigants, including pro ses, have an obligation to comply with court orders and with the Federal Rules of Civil Procedure.") (citations and internal quotation marks omitted). Moreover, "[d]ismissal of a complaint is proper when it is 'so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised.' " *Little v. U.S. Postal Service,* No. 3:99CV887(PCD), 2002 WL 32191568, *1 (D.Conn. Jan. 18, 2002) (quoting *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988)).

**\*13** Here "it is pointedly clear that the complaint at bar runs afoul of Rule 8," and "the prolixity of the pleading is greatly compounded by its vague and incomprehensible allegations." *Lonesome v. Lebefeff,* 141 F.R.D. 397, 398 (E.D.N.Y.1992). It thus follows that where the Complaint is vague, ambiguous, or otherwise unintelligible, were it to be determined that the Court possesses subject matter jurisdiction, the Complaint is alternatively dismissed for failure to state any claim upon which relief may be granted, Fed.R.Civ.P. 12(b)(6).

### C. *Rule 12(b)(5)*—*Insufficient Service of Process*
Lastly and alternatively, Defendants request that Plaintiffs' action be dismissed "due to insufficiency of service of process." Fed.R.Civ.P. 12(b)(5); *Eiden v. McCarthy,* 531 F.Supp.2d 333, 343 (D.Conn.2008). Absent sufficient service on a defendant, the Court may not exercise personal jurisdiction over that party, which provides "an interrelated ground on which to dismiss a case for lack of personal jurisdiction pursuant to Rule 12(b)(2)." *Carliell,* 2013 WL 4782133, at *2.

A motion to dismiss for insufficient service of process "must be granted if the plaintiff fails to serve a copy of the summons and complaint on the defendants pursuant to" Fed.R.Civ.P. 4. *Eiden,* 531 F.Supp.2d at 343. Once the validity of service is challenged, the plaintiff bears the "burden to prove that service of process was adequate." *Id.* (citations omitted).

Pursuant to Rule 4(m), Fed.R.Civ.P., "[i]f a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff —must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Defendants maintain that "[a]s of the date of the filing of Defendants' Motion to Dismiss—over 120 days since the Complaint was filed—Defendants have not been served with a copy of the summons and complaint." Doc. 17, p. 11. Moreover, Defendants point out that "Plaintiffs have not filed

a Proof of Service in accordance with Fed.R.Civ.P. 4(l), which mandates that "[u]nless service is waived, proof of service must be made to the Court.""

Despite Defendants' three motions to dismiss, notifying Plaintiffs of their failure to effect proper service since as early as November of 2012, Plaintiffs have failed to serve Defendants and/or to provide proof of service. Plaintiffs have neither established good cause for said failure nor sought an opportunity to effect service. Rather, Plaintiffs have refused to even acknowledge their failure to serve Defendants, evidenced by Plaintiffs' assertion that "the court would not have allowed the case to be filed if all parties had not been served." Doc. 25, p. 6 (Plaintiff's Opposition to Doc. 16 & 22). Unless proper service is made upon the Defendants, this Court lacks jurisdiction over them. In the absence of proper service and personal jurisdiction, "the court would normally dismiss the complaint." *Funches v. Conn. Dep't of Pub. Health,* No. 3:08–CV–1714 (RNC), 2010 WL 122445, at *1 (D.Conn. Jan. 7, 2010).

**\*14** As set forth *supra,* the Courts lacks subject matter jurisdiction so that no finding is required with respect to sufficiency of process. As an alternative grounds for dismissal, however, the Court will dismiss the action for insufficient service of process. Absent proof of service or a waiver, or any intervening circumstances to suggest additional time would result in Plaintiffs properly effecting service, the Complaint is properly dismissed pursuant to Fed.R.Civ.P. 4 and 12(b)(5). [26] *See, e.g., Rzayeva v. United States,* 492 F.Supp.2d 60, 76 (D.Conn.2007) (dismissing claims where plaintiffs failed to meet their burden of establishing proper service). [27]

---

[26]    In the present action, Defendants represent that they have not waived service and that the form entitled "Requests to Waive Service of a Summons Form" that they received from Plaintiffs was neither accompanied by the Complaint nor a prepaid means of returning that form, as mandated by Rule 4(d), Fed.R.Civ.P.

[27]    Furthermore, "[u]nreasonable delay in serving process ... may constitute a failure to prosecute under rule 41(b)." *Krank v. Express Funding Corp.,* 133 F.R.D. 14, 18 (S.D.N.Y.1990). *See also Europacific Asset Mgmt. Corp. v. Tradescape, Corp.,* 233 F.R.D. 344, 351 (S.D.N.Y.2005) ("It is unquestioned that an 'unreasonable' delay

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 39 of 238
Gonzalez v. Option One Mortg. Corp., Not Reported in F.Supp.3d (2014)

2014 WL 2475893

in serving process can constitute a failure to prosecute.") (citing *Krank,* 133 F.R.D. at 18). An action may be dismissed pursuant to Fed.R.Civ.P. 41(b) for failure of the plaintiff to prosecute his case with diligence.

## IV. *CONCLUSION*

In sum, Plaintiffs' Complaint must be dismissed because this Court lacks subject matter jurisdiction. Despite exercising leniency toward these *pro se* litigants and accepting as true all material allegations in the Complaint, the Court finds no legal basis to exercise subject matter jurisdiction. In particular, there is neither diversity of citizenship, 28 U.S.C. § 1332(a), nor a colorable claim arising under the Constitution or federal statute, *i.e.,* no "federal question," 28 U.S.C. § 1331.

Furthermore, were the Court to find that either basis for subject matter jurisdiction existed, the action is still barred by the Rooker–Feldman doctrine, which "directs federal courts to abstain from considering claims when ... (1) the plaintiff lost in state court, (2) the plaintiff complains of injuries caused by the state court judgment, (3) the plaintiff invites district court review of that judgment, and (4) the state court judgment was entered before the plaintiff's federal suit commenced." *McKithen,* 626 F.3d at 154. In the present action, the issues raised in Plaintiffs' complaint are inextricably intertwined with prior state court judgments, such that their federal claim would succeed only if the state court wrongly decided the issues. Under such circumstances, pursuant to Rooker–Feldman, the Court lacks subject matter jurisdiction to resolve Plaintiffs' requests for relief and must dismiss the action.

Defendants' alternative bases for dismissal, failure to state a claim upon which relief may be granted, Fed.R.Civ.P. 12(b)(6), and insufficient service of process, Fed.R.Civ.P. 12(b)(5), also warrant dismissal. Regarding failure to state a claim, the Court concludes, as did the state court, that no viable claims have been pled in the vague and circuitous allegations presented. With respect to insufficient service, as of this date —more than a year and a half after the Complaint was filed —there has been no documented proof of service of the Complaint and summons on Defendants. In light of this lack of service of process, the Court lacks personal jurisdiction over the Defendants.

Absent subject matter jurisdiction, the Court lacks power to declare the law and must simply dismiss the case. *Steel Co.,* 523 U.S. at 94. However, as alternative grounds for dismissal, the Court finds that Plaintiffs have failed to state any claims upon which relief can be granted and have failed to effect service of the Complaint and Summons on Defendants. The Court thus alternatively dismisses Plaintiffs' actions on these grounds.

**\*15** For all of the foregoing reasons, Defendants' Motions To Dismiss [Doc. 4, 16, & 22] are each GRANTED. The action is dismissed with prejudice and the Clerk is directed to close the file.

So Ordered.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 2475893

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

## Filings (9)

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Plaintiff(s) Motion & Opposition to Defendant(s) Motion to Dismiss & Defendant(s) Opposition to Plaintiff(s) Motion to Stay Opposition pursuant FRCP Rule 12**<br>GONZALEZ, Luis, Gonzalez Sonia, v. OPTION ONE MORTGAGE CORPORATION et al.<br>2014 WL 8726455 | — | D.Conn. | Mar. 20, 2014 | Motion |
| **2. Complaint Revised; Affidavit Substantiating Plaintiff's Complaint Standing**<br>GONZALEZ, v. OPTION ONE MORTGAGE CORPORATION AMERICAN HOME MORTGAGE SERVICE INC VALERIE NICOLE DOBLE; Deutsche Bnk National Trust Company Soundview Home Loan Trust 2005-OPT3 En legis et al subsidiary, fiduciary, trustee Nominee, predecessor and successor.<br>2013 WL 10543163 | — | D.Conn. | July 22, 2013 | Motion |
| **3. Memorandum of Law in Support of Defendant Sand Canyon Corporation's Motion to Dismiss**<br>LUIS GONZALEZ; and Sonia Gonzalez, Plaintiffs, v. OPTION ONE MORTGAGE CORPORATION; American Home Mortgage Servicing, Inc.; Deutsche Bank National Trust Company, as Trustee for Soundview Home Loan Trust 2005-OPT3 Asset-Backed Certificates, Series 2005 OPT3; Benjamin T. Staskiewicz, Esq.; S. Bruce Fair, Esq.; Valerie Nicole Kloecker; and Hunt Leibert Jacobson, P.C., Defendants.<br>2013 WL 10543135 | — | D.Conn. | May 13, 2013 | Motion |
| **4. Memorandum of Law in Support of Defendants' Motion to Dismiss**<br>Luis GONZALEZ; and Sonia Gonzalez, Plaintiffs, v. OPTION ONE MORTGAGE CORPORATION; American Home Mortgage Servicing, Inc.; Deutsche Bank National Trust Company, as Trustee for Soundview Home Loan Trust 2005-OPT3 Asset-Backed Certificates, Series 2005 OPT3; Benjamin T. Staskiewicz, Esq.; S. Bruce Fair, Esq.; Valerie Nicole Kloecker; and Hunt Leibert Jacobson, P.C., Defendants.<br>2013 WL 10543169 | — | D.Conn. | May 02, 2013 | Motion |
| **5. Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss Law and Argument**<br>GONZALEZ, v. OPTION ONE MORTGAGE CORPORATION American Home Mortgage Service Inc Valerie Nicole Doble: Deutsche Bnk National Trust Company Soundview Home Loan Trust 2005-OPT3 En Legis et al subsidiary, fiduciary, trustee Nominee, predecessor and successor.<br>2013 WL 8116779 | — | D.Conn. | Jan. 09, 2013 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **6.  Memorandum of Law in Support of the Defendant's Motion to Dismiss**<br>Luis GONZALEZ Sonia Gonzalez, Plaintiffs, v. HUNT LEIBERT JACOBSON, PC, et al, Defendants.<br>2012 WL 6802104 | PDF | D.Conn. | Nov. 25, 2012 | Motion |
| **7.  Memorandum of Law in Support of the Defendant's Motion to Dismiss**<br>Luis GONZALEZ Sonia Gonzalez, Plaintiffs, v. HUNT LEIBERT JACOBSON, PC, et al, Defendants.<br>2012 WL 6802106 | PDF | D.Conn. | Nov. 25, 2012 | Motion |
| **8.  Defendants' Rule 26(f) Report**<br>Luis GONZALEZ; and Sonia Gonzalez, Plaintiffs, v. OPTION ONE MORTGAGE CORPORATION; American Home Mortgage Servicing, Inc.; Deutsche Bank National Trust Company, as Trustee for Soundview Home Loan Trust 2005-OPT3 Asset-Backed Certificates, Series 2005 OPT3; Benjamin T. Staskiewicz, Esq.; S. Bruce Fair, Esq.; Valerie Nicole Kloecker; and Hunt Leibert Jacobson, P.C., Defendants.<br>2014 WL 8726418 | — | D.Conn. | Mar. 20, 2014 | Filing |
| **9.  Docket 3:12-CV-01470**<br>Gonzalez et al v. Option One Mortgage Corp et al | — | D.Conn. | Oct. 16, 2012 | Docket |

**History**

There are no History results for this citation.

2008 WL 4693153
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond ROBLES, Plaintiff,
v.
K. BLEAU, Correctional Officer, Riverview C.F.;
Peacock, Correctional Sergeant, Riverview C.F.;
R. Varkiar, Senior Counsel, Riverview C.F.; and
New York State Dep't of Corr. Servs., Defendants.

No. 9:07-CV-0464.
|
Oct. 22, 2008.

**Attorneys and Law Firms**

Raymond Robles, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, David L. Cochran, Esq., of Counsel, New York, NY, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action, brought pursuant to 42 U.S.C. § 1983, was referred to the Hon. George H. Lowe, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report-Recommendation dated September 12, 2008 recommended that Defendants motion to dismiss be granted in part and denied in part. Specifically, Judge Lowe recommended that Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be dismissed if, within thirty (30) days from the filing of this Final Order, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim. It was recommended that Plaintiff's remaining claims be dismissed with prejudice.

Plaintiff filed objections to the Report-Recommendation, essentially raising the same arguments presented to the Magistrate Judge.

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Lowe for the reasons stated in the Report-Recommendation.

It is therefore

**ORDERED** that Defendants motion to dismiss be **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

### *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me by the Honorable Thomas J. McAvoy, Senior United States District Judge, for Report and Recommendation with regard to any dispositive motions filed, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Complaint, Raymond Robles ("Plaintiff") alleges that three employees of the New York State Department of Correctional Services ("DOCS"), as well as DOCS itself, violated his rights under the Eighth and Fourteenth Amendments when they (1) required him to submit to a random urinalysis test when they knew he was taking a medication that would prevent him from providing a urine sample, and (2) charged, convicted, and punished him with eighty-seven days in a Special Housing Unit for refusing to provide a urine sample. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16.) For the reasons that

2008 WL 4693153

follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

*2 As Defendants correctly observe in their Memorandum of Law, Plaintiff's Complaint-which describes the events giving rise to his claims in two brief paragraphs without identifying any role played by Defendants in those events-is hardly a model of *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].) However, as explained below in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [1] Here, I find that the factual allegations contained in Plaintiff's Response Affidavit are consistent with the factual allegations of his Complaint. As a result, in construing Plaintiff's Complaint, I will consider his Response Affidavit as effectively amending the factual allegations of his Complaint. Thus construed, Plaintiff's Complaint alleges as follows:

1. On November 6, 2006, at about 7:28 a.m., Plaintiff was directed to report to the drug testing center at Riverview C.F.; [2]

2. Upon arriving at the drug testing center, Plaintiff was informed by Correctional Officer K. Bleau ("Defendant Bleau") that he had been randomly selected to submit to urinalysis drug testing; [3]

3. Defendant Bleau asked Plaintiff if he would provide a urine sample, and Plaintiff responded yes; [4]

4. Defendant Bleau then asked Plaintiff if he was taking any medications, and Plaintiff explained that (1) yes, he was taking Flomax and Omeprazole due to a prostate condition and a stomach problem, and (2) "d[ue] to the medication [s]" and the fact that he had used the bathroom at approximately 7:10 a.m. that morning, he would need more water in order to urinate; [5]

5. As Plaintiff was explaining these facts to Defendant Bleau, Defendant Bleau became upset and walked away from Plaintiff; [6]

6. When he returned, Defendant Bleau then informed Plaintiff that, pursuant to DOCS Directive 4937, Plaintiff had three hours provide a urine sample or he would be considered to be refusing to provide the urine sample; [7]

7. Defendant Bleau then gave Plaintiff a cup of water at approximately 7:30 a.m., and a second cup of water at approximately 9:30 a.m., but did not give him a third cup of water at approximately 8:30 a.m., as required by Part D.4. of DOCS Directive 4937; [8]

8. At approximately 10:30 a.m., Plaintiff was still unable to provide a urine sample; [9]

9. At that time, Defendant Bleau notified Correctional Sergeant Peacock ("Defendant Peacock") that Plaintiff was refusing a direct order to provide a urine sample; [10]

10. When Plaintiff tried to explain to Defendant Peacock that his medical condition prevented him from providing the urine sample, Defendant Peacock responded, "Shut up and put [your] hands behind [your] back"; [11]

*3 11. Both Defendants Bleau and Peacock failed to investigate or inquire as to why Plaintiff had been prescribed Flomax and Omeprazole, or what the potential side effects of those drugs were, although that information was readily obtainable from medical staff at Riverview C.F.; [12]

12. Instead, Defendants Bleau and/or Peacock escorted Plaintiff to the Riverview C.F. Special Housing Unit ("S.H.U."); [13]

13. On November 7, 2006, at about 8:55 a.m., while Plaintiff was in S.H.U., he was served with a copy of a misbehavior report authored by Defendant Bleau, charging him with (1) failing to comply with the urinalysis testing procedure, and (2) refusing a direct order to provide a urine sample; [14]

14. On November 10, 2006, Senior Correctional Counselor R. Varkiar conducted Plaintiff's disciplinary hearing on the misbehavior report; [15]

2008 WL 4693153

15. At the hearing, when Plaintiff entered a plea of "Not guilty, with an explanation," Defendant Varkiar gave Plaintiff "an opportunity to explain [him] self"; [16]

16. Plaintiff explained that he had a medical condition that prevented him from providing a urine sample, that he had attempted to inform Defendant Bleau of this medical condition (but Defendant Bleau walked away from Plaintiff), and that he had attempted to inform Defendant Peacock of this medical condition (but Defendant Peacock told Plaintiff to "[s]hut up"); [17]

17. Defendant Varkiar then made a telephone call; when he was done with the call, he told Plaintiff that (1) he had called the medical unit at Riverview C.F. to ask whether or not the medication that Plaintiff was taking would prevent him from urinating, and (2) someone in the medical unit had responded that no, the medication should not prevent Plaintiff from urinating; [18]

18. Plaintiff then attempted to explain to Defendant Varkiar *why* he was taking one of the medications, specifically, to remedy a prostate problem that itself interfered with his ability to urinate; [19]

19. However, Defendant Varkiar failed to call back the person in the medical unit at Riverview C.F. and request that he or she again answer the question he had posed before, taking into account Plaintiff's prostate condition as shown by his medical records; [20]

20. As a result, Defendant Varkiar found Plaintiff guilty of both disciplinary charges, and sentenced him to ninety (90) days in S.H.U ., with a corresponding loss of privileges; [21]

21. At the conclusion of the hearing, Plaintiff received a written copy of the hearing disposition, which stated that the evidence relied on included (1) the statements in the written misbehavior report of Defendant Bleau (which Defendant Varkiar stated were credible), and (2) Plaintiff's own hearing testimony (which Defendant Varkiar stated was not credible); [22]

22. On November 27, 2006, Plaintiff appealed his conviction to DOCS Director of Special Housing, Donald Selsky, who reversed the conviction on January 19, 2007; [23] and

*4 23. On February 1, 2007, Plaintiff was finally released from S.H.U., after spending eighty-seven (87) days there. [24]

It should be noted that, in addition to asserting constitutional claims against Defendants Bleau, Peacock, and Varkiar in their individual or personal capacities, Plaintiff's Complaint asserts a constitutional claim also against DOCS itself. It should also be noted that, as relief for Defendants' actions, Plaintiff requests money damages but no injunctive relief. [25]

### B. Summary of Grounds in Support of Defendants' Motion

Generally, Defendants' motion to dismiss for failure to state a claim is premised on two grounds: (1) Plaintiff's claim against DOCS is barred by the Eleventh Amendment; and (2) the allegations of Plaintiff's Complaint are too lacking in detail to give Defendants *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 2-5 [Defs.' Memo. of Law].)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); [26] or (2) a challenge to the legal cognizability of the claim. [27]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [28] The main purpose of this rule is to "facilitate a proper decision on the merits." [29] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [30]

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [31]

However, it is well established that even this liberal notice pleading standard "has its limits." [32] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard. [33]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). [34] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Fed.R.Civ.P. 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

**\*5** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Twombly* ). [35] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [36]

It should be emphasized that Fed.R.Civ.P. 8's plausibly standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [37] There must still be enough fact alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [38] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se." [39]* In other words, as stated above, while all pleadings are to be construed liberally under Fed.R.Civ.P. 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality . [40]

**\*6** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [41] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [42] Furthermore, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [43] Of course, an opportunity to amend is not required where "the problem

with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [44] In addition, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading. [45]

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed), [46] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [47] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [48] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [49]

## III. ANALYSIS

### A. Whether Plaintiff's Claim Against DOCS is Barred by the Eleventh Amendment

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's constitutional claims against Defendant DOCS are barred by the Eleventh Amendment to the United States Constitution. (Dkt. No. 16, Part 2, at 2-3 [Defs.' Mem. of Law].) In the interest of brevity, I will not repeat the well-established points of law that they correctly cite in support of their argument. Instead, I will only add three points that Defendants do *not* make in their succinct argument: (1) where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case (or claim), and "the case [or claim] *must* be stricken from the docket"; [50] (2) Plaintiff's civil rights claims against Defendant DOCS (an entity) are barred also by the express language of 42 U.S.C. § 1983, which confers liability upon only any *"person* who ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws .... " [51]; and (3) because the defect with this claim is substantive rather than merely formal, better pleading will not cure it, and thus it should be dismissed with prejudice. [52]

*7 For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant DOCS.

It should be noted that, in addition to barring Plaintiff's constitutional claims against Defendant DOCS, the Eleventh Amendment would also bar any claim by Plaintiff against Defendants Bleau, Peacock and Varkiar in their official capacities. [53] However, because I do not even liberally construe Plaintiff's Complaint (and Response Affidavit) as asserting such claims, no need exists to recommend the dismissal of those claims. (*See generally* Dkt. No 1, 17.)

### B. Whether the Allegations of Plaintiff's Complaint Are Too Lacking in Detail to Give Defendants *Fair Notice* under Fed.R.Civ.P. 8(a)(2)

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's Complaint-when considered alone-is too lacking in detail to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 3-5 [Defs.' Mem. of Law].) However, as explained above in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [54] Here, when construing Plaintiff's Complaint together with his Response Affidavit, I find that Plaintiff's allegations *are* detailed enough to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). *See, supra,* Part I.A. of this Report-Recommendation.

However, this does not end the Court's analysis of Plaintiff's Complaint because, even where a defendant has not advanced a certain argument on a motion to dismiss in a *pro se* prisoner civil rights case, a district court may (and, indeed, has a duty to) *sua sponte* address whether the pleading in such a case has successfully stated a claim upon which relief may be granted. [55] Here, Plaintiff's Complaint is plagued by several defects (some substantive and some formal) [56] that simply cannot be overlooked.

### C. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau, Peacock and Varkiar Arising Out of Plaintiff's Being Required to Provide

### a Urine Sample Given Their Knowledge of His Medications and/or Medical Condition

Among Plaintiff's claims is a claim that "[i]t is neither lawful nor [ ] reasonable to expect an Inmate to perform a bodily function on command when you know or should know that his medical condition and prescribed treatment plan indicate that when he urinates[,] and when he [can] not[,] can be beyond his control." (Dkt. No. 17, at 5 [Plf.'s Response Affid.].) I liberally construe this claim as one of harassment or perhaps inadequate-prison-conditions under the Eighth Amendment. (To the extent this allegation is also used to support a procedural due process claim under the Fourteenth Amendment, I address that claim below in Parts III.D. and III.E. of this Report-Recommendation.)

**\*8** The problem with Plaintiff's Eighth Amendment claim is that the rather detailed facts alleged by him in support of that claim do not suggest in any way that any of the three individual Defendants were acting with the sort of mental state that is required for them to incur liability under the Eighth Amendment, namely, *deliberate indifference.* Deliberate indifference is a state of mind akin to *criminal recklessness,* which involves *knowing* of and disregarding an excessive risk to inmate health or safety. [57] Here, Plaintiff himself alleges that the three individual Defendants did not in fact *understand* that he could not urinate due to his prostate condition. Indeed, as he was trying to explain his medical condition to Defendants, (1) Defendant Bleau became angry and "walked away" from Plaintiff, (2) Defendant Peacock told Plaintiff to "[s]hut up," and (3) Defendant Varkiar failed to call back the person in the medical unit of Riverview C.F. and ask him or her to report (to Varkiar) the impact of Plaintiff's prostate condition on his ability to urinate. *See, supra,* Part I.A. of this Report-Recommendation. [58]

At its heart, Plaintiff's Eighth Amendment claim alleges that the three individual Defendants *should have known* that he could not urinate during the time in question due to his enlarged prostate, but that they did not know that fact because they *failed to investigate* the nature and effects of his prostate condition. In other words, his Eighth Amendment claim is one of *negligence.* Such a claim is simply not actionable under the Eighth Amendment (or any constitutional provision). As is often observed, "[D]eliberate indifference describes a state of mind more blameworthy than negligence." [59] Finally, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [60]

For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau and Peacock Arising Out of His Receipt of an Erroneous or False Misbehavior Report

It is well established that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ). [61] Rather, the only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there is "more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at \*26, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

Here, Plaintiff alleges no actionable conduct regarding his being issued the misbehavior report in question, such as retaliation against him for exercising a constitutional right. *See, supra,* Part I.A. of this Report-Recommendation. Moreover, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [62]

**\*9** For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Fourteenth Amendment false-misbehavior-report claim.

### E. Whether Plaintiff Has Stated an Actionable Claim Against Defendant Varkiar Arising Out of Plaintiff's Erroneous or Unjustified Disciplinary Conviction

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient .... " *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). With regard to the first question, in 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause will not arise from the use of mandatory language of a particular state law or regulation,

but "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Here, Plaintiff alleges that the disciplinary hearing conducted by Defendant Varkiar resulted in a sentence of eighty-seven (87) days in the Riverview C.F. S.H.U. with a corresponding loss of privileges. *See, supra,* Part I.A. of this Report-Recommendation. Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of far more than the eighty-seven (87) days alleged here-even where the conditions of confinement in the S.H.U. were, to varying degrees, more restrictive than those in the prison's general population. [63] As a result, I find that Plaintiff has not alleged facts plausibly suggesting that he possessed, during the disciplinary hearing, a liberty interest that was protected by the Fourteenth Amendment.

However, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice. This is because it is conceivable to me that Plaintiff's Complaint and Response Affidavit-which are silent with regard to the conditions of confinement he experienced in the Riverview C.F. S.H.U.-may be amended so as to allege facts plausibly suggesting that those conditions were so restrictive as to impose on Plaintiff an *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life* (thus conferring on him a protected liberty interest under the Fourteenth Amendment).

I should also point out that, even assuming (for the sake of argument) that Plaintiff possessed a protected liberty interest with regard to his disciplinary hearing, I find that he has alleged facts plausibly suggesting that he was, in fact, given all the process that he was due under the circumstances. Specifically, Plaintiff alleges that he was given the following: (1) timely notice of the misbehavior report: (2) an "opportunity to explain [him]self" at his disciplinary hearing; (3) a written disciplinary hearing disposition; (4) a disciplinary hearing disposition that was based on at least some evidence (e.g., his own hearing testimony, which Defendant Varkiar found to be not credible); and (5) an opportunity to appeal the disciplinary hearing disposition (which he did so successfully). *See, supra,* Part I.A. of this Report-Recommendation.

**\*10** Of course, the defect that Plaintiff alleges occurred at his disciplinary hearing was Defendant Varkiar's failure to use the telephone to call back the person in the medical unit at Riverview C.F. and request that he or she again answer the question of whether Plaintiff was physically unable to urinate, taking into account his prostate condition as shown by his medical records. *Id.* Generally, it is not the duty of an impartial hearing officer to conduct an investigation of the merit of the disciplinary charges against an inmate; rather, the duty of a hearing officer is merely to review the evidence presented to him at the disciplinary hearing, and in *certain circumstances* identify defense witnesses for the inmate. [64] Here, I find that Plaintiff has alleged no circumstances conferring on Defendant Varkiar a duty to call back the medical unit at Riverview C.F. For example, I find that Plaintiff's Complaint and Response Affidavit are devoid of any allegation that, at his disciplinary hearing, he requested and was denied an adjournment of the hearing so that, with the help of a legal assistant, he could obtain his medical records and call as a witness a member of the medical unit, in order that he himself could introduce testimony that his prostate condition prevented him from urinating during the time in question. *See, supra,* Part I.A. of this Report-Recommendation. However, again, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice, because it is conceivable to me that Plaintiff's Complaint and Response Affidavit may be amended to allege facts plausibly suggesting that, at his disciplinary hearing, he made, and was denied, such a request.

For these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim regarding his disciplinary hearing if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing.

Finally, two points bear mentioning. First, to the extent that Plaintiff is attempting to allege that his procedural due process rights were violated at his disciplinary hearing also because Defendant Bleau violated Part D.4. of DOCS Directive 4937 by giving Plaintiff only two cups of water during the three-hour period in question, that allegation is not actionable under the circumstances. Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges,

or immunities secured by *the Constitution and laws,* shall be liable to the party injured ....“ 42 U.S.C. § 1983 [emphasis added]. The term “the Constitution and laws” refers to the United States Constitution and *federal* laws. [65] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983. [66] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation; [67] this is because a DOCS Directive is “merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion,” which he retains, despite any violation of that Directive. [68]

 *11 Second, in making the above recommendation (that Plaintiff be required to file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing, under penalty of dismissal), I am in no way “issuing specific instructions [to Plaintiff] mandating the content and format of the putative amended complaint”-instructions that the Second Circuit recently found erroneous in the case of *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *6 (2d Cir. Aug.12, 2008). Rather, I am merely reporting my finding that Plaintiff's current Fourteenth Amendment procedural due process claim regarding his disciplinary hearing fails to state a claim upon which relief might be granted, as pleaded.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 16) be ***GRANTED* in part** and ***DENIED* in part** in the following respects:

(1) Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be ***DISMISSED*** if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing; and

(2) The other claims asserted in Plaintiff's Complaint (as effectively amended by his Response Affidavit) be ***DISMISSED* with prejudice,** and without condition.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a) (2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [69]

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

30    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion), *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

1    *See, infra,* note 41 of this Report-Recommendation (citing cases).

2    (Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

3    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

4    (Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching

completed form entitled, "Request for Urinalysis Test".)

5    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled "Request for Urinalysis Test"; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

6    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

7    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid ., attaching page from DOCS Directive 4937].)

8    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid., attaching page from DOCS Directive 4937].)

9    (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf .'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

10   (Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

11   (Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

12   (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 9 [Ex. 2 to Plf.'s Response Affid., attaching page of his Ambulatory Health Record].)

13   (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

14   (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid ., attaching Inmate Misbehavior Report].)

15   (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

16   (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

17   (Id.)

18   (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

19   (Dkt. No. 17, at 2-3 [Plf.'s Response Affid.]; Dkt. No. 17, at 14-15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid., attaching page of information about Flomax].)

20   (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid ., attaching page of information about Flomax].)

21   (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

22   (Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 3 [Plf.'s Response Affid.].)

23   (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3-4 [Plf.'s Response Affid.]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 16 [Ex. 8 to Plf.'s Response Affid., attaching Donald Selsky's Review of Superintendent's Hearing, issued on January 19, 2007].)

24   (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 2 [Plf.'s Response Affid.].)

25   (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].)

26   See 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for

relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

27    *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,*

01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

28    *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U .S. at 512 [citation omitted]; *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

29    *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

31    *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

32    2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

33    *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after

2008 WL 4693153

*Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

34    The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

35    *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly*

] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in original].

36    *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

37    For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Twombly,* all that is required is a "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that

sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

38    *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

39    *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

40    *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation marks and citation omitted]; *McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted].

41    "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

42    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

43    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

44    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

45    *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.N.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109,

at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

46    *See Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

47    *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691] [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

48    *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes

by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

49    *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

50    *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) [citation omitted]; *see also* Fed.R.Civ.P. 12(h)(3).

51    42 U.S.C. § 1983 [emphasis added].

52    *See, supra,* note 44 of this Report-Recommendation.

53    *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) [citing cases].

54    *See, infra,* note 41 of this Report-Recommendation (citing cases).

55    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

56    As explained above in Part II of this Report-Recommendation, a dismissal for failure to state a claim may be based not only on a successful challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2), but also on a successful challenge to the legal cognizability of the claims asserted in the pleading. *See, supra,* notes 26 and 27 of this Report-Recommendation.

57    *Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.), *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.), *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

58    In addition, it is worth noting that Plaintiff's explanation to Defendant Bleau consisted of a statement that Plaintiff could not urinate because of his prostate *medication,* not because of his prostate *condition. See, supra,* Part I.A. of this Report-Recommendation. As a result, Defendant Bleau would not have become *aware* of the reason for Plaintiff's inability to urinate (which Plaintiff now alleges was his prostate *condition,* not his prostate *medication* ), even if Defendant Bleau had remained in Plaintiff's presence and listened to his explanation.

59    *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J .) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

60    *See, supra,* note 44 of this Report-Recommendation.

61    *Accord, Lugo v. Van Orden,* 07-CV-0879, 2008 U.S. Dist. LEXIS 56707, at *7, 2008 WL 2884925 (N.D.N.Y. July 23, 2008) (McAvoy, J.); *Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 60931, 2008 WL 3286250 (N.D.N.Y. Aug. 7, 2008) (Sharpe, J.), *adopting* 2008 U.S. Dist. LEXIS

52797, at *18, n. 5, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.); *Anderson v. Banks,* 06-CV-0625, 2008 U.S. Dist. LEXIS 60896, at *16-17, 2008 WL 3285917 (N.D.N.Y. May 19, 2008) (Homer, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 6, 2008) (Sharpe, J.); *Stewartson v. Almstead,* 04-CV-1097, 2008 U.S. Dist. LEXIS 22178, at *7, 2008 WL 783367 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *McEachin v. Goord,* 06-CV-1192, 2008 U.S. Dist. LEXIS 27479, at *12, 2008 WL 1788440 (N.D.N.Y. Feb. 8, 2008) (Treece, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 31879, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J.); *Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *27, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 23065, 2007 WL 956941 (N.D.N.Y. March 29, 2007) (Kahn, J.); *Madera v. Goord,* 103 F.Supp.2d 536, 542 (N.D.N.Y.2000) (Kahn, J., adopting Report-Recommendation by Di Bianco, M.J.).

62    *See, supra,* note 44 of this Report-Recommendation.

63    *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general

population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

64    *Jackson v. Onondaga County,* 05-CV-1393, 2008 U.S. Dist. LEXIS 64930, at *40 & n. 46, 549 F. Supp. 2d 204 (N.D.N.Y. Jan. 8, 2008) (Lowe, M.J.) [citations omitted], *adopted on* de novo *review by* 05-CV-1393, 2008 U.S. Dist. LEXIS 22175, 2008 WL 782655 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *see also Martin v. Mitchell,* 92-CV-0716, 1995 U.S. Dist. LEXIS 19006, at *10-12, 1995 WL 760651 (N.D.N.Y. Nov. 24, 1995) (McAvoy, C.J.) (rejecting plaintiff's assertion that prison disciplinary hearing officer "had a duty to investigate the identity of [a correction officer identified by the plaintiff merely as] 'Budd' and call him to testify"); *Hampton v. McGinnis,* 89-CV-6344, 1992 U.S. Dist. LEXIS 15696, at *6, 1992 WL 309553 (S.D.N.Y. Oct. 15, 1992) ("[I]t was not [the disciplinary hearing officer's] duty to investigate [the prisoner's assault] claim, and plaintiff was not precluded from offering his own evidence on that subject."); *cf. Kingsley v. Bureau of Prisons,* 937 F.2d 26, 31 (2d Cir.1991) (under circumstances, a hearing officer did have a duty to identify the name of the plaintiff's desired witness because [1] the plaintiff had an "especially compelling" need for the witness, [2] the witness's identity was "readily available" to the hearing officer, [3] the plaintiff had arrived at the prison only five days earlier, [4] fulfilling the request would not have delayed the imposition of "swift discipline," and [5] "no other institutional objective was implicated").

65    *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States."* ) (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985)

("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States."* ) [emphasis added].

66    *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at * 10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

67    *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

68    *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

69    *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990)

(district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default

argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4693153

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 9:07cv00464**<br>ROBLES v. BLEAU ET AL | — | N.D.N.Y. | May 02, 2007 | Docket |

**History**

There are no History results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Rose v. Masiey, Not Reported in F.Supp.2d (2008)
Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 63 of 238
2008 WL 706254

2008 WL 706254
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Roosevelt ROSE, Plaintiff,

v.

Correction Officer MASIEY # 4610, et al., Defendants.
Roosevelt Rose, Plaintiff,

v.

City of New York Department
of Correction, et al., Defendants.
Roosevelt Rose, Plaintiff,

v.

City of New York Department
of Correction, et al., Defendants.

Nos. 06 Civ. 464(GEL)(MHD), 05 Civ.
8829(GEL)(MHD), 05 Civ. 8828(GEL)(MHD).
|
March 14, 2008.

**ORDER**

GERARD E. LYNCH, District Judge.

**\*1** On February 19, 2008, United States Magistrate Judge Michael H. Dolinger issued a Report and Recommendation ("R & R"), recommending that defendants' motions to dismiss plaintiff's complaints in these related actions, be granted with respect to the claims against correction officer defendants Masley, Gerris, Brown, Allen, Patterson, Santaluna, and Chadwick (named in No. 06 Civ. 464), and Imam Muhammad (named in No. 05 Civ. 8828), and otherwise denied.

On February 26, 2008, plaintiff Roosevelt Rose objected to the R & R. Although he does "not object to the dismiss[a]l of the claim against Imam Muhammad" (Obj. at 5), he objects to the dismissal of the correction officer defendants in No. 06 Civ. 464. Rose contends that:

> these officer defendants should not be given immunity nor should the claim be dismissed because they are just like the other defendants they take part in the day to day operation and running of the facility commissary.... Also ... when I filed the grievance these officers were made aware of their actions as well as the warden and the commissioner and did not desist[ ] from their actions.

(*Id.* at 4.) [1]  Rose's objections regarding the corrections officers will be denied, for the same reasons that similar objections by fellow inmates were denied. *See* Order of Jan. 25, 2008, *Wesley v. Muhammad,* No. 05 Civ. 5833; Order of March 7, 2008, *Mason v. Masley,* No. 06 Civ. 1829.

[1]  Rose asserts that he attempted to mail an amended complaint to the Court in July 2006, "but due to a problem in the mail room my amended claim never reached the court." (Obj. at 3-4.) Rose acknowledges, however, that the amended complaint, for whatever reason, did not reach the Court; he does not indicate that the attempted amended complaint would have affected the resolution of the motion; and he evidently made no further attempt to file or serve the amended complaint in the 20 months since the failed attempt to file. The purported amended complaint thus has no bearing on the issue at hand.

In the Order adopting Judge Dolinger's R & R in *Wesley v. Muhammad* with respect to issues almost identical to those presented here, this Court noted that there was "no basis in the complaint ... for concluding that ordinary corrections officers responsible simply for operating the commissary had any authority over what was sold or how it was labeled" or that the corrections officers had any "reason to understand that simply doing their ministerial job could have any impact on plaintiff's religious practice or that selling a food product to an inmate who sought to purchase it could subvert plaintiff's constitutional rights via the chain of causation argued by plaintiff." *Id.* at 2-3. The same reasoning applies equally here. [2]

[2]  Judge Dolinger recommended that the claims against the corrections officer defendants in 05 Civ. 8828 and 05 Civ. 8829 not be denied because in those complaints Rose alleges that "[a]ll the CORRECTION OFFICER[ ]S are List[ed], Because they all got Notice from the[ir] Supervis

[o]r about the Violation[ ]s and Still Continue to Sell Pork in the Commissary." (R & R at 18.) The complaint in the 06 Civ. 464 action contains no such similar allegations. As it does not, it cannot withstand defendants' motion to dismiss.

Therefore, it is hereby ORDERED that the objections are overruled, the R & R is adopted as the opinion of the Court, and the defendants' motions to dismiss are granted with respect to the claims against the corrections officer defendants in No. 06 Civ. 464 and Imam Muhammad in No. 05 Civ. 8828, and otherwise denied.

SO ORDERED.

*REPORT & RECOMMENDATION*

MICHAEL H. DOLINGER, United States Magistrate Judge.

TO THE HONORABLE GERARD E. LYNCH, U.S.D.J.:
*Pro se* plaintiff Roosevelt Rose is an inmate in the New York City correctional system. In three lawsuits filed in 2005 and 2006, he has sued thirteen identified correctional officers from three Rikers Island facilities-the Anna M. Kross Center ("AMKC"), the Otis Bantum Correction Center ("OBCC") and the George Motchan Detention Center ("GMDC")-as well as Brian Riordan, who is the Warden of the AMKC; Carlis E. Thompson, the acting warden of the OBCC; Warden Walsh, the Warden of the GMDC; Martin Horn, who is the Commissioner of the New York City Department of Correction; and several other individuals.[1] Invoking 42 U.S.C. § 1983, plaintiff asserts claims for denial of his First and Fourteenth Amendment right to practice his religion, for which he seeks damages and injunctive relief.[2]

[1]    In the first of plaintiff's cases, he has named an Imam Muhammad of the OBCC, as well as Alvin Mack, the manager of its commissary. (Am. Compl. (No. 05 Civ. 8828), at p. 1, 4).

[2]    These three lawsuits press essentially the same claims, although their list of defendants only partially overlap. They are now docketed respectively as *Rose v. Muhammad,* No. 05 Civ. 8828 (S.D.N.Y. filed Oct. 18, 2005); *Rose v. Morgan,* No. 05 Civ. 8829 (S.D.N.Y. filed Oct. 18, 2005); and *Rose v. Correction Officer Masiey # 4610,* No. 06 Civ. 464 (S.D.N.Y. filed Jan. 23, 2006). In the first two, Rose filed amended

complaints, which are the target of defendants' first two motions. In the third, he filed only one version of the complaint but has since asked for leave to amend that complaint, although he has not specified in what respect he wished to amend.

**\*2**  Defendants have filed virtually identical motions in each case, under Fed.R.Civ.P. 12(b)(6), seeking to dismiss the complaints in their entirety. In support of those motions, they press five grounds: (1) that the complaints fail to state a claim because plaintiff's allegations demonstrate that he has not exhausted his prison remedies, as required by 42 U.S.C. § 1997e(a); (2) that plaintiff lacks standing to assert one of his claims, which is based on the prison's alleged sale of non-Halal food at its commissary; (3) that his claims against the individual defendants should be dismissed because he fails adequately to allege the defendants' personal participation in the constitutional torts that he asserts; (4) that the claims against these defendants should be dismissed because, based on the allegations of the complaint, they are immune from liability; and (5) that the complaints fail to state a claim because their allegations do not properly plead a violation of plaintiff's rights under the Free Exercise Clause of the First Amendment.

### A. *Plaintiff's Claims*

These lawsuits are among a group of more than a dozen cases filed more or less contemporaneously by current or former Muslim inmates at the Rikers Island prison facilities, all of whom complain about the handling of food and related items at the prison dining facilities. All allege that the New York City Department of Correction ("DOC") has failed to provide them with meals that comply with the Halal requirements of their faith, and has thereby denied them the free exercise of their religion, in violation of their First and Fourteenth Amendment rights.

These lawsuits were originally filed *pro se,* and hence their factual allegations lack some degree of precision, although, fairly construed, it is apparent that they are all complaining of essentially the same practices. In the case of Mr. Rose, as reflected in the amended complaints in the first two cases and the original complaint in the third case, he alleges that prison personnel have failed to provide proper Halal meals to Muslim inmates, himself included, in a variety of ways. These include the stacking and washing together of Halal and non-Halal trays, the use of soap that contains pork by-products, the failure to cook thoroughly the Halal meat, the failure to separate the Halal from the non-Halal utensils and

2008 WL 706254

food pans and carts, the failure to identify the Halal utensils and other kitchen items, and the failure to provide Halal meals to prisoners returning from court. (Am. Compls. (Nos. 05 Civ. 8828, 05 Civ. 8829) at pp. 5-a to d, 5-f to g). He also targets the manner in which food items are sold at the commissaries, alleging that they sell both Halal and non-Halal foods but fail to identify which are Halal, a practice that ultimately results in the contamination of the Halal food trays at the prison dining facilities. (*See* Am. Compls. (Nos. 05 Civ. 8828, 05 Civ. 8829) at pp. 5-a to d, 5-f to H).

**\*3** Rose further states that he filed grievances with each of the Rikers Island prison facilities at which he was confined and that there was no "result" from those grievances. (Am. Compls. (Nos. 05 Civ. 8828, 05 Civ. 8829) at p. 3). He also alleges that the defendant wardens and Commissioner, as well as all of the other defendants, were notified of these problems (Am. Compls. (Nos. 05 Civ. 8828, 05 Civ. 8829) at pp. 5-f, 5-H), and that he himself notified the wardens and Commissioner. (Am. Compls. (Nos. 05 Civ. 8828, 05 Civ. 8829) at p. 5-a).

We read plaintiff's allegations liberally in deference to his *pro se* status, *e.g., Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994), as well as because defendants seek dismissal under Rule 12(b)(6). *E.g., Achtman v. Kirby, McInerney & Squire, LLC,* 464 F.3d 328, 337 (2d Cir.2006). We infer that, except where Rose makes additional allegations, he is asserting the same claims, and in substance making the same allegations, as the *pro se* plaintiffs in the parallel cases. Moreover, we read his pleadings in light of the more specific allegations made by the one plaintiff among this group who subsequently obtained representation by *pro bono* counsel-a set of allegations that are described in *Wesley v. Muhammad,* 2008 WL 123812 (S.D.N.Y. Jan. 10, 2008).

As explained in *Wesley,* the claims in these cases concern two different sets of practices that are said to violate the rights of Muslim inmates. One set concerns the alleged failure of the prison facilities to adhere to Islamic religious tenets in food preparation and cleanup in the prison dining facilities. These failings, which assertedly also violate a DOC directive, involve the stacking and washing together of trays that are used to serve Halal and non-Halal meals, thereby contaminating the trays reserved for Halal food [3]; the washing of trays with soap that contains pork by-products; use of cooking ingredients with pork by-products; and the failure to cook Halal meats thoroughly, as required by Halal rules. *Id.* at *1, 11. *See also Randolph v. City of New York*

*Dep't of Correction,* 2007 WL 26602082, *2 (S.D.N.Y. Sept. 7, 2007). The other violation, according to Wesley, is that the prison commissaries sell both Halal and non-Halal food products without identifying which products are in fact non-Halal, a failing that, according to Wesley, leads to Muslim inmates unknowingly purchasing non-Halal food products at the commissary and then placing those products on the dining hall food trays that are reserved for Halal foods, thereby contaminating the trays for those inmates and for all other observant inmates who subsequently use the same trays. *Id.* at *1, 5.

3    According to the *Wesley* complaint, the DOC dining facilities color-code the trays, with one color designating trays for Halal food and another for non-Halal food. *Wesley,* 2008 WL 123812 at *1. This separation is apparently done to avoid what would otherwise be possible contamination of the Halal food if it were placed on trays that have previously been used to carry non-Halal food. It also identifies to serving personnel whether the inmate wants Halal food.

As for the role of the defendants named in Rose's lawsuits, he alleges that the corrections officers all work at the prison commissaries and are thus responsible for the sale of non-Halal food items without identification of their non-Halal status, thus resulting in food tray contamination. (*See* Am. Compls. (Nos. 05 Civ. 8828, 8829) at pp. 5-a to b, 5-d to H, 7-a). He further asserts that Commissioner, the wardens and the manager of the OBCC commissary have all been repeatedly notified of the cited failures to provide proper Halal meals and the sale of unidentified non-Halal foods at the commissaries, and that they have failed to act to correct these problems. (*See* Am. Compls. (Nos. 05 Civ. 8828, 8829) at pp. 5-a, 5-f, 5-H, 7-a).

**\*4** As reflected in the reports and recommendations we issued in three of the parallel cases, Rose's allegations of the defendants' personal involvement parallel those found in the other cases. The corrections officers named as defendants in those cases appear to have been assigned to work at the prison commissary, and the supervisory defendants-in those cases the DOC Commissioner and the Warden of the AMKC-were named because they had been notified of the problems alluded to in these parallel cases and had allegedly failed to respond or deal with those problems. *See, e.g., Wesley,* 2008 WL 123812 at *2, 6-7; *Randolph,* 2007 WL 26602082 at *2; *Mason v. Masley,* 06 Civ. 1829(GEL), Report & Recommendation at 5-6 (S.D.N.Y. Feb. 11, 2008).

2008 WL 706254

B. *Defendants' Motion*

Defendants press five grounds for dismissal of the complaints, all predicated on what defendants contend are fatal deficiencies in the complaints. [4] First, they assert that the complaints fail to state a claim because their allegations reflect that plaintiff did not exhaust his prison administrative remedies. Second, they argue that plaintiff lacks standing to assert a claim based on the sale of non-Halal food items at the prison commissaries, asserting that the complaints do not suggest that plaintiff unknowingly bought and consumed such items. Third, they argue that plaintiff does not adequately allege the personal participation of the defendants in the wrongdoing about which he is complaining. Fourth, they assert that they are protected from liability by a qualified immunity defense. Fifth, they urge that the allegations of the complaints do not state a claim for violation of plaintiff's First Amendment right to the free exercise of his religion.

[4]     As is the case in the parallel lawsuits by other Rikers Island inmates, the only evidence proffered by defendants is a copy of the DOC regulations that govern the procedures for filing and pursuing inmate grievances. (*See* Decls. of Ass't Corp. Counsel Kimberly Conway, executed May 7, 2007, Ex. A).

Plaintiff has not responded to these motions, but has filed an application in his latest case to amend his complaint, although he does not indicate in what respect he seeks to amend his pleading.

*ANALYSIS*

We address defendants' arguments in the order in which they make them. Because these arguments repeat in large measure the analysis that these and other defendants have made in four previously decided dismissal motions in parallel Rikers Island cases, [5] we will shorten our discussion, incorporating by reference or citation the assessments that we have made of these arguments in the earlier decisions.

[5]     Defendants here are represented by the same counsel as in the other cases.

A. *Exhaustion*

In plaintiff's three complaints he alleges that he attempted to utilize the prison grievance system to air each of the claims that he makes here. He also says that he did not receive a response to his grievances, and that he further notified the supervisory defendants, including the wardens and the Commissioner, again without response. (Am. Compls. (Nos. 05 Civ. 8828, 8829) at pp. 3, 5-a, 5-f to H, 7-a; Compl. (No. 06 Civ. 464), at pp. 3-5 & Exs. A-C). These allegations are consistent with the assertions of the four other plaintiffs in the parallel cases whose exhaustion status has also been challenged by defendants and adjudicated by this court.

**\*5**  The short answer to defendants' argument, as we have previously observed, is that a plaintiff is not obliged to allege his compliance with the exhaustion requirements of the Prison Litigation Reform Act, and that it is the defendants' burden both to plead this affirmative defense and to prove its applicability. The somewhat longer answer is that in any event (a) the allegations in Rose's complaints to which defendants seem to point as the basis for their argument do not clearly demonstrate that plaintiff failed to comply with the exhaustion requirement and (b) if he complied incompletely, the complaints do not preclude the application of one or more of the exceptions to complete exhaustion recognized by the Second Circuit (if, for example, corrections personnel prevented or interfered with an inmate's efforts to exhaust his remedies or simply ignored his grievance). *See, e.g., Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004). For further details of this analysis, we incorporate by reference our discussion of these issues found in *Wesley v. Muhhamad,* 2008 WL 123812 at \*3-4; *Randolph v. City of New York Dep't of Correction,* 2007 WL 2660282 at \*4-9; *Robinson v. New York City Dep't of Correction,* 06 Civ. 945(GEL), R & R at 5-17 and *Mason,* 06 Civ. 1829(GEL), R & R at 8-9.

B. *Plaintiff's Standing*

Defendants next focus on plaintiff's allegations concerning the failure to identify non-Halal food products sold at the commissaries. They argue that he lacks standing to press this claim since he does not suggest that he ever erroneously purchased and consumed non-Halal products from the commissaries.

Plaintiff states in his third complaint that he did in fact purchase products at the commissary which he learned, upon reading the ingredient lists after making his purchases, were not Halal. (Compl. (No. 06 Civ. 464) at 3). Although plaintiff does not suggest that he consumed non-Halal items purchased unknowingly from the commissary, we read

2008 WL 706254

plaintiff's allegations and claim in light of specific allegation in the *Wesley* complaint that the unknowing purchase of non-Halal items at the commissary by observant Muslim inmates leads to contamination of the trays upon which supposedly Halal meals are served. *See Wesley,* 2008 123812 at *1, 5.

The same standing defense was invoked by the defendants in *Randolph,* and we upheld it there. *See Randolph,* 2007 WL 2660282 at *9-10. The reason for that result was that we understood Randolph's claim to be simply that Muslim inmates were misled into purchasing and consuming non-Halal foods, and we concluded that he lacked standing because he failed to "allege, or even hint, that he has ever unknowingly purchased a pork product from the commissary, much less consumed it, and his allegations-in which he references specific products sold at the commissary that he asserts contain pork or pork by-products [cite omitted]-strongly indicate that he is aware of which commissary items his religious beliefs preclude him from using." *Id.* at *9.

**\*6** By contrast, in *Wesley* plaintiff's counsel made clear that the claim concerning the commissary was based on the assertion that observant inmates other than the plaintiff who mistakenly purchase pork products at the commissary then place those food items on the purportedly Halal trays at the dining facility, thus contaminating those trays. Since all plaintiffs allege that the Halal trays are not properly washed, it follows that this claim is based on injury to all Muslim inmates-the various plaintiffs included-since even if they do not buy non-Halal foods at the commissary, they all use the Halal trays and hence are exposed to the pork contamination assertedly caused by the challenged commissary practices. *See Wesley,* 2008 WL 123812, at *5-6, 12.

Reading plaintiff's pleading in light of *Wesley,* we conclude that he does allege sufficient facts to form a basis for finding that he is claiming to have been injured by virtue of the contamination of the Halal trays in the manner described, whether through his own purchase of non-Halal food or through the consumption of non-Halal commissary items by other observant Muslim inmates.[6] That suffices to allege injury to plaintiff and hence standing.

[6]    It bears noting that even plaintiff's *pro se* complaints, if carefully read, seem to rest on the same reasoning as Wesley's pleading. (*See, e.g.,* Am. Compl. (No. 05 Civ. 8828) at p. 5-a) ("With the Pork being Sold to the General Population, And touching the[ir] trays, and the Halal Trays being

Stack[ed] and Wash[ed] together this is a Form of Contamination to the Halal Meal.").

C. *Pleading of Defendants' Roles*

Defendants next assert that plaintiff has failed to specify the individual responsibility of each of the defendants for the wrongs about which he complains. As we have noted, a plaintiff is required to plead and prove such involvement. *See, e.g., Randolph,* 2007 WL 2660282, at *10 (citing *inter alia Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007); *Hendricks v. Coughlin,* 114 F.3d 390, 394 (2d Cir.1997)). Given plaintiff's status as a *pro se* litigant and his fairly specific allegations of personal involvement of all but one defendant, we conclude that his pleadings pass Rule 12(b)(6) muster on this point except as to a single defendant.

Like the complaints in *Randolph, Wesley* and *Mason,* plaintiff refers to the individually named corrections officers as having worked at the prison commissary and having either participated in or allowed the sale of non-Halal food products without providing any list or other means for Muslim inmates to identify which foods were non-Halal. (*Compare e.g., Wesley* Second Amended Compl. at ¶¶ 6(h)-(n), 37-42, 44-45). For reasons discussed at length in *Randolph* and *Wesley,* we conclude that Rose's allegations against these officers, which parallel those found in those two cases, sufficiently allege the defendants' participation in the identified practices at the commissaries that plaintiff asserts have violated his right to the free exercise of his religion. *See Wesley,* 2008 WL 123812 at *4-9; *Randolph,* 2007 WL 2660282 at *10-12.

As for the supervisory defendants named by plaintiff-DOC Commissioner Horn, Wardens Riordan, Thompson and Walsh, and OBCC commissary manager Alvin Mack-defendants again contend that their responsibility for the wrongs alleged by plaintiff is insufficiently identified in his complaint. This argument is also a repeat of arguments made in *Randolph* and *Wesley,* and we reject defendants' contentions for the same reasons.

**\*7** Apart from alleging the defendant supervisors' respective institutional positions, Rose asserts that he notified each of them about the problems, and he alleges as well in substance that nothing was done to correct the situation. From these allegations, we may infer-based on the rather flexible standard that applies to complaints targeted by a Rule 12(b)(6) motion and the still more liberal test that applies to the pleadings of an untutored *pro se*

litigant-that plaintiff is alleging that the Commissioner, the wardens and the commissary manager failed to correct constitutional violations of which they had actual notice, were grossly negligent in managing subordinates in this respect, and displayed deliberate indifference to plaintiff's First Amendment right to practice his religion. Such allegations suffice to state a claim for supervisory liability. *See, e.g., Randolph,* 2007 WL 2660282 at *10 (citing *inter alia Iqbal,* 490 F.3d at 152-53).

In any event, two of these defendants-Commissioner Horn and Warden Riordan-were also named as defendants in *Randolph* and in *Wesley,* and the complaints in those cases plainly illustrate the nature of the responsibility that Rose is attributing to these senior officials of the DOC for the complained-of practices cited in both the prison commissary and the dining facility. For the reasons noted in both *Randolph* and *Wesley,* plaintiff's allegations, when read in the light of those complaints, adequately plead supervisory liability on the part of these defendants. *See id.* at *11-12; *Wesley,* 2008 WL 123812 at *7-9. [7]

[7] We have noted that plaintiff also alleges that inmates returning from court are denied Halal meals, a claim that defendants do not explicitly address. In any event, plaintiff has standing to assert this claim, since he alleges that at one point he was a pre-trial detainee (Am. Compl. (No. 05 Civ. 8828) at p. 5-f), and hence it may be inferred that on one or more occasions he was taken to court and then denied a Halal meal. Plaintiff does not allege the specific responsibility of any one defendant for this apparently systemic failing, but since he represents that he has notified the wardens and the Commissioner of the problems concerning which he is now complaining, we infer that they are appropriately named defendants on this claim as well.

Finally, we note that the one defendant to whom plaintiff does not refer in the body of the complaint in which he is named as a defendant is the imam of OBCC, Imam Muhammad. (Am. Compl. (No. 05 Civ. 8828) *passim.*). Since plaintiff makes no reference to him at all, we conclude that the complaint fails to allege his participation in any wrongdoing, and for that reason the complaint should be dismissed as against this one defendant.

D. *Immunity*

Defendants next seek to invoke a qualified-immunity defense on behalf of all of the defendants, and in doing so they rely solely on the allegations of the complaint. Plaintiff's allegations closely parallel those in the *Randolph* and *Wesley* cases, and we conclude that the immunity defense applies here in the same manner as it does in those other cases with the exception of its application to some of the corrections officer defendants.

In *Wesley* and *Randolph,* we concluded that immunity was properly invoked to absolve the corrections officer defendants of liability. We inferred that their inclusion as defendants was based solely on their work at the commissaries, a role that could not trigger liability since (1) there was no reason for them to have believed that the sale of non-Halal products at the commissary violated any inmate's rights, and (2) their only stated role involved selling products at the commissary or supervising inmates in those sales, a function that offers no basis for inferring that they had any control over whether the commissaries provided identification of which food products were non-Halal. *See Randolph,* 2007 WL 26660282 at *13-14; *Wesley,* 2008 WL 123812 at *12. This reasoning applies as well to plaintiff's complaint in his third lawsuit, in which he merely alleges that the corrections officer defendants worked in the AMKC commissary during his incarceration and that the commissary sold items containing pork or pork by-products. (*See* Compl. (06 Civ. 0464) at 3). Thus, we recommend that the commissary claims against the corrections officer defendants in that case be dismissed. [8]

[8] The officers named in that complaint are Correction Officers Masley (sued as "Masiey"), Gerris, Brown, Allen, Patterson, Santaluna and Chadwick.

**\*8** In contrast, in the complaints in Rose's first two suits, he alleges that "[a]ll the CORRECTION OFFICER[ ]S are List[ed], Because they all got Notice from the[ir] Superviser about the Violation's and Still Continue to Sell Pork in the Commissary at [GMDC and OBCC]." (Am. Compls. (Nos. 05 Civ. 8828, 8829) at 5-H). We liberally construe this allegation to indicate that the corrections officer defendants were told by one or more of their supervisors that the sale of items containing pork and pork-by products without notifying observant Muslim inmates that they are non-Halal violated the constitutional or statutory rights of those inmates. We further infer that plaintiff is alleging that the officers were instructed to cease that practice but did not do so. In light of these allegations, and in contrast to *Wesley* and *Randolph,* we conclude that a trier of fact could find that

the correction officer defendants had reason to believe their actions were constitutionally suspect or otherwise unlawful. Thus, immunity cannot be granted to them at this stage on the commissary claim.

Immunity also cannot be granted to the supervisory defendants either on the claims regarding food preparation and washing procedures at the dining facility. As noted in both *Randolph* and *Wesley,* settled Supreme Court and Second Circuit precedent and the defendants' presumptive knowledge of Muslim dietary requirements should have made clear to the Commissioner and other senior supervisors that cooking Halal foods with pork-based products, failing to cook Halal meats thoroughly, stacking and washing Halal and non-Halal trays together and using pork-based soap to wash Halal trays violated the religious tenets of Muslim inmates and therefore violated their right to the free exercise of their religion. *See Randolph,* 2007 WL 2660282 at *14-16; *Wesley,* 2008 WL 123812 at *9-12. [9]

[9] The same may be said for the alleged practice of the Rikers prison facilities in not serving Halal meals to prisoners returning from court.

Finally, immunity must be denied the supervisory defendants on plaintiff's commissary claims insofar as they are construed consistently with the equivalent claim in *Wesley.* As we noted in that case, the plaintiff was alleging that the failure to identify non-Halal food products at the commissary led to the contamination of Halal trays in the dining facility, thus violating the First Amendment rights of Muslim inmates. On that basis and in view of the allegation that the Commissioner and the AMKC warden knew of the problem and failed to act, we concluded that they could not be granted immunity on this claim based solely on the face of the complaint. *Wesley,* 2008 WL 123812 at *12. The same result necessarily follows in this case for the Commissioner, the three wardens and the manager of the OBCC commissary.

E. *Pleading of a Free-Exercise Claim*
Finally, defendants in this case argue that the complaints fail to allege the elements of a violation of plaintiff's rights under the Free Exercise Clause of the First Amendment. In substance, they seem to say that the protection of that amendment is limited, in the current context, to the supplying of non-pork food to Muslim inmates and does not extend to the sorts of practices targeted by plaintiff, including the stacking and washing together of non-Halal trays, the use

of non-pork products in cooking Halal food and washing the Halal trays, the failure to cook meats thoroughly, the contamination of Halal trays by exposure to non-Halal foods from the commissary and the failure to provide Halal meals to inmates arriving at the prison from court. This analysis parallels arguments made by the defendants in *Randolph* and *Wesley,* although in those motions they pursued these arguments principally in the guise of an immunity defense. We rejected the same arguments there since they ignored controlling Supreme Court and Second Circuit law. *See Wesley,* 2008 WL 123812 at *9-11 (citing *inter alia Hudson v. Palmer,* 468 U.S. 517 (1984); *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004); *Ford v. McGinnis,* 352 F.3d 582, 597 (2d Cir.2003); *Benjamin v. Coughlin,* 905 F.2d 571, 579 (2d Cir.1990)). Necessarily, we reject them here as well; indeed, they are still weaker when pressed in the guise of a failure-to-state-a-claim defense.

*CONCLUSION*

**\*9** For the reasons stated, we recommend that defendants' motions to dismiss be granted with respect to the claims against correction officer defendants Masley, Gerris, Brown, Allen, Patterson, Santaluna and Chadwick in *Rose v. Correction Officer Masley # 4610* (No. 06 Civ. 464) and Imam Muhammad (named in 05 Civ. 8828), and should otherwise be denied.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Gerard E. Lynch, Room 910, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e); *Thomas v. Arn,* 470 U.S. 140, 150-52 (1985); *DeLeon v. Strack,* 234 F.3d 84, 86 (2d Cir.2000) (*citing Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989)).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 706254

2008 WL 706254

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (3)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:06cv00464**<br>ROSE v. CORRECTION OFFICER MASIEY #4610 ET AL | — | S.D.N.Y. | Jan. 23, 2006 | Docket |
| **2. Docket 1:05cv08828**<br>ROSE v. MUHAMMAD ET AL | — | S.D.N.Y. | Oct. 18, 2005 | Docket |
| **3. Docket 1:05cv08829**<br>ROSE v. MORGAN ET AL | — | S.D.N.Y. | Oct. 18, 2005 | Docket |

**History (3)**

**Direct History (1)**

1. Rose v. Masiey
   2008 WL 706254 , S.D.N.Y. , Mar. 14, 2008

**Related References (2)**

2. Rose v. Masiey
   2013 WL 4049512 , S.D.N.Y. , July 16, 2013

*Report and Recommendation Adopted by*

3. Rose v. Muhammed
   2013 WL 4046298 , S.D.N.Y. , Aug. 07, 2013 , appeal dismissed (2nd Circ. 13-3386) ( Oct 10, 2013 ) , appeal dismissed (2nd Circ. 13-3319) ( Nov 01, 2013 )

2011 WL 2565301

2011 WL 2565301
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Joy Eyvonne SOMMERSETT, Plaintiff,
v.
The CITY OF NEW YORK et al., Defendants.

No. 09 Civ. 5916(LTS)(KNF).
|
June 28, 2011.

### MEMORANDUM OPINION AND ORDER

LAURA TAYLOR SWAIN, District Judge.

**\*1** Joy Eyvonne Sommersett ("Plaintiff"), proceeding *pro se,* brings this action against the City of New York and the New York City Department of Probation ("Probation Department") (collectively, "Defendants"), alleging disparate treatment, failure to promote, and a hostile work environment due to age discrimination and retaliation for having filed previous race- and age-discrimination complaints with the New York State Division of Human Rights ("SDHR") (in 1991 and 2005) and the Equal Employment Opportunity Commission ("EEOC") (in 2005). The claims against Defendants are brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, *et seq* . ("ADEA"), and the New York State Human Rights Law, N.Y. Exec. L. §§ 290, *et seq.* ("NYSHRL"). The Court has jurisdiction of Plaintiff's federal-law claims pursuant to 28 U.S.C. § 1331, and exercises supplemental jurisdiction of the state-law claims pursuant to 28 U.S.C. § 1367(a).

Defendants urge that all of Plaintiff's claims under Title VII and the ADEA must be dismissed because Plaintiff failed to exhaust her administrative remedies for the acts complained of; that Plaintiff's claims under the NYSHRL are barred by the doctrine of election of remedies; and the complaint should be dismissed in its entirety, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.

The Court has considered thoroughly the parties' submissions. For the following reasons, Defendants' motion is granted in part and denied in part.

### BACKGROUND

According to the form complaint ("Compl.Form") and the attached exhibit ("Compl. Ex." and, with the Compl. Form, the "Complaint") outlining her Complaint for Employment Discrimination, Plaintiff is an African–American woman (Compl. Form at 1), was born in 1945 (Compl. Form at 3), and has worked for the Probation Department as a probation officer since 1984. (*Id.*) Plaintiff has filed race and age discrimination complaints with administrative agencies against the Probation Department twice, in 1991 and 2005.

*Plaintiff's 1991 Complaint to SDHR*
According to the Recommended Findings of Fact, Opinion and Decision, and Order issued in 2008 by an administrative law judge pursuant to Plaintiff's 2005 complaint ("2005 SDHR Opinion"), Plaintiff had filed a prior complaint ("1991 Admin Complaint") of racial discrimination with the SDHR (2005 SDHR Opinion ¶ 4), regarding an incident in which Arthur Levitt, a "white, Jewish male supervisor," now deceased, allegedly called her a "black bitch" in connection with a dispute over a parking space (Compl. Form at 2). The 1991 Admin Complaint was settled by the parties in 2003. (2005 SDHR Opinion ¶ 5.)

*Plaintiff's 2005 Complaints to SDHR and EEOC*
In 2005, Plaintiff filed a second complaint with the SDHR ("2005 Admin Complaint"), alleging unfair treatment because of her age and race, and retaliation for having filed the 1991 Admin Complaint. (2005 Admin Complaint ¶ 3.) This complaint was also concurrently submitted to the EEOC (*id.,* at 3; *see also* EEOC Letter to Department of Probation), and was amended in 2006 ("Amended Admin Complaint") to include additional allegations (*see generally* Amended Admin Complaint).

**\*2** In April 2008, following an investigation by the SDHR, an administrative law judge made a recommendation that all of Plaintiff's discrimination claims be dismissed. In June 2008, this recommendation was adopted in its entirety by the SDHR in a Notice and Final Order. In March 2009, the EEOC issued a letter to Plaintiff ("EEOC Right–to–Sue Letter"), notifying her that the Commission had adopted the SDHR's

findings and dismissed the Amended Admin Complaint, and that Plaintiff was entitled to file a lawsuit in federal or state court based on those Title VII and ADEA claims which had been raised in her administrative complaint.

*Filing and Factual Background of Plaintiffs' Instant Claims*
In the instant suit, Plaintiff complains primarily of numerous incidents that allegedly occurred subsequent to her 2005 Admin Complaint, in which her superiors and co-workers at the Department of Probation allegedly treated her improperly due to age discrimination, or in retaliation for her previous discrimination complaints, or both. In her Complaint, she states that the alleged discriminatory acts occurred on "1/1/08 —present. (additionally, the past 25 years)." (Compl. Form ¶ IIB.) However, the Complaint identifies only post–2007 events.

In the Exhibit to the Complaint, Plaintiff alleges that, in December 2008, she was falsely accused of mishandling a probation case in a manner which led to the deaths of three people. (Compl.Ex. ¶¶ 2–4.) As a result, Plaintiff was suspended (*id.* at 2); placed on probation (*id.*); and transferred to an assignment in Queens which was distant from her home in the Bronx, and which required her to perform "high-risk" duties (*id.* ¶¶ 9–11). Plaintiff further alleges, generally, that this transfer was part of a pattern in which employees were terminated in retaliation for filing complaints against the Probation Department (*id.* ¶ 1), and older probation officers with health problems were deliberately given assignments that were "inconvenient or risky because of their health" in order to encourage them to resign (*id.* ¶ 24), or were otherwise transferred to high-risk duties "as a punitive measure" (*id.* ¶ 32).

Plaintiff also complains that the Probation Department wrongfully failed to promote her (*id.* ¶ 25), that multiple supervisors have given her undeserved reprimands (*id.* ¶¶ 6, 17–18), that she was not evaluated properly immediately after the transfer to Queens (*id.* ¶¶ 8–10, 13), and that superiors have manipulated her working conditions in various ways in order to hamper her successful job performance—e.g., failing to provide her with proper duty instructions (*id.* ¶ 11), training (*id.* ¶ 29), case documentation (*id.* ¶ 12), field partners (*id.* ¶¶ 14–16), and computer equipment (*id.* ¶ 20)—while also sending her to unnecessary training sessions which took away from time needed to manage her workload (*id.* ¶¶ 19, 28).

**\*3** Additionally, Plaintiff alleges that several incidents which occurred both before and after her 2005 Admin

Complaint demonstrate hostility towards her based on her age and prior discrimination complaints—including a comment by a supervisor indicating that the Department was "just waiting for [Plaintiff] to retire" (*id.* ¶ 8); a supervisor's complaint about the cost of having to appear in court pursuant to Plaintiff's prior discrimination case (*id.* ¶ 27); comments by unspecified employees calling her a "troublemaker" following her complaints (*id.* ¶ 23); and loud statements by a supervisor that a discrimination complaint had been filed and a comment by the same supervisor that "[W]e have to get [Plaintiff]" (*id.* ¶ 22).

Finally, Plaintiff complains of a number of other incidents involving negative treatment by co-workers or superiors. She alleges that she frequently suffered "unprofessional and verbally abusive" treatment when meeting with a branch chief (Compl.Ex.¶ 5); and that she was: cursed at by a supervisor (*id.* ¶ 7); falsely accused of referring probationers to the wrong employment programs (*id.* ¶ 17); incorrectly criticized for the wording of one of her reports (*id.* ¶ 18); inappropriately questioned as to the contents of a bag containing personal items (*id.* ¶ 18); repeatedly told by a branch chief that "[i]f [he] didn't want [Plaintiff] to work here, [she] would not be here" (*id.*); targeted with glares and angry faces (*id.* ¶ 22); avoided by supervisors in the hallways (*id.*); criticized in front of others by a supervisor who said that "[Plaintiff] didn't do anything for five years" and ignored when she complained about this incident to the departmental EEO office (*id.* ¶ 26); harassed with false accusations of failing to read office emails, and told "in a loud harsh manner before staff in the immediate area" that she needed to attend computer training (*id.* ¶ 28); ignored by a supervisor who would avoid eye contact, frown, and mutter whenever Plaintiff asked a question; told not to "open[ ] up a can of worms" by filing reports of potential child abuse by probationers (*id.* ¶ 31); and forced to miss a doctor's appointment in order to avoid being disciplined (*id.* ¶ 33).

*DISCUSSION*

In deciding a Rule 12(b)(6) motion to dismiss, the Court accepts as true the non-conclusory factual allegations in the complaint and draws all reasonable inferences in the plaintiffs favor. *Roth v. Jennings,* 489 F.3d 499, 501 (2d Cir.2007); *see also Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). In adjudicating the motion, the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in [the complaint] by

reference." *Rothman v. Gregor,* 220 F.3d 81, 89 (2d Cir.2000). Furthermore, "where a *pro se* plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations." *Milano v. Astrue,* No. 05 Civ. 6527(KMW)(DF), 2007 WL 2668511, at *2 (S.D.N.Y. Sept. 7, 2007) (Freeman, M.J.) (collecting cases).

**\*4** With respect to the pleading standards of Rule 8, "[t]o survive a motion to dismiss, a. complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal,* 129 S.Ct. at 1949. This plausibility standard does not amount to a "probability requirement," but it calls for more than a "sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and citation omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and citation omitted). "[A] complaint need not establish a *prima facie* case of employment discrimination to survive a motion to dismiss; however, the claim must be facially plausible and must give fair notice to the defendants of the basis for the claim," *Barbosa v. Continuum Health Partners, Inc.,* No. 09 Civ. 6572(SAS), 2010 WL 768888, at *3 (S.D.N.Y. Mar. 8, 2010) (internal quotation marks omitted).

"A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]" *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (internal quotation marks and citations omitted); *see also Boykin v. KeyCorp,* 521 F.3d 202, 213–14 (2d Cir.2008). Such a complaint should be interpreted to raise the strongest arguments that it suggests, *Weixel v. Bd of Educ.,* 287 F.3d 138, 145–46 (2d Cir.2002), although it is not appropriate to assume that a plaintiff can prove facts or establish claims that she has not alleged in the complaint. *Assoc. Gen. Contractors of Cal. Inc. v. Cal. State Council of Carpenter,* 459 U.S. 519, 526 (1983).

*Administrative Exhaustion of Title VII and ADEA Claims*
Before seeking redress in federal court under Title VII or the ADEA for alleged instances of employment discrimination, a plaintiff must first address the alleged discrimination in a timely complaint to the EEOC or a state agency with equivalent authority. *See* 42 U.S.C, § 2000e–5(e) (Title VII); 29 U.S.C. §§ 626(d), 633(b) (ADEA). Defendants argue that Plaintiff's Complaint, which does not assert any of the claims

specifically described in Plaintiff's administrative complaints, must be dismissed as unexhausted to the extent Plaintiff seeks to pursue Title VII and ADEA claims.

The Second Circuit recognizes an exception to this "exhaustion" requirement where a plaintiff's claims in a discrimination suit are "reasonably related" to the allegations raised in her prior EEOC complaint, since allowing such a suit to be brought would not frustrate the statutory purpose of preserving an opportunity for administrative investigation, mediation, and redress of the complaint. *Butts v. New York Dep't of Hous. Preservation & Dev.,* 990 F.2d 1397, 1401–02 (2d Cir.1993). For the purposes of this exception, a claim is deemed to be "reasonably related" to a prior EEOC complaint (1) "where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination;" (2) where the claim alleges "retaliation by an employer against an employee for filing an EEOC charge;" or (3) where the claim "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Id.* at 1402–03. These exceptions apply with equal force to claims brought under the ADEA, whose exhaustion requirement is identical to that of Title VII. *Terry v. Ashcroft,* 336 F.3d 128, 151 (2d Cir.2003). The first of these exceptions is inapplicable to conduct which takes place after the EEOC has completed its investigation. *Perez,* 2009 WL 3634038 at *16.

**\*5** None of the conduct alleged in the Complaint was addressed in Plaintiff's previous administrative complaints. Thus, Plaintiff's claims under the ADEA and Title VII may proceed only to the extent they are reasonably related to the 2005 administrative complaints on the basis of which her EEOC Right–to–Sue Letter was granted.

None of the post–2007 conduct specifically alleged in the current Complaint would have fallen within the scope of an EEOC investigation that would have grown out of the 2005 administrative complaints, nor does any of the conduct described in the Complaint constitute discrimination allegedly carried out in precisely the same manner alleged in the EEOC charge. Accordingly, to the extent Plaintiff seeks to pursue the instant claims as ones of age- or other non-retaliation based disparate treatment or hostile work environment under ADEA or Title VII based on post–2007 conduct the Complaint must be dismissed as unexhausted. Plaintiff's allegations of retaliation suffice, however, to frame the requisite reasonable relationship with the year 2005 administrative complaints.

*Preclusion of Certain Claims Brought Under the NYSHRL*
In contrast with the federal statutes addressing employment discrimination, which require that plaintiffs *exhaust* their administrative remedies before filing suit, equivalent employment discrimination claims under New York state law are subject to an administrative *preclusion* rule, under which a party who has pursued an administrative complaint of discrimination with a state agency forfeits the right to sue upon the same claims. N.Y. Exec. Law § 297(9) (McKinney Supp.2011). The statutory preclusion rule does not, however, bar NYSHRL lawsuits based on claims that the state agency dismissed as untimely. *Id.*

Plaintiff is barred from pursuing her NYSHRL claims in this action to the extent the claims were raised in her 2005 administrative complaints, except any claims relating to the period prior to December 12, 2004, which were dismissed by the SDHR as untimely. [1] Plaintiff's NYSHRL claims regarding post–2007 conduct were not raised with the SDHR and thus are not precluded by the prior administrative proceedings.

[1]    As noted above, the Complaint in this action refers specifically only to post–2007 events.

*Whether Plaintiff's Remaining Claims are Plead Sufficiently*
Although Plaintiff need not allege facts sufficient to make out a *prima facie* case for any of her discrimination claims in her Complaint, the elements thereof provide an outline of what is necessary to render her claims for relief plausible. The same analysis is generally applied to claims brought under Title VII and the ADEA alleging disparate treatment, *Smith v. Xerox Corp.,* 196 F.3d 358, 367 (2d Cir.1999), a hostile work environment, *Brennan v. Metropolitan Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999), or retaliation, *Manzi v. DiCarlo,* 62 F.Supp.2d 780, 793–94 (E.D.N .Y.1999). Furthermore, "claims under the NYSHRL are analyzed identically to claims under the ADEA and Title VII," and thus "the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under the ADEA and Title VII." *Smith,* 196 F.3d at 363 n. 1. Consequently, the Court will only discuss Plaintiff's federal and state claims separately where the distinct administrative and procedural requirements of the respective statutes differ.

**\*6** A plaintiff alleging disparate treatment discrimination must establish a *prima facie* case by showing "(1) she

was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 498 (2d Cir.2009). Where the complaint alleges a failure to promote, the plaintiff must ultimately show that "1) she is a member of a protected class; 2) her job performance was satisfactory; 3) she applied for and was denied promotion to a position for which she was qualified; and 4) the position remained open and the employer continued to seek applicants." *Cruz v. Coach Stores, Inc.,* 202 F.3cl 560, 565 (2d Cir.2000) (internal quotation marks omitted).

Title VII also makes it unlawful for an employer "to discriminate against ... any individual ... because he has ... made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e–3(a). The ADEA includes a nearly identical anti-retaliation provision. 29 U.S.C. § 623(d); *see also Manzi,* 62 F.Supp.2d at 793–94. In order to prove a *prima facie* case of retaliation, a plaintiff must show that "(1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Gregory,* 243 F.3d at 700 (internal quotation marks omitted).

*Disparate Treatment*
As Plaintiff's federal disparate treatment claims are barred as unexhausted, Plaintiff's only remaining disparate treatment claim is the NYSHRL claim. Determining what constitutes an "adverse employment action" for the purposes of a discrimination claim requires a careful case-by-case analysis. *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997). In general,

> [a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might

be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.

*Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (alteration in original) (internal quotation marks and citations omitted). However, while a court must carefully consider the unique circumstances of each claim, employment-discrimination laws are not intended to establish a "general civility code for the American workplace." *See Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998) (discussing Title VII). Mere unfair criticism or reprimands unaccompanied by more serious results, such as probation or a decrease in pay, cannot by themselves support a discrimination claim. *Bennett v. Watson Wyatt & Co.,* 136 F.Supp.2d 236, 248 (S.D.N.Y.2001).

**\*7** Plaintiff alleges in her Complaint and/or proffers in her opposition papers that she was wrongfully suspended; placed on probation; and transferred to a distant assignment which required a four-hour commute and involved high-risk duties. Plaintiff additionally alleges that she applied for a promotion twice by taking a civil service exam designed for that purpose, but was not promoted; although she does not state whether she passed the exam, she does allege that other probation officers achieved or retained the same or higher positions despite failing the same exam multiple times. Plaintiff further points to incidents suggesting discriminatory animus on the part of at least one supervisor, and alleges a systematic pattern of concerted ill-treatment of older Probation Department employees intended to encourage their resignation. Taken together, these allegations suffice minimally, when read liberally and in the light most favorable to Plaintiff, to state a claim of unlawful age-based discriminatory treatment with respect to her allegations of wrongful suspension, probation status, transfer, and failure to promote, with which Plaintiff may proceed under the NYSHRL.

*Retaliation*

By contrast, a plaintiff alleging retaliation against protected activity need only show that her employer's actions were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57 (2006). For example, a shift in job responsibility involving an increased emphasis on "more arduous" duties might be considered adverse by a trier of fact, even where those duties are included in the plaintiff's job description. *Id.* at 70–71. This relaxed requirement is equally applicable to retaliation claims brought under the ADEA. *Boland v. Town of Newington,* 304 F. App'x 7, 9 (2d Cir.2008).

In addition to allegations of discriminatory animus, Plaintiff also refers to several incidents which raise a plausible, albeit barely, inference of retaliatory animus on the part of her co-workers and several supervisors, including one incident—a vocal expression of apparent intent, on the part of a supervisor, to retaliate against Plaintiff due to her administrative complaint—which clearly suggests a direct causal connection between the alleged animus and abusive conduct. Her allegations of retaliatory conduct include allegations of conduct that, when read liberally and in the light most favorable to her, could have deterred a reasonable employee from filing a discrimination complaint (e.g., wrongful demotion to probationary status, transfer to more arduous duty with significantly increased travel time, failure to provide necessary training). Plaintiff has thus pleaded sufficiently her Title VII, ADEA and NYSHRL retaliatory discriminatory treatment claims.

*Hostile Work Environment Claim*

A plaintiff's civil rights are violated where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris,* 510 U.S. at 21 (internal quotation marks and citations omitted).

**\*8** [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the

2011 WL 2565301

employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* at 23.

The Court finds that Plaintiff's allegations are sufficient, at this pleading stage, to state a claim for age- or retaliation-based hostile work environment. However, insofar as it is premised upon age discrimination rather than retaliation, Plaintiff's claim of a hostile work environment may only proceed under the NYSHRL, as the conduct alleged was neither addressed in, nor reasonably related to, her prior complaint to the EEOC.

*CONCLUSION*

For the foregoing reasons, Defendants' motion to dismiss the Complaint is granted to the extent noted above. The case will go forward with respect to Plaintiff's retaliation claims under the ADEA and Title VII and her NYSHRL age- and retaliation-based disparate treatment and hostile work environment claims.

This Memorandum Opinion and Order resolves docket entry no. 9.

This matter continues to be referred to Magistrate Judge Fox for general pretrial management purposes.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2565301

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1.  Docket 1:09cv05916**<br>SOMMERSETT v. THE CITY OF NEW YORK ET AL | — | S.D.N.Y. | June 29, 2009 | Docket |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (1)**

1. Sommersett v. City of New York
   2011 WL 2565301 , S.D.N.Y. , June 28, 2011

**Related References (1)**

2. Sommersett v. City of New York
   679 F.Supp.2d 468 , S.D.N.Y. , Jan. 14, 2010

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Hamilton v. Countant, Not Reported in Fed. Supp. (2016)

2016 WL 881126

2016 WL 881126
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kariva A. HAMILTON, Plaintiff,

v.

Frederick COUNTANT Jr., Anthony Chu, Catherine
Jacobsen, and William F. Keyser, Defendants.

No. 13-CV-669(RA)
|
Signed 03/01/2016

**Attorneys and Law Firms**

Karvia A. Hamilton, Malone, NY, pro se.

Abigail Everett Rosner, Julinda A. Dawkins, Anna
Hehenberger, New York State Office of the Attorney General
(NYC), New York, NY, for Defendants.

OPINION & ORDER

RONNIE ABRAMS, United States District Judge

**\*1** Plaintiff, Kariva A. Hamilton, a New York State prisoner
and member of the Rastafarian faith, brings this *pro se* action
alleging that Defendants Frederick Coutant, Jr., Anthony
Chu, Catherine Jacobsen, and William F. Keyser violated
his rights to religious liberty and equal protection of the
law. Hamilton claims that Defendants, all current or former
employees of the New York State Department of Corrections
and Community Supervision ("DOCCS"), infringed on his
statutory and constitutional rights when they seized religious
items from the prison chapel, made alterations to the calendar
on which the prison listed recognized religious holidays, and
refused to provide the cornbread and grape juice required
for him to take communion during a Rastafarian holiday.
Defendants argue that they are entitled to dismissal of these
claims as a matter of law and move for summary judgment on
all causes of action. The motion is granted.

BACKGROUND [1]

[1]    The following facts, uncontroverted unless
otherwise noted, are drawn primarily from

Plaintiff's 56.1 statement, Plaintiff's deposition
testimony, Plaintiff's declaration, and Plaintiff's
memorandum of law. A fact placed into the record
by Defendants is cited only where Plaintiff has
offered no evidence to refute that fact.

In 2011 and 2012, Plaintiff was imprisoned in DOCCS's
Sing Sing Correctional Facility in upstate New York where
he served as a "Levite," or leader, in the Church of Halie
Selassie I, Plaintiff's Rastafarian "mansion," or church. Pl.'s
56.1 Stmt. ¶¶ 1, 6; Pl.'s Dep. 63:9-16. Although Plaintiff is
now imprisoned at another facility, he brought this suit to
remedy three perceived violations of his rights as a practicing
Rastafarian while incarcerated in Sing Sing. *See* Decl. of
Kariva A. Hamilton ¶ 1 (hereinafter "Pl.'s DecL").

First, on September 14, 2011, security staff at Sing Sing
conducted a search of the prison chapel "in an effort to
locate contraband," Pl.'s 56.1 Stmt, ¶ 1, and "confiscated
numerous items from the Rastafarian area of the chapel,"
*id.* ¶ 2, that Plaintiff contends that "are central and critical
to the Rastafarian temple worship," Pl.'s Decl. ¶ 5. [2] In
particular, Plaintiff testified that the prison seized candles,
pots, frankincense, myrrh, an electric iron, and a computer.
Pl.'s Dep. 105:13-15. Prison records reveal that officials also
seized a DVD player and "unauthorized movies." Compl. Ex.
F. Following the seizure, Plaintiff and other inmates filed
grievances. Decl. of Quandera T. Quick ¶ 4.

[2]        Although none of the Defendants conducted the
search, it "was authorize[d] by Superintendent
William Keyser." Pl.'s 56.1 Stmt, ¶ 1.

Second, Plaintiff complains that DOCCS staff "alter[ed],
delet[ed], and amend[ed]" the contents of the 2012 religious
holiday calendar at Sing Sing (hereinafter the "Religious
Day Calendar" or "Calendar"). Pl.'s Mem. 16. On January 10,
2012, Plaintiff and other members of his congregation wrote
to Defendant Catherine Jacobson, the then-Acting Deputy
Commissioner of DOCCS Program Services, about their
objections to the 2012 Calendar. *See* Compl. Ex. A. They
protested both the removal from the Calendar of the special
menu items traditionally served on Rastafarian holidays and
the Calendar's references to a specific sect of Rastafarianism
to which Plaintiff did not belong. *See* Compl. Ex. A; Pl.'s
Dep. 63:23-64:20. To remedy these alleged issues, Plaintiff's
church demanded "a chaplain that can give us religious
counseling, spiritual guidance, and give the state a better
understanding of our practice." Compl. Ex. A. On January 30,
2012, Jacobson responded. *See* Compl. Ex. B. She explained

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 82 of 238

Hamilton v. Countant, Not Reported in Fed. Supp. (2016)

2016 WL 881126

that "efforts are in place to look for a suitable representative and volunteers for the Rastafarian faith group" and directed that all inquiries regarding food be addressed to "the Food Service Administrator at your current facility." *Id.* Plaintiff never filed a grievance regarding his concerns with the Calendar. Pl.'s Mem. 16; Decl. of Quandera T. Quick ¶ 5.

**\*2** Finally, Plaintiff asserts that his rights were violated when Defendants failed to provide him with cornbread and grape juice on May 5, 2012. Pl.'s Mem. 4. Each year, the members of Plaintiff's congregation celebrate the Rastafarian holiday of Fasika by conducting post-breakfast congregational services after which they consume a Fasika feast. Pl.'s Dep. 56:5-57:22; Pl.'s 56.1 Stmt. 12. The feast includes a meal of rice and vegetables followed by the taking of communion with cornbread and grape juice—a tradition that has endured "within DOCCS for the past 18, 19, maybe 20 years." Pl.'s Dep. 76:25-77:3. Although he identifies no issues with the Fasika celebration in years before or after, Plaintiff did not receive cornbread or grape juice on May 5, 2012. *Id.*

From the start of 2012, Plaintiff was dissatisfied with the prison's facilitation of Fasika. As described above, after learning that the 2012 Calendar did not include a special Fasika menu, Plaintiff and his congregation wrote to Defendant Jacobson who referred them to the food services staff. *See* Compl. Ex. B. On Jacobson's advice, Plaintiff spoke to Food Services Administrator Defendant Anthony Chu on March 20, some "two months before Fasika." Pl.'s Dep, 79:8-16. [3] According to Plaintiff, Chu "assured [him] not to worry about [the Fasika menu]," saying: "When May 5th comes around, all this stuff will be taken care of." *Id.* Nonetheless, on the morning of May 5, the delivery to the chapel of the breakfast that traditionally proceeded Fasika services was delayed. Pl.'s 56.1 Stmt. ¶¶ 12, 15. In response, Plaintiff brought the situation to the attention of Defendant Keyser, the Acting Superintendent of Sing Sing, who resolved the "stand-off by calling the "[m]ess-hall by phone inside the chapel." *Id.* ¶¶ 12-14. Following breakfast, the congregation held services and then "went to the Mess-hall to have a feast." *Id.* ¶ 15. At first, the Fasika feast proceeded as planned as "[r]ice and vegetables were served as inmates in attendance." *Id.* After they "finish[ed] eating and [they] reach[ed] the communion part of the celebration," however, someone "ask[ed] one of the cooks that work[s] in the mess hall" for cornbread and grape juice. Pl.'s Dep. 69:10-21. Defendant Coutant—who was overseeing the kitchen on May 5, 2012—rejected the request because "cornbread and grape

juice [were] not listed on the menu" for the Fasika feast. *Id.* at 70:15-17. Plaintiff testified that members of the congregation attempted to persuade Coutant that "if cornbread and grape juice are not listed on the menu, it probably was a mistake by his supervisor, [who] is Anthony Chu, or it probably was an internal error made by [the] central office." *Id.* at 70:23-71:3. According to Plaintiff, Defendant Coutant replied, "all I kn[o]w is what my supervisor instructed me: Whatever is not listed on the menu, I must not give it to anybody." *Id.* at 71:13-17. Plaintiff later filed a grievance and, upon adjudication, it was determined that Defendant "Chu had inadvertently failed to provide his staff with a copy of the approved menu for the Fasika event." Pl.'s 56.1 Stmt. ¶ 25.

[3]     Plaintiff testified about this interaction as follows:
        Q: But Defendant Jacobson did respond to Mr. Thomas's letter, and she said that—or she asked you to direct menu questions to the food service administrator. Did you follow up with your food service administrator after that?
        A: Yes, we do [sic]. That was March 20th that you mentioned earlier.
        Q: So that was you asking Defendant Chu about the event?
        A: Yes.
        Pl.'s Dep. 67:10-21.

Plaintiff filed this action on January 29, 2013 and Defendants moved to dismiss on December 16, 2013. On September 11, 2014, this Court dismissed from this action several defendants and claims but allowed Plaintiff's causes of action on the 2011 chapel search, the 2012 Religious Holy Day Calendar, and the 2012 Fasika holiday to survive the motion to dismiss. Following discovery, Defendants filed the instant motion for summary judgment.

## STANDARD OF REVIEW

**\*3** A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In ruling on a motion for summary

2016 WL 881126

judgment, 'the district court must view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party.'" *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 78 (2d Cir. 2002) (quoting *Gummo v. Vill. of Depew, N. Y.*, 75 F.3d 98, 107 (2d Cir. 1996)). "Because plaintiff is proceeding *pro se*, [the Court] must consider the pleadings under a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Perez v. Int'l Bhd. of Teamsters, AFL-CIO*, No. 00-CIV-1983 (LAP), 2004 WL 1824100, at *6 (S.D.N.Y. Aug. 16, 2004) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). "Nevertheless, proceeding *pro se* does not otherwise relieve [a] plaintiff from the usual requirements of summary judgment," *id.*, and a court "cannot credit a plaintiff's merely speculative or conclusory assertions," *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012).

## DISCUSSION

In the Complaint, Plaintiff alleges that Defendants violated his federal rights to religious liberty and equal protection. Defendants argue that they are entitled to summary judgment because there are no genuine disputes of material fact, and judgment as a matter of law in their favor is appropriate. After viewing the summary judgment record in the light most favorable to the Plaintiff by drawing all inferences in his favor, and after according his *pro se* submissions with the leniency to which they are entitled, the Court grants Defendants' motion for summary judgment.

## I. Religious Liberty Claims

Plaintiff first argues that Defendants violated his right to free expression of religion when they seized items from the chapel in 2011, altered the 2012 Religious Holy Day Calendar, and denied him cornbread and grape juice during the 2012 Fasika holiday. Defendants counter that none of these incidents constitutes a violation of federal law or the Constitution.

### A. Legal Standards

Plaintiff's religious liberty causes of action derive from two independent sources: Section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") and the Free Exercise Clause of the First Amendment.

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability," unless the government demonstrates that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that ... interest." 42 U.S.C. § 2000cc-I(a). Once "a plaintiff produces prima facie evidence to support a claim alleging a violation" of RLUIPA, "the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether [the challenged practice or law] substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc-2(b); *see also Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006).

Similarly, a claim under the Free Exercise Clause—made actionable against state officials by 42 U.S.C. § 1983—requires that "a plaintiff must show [1] that he has a sincerely held religious belief, [2] that it was substantially burdened, and [3] that defendants' conduct was not reasonably related to some legitimate penological interest." *Barnes v. Furman*, No. 14-581, 2015 WL 6216534, at *3 (2d Cir. Oct. 22, 2015) (citing *Holland v. Goord*, 758 F.3d 215, 220-23 (2d Cir. 2014); *Ford v. McGinnis*, 352 F.3d 582, 588-94 (2d Cir. 2003)). Although the Second Circuit has noted that "[i]t has not been decided in this Circuit whether ... a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs,'" *Holland*, 758 F.3d at 220 (quoting *Salahuddin*, 467 F.3d at 274-75), the circuit has required proof of a substantial burden in several cases without pronouncing the test generally applicable, *see Salahuddin*, 467 F.3d at 274-75; *Ford*, 352 F.3d at 592. Interpreting this precedent, another judge on this court observed that "[i]t is customary in this District, absent any contrary instruction from the Second Circuit, to assume that the substantial burden test survives." *Vann v. Fischer*, No. 11-CV-1958 (KPF), 2014 WL 4188077, at *8 (S.D.N.Y. Aug. 25, 2014), *reconsideration denied*, No. 11-CV-1958 (KPF), 2015 WL 105792 (S.D.N.Y. Jan. 7, 2015). This Court will do the same and "proceed to consider the First Amendment analysis, assuming that the substantial burden test is still valid." *Lopez v. Cipolini*, No. 14-CV-2441 (KMK), 2015 WL 5732076, at *15 n.4 (S.D.N.Y. Sept. 30, 2015); *accord Washington v. Chaboty*, No. 09 CIV. 9199 (PGG), 2015 WL 1439348, at *9 n.12 (S.D.N.Y. Mar. 30, 2015) ("Similarly here, because [plaintiff] has not argued that the substantial burden test is inapplicable, this Court has assumed that it applies."); *Rossi v. Fischer*, No. 13-CV-3167 (PKC), 2015 WL 769551, at

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 84 of 238

Hamilton v. Countant, Not Reported in Fed. Supp. (2016)

2016 WL 881126

*6 n.8 (S.D.N.Y. Feb. 24, 2015) ("[T]he Second Circuit and judges in this district have continued to require such a threshold showing, particularly in cases where the parties have not argued otherwise."); *Woodward v. Perez*, No. 12-CV-8671 (ER), 2014 WL 4276416, at *3 (S.D.N.Y. Aug. 29, 2014) (applying the substantial burden test because plaintiff satisfied this threshold step); *Vann*, 2014 WL 4188077, at *8.[4]

[4]     Other district courts in the Second Circuit have similarly applied the substantial burden test to prisoners' First Amendment claims. *See, e.g., Smith v. Artus*, No. 07-CV-l 150 (NAM), 2015 WL 9413128, at *9 (N.D.N.Y. Dec. 22, 2015) ("In the absence of guidance from a higher court, this Court applies the traditional formulation that, to prevail on a First Amendment claim, an inmate must show that he has a sincerely held religious belief, that it was substantially burdened, and that defendants' conduct was not reasonably related to some legitimate penological interest."); *Hilson v. Beaury*, No. 13-CV-0606 (LEK) 2014 WL 4457132, at *6 (N.D.N.Y. Sept. 10, 2014) ("Because ... the Second Circuit continues to apply the test, even when squarely faced with the question of its continued viability, I will assume a plaintiff must establish a substantial burden on his sincerely held beliefs to demonstrate a prima facie First Amendment free exercise claim."); *Weathers v. Rock*, No. 12-CV-1301 (NAM), 2014 WL 4810309, at *4 (N.D.N.Y. Sept. 23, 2014) ("This court will follow the analysis in *Holland* and proceed to consider the First Amendment analysis, assuming that the substantial burden test is still valid."); *Williams v. Fisher*, No. 11-CV-379 (NAM), 2015 WL 1137644, at *16 (N.D.N.Y. Mar. 11, 2015) ("The Court will follow *Holland* [and apply the substantial burden test].").

 *4 Although claims under RLUIPA and the Free Exercise Clause "proceed[ ] under a slightly different framework," *Salahuddin*, 467 F.3d at 274, the analysis is the same here in three relevant respects. First, the required "substantial burden" is identical under both provisions. *See Loccenitt v. City of New York*, No. 12-CV-948 (LTS), 2013 WL 1091313, at *3 (S.D.N.Y. Mar. 15, 2013). The Second Circuit "define[s] a substantial burden as a situation where 'the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs,'" unlike imposing "inconveniences

so trivial that they are most properly ignored." *McEachin v. McGuinnis*, 357 F.3d 197, 202-03 n.4, 6 (2d Cir. 2004) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)); *accord Singh v. Goord*, 520 F. Supp. 2d 487, 498 (S.D.N.Y. 2007) (applying the same substantial burden definition to RLUIPA).

Second, a prisoner must exhaust any available prison grievance procedures before bringing claims in district court pursuant to either RLUIPA or the First Amendment. "As made clear by the pertinent statutory language, the exhaustion requirement embodied in the [Prison Litigation Reform Act ("PLRA") ] applies not only to claims under section 1983, but also to claims asserted under other federal statutes, including the RLUIPA." *Rose v. Masiey*, No. 05-CV-8828 (LAK) (MHD), 2013 WL 4049512, at *9 (S.D.N.Y. July 16, 2013) *report and recommendation adopted sub nom. Rose v. Muhammed*, No. 05-CV-8828 (LAK), 2013 WL 4046298 (S.D.N.Y. Aug. 7, 2013); *accord Collitonv. Gonzalez*, No. 07-CV-02125 (RJH), 2011 WL 1118621, at *8 (S.D.N.Y. Mar. 23, 2011) (collecting cases).

Third, damages claims based solely on the negligent infringement of a prisoner's right to religious freedom are not actionable under either the First Amendment or RLUIPA. *See Guillory v. Ellis*, No. 11-CV-600 (MAD), 2014 WL 4365274, at *9 (N.D.N.Y. Aug. 29, 2014). As the Court of Appeals for the Fourth Circuit observed, "the operative word 'prohibit' in the First Amendment connotes a 'conscious act' rather than a merely negligent one,"[5] and "[a]llowing negligence suits to proceed under RLUIPA would undermine [Congress's] deference [to prison officials] by exposing prison officials to an unduly high level of judicial scrutiny." *Lovelace v. Lee*, 472 F.3d 174, 194, 201 (4th Cir. 2006). Although the Second Circuit does not appear to have addressed whether negligence can sustain a First Amendment claim outside the context of retaliatory litigation, *see Greenwich Citizens Comm'n, Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 30 (2d Cir. 1996), the Third, Fourth, Fifth, and Tenth Circuits have found negligence insufficient, *see Schreane v. Seana*, 506 F. App'x 120, 124 (3d Cir. 2012) ("[A]n isolated act of negligence does not violate an inmate's First Amendment right to free exercise of religion."); *Gallagher v. Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009) ("[T]here is no basis to conclude that any of the defendants deliberately contaminated the kosher utensils, in violation of Gallagher's right to free exercise of religion."); *Lovelace*, 472 F.3d at 201; *Eason v. Thaler*, 73 F.3d 1322, 1328 (5th Cir. 1996) ("Even if... an administrative foul-up occurred regarding the religious

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 85 of 238

Hamilton v. Countant, Not Reported in Fed. Supp. (2016)

2016 WL 881126

designation on his travel card, this would amount to no more than a claim of negligence. Such a claim would not support his allegations of a constitutional violation in this context."), and this Court is unaware of a decision of any federal court holding to the contrary. This Court shares the view of these circuit courts, as well as that of other judges in this district, that a prison official must *knowingly* place a substantial burden on a prisoner's religious beliefs to incur liability for damages under RLUIPA or the Constitution. *See Tafari v. Annets*, No. 06-CV-11360 (GBD) (AJP), 2008 WL 2413995, at *17 (S.D.N.Y. June 12, 2008) *report and recommendation adopted* No. 06-CV-11360 (GBD), 2008 WL 4449372 (S.D.N.Y. Oct. 2, 2008) *aff'd sub nom. Tafari v. Annetts*, 363 F. App'x 80 (2d Cir. 2010) ("[T]he denials were not intentional or malicious, but appear to at most be the result of negligence by prison officials."); *Young v. Scully*, No. 91-CV-4332 (JSM), 1993 WL 88144, at *7 (S.D.N.Y. Mar. 22, 1993) ("There is no evidence in the record that the alleged deprivation of Plaintiff s first amendment [religious] rights involved any degree of fault by defendants .... Negligence alone will not carry a § 1983 action."); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 848-849 (1998) ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). [6]

[5]    The First Amendment reads in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. Const. amend. I.

[6]    This view is echoed by courts in this circuit outside of this district. *See Guillory*, 2014 WL 4365274, at *9 ("[N]egligence is not actionable under section 1983 [or RLUIPA]."); *Phillips v. LaValley*, No. 12-CV-609 (NAM), 2014 WL 1202693, at *7 (N.D.N.Y. Mar. 24, 2014) ("This behavior was, at worst, negligence on behalf of the staff which is insufficient to establish liability under § 1983."); *Scott v. Shansiddeen*, No. 12-CV-84 (GLS), 2013 WL 3187071, at *4 (N.D.N.Y. June 20, 2013) ("[N]o rational fact-finder could conclude that Defendant's failure to catch the mistake ... amounted to anything more than negligence, which is not actionable under the First Amendment [or RLUIPA]."); *Odom v. Dixion*, No. 04-CV-889F, 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008) ("It is settled that

mere negligence on the part of prison officials is insufficient to establish liability under § 1983 [for a violation of religious liberty].").

## A. 2011 Chapel Search

**\*5** Plaintiff argues that the 2011 seizure of "candles, pots, [f]rankincense," "myrrh," an "electric iron, and [a] computer" from the prison chapel, Pl.'s Dep. 105:13-20, constituted a violation of his rights under RLUIPA and the Free Exercise Clause, Pl.'s Mem. 14-15. In support of this allegation, Plaintiff asserts, without indicating the religious import of any particular item, that "[t]he religious items confiscated by defendant on September 2011 are central and critical to the Rastafarian temple worship (ritual) on the Sabbath and without these religious items the Sabbath worship have to be cancel," [sic]. Pl.'s Decl. ¶ 5. Plaintiff did not, in his filings or at his deposition, elaborate on this conclusory statement by, for example, differentiating between the items seized, identifying the significance of the items to the Rastafarian religion, or explaining why the Sabbath would have to be cancelled in their absence. As a "pure legal conclusion ... is entitled to no weight at summary judgment," *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 96 (2d Cir. 2015), Plaintiff's sole conclusory statement about the seizure's burden on his religious beliefs cannot alone sustain his claim, *see Jackson v. Boucaud*, No. 08-CV-1373 (TJM) (DEP), 2009 WL 6066799, at *6 (N.D.N.Y. Dec. 31, 2009) *report and recommendation adopted*, No. 08-CV-1373 (TJM), 2010 WL 933744 (N.D.N.Y. Mar. 15, 2010) (dismissing plaintiff's claim because he failed to "explain why denial of this interpretative book constituted a deprivation that imposed anything more than a *de minimis* burden upon his religious practice"); *Ochoa v. Connell*, No. 05-CV-1068 (GLS), 2007 WL 3049889, at *7 (N.D.N.Y. Oct. 18, 2007) (rejecting a claim that interruption of a prayer was a substantial burden because plaintiff "gives no explanation as to the type of prayer ... and/or the importance of the particular prayer.").

A review of the record confirms that the seizure was not a substantial burden. Although Plaintiff does not raise it, the only inference regarding the significance of any of the seized items can be drawn from the final decision on Plaintiff's grievance from the Inmate Grievance Program Central Office Review Committee, which was submitted as an exhibit to Plaintiff's complaint. *See* Compl. Ex. F. In it, officials noted that "inmates cancelled their own services because they did not have an iron for the robes. The facility administration took appropriate action to provide an iron as needed and

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 86 of 238
**Hamilton v. Countant, Not Reported in Fed. Supp. (2016)**

2016 WL 881126

there have been no further issues." Compl. Ex. F. [7] To the extent Plaintiff could assert that "the robes" are central to Rastafarianism and the seizure of the electric iron used for their upkeep was a substantial burden, this argument fails. "A substantial burden is more than a mere inconvenience but rather involves, for example, a situation where an adherent is forced to modify his behavior and violate his beliefs." *Gill v. Defrank*, No. 98-CV-7851 (NRB), 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) *aff'd*, 8 F. App'x 35 (2d Cir. 2001) (internal citation omitted); *accord Lloyd v. City of New York*, 43 F. Supp. 3d 254, 263 (S.D.N.Y. 2014). In *Van Wyhe v. Reisch*, 581 F.3d 639 (8th Cir. 2009), for example, the Eighth Circuit considered whether a prison's refusal to allow an inmate to keep a tape recorder that he argued was necessary for the practice of his religion constituted a substantial burden on his religious expression. *Id.* at 657. It held that RLUIPA and the Free Exercise Clause do "not require the prison to permit an inmate to possess every tangential item of property that could aid the inmate's religious exercise." *Id.* Here, the absence of the iron—or any of the other seized items the significance of which is unclear—did not force Plaintiff to modify his behavior or violate his beliefs. Summary judgment is therefore granted because this Court has been provided no non-conclusory basis to find that the absence of the items seized in the 2011 search "significantly inhibited Plaintiff's] religious expression, meaningfully curtail[ed] his ability to adhere to his faith, or deprive[d] him of a reasonable opportunity to engage in religious activity." *Van Wyhe*, 581 F.3d at 657.

[7]    The record reveals that an iron was provided in the chapel for use by all denominations soon after the chapel search. *See* Decl. Quandera T. Quick, Ex. A (Memorandum from William Keyser to All Staff (Nov. 8, 2011) ("Effective immediately, all religious denominations will share one (1) iron in the Chapel area.")).

### B. 2012 Religious Holy Day Calendar

**\*6**  Defendants also seek summary judgment on Plaintiff's claims regarding the 2012 Religious Holy Day Calendar, arguing that Plaintiff did not exhaust the available administrative remedies as required to recover under RLUIPA and the First Amendment through 42 U.S.C. § 1983. Defs.' Mem. 16; *see also Rose*, 2013 WL 4049512, at *9. In Plaintiff's brief, he acknowledges that he "did not file a grievance regarding this issue," but argues that the omission

is not dispositive because it "does not deprive this Court of jurisdiction." Pl.'s Mem. 16.

Plaintiff's claims are barred by the PLRA, which "provides that '[n]o action shall be brought with respect to prison conditions under [42 U.S.C. §] 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.'" *Johnson v. Rowley*, 569 F.3d 40, 45 (2d Cir. 2009) (quoting 42 U.S.C. § 1997e(a)). As the Second Circuit has instructed, "the PLRA's exhaustion requirement is mandatory" unless "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such as way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (internal citations and quotations omitted). None of these exceptions are presented here as Plaintiff knew of and frequently used the prison's administrative remedies to grieve alleged violations of his religious liberty, *see* Compl. Exs. C, E, F, and Defendants raised the exhaustion defense in their briefing, *see* Defs.' Mem. 16. Defendants' motion for summary judgment of the Calendar claims is therefore granted.

### C. Fasika Communion

Lastly, Plaintiff contends that his inability to obtain cornbread and grape juice on May 5, 2012 constituted a violation of his rights. [8] Defendants argue that they are entitled to summary judgment on these claims because Defendants acted negligently, a state of mind for which liability cannot be imposed under RLUIPA or the Free Exercise Clause. As there is no genuine factual dispute that Defendants acted—at most —negligently, the Court agrees that these claims must be dismissed.

[8]    According to Plaintiff, Defendants Jacobson, Chu, Coutant, and Keyser were personally responsible for the deprivation of grape juice and cornbread. Pl.'s Mem. 13. Plaintiff recognized during his deposition testimony, however, that "in that instance right there, [Keyser] wasn't involved as far as preventing us from receiving the proper items for our holy day." Pl.'s Dep. 104:4-17.

Although Plaintiff asserts that "evidence indicates intentional conduct," Pl.'s Mem. 9, the facts in the record confirm that the denial of cornbread and grape juice on May 5, 2012 was the result of errant paper work and a miscommunication between Defendant Chu and Defendant Coutant. The conclusion that these oversights resulted from, at most, negligence is evident from Food Services Administrator Chu's declaration that he "did not intentionally deprive [P]laintiff of the missing food items," Decl. of Anthony Chu ¶ 3, and Plaintiff's own deposition testimony. Plaintiff testified that Chu told him that he intended to provide the requested items in 2012—as the prison has in every other year—and even assured Plaintiff that "[w]hen May 5 comes around, all this stuff will be taken care of." Pl.'s Dep. at 76:25-77:3, 79:8-16. While Defendant Chu neglected to note the need for cornbread and grape juice in addition to the feast of rice and vegetables in the special Fasika menu, *see id.* at 70:22-71:3; Pl.'s 56.1 Stmt, ¶ 25, his error was not intentional. As Plaintiff acknowledged at his deposition, he and his fellow congregants told prison officials that "if cornbread and grape juice are not listed on the menu, it *probably was a mistake* by [the food service staff] supervisor ... Anthony Chu." *Id.* at 70:23-71:3 (emphasis added).

**\*7** The record is further clear that Defendant Coutant—who was running the kitchen in Chu's absence on May 5, 2012 —did not purposefully violate Plaintiff's rights when he did not provide cornbread and grape juice. Not only did Coutant declare that he "did not intentionally deprive [P]laintiff of the missing food items," Decl. of Federick Coutant, Jr. ¶ 3, but Plaintiff admits that Coutant's refusal was reasonable in the circumstances. Plaintiff testified that Coutant refused to provide cornbread and grape juice because he was instructed "[w]hatever is not listed on the menu, [he] must not give it to anybody." *Id.* at 71:13-17. At his deposition, Plaintiff twice conceded that Defendant Coutant could not reasonably have been expected to distribute off-menu food items to inmates, in contravention of the pertinent paperwork and the instructions of his supervisor, based solely on the prisoners' insistence that they were entitled to special treatment. He testified as follows:

Q: So a DOCCS employee is supposed to follow your direction as an incarcerated inmate?

A: Honestly, no; ...

Q: Then [Coutant's] supposed to follow the direction of an inmate?

A: I guess no.

Pl.'s Dep. 106:5-107:14. In light of this deposition testimony regarding Defendant Coutant's reasonable refusal to violate protocol, together with Plaintiff's recognition that this was "probably a mistake," *id.* 70:23-71:3, this Court concludes that no reasonable juror could find that the Defendants' conduct amounted to anything more than negligence, which is insufficient for recovery under RLUIPA or the First Amendment. *See Scott*, 2013 WL 3187071, at *4 ("[N]o rational fact-finder could conclude that Defendant's failure to catch the mistake ... amounted to anything more than negligence, which is not actionable under the First Amendment." (internal quotation omitted)).

In any event, Plaintiff's inability to obtain cornbread and grape juice was not a substantial burden on his religious liberty. Accepting that "Fasika[ ] is unique in its importance within Rastafarian[ism]," Pl.'s Mem. 6, and that the Fasika feast "is not relevant without grape juice and cornbread," Pl.'s Dep. 73:22-74:17, Defendants' failure to provide these items did not substantially burden Plaintiff's religious liberty. Although the inability to take communion with cornbread and grape juice may have altered Plaintiff's normal Fasika practice, it did not constitute a *substantial* burden because communion makes up only one aspect of the day-long Fasika celebration. According to Plaintiff, he requested and was provided a breakfast delivered to him in the chapel, *id.* at 80:4-9, space to conduct a religious service for his congregation, *id.* at 75:10-13, and a feast of vegetables and rice that Plaintiff states is equal in importance for observance of Fasika to the taking of communion, *id.* at 68:25-69:6, 75:3-9 (explaining that a lack of the "mandatory vegetable ... would forfeit the event also"). In light of all the prison did to facilitate the Fasika celebration, the failure to provide cornbread and grape juice was a de minimis burden on Plaintiff's religious freedom.

In arguing otherwise, Plaintiff relies on the Second Circuit's decision in *Ford v. McGinnis*, 352 F.3d 582 (2d Cir. 2003). In that case, a prison policy prevented an inmate housed in a unit reserved for prisoners with disciplinary problems from participating in a Muslim holiday. *Id.* at 586-87. The circuit rejected the defendants' argument that the burden imposed by the policy was insubstantial because the holiday was not religiously mandated, instead finding it satisfactorily "unique in its importance within Islam." *Id.* at 594 n.6 (citing *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999)). Unlike in *Ford*, however, where the prisoner was wholly prevented from observing the holiday in its entirety, *id.* at 586-87, Plaintiff here participated in every aspect of Fasika bar communion.

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 88 of 238
Hamilton v. Coutant, Not Reported in Fed. Supp. (2016)
2016 WL 881126

Courts in this district have refused to impose liability where a prisoner is denied a limited number of meals that conform to his dietary restrictions, distinguishing such de minimis burdens from the impermissible deprivation described in *Ford*. *See, e.g., JCG v. Ercole*, No. 1 l-CV-6844 (CM) (JLC), 2014 WL 1630815, at *23 (S.D.N.Y. Apr. 24, 2014) *report and recommendation adopted*, No. 1 l-CV-6844 (CM), 2014 WL 2769120 (S.D.N.Y. June 18, 2014) ("The denial of one meal does not substantially burden Plaintiff's rights under the Free Exercise clause as it constitutes no more than a *de minimis* harm."); *Leach v. New York City*, No. 12-CV-3809 (PAC), 2013 WL 3984996, at *2 (S.D.N.Y. Aug. 2, 2013) ("The intermittent failure to provide incarcerated individuals with food complying with their religious dietary restrictions is a *de minimis* imposition falling far short of the substantial burden requirement."); *Tafari*, 2008 WL 2413995, at *16 ("[T]his single in transit meal, by itself, does not constitute a violation under the First Amendment or RLUIPA, as any violation was *de minimis*.");*Thomas v. Picio*, No. 04-CV-3174 (KMW), 2008 WL 820740, at *6 n.8 (S.D.N.Y. Mar. 26, 2008) ("[A]ssuming *arguendo* that Plaintiff was denied kosher meals on February 8, 2001, the Court finds that such a denial is not a substantial burden."). The absence of the Fasika communion in 2012 [9] —one aspect of a more extensive Fasika celebration—is more akin to those cases "in which the mere inability to provide a small number of meals commensurate with a prisoner's religious dietary restrictions was found to be a de minimis burden" than those cases, like *Ford*, in which the prisoner suffered complete exclusion from participation in a religious holiday. 352 F.3d at 594 n. 12.

[9]    Plaintiff acknowledges that 2012 is the only year in which he was prevented from obtaining the cornbread and grape juice required for Fasika communion. Pl.'s Dep. 76:25-77:3 ("[T]his standard menu has been established within DOCCS for the past 18, 19, 20 years.").

**\*8** As Plaintiff's inability to obtain cornbread and grape juice was the result of inactionable negligence and did not substantially burden his rights under RLUIPA or the Constitution, Defendants' motion for summary judgment of the Fasika claims is granted.

## II. Equal Protection Claim

Finally, Defendants seek summary judgment on Plaintiff's equal protection claim. "A claim of violation of equal protection by selective enforcement of the law generally has two elements: '(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Snyder v. Pugliese*, 144 F. App'x 174, 175 (2d Cir. 2005) (quoting *LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994)). Plaintiff asserts that his right to equal protection was violated because Defendants Chu and Coutant favored adherents to Judaism over Rastafarians in refusing to dispense any available grape juice on Fasika "even though the Jewish holiday was about two weeks after May 5[,] 2012." Pl.'s Mem. 20. The sole support offered by Plaintiff for this accusation is Defendant Coutant's comment that "cornbread and grape juice are Jewish customs," *id.*, which, Plaintiff argues, "shows Coutant['s] state of mind," Pl.'s 56.1 Stmt, ¶ 34. This statement, however, while it may have been misguided, does not alone raise an inference of discrimination. Unlike in *Orafan v. Goord*, 411 F. Supp. 2d 153 (N.D.N.Y. 2006) *vacated and remanded sub nom. Orafan v. Rashid*, 249 F. App'x 217 (2d Cir. 2007), cited by Plaintiff, Plaintiff here presents no evidence that Defendant Coutant exhibited a preference for any religion or displayed discriminatory animus towards any other. *See id. at 163* (describing a Sunni cleric who "told Shiite inmates that their religious beliefs were wrong"). Plaintiff's equal protection claim is thus dismissed.

## CONCLUSION

As no genuine disputes of material fact prevent this Court from finding in favor of Defendants as a matter of law, and Plaintiff cannot meet his burden on his asserted RLUIPA, free exercise, and equal protection claims, Defendants are entitled to summary judgment. Defendants' motion is granted and the action is dismissed. The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 881126

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:13cv00669**<br>HAMILTON v. COUNTANT ET AL | — | S.D.N.Y. | Jan. 29, 2013 | Docket |

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History**

There are no History results for this citation.

Case 9:25-cv-00216-LEK-MJK   Document 23   Filed 10/01/25   Page 91 of 238

Powell v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 4159897

KeyCite Yellow Flag

Declined to Follow by   Clark v. City of New York,   S.D.N.Y.,   September 17, 2021

2016 WL 4159897
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Daniel POWELL, Plaintiff,
v.
CITY OF NEW YORK, Imam Habib Hasan,
and Warden V. Vasquez, Defendants.

14-CV-09937 (PAC)(BCM)
|
Signed 07/14/2016

**Attorneys and Law Firms**

Daniel Powell, Philadelphia, PA, pro se.

Elizabeth Edmonds, Kate Fay McMahon, New York City Law Department, New York, NY, for Defendants.

**REPORT AND RECOMMENDATION TO
THE HONORABLE PAUL A. CROTTY**

BARBARA MOSES, United States Magistrate Judge

**\*1** Plaintiff Daniel Powell claims that for two weeks he was denied the opportunity to attend congregate religious services while incarcerated at the Eric M. Taylor Center (EMTC) on Rikers Island. Now before me for report and recommendation is a motion by defendants City of New York (City), Imam Habib Hasan, and Warden V. Vasquez for summary judgment. For the reasons set forth below, I respectfully recommend that defendants' motion be GRANTED and the case be DISMISSED.

**BACKGROUND**

**I. Procedural Background**

Plaintiff filed this pro se action on December 9, 2014. His complaint (Dkt. No. 1) asserts that he is a practicing and registered Muslim but that during the period November 7-19, 2014, while he was held at the EMTC in the custody of the New York City Department of Correction (DOC), he

was denied the opportunity to attend Friday Muslim services. Compl. at 3-4. During that period there were two Fridays, which fell on November 7 and November 14, 2014. Plaintiff claims that defendants violated his constitutional right to freely practice his religion and claims that he was singled out because he was Muslim. Id. He alleges that he experienced fear and emotional distress, and demands $100 million in compensation. Id. at 3, 5.

By letter dated February 22, 2015 (Dkt. No. 11), plaintiff notified the Court that he was no longer incarcerated, and supplied an address in Brooklyn.

Defendants answered on March 31, 2015 (Dkt. No. 14), denying most of plaintiff's material allegations, but admitting that DOC records identified Powell as Muslim and that Muslim services were held on November 7 and 14, 2014. Ans. ¶¶ 10-11. On October 7, 2015, after the close of discovery, defendants moved for summary judgment, filing a notice of motion (Dkt. No. 22), a brief (Dkt. No. 23), a statement of undisputed material facts pursuant to Local Civil Rule 56.1 (Dkt. No. 25) and a declaration executed by Assistant Corporation Counsel Elizabeth Edmonds (Dkt. No. 24), attaching three exhibits: plaintiff's complaint; excerpts of the transcript of plaintiff's deposition, conducted on May 28, 2015; and a document entitled "Inmate Movement History Log." Edmonds Decl. ¶¶ 2-3 & Exs. A-C.

Plaintiff responded to the motion with a two-page hand-written letter, bearing a return address in Philadelphia, which cited case law and repeated his assertions that he was "singled out" and "not allowed to practice my religion freely." Pl. Ltr. dated Nov. 1, 2015 (Dkt. No. 29) at 2. Plaintiff did not provide any new factual details or attach any evidentiary material. On January 4, 2016, defendants filed a reply brief (Dkt. No. 30), and on January 13, 2016, this action was referred to me for general pretrial management and report and recommendation.

**II. Undisputed Facts**

Unless otherwise noted, the following facts are based on plaintiff's complaint, which he executed under penalty of perjury,[1] and his deposition testimony:

[1]  Ordinarily, allegations in a pleading are not considered evidence for purposes of a motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 324-25, 106 S. Ct. 2548, 2553-54 (1986). However, plaintiff executed his complaint under

Case 9:25-cv-00216-LEK-MJK   Document 23   Filed 10/01/25   Page 92 of 238

Powell v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 4159897

penalty of perjury, in substantial compliance with 28 U.S.C. § 1746. To the extent its contents are otherwise admissible, therefore, the Court may treat the complaint as an affidavit. *See Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir, 1995) (where plaintiff "verifie[s] his complaint by attesting under penalty of perjury that the statements in the complaint [are] true to the best of his knowledge," the "verified complaint is to be treated as an affidavit for summary judgment purposes"); *Rickett v. Orsino,* 2013 WL 1176059, at *2 n.5 (S.D.N.Y. Feb. 20, 2013) (construing plaintiff's verified pleading as an affidavit for purposes of summary judgment), *report and recommendation adopted,* 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013); *Barrington v. New York,* 806 F. Supp. 2d 730, 737 (S.D.N. Y, 2011) ("Since Barrington verified his complaint under penalty of perjury, the complaint can serve as an affidavit for summary judgment purposes."). In this case the complaint is the *only* admissible evidence in the record other than the plaintiff's deposition testimony. Although defendants attached a third document to their summary judgment papers the "Inmate Movement History Log," Edmonds Decl. Ex A – they make no effort to authenticate that document. *See id.* ¶ 2. Moreover, although defendants rely on the log to show that plaintiff was transferred to the EMTC on November 2, 2014, *see id.,* the document actually states that he was housed at the "CIFM" from November 2 to December 3, 2014. *Id.* Ex. A. As a result of independent research, the Court can deduce that "CIFM" likely stands for "Correctional Institution for Men," the former name of the EMTC. For summary judgment purposes, however, the Court cannot rely on the un-authenticated, uninterpreted log. Instead, the Court relies on plaintiff's verified pleading, *see* Compl. at 2-3, partially corroborated by his deposition testimony, *see* Powell Dep. (Edmonds Decl. Ex. C) at 13:01-14:14, to establish that he was in the EMTC during the relevant period.

**\*2** During the period November 7-19, 2014, plaintiff was in the custody of the DOC and housed in the EMTC on Rikers Island. *See* Compl. at 2-3; Powell Dep. at 13:01-14:14. There were two Fridays during that period. Although plaintiff is a practicing Muslim, and was registered as such with the DOC, he was not called to attend Jummah services on either Friday November 7 or Friday November 14. Compl. at 3;

Powell Dep. at 14:4-9, 19:9-25. [2] No one else in plaintiff's housing unit was called for Muslim services on those days either, *id.* at 21:25-22:11, although there were "a few" other Muslims there. *Id.* at 22:16-20. However, "every other house and everybody else in the building was called." *Id.* at 14:8-9. Plaintiff was not in solitary confinement at the time; nor was his housing unit on lockdown. Compl. at 3.

[2]    Plaintiff initially testified at deposition that he missed four Jummah services. Powell Dep. at 14:4-19. He then conceded that it was possible he missed only two, which would be consistent with the time period described in his complaint. *Id.* at 14:12-19.

After the first missed service, when plaintiff asked the correction officer on duty why he was not called for the Jummah service, he was told that "religious services never called, never called for anybody to go out." Powell Dep. at 19:14-15. The officer added that there were "alarms," and people were not allowed to move around. *Id.* at 19:16-18; 20:3-13. After the second missed service, the officers to whom plaintiff spoke "said they was never called, they didn't call at all." *Id.* at 20:5-6. Similarly, the area captain told plaintiff that "they suppose to call it but they never called it for [plaintiff]." *Id.* at 13:12-14. Plaintiff also spoke to the "officer that runs the service," that is, the officer who is responsible for calling the housing units; that officer told plaintiff that he "tried to call" on both occasions. *Id.* at 19:18-19; 20:5-6; 20:14-21:12. Plaintiff does not recall the names of any of the correction officers he spoke to about the missed services. *Id.* at 19:1-8; 20:25-21:2.

The next week, after plaintiff filed two grievance slips, he was called to attend the Jummah service on Friday, November 21, 2014. Powell Dep. at 13:16-18; 24:2-24. There, he complained to Imam Hasan, who gave the service, about not being called previously, but the imam did nothing. *Id.* at 26:7-27:2. During the same two-week period when Powell missed Friday services, he was called to attend Muslim classes every Wednesday, *id.* at 13:6-9, and other prisoners were called for church services. *Id.* at 22:4-9.

Powell sued Imam Hasan because he was "supposed to know all the Muslims that is within the building," and therefore, in plaintiff's view, "it is [the imam's] job to make sure that every housing unit is called, that each housing area is called. That is what an imam is for." *Id.* at 30:1-12. As for Warden Vasquez, plaintiff explained, "this is his facility." *Id.* at 31:1. There are

Case 9:25-cv-00216-LEK-MJK   Document 23   Filed 10/01/25   Page 93 of 238

Powell v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 4159897

no other facts in the record concerning either Imam Hasan or Warden Vasquez.

## ANALYSIS

### I. Standard for Summary Judgment

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. *See also Celotex Corp.,* 477 U.S. at 322-23, 106 S. Ct. at 2552; *Amaker v. Foley,* 274 F.3d 677, 680-81 (2d Cir. 2001). The moving party bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *Fed. R. Civ. P. 56(c)*; *Celotex Corp.,* 477 U.S. at 322, 106 S. Ct. at 2552; *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir. 2002). "[T]he district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Amaker,* 274 F.3d at 681. If not, "summary judgment is inappropriate, for 'no defense to an insufficient showing is required.' " *Id.* (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 161, 90 S. Ct. 1598, 1610 (1970)). *See also Smith v. Graziano,* 2010 WL 1330019, at *5 (N.D.N.Y. Mar. 16, 2010) ("[e]ven in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law"), *report and recommendation adopted*, 2010 WL 1332503 (N.D.N.Y. Apr. 6, 2010).

**\*3** Assuming that the moving party meets its initial burden, the burden shifts to the non-moving party to establish a genuine dispute of material fact. *Celotex Corp.,* 477 U.S. at 322, 106 S. Ct. at 2552; *Beard v. Banks,* 548 U.S. 521, 529, 126 S. Ct. 2572, 2578 (2006); *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir. 2001). At this stage, the non-moving party cannot "rely merely on allegations or denials" of the factual assertions of the moving party. *Fed. R. Civ. P. 56(e)(2)*. Moreover, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir. 1996). *See also Salahuddin v. Goord,* 467 F.3d 263,273 (2d Cir. 2006) ("the non[-]movant cannot rest on allegations in the pleadings"). Rather, the non-moving party must present admissible evidence in support of its contention that there is a genuine dispute as to the material facts. *See Celotex Corp.,* 477 U.S. at 324, 106 S. Ct. at 2553; *Presbyterian Church of*

*Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 264 (2d Cir. 2009); *Salahuddin v. Goord,* 467 F.3d at 273 (the non-movant "must point to specific evidence in the record to carry its burden on summary judgment"). As noted above, a verified complaint – if its otherwise admissible – may be treated as an affidavit and relied on as evidence for this purpose. *Colon,* 58 F.3d at 872.

The court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); *In re "Agent Orange" Prod. Liab. Litig,* 517 F.3d 76, 87 (2d Cir. 2008). In order to defeat a summary judgment motion, the evidence – so construed – must be sufficient to permit a reasonable jury to return a verdict in the non-moving party's favor. *See Liberty Lobby,* 477 U.S. at 248, 106 S. Ct. at 2510; *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 101 (2d Cir. 2001).

In this District, the Local Civil Rules require the party moving for summary judgment to submit a statement, in numbered paragraphs, setting forth "the material facts as to which the moving party contends there is no genuine issue to be tried." Loc. Civ. R. 56.1 (a). The opposing party must specifically controvert each numbered paragraph in a corresponding paragraph of its own. Loc. Civ. R. 56.1(b). If the opposing party fails to do so, that paragraph is deemed admitted. Loc. Civ. R. 56.1(c); *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir. 2003) (if the non-moving party fails to submit Rule 56.1 counter-statement, all material facts offered by the movant, if supported by the record, will be deemed admitted).

"Pro se litigants are 'not excused from meeting the requirements of Local Rule 56.1' " *Diggs v. Volpe,* 2013 WL 4015758 at *1 n.1 (S.D.N.Y. Aug. 7, 2013) (quoting *Wali v. One Source Co.,* 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009)). Here, plaintiff's only response to defendant' motion was a hand-written letter that does not address, much less controvert, defendants' Rule 56.1 statement. Nonetheless, "where a pro se plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali,* 678 F. Supp. 2d at 178. *See also Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir. 2001) ("while a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 94 of 238

Powell v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 4159897

the record even where one of the parties has failed to file such a statement") (internal quotation marks omitted).

Additionally, for a pro se litigant, courts "read [the litigant's] supporting papers liberally and will interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994) (citing *Mikenberg v. Baltic S.S. Co.,* 988 F.2d 327, 330 (2d Cir. 1993); *accord McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir. 1999); *Diggs,* 2013 WL 4015758 at *6. However, " 'bald assertions,' unsupported by evidence, will not overcome a motion for summary judgment," regardless of whether the party opposing summary judgment is counseled or pro se. *Diggs,* 2013 WL 4015758 at *6 (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir. 1991)).

**\*4** In this case, I have examined defendants' motion papers assiduously to determine whether they have met their burden of demonstrating that no material issue of fact remains for trial, and I conclude that they have. In addition, even though plaintiff failed to file a Rule 56.1 counter-statement, I have carefully read his submissions, interpreted them to raise "the strongest arguments that they suggest," *Burgos,* 14 F.3d at 790, and treated his complaint, to the extent otherwise admissible, as an affidavit in opposition to defendants' motion Even giving plaintiff every favorable inference, however, I cannot find any genuine factual dispute in the record that might prevent the entry of judgment in defendants' favor.

## II. Free Exercise Claim

Plaintiff's primary claim appears to be that defendants deprived him of his rights under the Free Exercise Clause of the First Amendment, U.S. Const, amend. I, as applied to the states through the Fourteenth Amendment, U.S. Const, amend, XIV § 1, in violation of 42 U.S.C. § 1983. "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974)). Among other things, prisoners retain the "constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir. 1993). However, "a prisoner's right to practice his religion is not absolute." *Id.* at 308. It must be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford,* 352 F.3d at 588 (quoting *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir 1990)).

To establish a free exercise claim, the prisoner must show "(1) that he has a sincerely held religious belief, (2) that it was substantially burdened, and (3) that defendants' conduct was not reasonably related to some legitimate penological interest." *Hamilton v. Countant,* 2016 WL 881126, at *3 (S.D.N.Y. Mar. 1, 2016) (quoting *Barnes v. Furman,* 629 Fed.Appx. 52, 55 (2d Cir. 2015)). *See also Salahuddin v. Goord,* 467 F.3d at 274-75 ("[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs"). [3]

[3]
    The continuing viability of the *Salahuddin v. Goord* threshold test "has not been decided in this Circuit." *Holland v. Goord,* 758 F.3d 215, 220-21 (2d Cir. 2014). The underlying concern is the courts reluctance to "pass[ ] judgment on the 'centrality of different religious practices,' which is a misguided enterprise that the Supreme Court has called 'akin to the unacceptable business of evaluating the relative merits of differing religious claims.' " *McEachin v. McGuinnis,* 357 F.3d 197. 202 (2d Cir. 2004) (quoting *Empl. Div. v. Smith,* 494 U.S. 872, 887, 110 S. Ct. 1595, 1604 (1990)). However, "the Second Circuit and judges in this district have continued to require such a threshold showing, particularly in cases where the parties have not argued otherwise." *Rossi v. Fischer,* 2015 WL 769551, at *6 n.8 (S.D.N.Y. Feb. 24, 2015). *See also Hamilton,* 2016 WL 881126, at *3 (collecting cases). Here, no party has "argued otherwise." Moreover, neither party has asked this Court to evaluate the "centrality" of different religious practices or the "relative merits" of differing religious claims.

Moreover, "a prison official must *knowingly* place a substantial burden on a prisoner's religious beliefs." *Hamilton,* 2016 WL 881126, at *4 (emphasis in the original). "[D]amages claims based solely on the negligent infringement of a prisoner's right to religious freedom" are not actionable under § 1983. *Id. See also Scott v. Shansiddeen,* 2013 WL 3187071, at *4 (N.D.N.Y. Jun. 20, 2013) (granting summary judgment on plaintiff's free exercise claim where defendants' error in preparing call-out list for religious meals was not more than "negligence, which is not actionable under the First Amendment") (quoting *Tafari v. Brown,* 2012 WL 1098447, at *6 (N.D.N.Y. Mar. 30, 2012): *Odom v. Dixon,* 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008) (granting summary judgment on plaintiff's free exercise claim

Case 9:25-cv-00216-LEK-MJK   Document 23   Filed 10/01/25   Page 95 of 238

Powell v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 4159897

where defendants' administrative error "at most, constitutes negligence," and therefore "provides no basis for § 1983 relief"); *Young v. Scully,* 1993 WL 88144, at *7 (S.D.N.Y. Mar. 1, 1993) ("[n]egligence alone will not carry a § 1983 action") (quoting *Paulsen v. Gotbaum,* 1992 WL 8361, *8 (S.D.N.Y. Jan. 15, 1992)). [4]

[4]     As Judge Abrams noted in *Hamilton,* "the Second Circuit does not appear to have addressed whether negligence can sustain a First Amendment claim outside the context of retaliatory litigation" 2016 WL 881126, at *4. At least four Circuits have addressed the issue, however, and have uniformly "found negligence insufficient." *Id.* (citing *Schreane v. Seana,* 506 Fed.Appx. 120, 124 (3d Cir. 2012); *Gallagher v. Shelton,* 587 F.3d 1063, 1070 (10th Cir. 2009); *Lovelace v. Lee,* 472 F.3d 174, 201 (4th Cir. 2006); and *Eason v. Thaler,* 73 F.3d 1322, 1328 (5th Cir. 1996)).

**\*5** Defendants do not dispute the sincerity of Powell's religious belief, nor the importance to him of attending Friday services. I therefore proceed to the next step of the analysis, which asks whether defendants' conduct, which caused plaintiff to miss two consecutive Jummah services, "substantially burdened" his religious practice.

"The Second Circuit defines a substantial burden as a situation where 'the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.' " *Hamilton,* 2016 WL 881126, at *4 (quoting *McEachin,* 357 F.3d at 202-03 n.4). Alternatively, plaintiff must demonstrate "that the government's action ... prevent[ed] him from engaging in conduct or having a religious experience mandated by his faith." *Smith v. Artus,* 2010 WL 3910086, at *11 (N.D.N.Y. Sept. 30, 2010) (quoting *Muhammad v. City of New York Dep't of Corr.,* 904 F. Supp. 161, 188 (S.D.N.Y. 1995) (citations omitted)), *vacated in part on other grounds,* 522 Fed.Appx. 82 (2d Cir. 2013).

Although demonstrating a substantial burden is "not a particularly onerous task," *McEachin,* 357 F.3d at 202, the requirement is not met "by a *de minimis* imposition on the free exercise of religion." *Leach v. New York City,* 2013 WL 3984996, at *5 (S.D.N.Y. Aug. 2, 2012). " '[M]ere inconvenience' is insufficient to establish a substantial burden." *Salvatierra v. Connolly,* 2010 WL 5480756, at *12 (S.D.N.Y. Sept. 1, 2010) (quoting *Pugh v. Goord,* 571 F. Supp. 2d 477, 505 (S.D.N.Y. 2008)), *report and recommendation*

*adopted,* 2011 WL 9398, at *1 (S.D.N.Y. Jan. 3, 2011); *accord Woodward v. Perez,* 2014 WL 4276416, at *4 (S.D.N.Y. Aug. 29, 2014). Even if the "substantial burden" test were rejected entirely, "[t]here may be inconveniences so trivial that they are most properly ignored." *McEachin,* 357 F.3d at 203 n.6.

It is well-settled in this Circuit that missing two weekly religious services does not substantially burden a prisoner's right to freely exercise his religion. *See, e.g., Smith v. Goord,* 541 Fed.Appx. 133, 134 (2d Cir. 2013) (affirming jury verdict for defendants where prison failed to hold any Islamic services during plaintiff's stay, which included four Fridays); *Hanton v. Mathiau,* 29 Fed.Appx. 772, 773 (2d Cir. 2000) (affirming district court's grant of summary judgment to defendants where prison officials prevented plaintiff from attending weekly services once in August 1997 and "for a three-week period in October 1997"); *Blalock v. Jacobsen,* 2014 WI 5324326, at *7 (S.D.N.Y. Oct. 20, 2014) (dismissing plaintiff's free exercise claim pursuant to Fed. R. Civ. P. 12(b)(6) because "the denial of two religious services ... does not substantially burden an inmate's right to religious observation"); *Shapiro v. Cmty. First Servs., Inc.,* 2014 WL 1276479, at *11 (E.D.N.Y Mar. 27, 2014) (dismissing plaintiffs free exercise claim pursuant to Fed. R. Civ. P. 12(b) (6), even though defendants did not brief the point, because "not permitting a prisoner to attend two religious services 'is a *de minimis,* or insubstantial, burden on an inmate's ability to freely exercise his religion' ") (quoting *Graziano,* 2010 WL 1330019, at *9); *Williams v. Weaver,* 2006 WL 2794417, at *5 (N.D.N.Y. Sep. 26, 2006) (collecting earlier cases and holding, on a Rule 12(c) motion, that depriving a prisoner of the right to attend Friday services and religious classes for two weeks did not, "as a matter of law," substantially burden his right to practice his religion).

**\*6** In this case, not only was the deprivation *de minimis*; there is no evidence that the failure to call Powell for two consecutive Friday services was more than a negligent oversight, quickly remedied when plaintiff complained through prison channels. *See* Powell Dep. at 13:15-18; 24:2-24 (after "dropping a grievance," plaintiff was called for the next Jummah service). Significantly, plaintiff was able to attend weekly religious classes on Wednesdays during the same period. *See id.* at 13:5-9. Moreover, although the explanations plaintiff was given as to why he was not called for two Jummah services suggest a certain degree of bureaucratic finger-pointing, nothing that he was told, and no other evidence in the record, indicates that the underlying sin was graver than inattention. *See id.* at 19:18-19, 20:5-6,

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 96 of 238

Powell v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 4159897

20:14-21:12. This case most resembles *Graziano,* where the prisoner missed two consecutive weekly religious services "due to a lack of communication involving security staff and ministerial services." 2010 WL 1330019, at *7. In *Graziano,* as here, the burden was minimal and the oversight quickly remedied. The court concluded:

> [W]hether we apply the substantial burden test or simply look to the level of infringement on Plaintiff's ability to freely exercise his religion, we find that the cancellation of two services did not violate Plaintiff's free exercise rights and such First Amendment claim should be dismissed.

*Id.* at *9. *See also Graham v. Mahmood,* 2008 WL 1849167, at *15 (S.D.N.Y. Apr. 22, 2008) (granting summary judgment on plaintiff's free exercise claim arising out of correction officers' shut-down of two weekly religious meetings where officers were "confused" but defendants quickly took "measures to ensure that similar shut downs did not occur").

Defendants here have made no effort to demonstrate that their conduct was "reasonably related to some legitimate penological interest." *Hamilton,* 2016 WL 881126, at *3. Nonetheless, because the conduct complained of did not substantially burden plaintiffs religious practice, and in any event was no worse than negligent, I respectfully recommend that the District Judge grant summary judgment to defendants with respect to plaintiff's free exercise claim.

### III. RLUIPA Claim

Plaintiff's papers may also be construed to charge that defendants violated § 3 of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1. Under RLUIPA, the government may not "impose a substantial burden on the religious exercise" of a prisoner, even if the burden results from a "rule of general applicability," unless the government demonstrates "a compelling governmental interest" and that the imposition of the burden is "the least restrictive means" of furthering that interest. *Id.* Once the plaintiff produces "prima facie" evidence of a violation of RLUIPA, "the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion

on whether the ... practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc-2(c).

Although claims under RLUTPA and under the Free Exercise Clause proceed "under a slightly different framework," *Salahuddin v. Goord,* 467 F.3d at 274, "[t]he required 'substantial burden' is identical under both provisions." *Hamilton,* 2016 WL 881126, at *4. *See also Lopez v. Cipolini,* 136 F. Supp. 3d 570, 587 (S.D.N.Y. 2015) ("[w]hether or not a prisoner sufficiently pleads a substantial burden ... under RLUIPA involves the same threshold analysis as under the First Amendment"); *Loccenitt v. City of New York,* 2013 WL 1091313, at *3 (S.D.N.Y. Mar. 15, 2013) (plaintiff must make the same threshold showing "[i]n order to make out a claim of a violation of the Free Exercise Clause or the RLUIPA").

Once a plaintiff makes the required threshold showing, "the Court's analysis of a First Amendment claim and a RLUIPA claim will diverge." *Valdez v. City of New York,* 2013 WL 8642169, at *12 (S.D.N.Y. Sept. 3, 2013), *report and recommendation adopted,* 2014 WL 2767201 (S.D.N.Y. June 17, 2014). [5] However, under RLUIPA, as under § 1983, "damages claims based solely on the negligent infringement of a prisoner's right to religious freedom are not actionable." *Hamilton,* 2016 WL 881126, at *4. *See also Guillory v. Ellis,* 2014 WL 4365274, at *9 n.10 (N.D.N.Y. Aug. 29, 2014) ("negligent action" is "not actionable under section 1983 or under RLUIPA"); *Scott,* 2013 WL 3187071, at *4 (negligent actions are not "sufficient to support a claim under the Religious Land Use and Institutionalized Person Act"); *Odom,* 2012 WL 466255, at *11 (negligent conduct was insufficient to support liability "under either the First Amendment or RLUIPA"). [6]

[5]

> "To prevail on a First Amendment claim, a plaintiff must also show that his religious belief is 'sincerely held,'; '[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct,' although 'the burden remains with the prisoner to show that these articulated concerns were irrational.' " *Valdez,* 2013 WL 8642169, at *12 (quoting *Salahuddin v. Goord,* 467 F.3d at 274-75). "Under RLUIPA, however, the defendants bear the heavier burden of demonstrating that their challenged conduct '(1) [was] in furtherance of a *compelling* governmental interest, and (2)

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 97 of 238
Powell v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 4159897

[was] the *least restrictive* means of furthering that compelling governmental interest.' " *Valdez,* 2013 WL 8642169, at *12 (quoting § 2000cc-1(a) and adding emphases).

6    Although the Second Circuit has not yet spoken on this issue, the Fourth Circuit reasoned that a negligence standard, which it termed the "lowest common denominator of customary tort liability," would "open prison officials to unprecedented liability for burdening an inmate's religious exercise," contrary to Congress's intention when enacting RLUIPA. *Lovelace,* 472 F.3d at 194 (quoting *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 848-49, 118 S. Ct. 1708, 1718 (1998)).

**\*7** Because the "substantial burden" test is the same under RLUIPA as under the Free Exercise Clause, evidence that a plaintiff was unable to attend two Jummah services does not make out a claim for violation of RLUIPA. *See, e.g., Smith,* 541 Fed.Appx. at 134 (affirming jury verdict for defendants under both RLUIPA and § 1983 where prison failed to hold any Islamic services for four weeks); *Graziano,* 2010 WL 1330019, at *10 (dismissing claims under both RLUIPA and § 1983 because cancellation of two weekly religious services did not substantially burden plaintiffs religious exercise). Similarly, the relatively brief failure of corrections officers to call out one housing unit for Jummah services – promptly corrected after complaint – does not rise beyond the "lowest common denominator" of negligence, which is not actionable under RLUIPA. *Lovelace,* 472 F.3d at 194.

Even if there were evidence from which a jury could conclude that plaintiff's religious exercise was substantially burdened, by conduct that was more than negligent, his RLUIPA claim would fail because the only relief he seeks is $100 million in damages. Compl. at 5. Money damages are not available under RLUIPA. *See Sossamon v. Texas,* 563 U.S. 277, 280, 131 S. Ct. 1651, 1655 (2011); *Holland,* 758 F.3d at 224; *Washington v. Gonyea,* 731 F.3d 143, 145 (2d Cir. 2013) (per curiam); *Brandon v. Schroyer,* 2016 WL 1638242, at *9 (N.D.N.Y. Feb. 26, 2016), *report and recommendation adopted,* 2016 WL 1639904 (N.D.N.Y. Apr. 25, 2016); *Lopez,* 136 F. Supp. 3d at 589; *Ramrattan v. Fischer,* 2015 WL 3604242, at *9 (S.D.N.Y. June 9, 2015). Moreover, to the extent Powell's complaint could be construed to seek injunctive relief that request became moot on or before February 22, 2015, when he wrote to the Court to advise that he was out of custody and living in Brooklyn. *See Brandon,* 2016 WL 1638242, at *9 (former inmate's claims

for injunctive and declaratory relief under RLUIPA "are now moot" based upon plaintiff's transfer out of the prison where his rights were allegedly violated); *Lopez,* 136 F. Supp. 3d at 589 ("because Plaintiff is no longer incarcerated, to the extent Plaintiff requests any injunctive relief, this request is moot"); *Pugh,* 571 F. Supp. 2d at 498-99 (dismissing former inmate's RLUIPA claim because, "[w]here a prisoner has been released from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot"). I therefore respectfully recommend that the District Judge grant summary judgment to defendants with respect to plaintiff's RLUIPA claim.

## IV. Equal Protection Claim

Because plaintiff alleges that he was "singled out for being Muslim," Compl. at 3, I also construe his pleadings to assert a claim under § 1983 for violation of the Equal Protection Clause, U.S. Const. amend. XIV, § 1. To sustain such a claim, a plaintiff "must prove purposeful discrimination directed at an identifiable or suspect class." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir. 1995) (internal citation omitted). *See also Snyder v. Pugliese,* 144 Fed.Appx. 174, 175 (2d Cir. 2005) (equal protection claimant must prove that he was "selectively treated" based on "impermissible considerations," and that the discrimination was "purposeful"); *Dilworth v. Goldberg,* 2014 WL 3798631, at *6 (S.D.N.Y. Aug. 1, 2014) (equal protection claim requires proof of "purposeful discrimination directed at an identifiable or suspect class"); *accord Hamilton,* 2016 WL 881126, at *8; *Williams v. King,* 56 F. Supp. 3d 308, 322 (S.D.N.Y. 2014).

If prison rules and policies make distinctions between religious groups, those rules or policies "must be examined to determine whether [they are] are reasonably related to legitimate penological interests." *Benjamin,* 905 F.2d at 575. *See also Williams v. King,* 56 F. Supp. 3d at 323 (distinctions between "similarly situated religious groups in prison" must "withstand a rational basis review and be reasonably related to legitimate penological interests"). "Thus, even if plaintiffs can demonstrate that two groups are similarly situated, disparate treatment may still be warranted if the government can demonstrate that the distinctions are 'reasonably related to legitimate penological interests.' " *Pugh,* 571 F Supp. 2d at 502 (citing *Benjamin,* 905 F.2d at 575).

**\*8** Here, plaintiff has adequately adduced evidence of his membership in a suspect class, but there is no evidence of purposeful discrimination against that class. At most, plaintiff could show that the Muslim prisoners in his housing unit

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 98 of 238

Powell v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 4159897

were not called for Jummah services for two consecutive weeks while Christian prisoners in the same unit were called for church services. *See* Powell Dep. at 22:4-9. Plaintiff concedes, however, that during the same two-week period he was able to attend Muslim classes on Wednesdays, *see id.* at 13:6-9 ("I was there every Wednesday"), and that Muslim prisoners in other housing units were called for Jummah services. *Id.* at 14:8-9 ("every other house and everybody else in the building was called except my MOD"). He also concedes that his complaints were quickly addressed and that he was properly called for the Jummah service on the third Friday he was housed at the EMTC. *Id.* at 24:16-24. There is thus no evidence that prison rules or policies disadvantaged Muslim prisoners in general, nor that defendants intentionally slighted plaintiff (or other Muslim prisoners in his housing unit) on the basis of religion.

As noted above, defendants make no effort to show that their failure to call Powell for two Muslim services during the period November 7-19, 2014 was "reasonably related to legitimate penological interests." *Benjamin,* 905 F.2d at 575. Defendants do not even discuss plaintiff's potential Equal Protection claim in their summary judgment papers. Nonetheless, because no reasonable factfinder could conclude that plaintiff missed those two services because of purposeful discrimination, I recommend that summary judgment be granted in defendants' favor with respect to plaintiff's Equal Protection claim.

## V. Municipal and Supervisory Liability under § 1983
Since there is insufficient evidence in the record to establish any constitutional violation for which plaintiff could seek redress, it is unnecessary to consider whether and to what extent each named defendant could be held liable under § 1983 for such a violation, For the avoidance of doubt, however, I briefly address each defendant in turn.

### A. New York City
A municipality cannot be sued on a *respondeat superior* theory for a constitutional tort committed by its employees or agents. *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978).

Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.,* 436 U.S. at 694, 98 S. Ct. at 2037-38. To make out a *Monell* claim against: a municipality, a plaintiff must establish: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York,* 490 F.3d 189, 195 (2d Cir. 2007).

"An 'official policy' within the meaning of *Monell* [can] be inferred from informal acts or omissions of supervisory municipal officials." *Turpin v. Mailet,* 619 F.2d 196, 200 (2d Cir. 1980), *cert. denied,* 449 U.S. 1016, 101 S. Ct. 577 (1980); *accord Phillip v. Schriro,* 2014 WL 4184816, at *6 (S.D.N.Y. Aug. 22, 2014). "For example, where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts." *Turpin,* 619 F.2d at 201. However, a municipality "may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees." *Curry v. City of Syracuse,* 316 F.3d 324, 329 (2d Cir. 2003).

In this case, the summary judgment record contains no evidence suggesting that the failure to call plaintiff for Jummah services for two weeks in November 2014 resulted from an "official policy or custom," formal or informal. *Cf. Phillip,* 2014 WL 4184816, at *6 (holding that for pleading purposes plaintiff adequately alleged a "policy or custom" where he alleged "consistent, repeated" denials of his right to attend Jummah services for ten consecutive weeks, including eight weeks after he first filed a grievance). Here, by way of contrast, plaintiff missed two services altogether, including one (at most) after he first filed a grievance. Moreover, it is undisputed that other Muslim prisoners, in other housing units, were properly called for services every Friday. I therefore respectfully recommend that summary judgment on plaintiffs' § 1983 claims be granted in favor of the City for the additional reason that plaintiff cannot satisfy *Monell.*

### B. Warden Vasquez and Imam Hasan

Case 9:25-cv-00216-LEK-MJK   Document 23   Filed 10/01/25   Page 99 of 238

Powell v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 4159897

**\*9** The complaint does not set out the basis of plaintiff's claims against Warden Vasquez or Imam Hasan. At deposition, plaintiff explained that he sued the warden because "this is his facility. So, this is his programs." Powell Dep. at 31:1-2. He sued the imam because "they know, they are supposed to know all of the Muslims that is within the building. So, that is their job .... [I]t is their job to make sure that ... each housing area is called. That is what an imam is for." *Id.* at 30:1-12.

### 1. Official Capacity

To the extent plaintiff intended to sue the warden and the imam in their official capacities, "that is equivalent to bringing a claim against the City itself." *Phillip,* 2014 WL 4184816, at \*6; *see also Jackler v. Byrne,* 658 F.3d 225, 244 (2d Cir. 2011) ("a claim asserted against a government official in his official capacity is essentially a claim against the governmental entity itself"). Such claims therefore fail along with plaintiff's *Monell* claims against the City.

### 2. Individual Capacity

To the extent plaintiff intended to sue the warden and the imam in their individual capacities, he must show "more than the linkage in the prison chain of command; the doctrine of *respondeat superior* does not apply." *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985). "It is well-settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)). In a § 1983 suit (as in its federal counterpart, the *Bivens* action), "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S. Ct. 1937, 1948 (2009). Moreover, "[p]ersonal involvement is a question of fact and must be satisfied as to each individual defendant." *Lloyd v. City of New York,* 43 F. Supp. 3d 254, 266 (S.D.N.Y. 2014) (quoting *Cabassa v. Oshier,* 2013 WL 1183296, at \*8 (N.D.N.Y. Mar. 21, 2013)).

In *Colon,* the Second Circuit set out a five-factor test for supervisory liability:

The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873 (citing *Wright,* 21 F.3d at 501).

In *Iqbal,* however, the Supreme Court cast doubt on the continuing viability of the *Colon* factors, at least where the *mens rea* element of the underlying constitutional tort is more demanding than the *mens rea* element of the *Colon* factor on which the plaintiff hopes to rely. "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676, 129 S. Ct. at 1948. The Court went on to explain that where "purpose rather than knowledge" is required to impose liability on a subordinate (as in *Iqbal* itself, where the claim was for "invidious discrimination" based on race, religion and national origin) "purpose rather than knowledge" is also required to impose liability on "an official charged with violations arising from his or her superintendent responsibilities." *Id.,* 566 U.S. at 676, 129 S. Ct. at 1949. At a minimum, therefore, the second, fourth, and fifth *Colon* factors – which do not require any showing of discriminatory "purpose" by the supervisor – can no longer be relied on to hold a senior official personally liable for conduct by her juniors in violation of the Equal Protection Clause. *See, e.g., Reynolds v. Barrett,* 685 F.3d 193, 204 (2d Cir. 2012) ("liability for an Equal Protection Clause violation

Powell v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 4159897

under § 1983 requires personal involvement by a defendant, who must act with discriminatory purpose"); *Marom v. City of New York,* 2016 WL 916424, *15 (S.D.N.Y. Mar. 7, 2016) ("the second, fourth and fifth *Colon* factors should not be viable bases for holding the supervisory defendants liable for the First Amendment retaliation claims because those claims have an intent requirement").

**\*10** The principle announced by *Iqbal,* however, is not confined to intentional discrimination cases. Nor is there a static list of *Colon* factors that remain viable in all § 1983 cases. "The proper inquiry is not the name we bestow on a particular theory or standard, but rather whether that standard – be it deliberate indifference, punitive intent, or discriminatory intent – reflects the elements of the underlying constitutional tort." *Turkmen v. Hasty,* 789 F.3d 218, 250 (2d Cir. 2015) (holding that where the underlying tort required "deliberate indifference," plaintiffs were required to plead that the supervisory defendants "kn[e]w of, and disregard] [ed], an excessive risk to inmate health or safety") (internal quotation marks omitted; alterations in the original). *Accord Stephens v. Venettozzi,* 2016 WL 929268, at *12 (S.D.N.Y. Feb. 24, 2016), *report and recommendation adopted,* 2016 WL 1047388 (S.D.N.Y. Mar. 10, 2016); *see also Manning v. Griffin,* 2016 WL 1274588, at *12 (S.D.N.Y. Mar. 31, 2016) (the *Colon* factors "remain relevant" only to the extent that the type of conduct sufficient for supervisory liability under *Colon* "could serve as conduct that supports a theory of direct liability"); *Marom,* 2016 WL 916424, at *14 ("[t]he *Iqbal* decision rejected *Colon's* one-size-fits-all 'supervisory liability' test"); *Lloyd,* 43 F. Supp. 3d at 267 ("the personal involvement analysis varies by claim"); *Delgado v. Bezio,* 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) ("the applicability of each *Colon* category will depend on the nature of the violation alleged").

In this case, both of the underlying constitutional torts – the free exercise claim and the equal protection claim – require more than negligence, *see Hamilton,* 2016 WL 881126, at *4, *8, but only the equal protection claim requires proof of "purposeful" discrimination. *Giano,* 54 F.3d at 1057. Under *Iqbal* and *Turkmen,* therefore, the *Colon* factors may not apply equally to these two claims. To survive summary judgment on an equal protection claim, a plaintiff must adduce evidence from which a jury could conclude that "each supervisory defendant actively participated in the alleged constitutional violations," *Lloyd,* 43 F. Supp. 3d at 267, or "created a policy or custom under which unconstitutional practices occurred." *Colon,* 58 F.3d at 873. *See also Firestone v. Berrios,* 42 F.

Supp. 3d 403, 416-17 (E.D.N.Y. 2013) ("only the first and part of the third *Colon* categories appears to pass *Iqbal's* muster" in the case of "intent-based constitutional claims" under the Equal Protection Clause). In such cases, "a defendant's failure to act will not result in liability." *Lloyd,* 43 F. Supp. 3d at 267.

Lesser proof is required with respect to free exercise claims, which "do not require a showing of discriminatory intent." *Lloyd,* 43 F. Supp. 3d at 267 (holding that all five *Colon* factors may still be relied on to establish supervisory liability for free exercise violations). *See also El Badrawi v. United States,* 2011 WL 13086946, at *4 (D. Conn. May 16, 2011) ("with respect to El Badrawi's free exercise claim, *Iqbal* does not limit application of *Colon*"); *Phillip,* 2014 WL 4184816, at *4 (holding, in a free exercise case, that "*Colon* remains good law"); *Smolen v. Fischer,* 2012 WL 5928282, at *5 (S.D.N.Y. Nov. 27, 2012) ("where the constitutional claim does not require a showing of discriminatory intent ... the personal involvement analysis set forth in *Colon* may still apply"), *report and recommendation adopted,* 2013 WL 765315 (S.D.N.Y. Feb. 28, 2013).

I am not convinced that all five *Colon* factors have survived *Iqbal* and *Turkmen* as to a free exercise claim [7]. Regardless of how many *Colon* factors remain viable, however, it is clear in this case that the plaintiff has not adduced evidence sufficient to proceed against either Warden Vasquez or Imam Hasan on either of his constitutional claims. Neither of the individual defendants participated directly in the events claimed by plaintiff to have violated his rights. As to the warden, there is no evidence that he was even aware of those events, much less that he "failed to act" on such information or "failed to remedy the wrong." *Colon,* 58 F.3d at 873. Nor is there any evidence that either individual defendant created or tolerated a policy under which prisoners were kept from congregate services, or was "grossly negligent" in supervising those responsible for facilitating their attendance at such services. *Id.*

[7]     For example, the fourth factor, which explicitly asks whether the supervisory defendant was "grossly negligent," begs the question whether "gross negligence," as opposed to ordinary negligence, is sufficient for liability under the Free Exercise Clause.

**\*11** Plaintiff did inform Imam Hasan that he missed two Jummah services, but only after the wrong had been "resolved." Powell Dep. at 27:2. In fact, plaintiff testified, the conversation occurred after he attended the Jummah

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 101 of 238

Powell v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 4159897

service on November 21, 2014. *Id.* at 26:7-27:4. Since no additional action was required at that point, the imam's inaction could not render him retroactively liable for the wrong. *See Harnett v. Barr,* 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) (a supervisory official who is presented with a grievance concerning a violation "that has already occurred and not ongoing" will not be found liable, on that basis, for failing to "remedy" the violation). *See also McIntosh v. United States,* 2016 WL 1274585, at *16 (S.D.N.Y. Mar. 31, 2016) (mere receipt of a complaint or grievance from an inmate is insufficient to establish "personal involvement" in the underlying violation). Here, as in *Washington v. Chaboty,* 2015 WL 1439348, at *14 (S.D.N.Y. Mar. 30, 2015), there is simply no evidence that either individual defendant played any role in causing, or failing to prevent or remedy, the circumstances that led to plaintiff missing two congregate religious services. For this reason as well, I respectfully recommend that summary judgment be granted in their favor.

### 3. Qualified Immunity

Even where prison officials are personally involved in the conduct complained of, they are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford,* 352 F.3d at 596; *accord Saucier v. Katz,* 533 U.S. 194, 201,121 S. Ct. 2151, 2156 (2001) (even if a constitutional violation "could be made out on a favorable view of the parties' submissions," the court must also "ask whether the right was clearly established"). "Thus, qualified immunity protects government officials when they make 'reasonable mistakes' about the legality of their actions." *Doninger v. Niehoff,* 642 F.3d 334, 353 (2d Cir. 2011) (quoting *Saucier,* 533 US. at 206, 121 S. Ct. 2151). *See also Pearson v. Callahan,* 555 US. 223, 236, 129 S. Ct. 808, 818 (2009) (court may exercise its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be ad dressed first"). A right is "clearly established," for qualified immunity purposes, if "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir. 2003) (quoting *Young v. Cty. of Fulton,* 160 F.3d 899, 903 (2d Cir. 1998)) (alterations in original).

There is no need to linger on the qualified immunity analysis in this case, since, as shown above, no constitutional violation can be made out, even "on a favorable view of the parties' submissions." *Saucier,* 533 U.S. at 201, 121 S. Ct. at 2156. However, "should the District Court disagree with the above analysis and determine that Defendants are not entitled to summary judgment on the merits of Plaintiff['s] claims, Defendants have nonetheless established that they are entitled to qualified immunity." *Persad v. Savage,* 2004 WL 1570286, at *7 (W.D.N.Y. May 25, 2004) (holding that a reasonable prison official could not have understood that cancelling two Jummah services would result in a constitutional violation), *report and recommendation adopted,* 2004 WL 1858140 (W.D.N.Y. Aug. 19, 2004). By 2014, when Powell was in the EMTC, the law on this issue was, if anything, even more favorable to the defendants than when *Persad* was decided in 2004. *See, e.g., Hanton,* 29 Fed.Appx. 773; *Blalock,* 2014 WL 5324326, at *7; *Shapiro,* 2014 WL 1276479, at *11; *Williams v. Weaver,* 2006 WL 2794417, at *5. The individual defendants are therefore entitled to summary judgment as to plaintiffs § 1983 claims on qualified immunity grounds as well.

### CONCLUSION

For the foregoing reasons, I respectfully recommend that defendants' motion for summary judgment be GRANTED and that the case be DISMISSED. The Clerk of the Court is requested to mail a copy of this Report and Recommendation to the plaintiff.

### NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

**\*12** The parties shall have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Paul A. Crotty at 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned magistrate judge. Any request for an extension of time to file objections must be directed to Judge Crotty. Failure to file timely objections will preclude appellate review. *See Thomas v. Am,* 474 U.S. 140, 106 S. Ct. 466 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins,*

2016 WL 4159897

*Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92
(2d Cir. 2010).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4159897

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (2)**

⚑  1.  Powell v. City of New York
2016 WL 4159897 , S.D.N.Y. , July 14, 2016

*Report and Recommendation Adopted by*

2.  Powell v. City of New York
2016 WL 4147203 , S.D.N.Y. , Aug. 03, 2016

**Filings**

There are no Filings for this citation.

Thawney v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4935844

2018 WL 4935844
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Reginald THAWNEY, Plaintiff,

v.

The CITY OF NEW YORK; Department of Correction
Commissioner Joseph Ponte; Captain Nacirema Summers
Shield No. 1108; Correction Officer Bianery Garcia
Shield No. 4878; John Doe Correction Official in
Charge of Prisoner Movement at MDC; John and
Jane Doe Correction Officers ## 1–9, Defendants.

17 Civ. 1881 (PAE)
|
Signed 10/11/2018

**Attorneys and Law Firms**

Nicholas Henry Mindicino, Leo Glickman, Stoll Glickman &
Bellina LLP, Brooklyn, NY, for Plaintiff.

Kaitlin Elizabeth Fitzgibbon, New York City Law
Department, New York, NY, for Defendants.

OPINION & ORDER

PAUL A. ENGELMAYER, United States District Judge

**\*1** Plaintiff Reginald Thawney brings this action under 42
U.S.C. §§ 1983 and 1988 and New York state law against
the City of New York ("City"), the Department of Correction
("DOC") Commissioner Joseph Ponte, Captain Nacirema
Summers and Correction Officer Bianery Garcia, and several
John Doe correction officials (collectively, "defendants").
Thawney, an inmate formerly housed at the Manhattan
Detention Complex ("MDC"), alleges that on April 12,
2016, several other inmates assaulted him as he was being
transferred to a new housing unit. He alleges that defendants
were deliberately indifferent to his risk of serious harm at the
hands of other inmates, and he claims that defendants' conduct
deprived him of his rights under the Eighth and Fourteenth
Amendments. Pending now is defendants' motion to dismiss
pursuant to Federal Rule of Civil Procedure 12(b)(6). For the
following reasons, the Court dismisses Thawney's claim of
municipal liability against the City and Commissioner Ponte,
and denies the motion to dismiss as to all other claims.

**I. Background** [1]

[1]     The facts related herein are drawn from the
Second Amended Complaint ("SAC") and attached
exhibits. See DiFolco v. MSNBC Cable LLC, 622
F.3d 104, 111 (2d Cir. 2010) ("In considering
a motion to dismiss for failure to state a claim
pursuant to Rule 12(b)(6), a district court may
consider the facts alleged in the complaint,
documents attached to the complaint as exhibits,
and documents incorporated by reference in
the complaint."). The Court accepts all factual
allegations in the SAC as true and draws all
reasonable inferences in plaintiffs' favor. See Koch
v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir.
2012).

**A. Factual Background**

At some point before April 12, 2016, Thawney was processed
into a correctional facility on Rikers Island. As part of
this intake process, Thawney alleges, he was questioned by
a DOC official about whether he had a gang affiliation.
Thawney disclosed that he previously identified as a Crips
gang member and was "not a Blood." SAC ¶ 7. At that time,
Thawney was 43 years old and no longer considered himself
a member of the Crips gang. However, he understood that his
prior affiliation with the gang put him in danger of assault
from younger members of a rival gang like the Bloods. *Id.* ¶
28.

On April 12, 2016, Thawney was returning to the MDC from a
court appearance when correction officers informed him that
he would be moved to a new housing unit. Thawney alleges
that the transfer was authorized by Captain Summers. *Id.* This
new housing unit, Thawney asserts, housed many members
of the rival Blood gang. *Id.* ¶ 29. Thawney also alleges
that the correction officer who authorized and executed his
transfer knew that Thawney was identified as a Crip "with a
low security risk classification," *id.* ¶ 30, and knew that this
new housing unit would be dangerous for inmates such as
Thawney who were not members of the Blood gang, *id.* ¶ 35.

Thawney was escorted by several officers, identified here as
the John Doe defendants, to his new housing unit. *Id.* ¶ 31.
Thawney objected to the move. He explained that because
he was not a Blood gang member, he would be in danger in
the new unit. The John Doe officers responded that Thawney
should take up his complaint with the officers working the
next shift. *Id.* ¶ 32.

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 106 of 238

Thawney v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 4935844

**\*2**  When Thawney arrived at the housing unit, the officers ordered him into a cell. While he was walking to his designated cell, several inmates asked if he was "banging"—an apparent reference to gang membership. *Id.* ¶ 31. Thawney ignored the question. *Id.* Before he could arrive in his cell, a number of inmates surrounded and attacked him with "sharp razor like objects" that, according to Thawney, could only have been smuggled into the jail. *Id.* ¶¶ 32–33. Thawney alleges that, as the other inmates attacked him, Officer Garcia and the John Doe correction officers stood by and did nothing to break up the assault. *Id.* ¶ 34.

Thawney was then taken to the medical clinic. *Id.* ¶ 35. His medical records note that he suffered lacerations that were caused by "a sharp razor like object." *Id.* ¶ 36. Thawney asserts that he suffered, among other injuries, multiple cuts to the back of his head, his left eyelid, and his face under his left eye.

Thawney brings six claims: (1) a § 1983 claim against Captain Summers and the John Doe defendants for moving Thawney to a housing unit where they knew he would be endangered, *id.* ¶¶ 40–43; (2) a § 1983 claim against Officer Garcia and the John Doe correction officers for failing to intervene as inmates attacked Thawney, *id.* ¶¶ 44–46; (3) a claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), alleging that the City and DOC Commissioner Ponte (i) refused to implement procedures that would reduce the smuggling of contraband into DOC facilities and (ii) failed to enforce existing procedures intended to prevent smuggling, *id.* ¶¶ 48–51; (4) a state law negligence claim against Captain Summers and the John Doe defendants for moving Thawney to the housing unit, *id.* ¶¶ 52–56; (5) a state law negligence claim against Officer Garcia and the John Doe defendants for failing to prevent or stop the assault, *id.* ¶¶ 57–61; and (6) a state law tort action against the City under a respondeat superior theory of liability, *id.* ¶¶ 62–64.

**B. Allegations Regarding the Smuggling of Contraband into DOC Facilities**
As background to his *Monell* claim, Thawney provides information about the smuggling of contraband and weapons into DOC facilities.

Thawney attaches as an exhibit to his Second Amended Complaint ("SAC") a New York City Department of Investigation ("DOI") Report from November 2014 that addresses the smuggling of contraband into DOC prisons.

The report "uncovered several key vulnerabilities for DOC facility security" and criticized "lax basic procedures." *See* SAC, Ex. A ("DOI 2014 Report") at 6. The report identifies two causes of the failure to prevent widespread smuggling of contraband: First, existing protocols were insufficient to detect and prevent illegal conduct. *Id.* at 1. Second, personnel did not consistently follow even those insufficient protocols. *Id.* As a result, the DOI report concludes, "weapons and narcotics remain easily available to any inmate with funds to pay for them." *Id.* Thawney also attaches a 2018 DOI report identifying vulnerabilities and security failures at municipal detention centers in Manhattan and Brooklyn. The 2018 report concludes: "[T]hree years after our 2014 undercover contraband operation, many of the same vulnerabilities remain at DOC and essential recommendations DOI made in 2014 have not been fully implemented." SAC, Ex. C ("DOI 2018 Report") at 1–2. Thawney asserts that these vulnerabilities made it possible for inmates to obtain sharpened weapons, and he alleges that his assailants used such weapons during the April 12, 2016 attack.

In addition to the 2014 and 2018 DOI reports, the SAC references the Mayor's Management Report from fiscal year 2017. That report notes that, despite decreasing crime levels and inmate populations, the number of inmate stabbings has increased. SAC ¶¶ 13, 18, 26. Additionally, the SAC references news articles. *Id.* ¶ 14.

**C. Procedural History**
**\*3**  On March 15, 2017, Thawney commenced this action. Dkt. 1. On June 23, 2017, defendants answered. Dkt. 12. On January 23, 2018, Thawney filed his First Amended Complaint. Dkt. 32. On March 22, 2018, defendants moved to dismiss the First Amended Complaint. Dkt. 45. On April 12, 2018, Thawney filed the operative SAC. Dkt. 49. On May 10, 2018, defendants moved to dismiss that complaint. Dkt. 51. On June 5, 2018, Thawney filed a memorandum of law in opposition to defendants' motion. Dkt. 53. On June 21, 2018, defendants filed a reply memorandum of law in support of their motion to dismiss. Dkt. 54.

**II. Applicable Legal Standards**
To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for

2018 WL 4935844

the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted) ). However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's [f]actual allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570 (internal quotation marks omitted) (emphasis in *Arista Records* ) ). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

### III. Discussion

Defendants move to dismiss Thawney's SAC on five grounds —that: (1) the SAC fails to state a cause of action against Captain Summers and Officer Garcia; (2) Captain Summers and Officer Garcia are entitled to qualified immunity; (3) the SAC fails to state a viable *Monell* claim; (4) the SAC fails to allege that Commissioner Ponte is involved in any constitutional violations; and (5) the Court should decline to exercise supplemental jurisdiction over Thawney's state-law claims. The Court addresses each argument in turn.

### A. Claims Against Captain Summers and Officer Garcia

The Eighth Amendment imposes on prison officials an obligation to "take reasonable measures to guarantee the safety of the inmates," which includes a duty "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (internal quotations omitted). Thus, prison officials are liable for harm incurred by an inmate if the officials act with "deliberate indifference" to an inmate's safety. *Hayes v. N. Y. City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). To state a claim

that prison officials acted with deliberate indifference, an inmate must plausibly allege "that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the ... detainee even though the defendant-official knew, or should have known, that the conditions posed an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

**\*4** Defendants argue that the SAC does not set forth sufficient facts from which one could draw the inference that Captain Summers or Officer Garcia acted with deliberate indifference. That argument is unpersuasive. In the first place, the SAC has plausibly pled that a substantial threat to his safety existed. It alleges that Thawney previously identified as a Crip, and was transferred to a housing unit dominated by rival gang members. As courts in this Circuit have repeatedly recognized, gang-affiliated inmates may face a substantial risk of harm when they are housed in areas controlled by rival gangs. *See Greene v. Garcia*, No. 12 Civ. 4022 (LAP)(MHD), 2013 WL 1455029, at \*6 (S.D.N.Y. Mar. 26, 2013) (denying motion to dismiss § 1983 claim where inmate alleged that prison officials placed him into rival gang's housing area); *Plunkett v. City of New York*, No. 10 Civ. 6778 (CM), 2011 WL 4000985, at \*4 (S.D.N.Y. Sept. 2, 2011) (holding that trier of fact could conclude that housing one gang member in rival gang's unit poses a substantial risk of serious harm to inmate); *Walker v. Shaw*, No. 08 Civ. 10043 (CM), 2010 WL 2541711, at \*8 (S.D.N.Y. June 23, 2010) (noting that plaintiff could state a deliberate indifference claim "if he alleged that identified, responsible prison officials failed to promptly relocate him from the Crips cell block after he was classified as a Blood"). The risk to gang-affiliated inmates housed with members of a rival gang is especially serious with respect to Crips and Bloods, whose violent rivalry is "long-standing and well-documented." *Walker*, 2010 WL 2541711, at \*4.

Defendants next argue that Thawney has failed to plead that either Captain Summers or Officer Garcia knew of, and disregarded, the substantial risk presented by Thawney's housing transfer. The Court disagrees. With respect to Captain Summers, the SAC alleges both that Thawney identified as a former Crip, and that this information was contained on his floor card. SAC ¶ 27. Notwithstanding this designation, Captain Summers allegedly ordered his transfer to a unit that had "a high concentration of ... Blood and ... Trinitarian" gang members. SAC, Ex. E ("DOC Memorandum"). The very purpose of documenting gang affiliations such as Thawney's

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 108 of 238

Thawney v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4935844

is to ensure that "members of rival gangs can be separated in order to minimize the risk of disruption and injury to inmates and staff alike." *Plunkett*, 2011 WL 4000985, at *4. Indeed, "prison [officials are] well aware of the substantial risk of attack to inmates who are affiliated with one gang and housed with members of a rival gang." *Walker v. City of New York*, No. 08 Civ. 10043 (KBF), 2012 WL 345890, at *4 (S.D.N.Y. Feb. 2, 2012). Based on Thawney's allegations, a trier of fact could conclude that Captain Summers knew, or should have known, that Thawney had been designated as a Crip on his floor card yet consciously ignored the risk to his safety by authorizing his transfer to a unit that housed "a high concentration" of rival gang members. This is sufficient to state a viable claim of deliberate indifference. *See Walker*, 2010 WL 2541711, at *8–11.

As to Officer Garcia, Thawney alleges that Garcia stood by as Thawney was attacked and stabbed by other inmates. It is well established that an officer acts with deliberate indifference if he is aware of an attack, has an opportunity to protect the inmate, and does not intervene. *See, e.g., Rosen v. City of New York*, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009) ("In the context of a failure to intervene claim, an officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." (internal quotations omitted) ); *Taylor v. City of New York*, No. 16 Civ. 7857 (NRB), 2018 WL 1737626, at *12 (S.D.N.Y. Mar, 27, 2018) ("Likewise, plaintiff here has stated a claim for deliberate indifference to safety against [defendant], who witnessed the attack on plaintiff and allegedly failed to take action to prevent it."). While the facts remain to be discovered, the Court concludes that the SAC has adequately pled claims against Officer Garcia.

Finally, defendants argue that Thawney's claims fall because he does not specifically allege that he was attacked by Bloods; he identifies his assailants only as other "inmates." SAC ¶ 32. This argument ignores Thawney's allegation that the assault occurred almost immediately after Thawney was "asked if he was 'banging' "—a reference to gang membership—and Thawney ignored the question. *Id.* ¶ 31. Indeed, after the assault, another non-defendant officer wrote that Thawney, "an assessed [Security Risk Group] Crip, was assaulted by several ... Trinitarian and ... Blood members." DOC Memorandum. While discovery may shed more light on the affiliations of Thawney's assailants, the SAC's allegations are

sufficient to give rise to a plausible inference that Thawney was attacked because he was a Blood rival.

### B. Qualified Immunity

**\*5** Defendants next argue that even if Thawney stated a claim against Captain Summers and Officer Garcia, they are entitled to qualified immunity. Under the familiar qualified immunity standard, a government employee acting in his or her official capacity "is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (internal quotations omitted). "As long as reasonably competent officials could disagree about whether the conduct at issue would violate clearly established rights, the immunity defense is available." *Plunkett*, 2010 WL 4000985, at *6 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ). On a motion to dismiss, a qualified immunity defense will prevail "if the complaint fails to allege the violation of a clearly established constitutional right." *Williams v. Fisher*, No. 02 Civ. 4558 (LMM), 2003 WL 2217010, at *11 (S.D.N.Y. Sept. 18, 2003).

Here, Thawney has plausibly alleged a violation of his clearly established constitutional rights. As discussed above, Thawney alleges that Captain Summers and Officer Garcia acted with deliberate indifference to the serious risk that Thawney would be injured by rival gang members with whom he was to be housed. This alleged conduct violates the clearly established rule that "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833. And the Second Circuit has so held in a similar context to the one presented here: that an incarcerated plaintiff may bring a § 1983 deliberate indifference action based on allegations that prison officials housed "gang members [and] non-gang members" in the same housing unit and so allowed "gang activities, violence ... [and] fights" to flourish. *Walker v. Schult*, 717 F.3d 119, 122, 126 (2d Cir. 2013) (holding that plaintiff "plausibly alleged violations of clearly established rights" when he asserted that prison officials were deliberately indifferent to the risk of housing non-gang members with gang members). As another court in this district has explained, "any reasonable corrections officer would know that placing Bloods and Crips together creates a recipe for violence." *Plunkett*, 2011 WL 4000985, at *7. Thus, "no reasonable corrections officer could possibly have thought that he was doing anything other

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 109 of 238

Thawney v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4935844

than placing a Crip ... in danger" by housing a Crip in a unit dominated by Bloods. *Id.*

Because the SAC has pled the violation of a clearly established constitutional right, the Court must reject, at this stage of the litigation, defendants' qualified immunity argument. While discovery may yield evidence showing that defendants' conduct was "objectively reasonable" in the circumstances, the Court cannot now reach that conclusion as a matter of law. *See Salahuddin v. Goord,* 467 F.3d 263, 275–76 (2d Cir. 2006).

### C. *Monell* Claim

To state a § 1983 claim against a municipality, the plaintiff must allege that an officially adopted policy or custom caused his injury. *See Monell,* 436 U.S. at 694; *see also Bd. of Cty. Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 403 (1997) (plaintiff must demonstrate a "direct causal link between the municipal action and the deprivation of federal rights"). A plaintiff may satisfy the "policy or custom" requirement by alleging

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*\*6 Brandon v. City of New York,* 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (citations omitted).

The SAC's *Monell* allegations appear principally to implicate the third method. [2] Under that method, "an act performed pursuant to a 'custom' that has not been formally approved

by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cty. Comm'rs of Bryan Cty.,* 520 U.S. at 404; *see also Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir. 1996) (noting that a municipality's custom "need not be memorialized in a specific rule or regulation"). Thus, a plaintiff may establish municipal liability by demonstrating that a policy maker "indirectly caused the misconduct of a subordinate municipal employee by acquiescing in a longstanding practice or custom which may fairly be said to represent official policy." *Miller v. Cty. of Nassau,* 467 F. Supp. 2d 308, 314 (E.D.N.Y. 2006). To prevail on this theory of municipal liability, however, a plaintiff must prove that the custom at issue is permanent and well-settled. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988) (noting that Supreme Court "has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law" (internal quotations omitted) ).

[2]  The SAC also implicates the fourth method by which a plaintiff may satisfy *Monell*'s policy requirement. It alleges, in passing, that the City "fail[ed] to train, supervise, or discipline" its prison officials. SAC ¶ 51. However, the SAC does not develop that failure to train allegation or substantiate it in any way. Such conclusory and boilerplate language, without more, is insufficient to state a *Monell* claim. *See Plair v. City of New York,* 789 F. Supp. 459, 469 (S.D.N.Y. 2011) (collecting cases).

Municipal inaction may constitute a policy or custom under *Monell* "where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir. 2007). A municipal failure to act will constitute official policy or custom "only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Id.* Such inadequate policies "must reflect a deliberate choice among various alternatives, rather than negligence or bureaucratic inaction." *Id.* at 193. In addition, the plaintiff must "show a causal relationship" between the municipalities' failures and "the alleged deprivations to plaintiffs." *Id.*

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 110 of 238

Thawney v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4935844

Thawney's *Monell* claim can be summarized as follows: The DOC has a policy of ignoring the smuggling of weapons into prisons, and its refusal to implement or enforce effective policies constitutes deliberate indifference. To substantiate these allegations, he points to two DOI reports from 2014 and 2018, as well as the Mayor's Management Report from fiscal year 2017, that criticize existing DOC policies regarding the detection of contraband. In particular, the DOI reports indicate that DOC has not implemented adequate procedures to stem the flow of weapons and other contraband into prisons. *See generally* DOI 2014 Report; DOI 2018 Report.

**\*7**  Thawney, however, has not alleged, as he must, that the City's policies regarding the prevention of smuggling of contraband constitute a deliberate choice rather than mere negligence. He cites DOI reports concluding that "the smuggling of weapons and narcotics" into jails is a "significant problem," DOI 2014 Report at 1, and these reports document numerous instances of non-compliance with DOC anti-smuggling policies. But the DOI reports, on which Thawney relies to demonstrate the City's inadequate enforcement, also document the City's efforts to combat illegal smuggling and formulate more effective procedures to prevent the flow of weapons and drugs to prisoners. For instance, the 2014 DOI Report notes that city officials have conducted undercover investigations intended to test the efficacy of existing security policies. *Id.* at 6. The City's investigation led to the arrest of a number of correctional officers who were accused of smuggling. *Id.* The 2018 DOI Report documents similar investigations, which took place in 2017. 2018 DOI Report at 3–6.

Efforts to crack down on the smuggling of weapons into prisons, as reflected in the reports generated by city officials at DOI, reflect an attempt to preserve prisoners' constitutional rights. Although DOI concludes that the City's efforts have not yet been sufficient to fully remedy the problem, its lack of efficacy does not render the City's conduct unconstitutional. To the contrary, where a municipality takes steps "to protect plaintiffs' rights, it cannot, at the same time, be deemed deliberately indifferent to those rights." *Reynolds*, 506 F.3d at 197; *see also id.* ("State defendants took affirmative steps to investigate and correct the City's misconduct, including specific directions to the city agency to correct incidents of non-compliance. We cannot conclude the state defendants have tacitly authorized ... the violations that [they have] vocally and actively opposed."). At most, Thawney's allegations give rise to a plausible inference of "negligence

or bureaucratic inaction." *Id.* at 193. But that is not enough to provide a basis for liability under *Monell*. Accordingly, Thawney's *Monell* claim against the City and Commissioner Ponte must be dismissed.

### D. Claims Against Commissioner Ponte

Defendants also argue that Thawney has failed to allege that Commissioner Ponte was personally involved in any constitutional violation. Thus, they contend, to the extent that Thawney asserts any claims against Ponte, those claims must be dismissed. In the SAC, Commissioner Ponte is mentioned as a defendant only with respect to the alleged *Monell* violations. SAC ¶ 49. As the Court has dismissed Thawney's *Monell* claim, it has dismissed the sole claim made against Commissioner Ponte. Accordingly, it need not consider this argument.

### E. State Law Claims

Thawney has also asserted three state law claims. He alleges (1) negligence by Captain Summers and the John Doe defendants for transferring him into a high risk housing unit, SAC ¶¶ 52–56; (2) negligence against Officer Garcia and the John Doe defendants for failing to prevent and stop the attack on Thawney, *id.* ¶¶ 57–61; and (3) a claim against the City under a respondeat superior theory of liability, *id.* ¶¶ 62–64. Defendants argue that if the Court dismisses all the federal claims, it should decline to exercise jurisdiction over the remaining state law claims. They do not argue that the state law claims should be dismissed on any other basis. Because the Court has denied defendants' motion to dismiss two of the three federal claims, it denies their request that the Court decline to exercise supplemental jurisdiction over the related state law claims.

### CONCLUSION

For the reasons stated above, the Court denies defendants' motion to dismiss Thawney's first, second, fourth, fifth, and sixth causes of action; and grants defendants' motion to dismiss claim three, which alleges municipal liability under *Monell*. The Clerk of Court is respectfully directed to remove Commissioner Ponte from the caption of this case and to terminate the motions pending at docket numbers 45 and 51. Within one week of this decision, the parties are directed to submit a revised case management plan to govern discovery, consistent with the Court's individual rules.

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 111 of 238

Thawney v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 4935844

**\*8**  SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4935844

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Filings (6)

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1. Second Amended Complaint and Jury Demand**<br>Reginald THAWNEY, Plaintiff, v. THE CITY OF NEW YORK; Department of Correction Commissioner Joseph Ponte; Captain Nacirema Summers Shield No. 1108; Correction Officer Bianery Garcia Shield No. 4878; John Doe Correction Official in Charge of Prisoner Movement at MDC; John and Jane Doe Correction Officers ##1-9, Defendants.<br>2018 WL 11267401 | — | S.D.N.Y. | Apr. 12, 2018 | Pleading |
| **2. Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss**<br>Reginald THAWNEY, Plaintiff, v. THE CITY OF NEW YORK; Department of Correction Commissioner Joseph Ponte; Captain Nacirema Summers Shield No. 1108; Correction Officer Bianery Garcia Shield No. 4878; John Doe Correction Official in Charge of Prisoner Movement at MDC; John and Jane Doe Correction Officers ##1-9, Defendants.<br>2018 WL 11267408 | — | S.D.N.Y. | June 21, 2018 | Motion |
| **3. Memorandum of Law in Opposition to Defendants' Motion to Dismiss**<br>Reginald THAWNEY, Plaintiff, v. THE CITY OF NEW YORK; Department of Correction Commissioner Joseph Ponte; Captain Nacirema Summers Shield No. 1108; Correction Officer Bianery Garcia Shield No. 4878; John Doe Correction Official in Charge of Prisoner Movement at MDC; John and Jane Doe Correction Officers ##1-9, Defendants.<br>2018 WL 11267403 | — | S.D.N.Y. | June 05, 2018 | Motion |
| **4. Memorandum of Law in Support of Defendant City, Ponte, Summers and Garcia's Motion to Dismiss the Second Amended Complaint**<br>Reginald THAWNEY, Plaintiff, v. THE CITY OF NEW YORK; Department of Correction Commissioner Joseph Ponte; Captain Nacirema Summers Shield No. 1108; Correction Officer Bianery Garcia Shield No. 4878; John Doe Correction Official in Charge of Prisoner Movement at MDC; John and Jane Doe Correction Officers ##1-9, Defendants.<br>2018 WL 11267402 | — | S.D.N.Y. | May 10, 2018 | Motion |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **5. Memorandum of Law in Support of Defendant City, Ponte, Summers and Garcia's Motion to Dismiss the First Amended Complaint**<br>Reginald THAWNEY, Plaintiff, v. THE CITY OF NEW YORK; Department of Correction Commissioner Joseph Ponte; Captain Nacirema Summers Shield No. 1108; Correction Officer Bianery Agrcia Shield No. 4878; John Doe Correction Official in Charge of Prisoner Movement at MDC; John and Jane Doe Correction Officers ##1-9, Defendants.<br>2018 WL 11267404 | — | S.D.N.Y. | Mar. 22, 2018 | Motion |
| **6. Docket 1:17-CV-01881**<br>Thawney v. City Of New York , et al | — | S.D.N.Y. | Mar. 15, 2017 | Docket |

**History**

There are no History results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 541089

2012 WL 541089
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Matthew COULOUTE, Jr., Plaintiff,

v.

Amanda RYNCARZ and Stacey Blitsch, Defendants.

No. 11 CV 5986(HB).
|
Feb. 17, 2012.

**OPINION & ORDER**

Hon. HAROLD BAER, JR., District Judge.

**\*1** Before the Court is a motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Matthew Couloute, Jr. ("Plaintiff") filed this Complaint seeking damages against Amanda Ryncarz and Stacey Blitsch (collectively "Defendants") for engaging in tortious interference with prospective business relations when they allegedly posted comments about Plaintiff on an Internet website. For the following reasons, the motion to dismiss is granted and leave to amend the Complaint is denied.

**I. BACKGROUND**

The following is meant to provide context and has no bearing on the present motion: Plaintiff's relationship with Defendant Blitsch began in 2003 in California. They separated sometime after they moved to Atlanta and had a child together. Plaintiff moved to Florida with their son, and Defendant Blitsch followed. Plaintiff now resides in New Jersey. Plaintiff's relationship with Defendant Ryncarz began during Plaintiff's residency in Florida. After they separated, Plaintiff married a third woman not involved in this lawsuit. Both Defendants still reside in Florida.

The following facts are taken from Plaintiff's original Complaint and are assumed to be true for the purposes of this motion to dismiss. Since 2011, Plaintiff has practiced law out of his office in Manhattan. Compl. ¶¶ 7–8. Plaintiff alleges that between December 25, 2010, and May 2011, Defendants posted malicious statements about him on the website www.liarscheatersrus.com. *Id.* ¶ 9. In particular, Plaintiff asserts that at least the following statements were made by Defendant Ryncarz on or shortly after December 25, 2010:

1. "[Mr. Couloute] lied and cheated all through his 40 years of life." *Id.* ¶ 10.

2. "[Mr. Couloute] [u]ses people/his son/women to get what he wants then dumps you when he's done with them. Has no long term friends. He rents or finances everything and owns absolutely nothing." *Id.*

3. A comment posted anonymously responding to earlier comments, including: "He is very very manipulating he's an attorney so he's great at lying and covering it up without batting an eye." [1] *Id.*

[1]

The comment in full reads: "This is the absolute truth about this man!! He will stop communication with you suddenly, then reach out years later as he did with me trying to sweet talk you and make you feel like you're the most special woman in the world that he's been looking for. He is very very manipulating he's an attorney so he's great at lying and covering it up without batting an eye. Our relationship didn't last long as I figured him out pretty quickly but for others, BE FOREWARNED, HE'S SCUM! RUN FAR A WAY!" Compl. ¶ 10.

And by Defendant Blitsch on or shortly after January 4, 2011:

1. "[W]hat these ladies have said about his character is very true. I met him and dated briefly and I was taken in with the charm and instant "connection" he claimed we had ... [A]s soon as I started asking questions about other aspects of his life and figured out he wasn't comple[tely] honest he turned cold then disappeared. And of course another male is going to say Matt is a "solid dude" ... if you agree with lieing [sic] and manipulating any female you come in contact with I guess he could be considered that...." *Id.* ¶ 11.

2. A comment referring to Plaintiff's previous legal employer, United Football League: "I came across this site by accident by following a UFL news feed, so your friend Matt has more problems than these posts if in search for the league his name is associated with this site." *Id.* ¶ 12.

2012 WL 541089

**\*2** Plaintiff alleges that Defendants made these statements knowing that Plaintiff was working in New York as an attorney and made them with the aim of interfering with Plaintiff's ability to market his legal skills. In doing so, Defendants "unfairly and maliciously damaged one of Mr. Couloute's most valuable asset [sic] as an attorney, his reputation for honesty and integrity." *Id.* ¶ 13. Plaintiff's proposed Amended Complaint includes the allegation that these statements defamed him, causing present and prospective clients to view Plaintiff in a negative and false light. Am. Compl. ¶ 13. Plaintiff states that due to these postings, prospective clients are discouraged from contacting Plaintiff for legal services. *Id.* ¶ 14; *see also* Compl. ¶ 14.

Originally and on August 25, 2011, Plaintiff filed this Complaint alleging a single cause of action for tortious interference with prospective business relations. On September 14, 2011, Defendants filed the present motion to dismiss. On October 8, 2011, Plaintiff opposed the motion and requested leave to amend the Complaint to cure deficiencies elicited in Defendants' motion and to add a second cause of action for defamation. Defendants submitted the reply memorandum to their motion on October 18, 2011, where they argued that the Amended Complaint that Plaintiff sought to submit failed to adequately state a claim. On October 20, 2011, Plaintiff submitted a motion to amend and an accompanying memorandum arguing that the Court should accept the Amended Complaint without addressing the concerns Defendants raised regarding the new defamation claim. [2] The Defendants have not sought leave to respond to Plaintiff's most recent memorandum, nor has Plaintiff sought leave to respond to Defendants' arguments regarding the defamation claim. As such, the motion to dismiss and request for leave to amend the Complaint are considered fully briefed.

[2]     Plaintiff submitted his October 20 memorandum twice, once categorizing it as a Motion to Amend/ Correct the Complaint and a second time as a Reply Memorandum in support of that same motion. These memoranda are excerpts from Plaintiff's October 8th opposition memorandum, where the request for leave to amend was originally made.

## II. DISCUSSION

### A. Adequacy of Pleadings and Leave to Amend

The Plaintiff's case may be dismissed to the extent that he "fail[s] to state a claim upon which relief can be granted."

Fed.R.Civ.P. 12(b)(6). To survive dismissal on this ground, Plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A facially plausible claim is one where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). The Court's determination of whether a complaint states a "plausible claim for relief" is a "context-specific task" that requires application of "judicial experience and common sense." *Id.* at 1950. Unless the Plaintiff's well-pleaded allegations have "nudged [his] claims across the line from conceivable to plausible, [Plaintiff's] complaint must be dismissed." *Twombly,* 550 U.S. at 570. Additionally, the court must draw all reasonable inferences in the non-movant's favor, *Roth v. Jennings,* 489 F.3d 499, 503 (2d Cir.2007), but it "need not accord [l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir.2007) (internal citation and quotation marks omitted).

**\*3** Leave to amend a pleading should be freely granted when justice so requires. Fed.R.Civ.P. 15(a)(2). "[A]bsent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility," the Court will grant leave to amend. *Monahan v. New York City Dept. of Corr.,* 214 F.3d 275 (2d Cir.2000). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss ...." *Lucente v. Inter'l Bus. Machs. Corp.,* 310 F.3d 243 (2d Cir.2002).

### B. Tortious Interference with Prospective Business Relations

Under New York law, [3] to establish a claim for tortious interference with prospective business relations, a plaintiff must establish: "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair or improper means; and (4) injury to the business relationship." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 114 (2d Cir.2010).

[3]     The parties proceed under the assumption that New York law governs the conduct alleged in this case. The possible conflicts of law have not been raised and thus are not presently before the Court. *See*

*Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir.2000) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (internal quotation marks omitted)).

### i. Original Complaint

Plaintiff concedes that his original Complaint fails to specify a "relationship with a client that was interfered [with] by Defendants' wrongful conduct as alleged in the complaint." [4] Pl.'s Mem. Opp'n Mot. Dismiss ("Pl.'s Opp'n") 1. This shortcoming alone warrants dismissal of the Complaint. *See, e.g., DiFolco,* 622 F.3d at 115 ("[T]he complaint fails entirely to describe any third party with whom [Plaintiff] had prospective business relations to be interfered with ...."). Because of this admitted defect, I turn to Plaintiff's proposed Amended Complaint which seeks to satisfy the pleading requirements.

[4]     Defendants point to three shortcomings in the Complaint: Plaintiff failed to (1) specify a specific business relationship that was harmed; (2) allege that any of Defendants' actions were specifically directed at the third parties; and (3) allege that Defendants acted with the sole purpose of harming Plaintiff or used wrongful means. Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Supp.") 6–9.

### ii. Proposed Amended Complaint

Plaintiff alleges interference by Defendants with four attorney-client relationships and indicates that these instances are exemplary of Defendants' goal which Plaintiff posits as sufficient to show interference with Plaintiff's legal practice generally. Am. Compl. ¶¶ 15–22. With respect to the four listed clients:

a. Client 1, after having read Defendants' comments on or around March 2011, refused to continue his business relationship with Plaintiff;

b. Client 2, after becoming aware of the comments on September 14, 2011, refused to continue his business relationship with Plaintiff;

c. Clients 3 and 4, after reading the comments in middle to late 2011, refused to engage in business with Plaintiff;

*Id.* at ¶ 16. Plaintiff states that, based on Defendants' knowledge of Plaintiff's profession and the language used by Defendants (calling him a "liar" and a "cheater"), it was

Defendants' intention to reach all of Plaintiff's current and prospective clients. *Id.* ¶¶ 17–18; *see also* Pl.'s Opp'n 3–4 (arguing that Defendants "must have known that Plaintiff had current clients"). Not only was the interference the Defendants' sole motive, the means by which Defendants interfered was improper because the comments were false and defamatory. Am. Compl. ¶ 19.

**\*4** Defendants maintain that the proposed Amended Complaint is still deficient. First, Plaintiff fails to allege that Defendants knew or could have known of a specific business relationship, to say nothing of a failure to make the required showing that it was that client relationship with which she sought to interfere. Defs.' Reply Supp. Mot. Dismiss ("Defs.' Reply") 3 ("Plaintiff alleges *essentially the opposite*—that defendants were generally directing comments at everyone who might be a client."). Second, Plaintiff fails to demonstrate either that Defendants' sole purpose was to harm his business relations or that Defendants used wrongful means to interfere with those relations. *Id.* at 4–5. With respect to the question of Defendants' purpose in posting the comments, Defendants point to the context in which they were made; a website meant to "allow individuals who have been lied to and cheated on in their personal relationships to express themselves about their experience and to 'find support'...." *Id.* at 5.

For Plaintiffs tortious interference claim to survive, Plaintiff must allege that Defendants "directly interfered with the [identified] business relationship by directing some activities towards the third party and convinc [ing] the third party not to enter into a business relationship with the plaintiff." *Zdenek Marek v. Old Navy (Apparel), Inc.,* 348 F.Supp.2d 275, 280 (S.D.N.Y.2004) (internal quotation marks omitted); *see also G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 768 (2d Cir.1995). Plaintiff fails to point to any client, current or prospective, about which Defendants had knowledge and to whom their comments were directed. *See Old Navy,* 348 F.Supp.2d at 280 ("It is due to this utter failure to allege any knowledge on the part of defendants of any business relationships with which they allegedly interfered that plaintiff's claim must fail."). Plaintiff would have the Court infer from the Defendants' comments (accusing Plaintiff of being a "liar" and a "cheater") and the fact that Defendants "must have known that Plaintiff had current clients" that Defendants specifically targeted those clients. Am. Compl. ¶¶ 17–18; Pl.'s Opp'n 3–4. Plaintiff provides no cases to support the idea that potentially harmful statements posted on a website such as this one, coupled with the knowledge that the statements might be read by third parties,

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 118 of 238
Couloute v. Ryncarz, Not Reported in F.Supp.2d (2012)
2012 WL 541089

is sufficient to show that one or more relationships were intentionally interfered with by Defendants. In their search for a lawyer, the clients, as asserted by Plaintiff, were influenced by the comments in their decision not to retain Plaintiff's services. [5] Even though Plaintiff's reputation has suffered, I am unwilling to take the leap from generalized comments calling Plaintiff a "liar" and a "cheater"—on a website called "liarscheatersrus" no less—to actions directed at specific business relationships. *See Memnon v. Clifford Chance US, LLP,* 667 F.Supp.2d 334, 349 (S.D.N.Y.2009) ("[T]he wrongful conduct that is relevant [is] that which was directed not at the plaintiff, but at the third party with whom the plaintiff has or seeks to have a relationship."); *Dessert Beauty, Inc. v. Fox,* 568 F.Supp.2d 416, 429 (S.D.N.Y.2008) (posting comments on a website directed at the "public and customers at large [was] far too general to constitute a specific third party for purposes of a tortious interference claim" (internal quotation marks omitted)); *see also DiFolco,* 622 F.3d at 115 (describing "harm to ... career development, economic harm in the form of lost income and benefits, harm to her professional and personal reputation, and harm consisting of mental anguish and emotional distress" as "too conclusory, vague, and lacking in a factual basis to make out [plaintiff's] tortious interference claim"). To do otherwise would be to elevate conceivable, "defendant-unlawfully-harmed-me" accusations to the level of plausibility. *Iqbal,* 129 S.Ct. at 1949.

[5]     Defendants do not even raise the issue of whether Plaintiff satisfied the "but for" causation requirement in the claim. *See Riddell Sports Inc. v. Brooks,* 872 F.Supp. 73, 78 (S.D.N.Y.1995) ("[A] plaintiff must allege that, but for defendant's conduct, his prospective business relations would have coalesced into an actual contract."). I am doubtful, though, that Plaintiff has even satisfied this requirement. While Plaintiff says that clients refused to enter into agreements or continue established business relationships with him after reading the comments, *see* Am. Compl. ¶ 16, "mere contentions that third parties canceled contracts ... because of the alleged defamatory remarks made by [Defendants], offered with no factual basis to support the allegations, [are] insufficient to state a cause of action for tortious interference with contractual relations." *M.J. & K. Co. v. Matthew Bender and Co.,* 220 A.D.2d 488, 631 N.Y.S.2d 938, 940 (N.Y.App.Div.1995); *see also Fine v. Dudley D. Doernberg & Co.,* 203 A.D.2d

419, 610 N.Y.S.2d 566, 567 (N.Y.App.Div.1994) ("The requirements for establishing liability for interference with prospective contractual relations are more demanding than those for interference with [the] performance of an existing contract." (internal quotation marks omitted)).

**\*5** Plaintiff's claim for tortious interference with prospective business relations is dismissed, and Plaintiff's request for leave to amend the Complaint as to this claim is denied as futile.

### C. Defamation

A plaintiff asserting a claim for defamation is required to plead: "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." *Albert v. Loksen,* 239 F.3d 256, 265–66 (2d Cir.2001) (footnotes omitted) (citing *Dillon v. City of New York,* 261 A.D.2d 34, 704 N.Y.S.2d 1, 5 (N.Y.App.Div.1999)). "In evaluating whether a cause of action for defamation is successfully pleaded, the words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Dillon,* 704 N.Y.S.2d at 5 (internal brackets omitted). "Courts will not strain to find defamation where none exists. Loose, figurative or hyperbolic statements, even if deprecating the plaintiff, are not actionable." *Id.* (internal quotation marks and citations omitted). And it is well-established that "[t]ruth provides a complete defense to defamation claims." *Dillon,* 704 N.Y.S.2d at 6 (citing, *inter alia, Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, 1306 (N.Y.1977)).

### i. Plaintiff's Proposed Amended Complaint

Plaintiff seeks leave to amend the Complaint to add an additional claim for defamation. Plaintiff states that Defendants' comments were "untrue and defamatory in that they falsely reported Plaintiff's professional character, actions and statements, and were made with an intent to harm Plaintiff professionally." Am. Compl. ¶ 25. The comments constitute *slander per se* "because they impugn Plaintiff's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely charging [him] with conduct that would

tend to injure [his] trade or business." *Id.* at ¶ 29, 397 N.Y.S.2d 943, 366 N.E.2d 1299.

*ii. Defendants' Statements are Hyperbolic Opinions*
The key question here is whether, drawing all reasonable inferences in favor of Plaintiff, the comments contain assertions of fact or opinion. The New York Court of Appeals distilled the following three factors which courts are instructed to consider in determining whether a statement is one of fact or opinion:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal [to] readers or listeners that what is being read or heard is likely to be opinion, not fact.

**\*6** *Brian v. Richardson,* 87 N.Y.2d 46, 637 N.Y.S.2d 347, 660 N.E.2d 1126, 1129 (N.Y.1995) (internal quotation marks and citations omitted), *cited in Levin v. McPhee,* 119 F.3d 189, 196 (2d Cir.1997). The third factor "lends both depth and difficulty to the analysis" and is critical to determining whether the alleged defamatory statements consist of "assertions of facts [or] nonactionable expressions of opinion." *Id.* It is important for a court to "consider the content of the communications as a whole, as well as its tone and apparent purpose." *Id.* at 1129–30 (citation omitted). "Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff." *Id.* at 1130 (internal quotation marks omitted). Beyond the "immediate context in which the disputed words appear," the New York Court of Appeals requires courts "to take into consideration the larger context in which the statements were published, including the nature of the particular forum." *Id.*

Defendants argue that the comments are hyperbolic statements of opinion. *See* Defs.' Reply 8–10. With the possible exception of the statement that Plaintiff "rents or finances everything and owns absolutely nothing"—a statement clearly capable of being proven true or false—the comments, even if viewed in isolation, are opinion. Defendants state that Plaintiff "lied and cheated all through his 40 years of life", and that, because Plaintiff is an attorney, "he's great at lying and covering it up without batting an eye." Comments such as these are clearly hyperbolic. And when viewed within the larger context of the website on which they were posted, there can be no doubt that a reasonable reader would understand the comments to be opinion. As Defendants note, liarscheatersrus.com is "specifically intended to provide a forum for people to air their grievances about dishonest romantic partners ." *Id.* at 9, 637 N.Y.S.2d 347, 660 N.E.2d 1126. The average reader would know that the comments are "emotionally charged rhetoric" and the "opinions of disappointed lovers." *Id.* Of course the Internet makes it more likely that a greater number of people will read comments such as these, and thereby amplify the impact they may have on a person, but this does not change the underlying nature of the comments themselves. *See Sandals Resorts Intern., Ltd. v. Google, Inc.,* 86 A.D.3d 32, 925 N.Y.S.2d 407, 415–16 (N.Y.App.Div.2011) (noting the Internet "encourage[es] a freewheeling, anything-goes writing style", and that "readers give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts" (internal quotation marks omitted)). Because I find that Defendants' comments are opinion, the Plaintiff's request for leave to amend the Complaint to add an additional claim for defamation is denied as futile. *See* Robert D. Sack, *Sack on Defamation* § 4:3.1 (4th ed. 2011) ("If a statement appears in a place usually devoted to, or in a manner usually thought of as representing personal viewpoints, it is also likely to be understood—and deemed by a court—to be nonactionable opinion.").

## III. CONCLUSION

**\*7** For the foregoing reasons, Defendants' motion to dismiss the Complaint is GRANTED, and the Plaintiffs request for leave to amend the Complaint is DENIED. The Clerk of the Court is directed to close the relevant motions and remove the matter from my docket.

**SO ORDERED.**

2012 WL 541089

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 541089

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (3)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Memorandum of Law in Support of Plaintiff's Motion to Amend the Complaint**<br>Matthew COULOUTE, Jr., Plaintiff, v. Amanda RYNCARZ, Stacey Blitsch, Defendants.<br>2011 WL 11550323 | PDF | S.D.N.Y. | Oct. 20, 2011 | Motion |
| **2. Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Complaint**<br>Matthew COULOUTE, Jr., Plaintiff, v. Amanda RYNCARZ and Stacey Blitsch, Defendants.<br>2011 WL 11553011 | PDF | S.D.N.Y. | Oct. 18, 2011 | Motion |
| **3. Docket 1:11cv05986**<br>COULOUTE v. RYNCARZ ET AL | — | S.D.N.Y. | Aug. 25, 2011 | Docket |

**History**

There are no History results for this citation.

2014 WL 4460393

2014 WL 4460393
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

AMUSEMENT INDUSTRY, INC., et al., Plaintiffs,
v.
Moses STERN, aka Mark Stern, et al., Defendants.

No. 07 Civ. 11586(LAK)(GWG).
|
Signed Sept. 11, 2014.

*OPINION AND ORDER*

GABRIEL W. GORENSTEIN, United States Magistrate
Judge.

**\*1** Amusement Industry, Inc., Practical Finance Co.,
Inc., Joshua Safrin, Avery Egert, and the Safrin Group,
LLC (collectively the "Moving Parties") have moved to
amend their pleadings pursuant to Fed.R.Civ.P. 15(a)(2)
and Fed.R.Civ.P. 21. The Moving Parties seek to assert
claims for "deceit" under New York Judiciary Law § 487
against Buchanan Ingersoll & Rooney, P.C. ("Buchanan")
and Stephen Friedman, who are currently parties, and to join
as new parties Hoffinger Stern & Ross LLP ("Hoffinger")
and Stephen Stern, who are or were attorneys appearing in
this case. The proposed claims for deceit are premised on
the alleged wrongful conduct of these attorneys during the
discovery phase of this litigation. Buchanan and Friedman
—whom we will refer to as "the Attorneys"—have filed
submissions opposing the motion. For the following reasons,
the motion to amend is denied.

I. *BACKGROUND*

A. *The Parties' Allegations in the Current Pleadings*
In April 2007, defendant Moses Stern, operating through an
entity called First Republic Group, Corp. ("FRG"), entered
into a contract with non-party Colonial Realty Limited
Partnership for the purchase of a real estate portfolio
consisting of eleven shopping centers. *See* Third Amended
Complaint, filed Apr. 27, 2010 (Docket # 405) ("3d Am.
Compl."), ¶¶ 2, 20. [1] As the closing date approached, Moses
Stern still had not obtained the required amount of financing
for the acquisition, so he authorized Steven Friedman, an

attorney at Buchanan, to help locate potential sources of
financing. *See id.* ¶¶ 2, 22. Defendants Joshua Safrin and
Avery Egert, "who were contributing money to facilitate the
acquisition of the Portfolio," also allegedly played a role in
securing the additional funds needed for the closing. *See id.*
¶ 2.

[1]     *See also* Proposed Fourth Amended Complaint;
        Demand for Jury Trial (attached as Ex. A to
        Declaration of Mariana Aguilar in Support of
        Moving Parties' Notice of Joint Motion to Amend
        Their Pleadings, filed May 9, 2014 (Docket #
        759) ("Aguilar Decl.")) ("Prop.Compl."); Joshua
        Safrin's Fourth Amended Third–Party Complaint
        and Demand for Jury Trial (attached as Ex. A to
        Declaration of Thomas M. Wood IV in Support of
        Moving Parties' Notice of Joint Motion to Amend
        Their Pleadings, filed May 9, 2014 (Docket # 758)
        ("Wood Decl.")) ("Safrin Prop. Pl.").

In June 2007, Friedman approached plaintiff Amusement
Industry, Inc. ("Amusement") and "offered Amusement the
opportunity to invest in the Portfolio." *Id.* ¶ 23. Friedman
"repeatedly represented to Amusement that he had been
retained by [Moses] Stern, Safrin, Egert, and the entity
designated to buy the Colonial Portfolio, which was FRG
Corp. and/or FRG LLC, to act as an attorney for them and
to serve as an agent for them to locate, negotiate and close
financing for the planned acquisition of the Portfolio." *Id* .
¶ 25. In reliance on Friedman's representations, on June
29, 2007, Amusement executed a Letter of Understanding
with Moses Stern in which Amusement agreed to provide
$13 million in financing in exchange for a 50 percent
equity and voting interest in the portfolio. *See id.* ¶¶ 29–
31. Amusement thereafter deposited the $13 million into an
escrow account pending finalization of the agreement. *See
id.* ¶¶ 2, 32–33. Over the course of the next two weeks,
Amusement attempted to negotiate the final agreement
with Moses Stern and the other defendants. *See id.* ¶
35. However, instead of finalizing the financing agreement
with Amusement, defendants unilaterally transferred the $13
million out of the escrow account and completed the purchase
of the portfolio "without [Amusement's] permission and
knowing that they did not have [its] permission." *Id.* ¶¶
3–4; see also *id.* ¶ 40. Specifically, Amusement alleges
that on July 3, 2007, defendant Ephraim Frenkel, who
was the principal of Land Title Associates Agency, LLC
("LTA"), "transferred Amusement's money from the account
into which Amusement had wired the funds into once
controlled by FRG ... [and] disbursed the $13 million in

2014 WL 4460393

accordance with instructions from Stern [and] FRG." *Id.* ¶
3. Defendants subsequently attempted to have Amusement
ratify the unauthorized use of its funds, but Amusement
refused. *See id.* ¶ 4.

**\*2** Joshua Safrin, who was alleged to have been involved
as one of the key investors in defendants' real estate scheme,
later contended that "he had no knowledge of any of
the representations or actions described in [Amusement's]
Complaint" and that he was "unaware of the existence
of the Colonial Transaction and the events that occurred
in connection with securing the necessary financing until
shortly before being served with process in late 2007." *See*
Safrin Prop. Pl. ¶¶ 8–9. According to Safrin, "[Moses] Stern,
Friedman, [and FRG] together with Frenkel, LTA, Buchanan,
Steven Alevy/Bankers were an integral part of a conspiracy to
defraud Safrin by, among other things, forging his signature
on documents relating to the Colonial Transaction ... and
by misappropriating Safrin's identity ... in order to secure
financing for the Colonial Transaction. *Id.* ¶ 10. Safrin alleges
that, when Friedman was negotiating with Amusement on
Moses Stern's behalf, Friedman represented that "Safrin and/
or Egert were equity participants in the Colonial Transaction,
when [he] knew that neither Safrin nor Egert had made any
such commitment and that Egert was not authorized to make
any such commitment on behalf of Safrin." *Id.* ¶ 39.

According to Safrin, Moses Stern was able to obtain "a
commitment from Citigroup to provide senior and mezzanine
financing in the amount of approximately $126 million for
the purchase of the Portfolio" based on his "representation to
Citigroup that Safrin was a sponsor/investor and would sign
carve out and environmental guarantees." *Id.* ¶¶ 40–41. As
part of the negotiations for this transaction, Citigroup required
that certain financing and organizational documents be signed
by Safrin. *Id.* ¶ 51. Thus, many documents pertaining to
the financing agreement with Citigroup, as well as to the
closing of the Colonial Transaction, purported to contain
Safrin's signature. *See id.* ¶¶ 37, 84, 88, 105, 128, 133–
34. However, Safrin contends that he did not sign any
documents relating to the negotiations with Citigroup or
Amusement and that he was not even aware of the Colonial
Transaction until much later. *See id.* ¶¶ 47, 50, 52, 90, 100,
125. Safrin alleges that certain defendants, including Stern,
Buchanan, and Friedman, conspired to forge his signature
on these documents. *See id.* ¶¶ 165–73; *see also id.* ¶
87. Safrin has pointed to certain contemporaneous emails
between Moses Stern, attorneys at Buchanan and others—
referred to as the "wizzy bizzy" emails—in which these

individuals discussed the need for Safrin's signature and
exchanged various documents containing forgeries of Safrin's
signature. *See id.* ¶¶ 84–91, 103–05. As explained by the
Moving Parties, wizzy bizzy is "the anonymous email sender
who took part in the forgery of Safrin's signatures on the
Citigroup loan document." *See* Moving Parties' Memorandum
in Further Support of Their Joint Motion to Amend Their
Pleadings, filed June 16, 2014 (Docket # 765) ("Mov.Reply"),
at 5.

B. *The Alleged Discovery Misconduct*
**\*3** On December 27, 2007, Amusement and a related
company filed the original complaint in this action, seeking
to recover $13 million in damages from Moses Stern, Joshua
Safrin Ephraim Frenkel and other defendants. *See* Complaint,
filed Dec. 27, 2007 (Docket # 1). Amusement raised "claims
asserting a security interest in the real estate ... claims of
tort resulting from the theft of the funds ... [and] claims
related to the agreements reached between the parties and the
unjust enrichment of the defendants." 3d Am. Compl. ¶ 5.
Since the filing of the original complaint, this case became
increasingly complex as other parties have been joined as
third party defendants, including Stephen Friedman, Steven
Alevy, Buchanan, and Bankers Capital Realty Advisors LLC.
*See* Third Party Complaint, filed May 1, 2008 (Docket #
65). Later, Avery Egert and the Safrin Group, LLC were
sued as fourth party defendants. *See* Fourth Party Complaint,
filed Mar. 17, 2009 (Docket # 238). The various parties have
asserted numerous counterclaims, cross-claims, and third
party claims.

On March 12, 2008, plaintiffs issued a subpoena to
Buchanan, which at that time was a non-party, requesting
documents concerning its representation of Moses Stern in
the underlying real estate transaction and about Stephen
Friedman's financing negotiations with Amusement. *See*
Prop. Compl. ¶ 61. Specifically, plaintiffs requested:
"Documents sent by [Buchanan] to, and received by
[Buchanan] from, Amusement, [Moses] Stern, [FRG], [and]
Safrin ... concerning the loans and First Republic LLC's
purchase of shopping centers from Colonial in 2007";
"Documents concerning monies received by [Buchanan] or
by Friedman from Amusement, [Moses] Stern, [FRG], [and]
Safrin ... during the period of April 1, 2007 through December
31, 2007 as to the loans and First Republic LLC's purchase
of shopping centers from Colonial in 2007"; "Documents
that contain information to induce Citigroup to make the
loans"; and "Signature pages that contain a signature of
Joshua Safrin, from Documents concerning business or loan

2014 WL 4460393

transactions." *Id.* (emphasis removed). On March 7, 2008, defendant Safrin similarly issued subpoenas to Buchanan and to Friedman, seeking, "documents concerning Safrin," "documents concerning the negotiation and execution of the Loan Agreement between First Republic LLC and Citibank," "documents concerning the negotiation and execution of the Mezzanine Loan Agreement between [FRG] and Citibank," and "documents and communications concerning the closing of the sale of the Property Portfolio." *Id.* ¶ 62.

Before Buchanan and Friedman complied with the subpoenas, they were contacted by attorneys at Hoffinger about the proper scope of the document production. *See id.* ¶ 64. At that time, Hoffinger and Stephen Stern of that firm were representing Moses Stern in the litigation. *See* Notice of Appearance by Stephen Stern, filed Apr. 11, 2008 (Docket # 50). On April 1, 2008, Stephen Stern wrote a letter to Buchanan attorney John Leathers, stating, "[w]e have been instructed to advise [you that] our clients do NOT waive any privilege including, *inter* alia, the attorney client privilege with respect to any files, documents, communications, etc. in your custody, possession or control and as an outgrowth of your representation of any of our clients." Stephen Stern Letter to Hoffinger, dated Apr. 1, 2008 (annexed as Ex. 1 to Declaration of Jeffrey H. Zaiger in Support of Buchanan Ingersoll & Rooney PC's Opposition to Moving Parties' Joint Motion to Amend Their Pleadings, filed May 30, 2014 (Docket # 762) ("Zaiger Decl.")). There followed various communications among Stephen Stern, Leathers, and Friedman regarding Stephen Stern's review of the production and privilege log. *See* April 22 Email Chain, dated Apr. 22, 2008 (annexed as Ex. 2 to Zaiger Decl.). Over the next couple weeks, Stephen Stern searched through the responsive documents and discussed with several attorneys at Buchanan which subpoenaed documents should be withheld. *See* April 23 & 24 Email Chain, dated Apr. 24, 2008 (annexed as Exs. 3–4 to Zaiger Decl.); May 6 & 7 Email Chain, dated May 7, 2008 (annexed as Ex. 5 to Zaiger Decl.). These emails reflect that there was some disagreement between Stephen Stern and the Buchanan attorneys about the proper scope of the document request and about which documents should be withheld. *See generally id.*

**\*4** On May 8, 2008, Buchanan and Friedman produced documents and a privilege log in response to plaintiffs' and Safrin's subpoenas. Prop. Compl. ¶ 63. The Moving Parties allege, however, that Buchanan and Friedman "intentionally withheld certain key documents from the May 2008 Production that should have been produced in response to the

subpoenas" and that they did so by listing "some, but not all, of those documents on the May 2008 Privilege Log knowing that no good faith basis existed to assert a privilege over the documents in a further effort to conceal the documents from Plaintiffs." *Id.* The Moving Parties further contend that "[Hoffinger] and Attorney [Stephen] Stern communicated with [Buchanan] concerning the production and the privilege log," and Hoffinger and Stephen Stern "had asserted that, as counsel for [Moses] Stern[,] ... they had the 'right to review the documents and privilege log' prior to the production." *Id.* ¶ 64. Thus, it is alleged, "[Buchanan] permitted [Hoffinger] and Attorney [Stephen] Stern to participate in the document review process and on April 23, 2008, Attorney [Stephen] Stern went to [Buchanan's] offices to review the documents prepared for production and [Buchanan's] proposed privilege log." *Id.*

Based on this conduct, the Moving Parties allege in their proposed complaint that Buchanan, Hoffinger, Friedman, and Stephen Stern "engaged in an intentional pattern of deceit and collusion with the intent to deceive Plaintiffs and the United States District Court for the Southern District of New York." *Id.* ¶ 149. Specifically, Moving Parties assert that these individuals and entities "participated in the May 2008 Production and in the preparation of the May 2008 Privilege Log, which wrongfully omitted certain key documents from the production and improperly listed documents on the privilege log ... [and] did so with the intent to deceive Plaintiffs and the Court by attempting to conceal the true nature of [Moses] Stern's scheme and the involvement of Friedman in that scheme." *Id.* ¶ 150.

The Moving Parties assert that the documents that were improperly withheld include:

a. A June 29, 2007 3:18 p.m. email where Friedman forwarded to Stern an email that he had previously sent to Egert with the subject line: "Let's talk." Friedman then stated in the body of the email: "Here are all the documents." Attached to the email were signature pages that Citigroup needed Safrin to sign for the Colonial deal to close including: (1) the Directorship Agreement; (2) the JSAE Colonial LLC Operating Agreement; (3) the FRGR Holdings LLC Operating Agreement; (4) the Guaranty; (5) the Environmental Indemnity; and (6) the Officer's Certificate.

b. A June 29, 2007 3:21 p.m. email that Friedman sent to Stern with the subject line: "Signature Examples." Friedman then stated in the body of the email: "Signature

2014 WL 4460393

Examples." Attached to that email were five emails from Joseph Kelemer, an employee of The Safrin Group, attaching various examples of what purported to be Joshua Safrin's signature.

**\*5** c. A July 11, 2007 3:09 p.m. email where Stern forwarded to Friedman a July 11, 2007 email from wizzy bizzy attaching an email from wizzy bizzy to Herrick Feinstein, LLP ("Herrick") attorney Dena Cohen ("Cohen") attaching Safrin's purported signature on Colonial deal-related documents.

d. A July 11, 2007 3:16 p.m. email where Stern forwarded to Friedman a July 11, 2007 email from wizzy bizzy to Stern attaching an email that wizzy bizzy had sent to Herrick attorney Cohen attaching Safrin's purported signature on Colonial deal-related documents.

e. A July 11, 2007 3:16 p.m. email where Stern forwarded to Friedman a July 11, 2007 email from wizzy bizzy to Stern attaching an email that wizzy bizzy had sent to Herrick attorney Stephen Fleissig attaching Safrin's purported signature on Colonial deal-related documents.

*Id.* ¶ 65. [2]

[2]    Buchanan's former counsel David Bayne explains in his declaration that all of these withheld documents were identified on the May 2008 privilege log except the email from June 29, 2007, at 3:18 p.m. *See* Declaration of David F. Bayne, filed May 30, 2014 (Docket # 763) ("Bayne Decl."), ¶ 5. According to Bayne, the email from June 29, 2007, at 3:18 p.m., was not included on the privilege log because it "was located in the wrong client folder." *Id.* ¶ 4(a).

C. *The Moving Parties Become Aware of the Discovery Misconduct*

On August 28, 2009, David Miller, counsel for Safrin and fourth party defendants Avery Egert and the Safrin Group, wrote a letter to Buchanan's counsel about certain documents that had been listed on the privilege log that Miller suspected were "not protected by the attorney-client privilege." Miller Letter to Bayne, dated Aug. 28, 2009 (annexed as Ex. 7 to Zaiger Decl.), at 1. Miller noted that the privilege log contained "at least three documents concerning 'Safrin' " but that it was not at all clear about the nature and scope of such documents. *Id.* at 2. Accordingly, Miller requested that Buchanan "identify with specificity any documents

pertaining to Joshua Safrin, Avery Egert and/or The Safrin Group that have been withheld on grounds of privilege and provide sufficient information so that [they] may determine whether good cause exists for seeking an order compelling the production of those documents." *Id.* Buchanan's counsel forwarded the letter to Stephen Stern in an email, writing, "[b]ecause the privilege belongs to your clients we wanted to bring you into this conversation promptly." August 28 Email to Stephen Stern, dated Aug. 28, 2009 (annexed as Ex. 8 to Zaiger Decl.).

On September 8, 2009, Buchanan's counsel responded to Miller's August 28 letter. *See* September 8 Letter to Miller, dated Sept. 8, 2009 (annexed as Ex. 9 to Zaiger Decl.) ("Bayne Letter"). Buchanan noted in the letter that it had "forwarded [the] correspondence to [Hoffinger] for consideration because the privilege ... belongs to their clients ... [and Buchanan] is simply a stake holder in this dispute." *Id.* at 1. Buchanan then asserted that the privilege had properly been claimed for the withheld documents, arguing that "[Buchanan's] role in the Colonial Transaction was as legal counsel for [Moses] Stern and his affiliated entities. If you have reason to believe that [Buchanan] acted in some other capacity, then please provide us with the basis for your belief. Similarly, if you have evidence that [Buchanan] rendered purely commercial advice on any specific topic rather than legal advice, please provide us with your evidence." *Id.* at 2. Buchanan stated that it was refusing to "provide additional information about each of the thousands of documents on the privilege log," contending that this request "appears to be aimed more at diverting our time and spending our client's money than it does with any good faith discovery dispute." *Id.* at 2–3. Nevertheless, Buchanan conceded, "[i]f there are specific documents on the log about which you are interested in gaining more information to assess the claim of privilege, then please identify such documents ... and we will determine with [Hoffinger] whether there is more information that we can provide." *Id.* at 3. Additionally, Buchanan agreed to "review the specific entries identified in [the] letter mentioning 'Safrin' and will consult with [Hoffinger] concerning whether to continue to maintain the assertion of the privilege over them and will advise [Miller] of their decision." *Id.*

**\*6** On October 6, 2009, Buchanan's counsel wrote another letter to Miller, stating, "we have been authorized by [Hoffinger] to produce the documents bates stamped ... BIRFR0005909–20, which are attachments to a privileged email over which [Hoffinger] continues to assert the

privilege.... We will produce these documents to all parties shortly." October 6 Letter to Miller, dated Oct. 6, 2009 (annexed as Ex. 10 to Zaiger Decl.) ("October 6 Letter"). On October 19, 2009, Buchanan followed through on this promise by producing these and other documents on a disc, and providing "a supplemental privilege log of documents from this production that [Moses] Stern's counsel has designated as being covered by the attorney client privilege." October 19 Letter from Bayne, dated Oct. 19, 2009 (annexed as Ex. 12 to Declaration of Thomas M. Wood in Support of Moving Parties' Reply in Support of Their Joint Motion to Amend Their Pleadings, filed June 16, 2014 (Docket # 767) ("Wood Supp. Decl.")). Among the documents produced in October 2009 were some of the documents the Moving Parties now assert had been improperly and deliberately withheld in the May 2008 production. Specifically, "[t]he attachments to the June 29, 2007 3:21 p.m. email from Stephen Friedman to [Moses] Stern ... were produced in October 2009 bates-numbered BIRFR0005909–0005920" but "[t]he cover email, which had been identified [in the privilege log]," was not produced until July 2013. Bayne Decl. ¶ 4(b). Counsel for Safrin, Thomas Wood, asserts that when Buchanan made this production in October 2009, it should have "produce[d] the entire Signature Examples email with all of its attachments (BIRFR005908–5920) and redact[ed] the purportedly privileged communication on the email." Wood Supp. Decl. ¶ 15. Wood also asserts that because Buchanan "release[d] only the attachments ... without any metadata," this "ma[de] it impossible for the Moving Parties to determine that the released documents were attachments to the Signature Examples email and not just five separate emails with attachments." Wood Supp. Decl. ¶ 15. The Court notes that, notwithstanding this assertion, Buchanan's October 6 Letter to Miller specifically stated that Buchanan would be producing "documents bates stamped ... BIRFR0005909–20, which are attachments to a privileged email." October 6 Letter.

On May 31, 2012, after all of the parties except Buchanan had been deposed, Buchanan produced a revised privilege log and also produced "approximately 895 documents previously withheld as privileged or non-responsive." Wood Supp. Decl. ¶ 16. It was at this point that Buchanan produced most of the documents now at issue including "[t]he July 11, 2007 3:09 p.m. email from Mark Stern to Stephen Friedman," "[t]he July 11, 2007, 3:16 p.m. email from Mark Stern to Stephen Friedman attaching email to Dena Cohen," and "[t]he July 11, 2007 3:16 p.m. email from Mark Stern to Stephen Friedman attaching email to Stephen Fleissig." Bayne Decl. ¶¶ 4(c)-

(e). Although the produced documents "were originally electronic documents consisting of emails with attachments," Buchanan "unilaterally and without explanation produced them in a format that stripped them of all metadata making it more burdensome and difficult, if not impossible, for the Moving Parties to use the information efficiently." Wood Supp. Decl. ¶ 16. From June 2012 until November 2012, Buchanan's counsel and Safrin's counsel engaged in various communications during which Safrin's counsel attempted to obtain "native files or tiffs with metadata and extracted text" of the aforementioned documents. See Metadata Emails (annexed as Ex. 13 to Wood Supp. Decl.), at 1.

**\*7** In a letter dated October 9, 2012, Safrin's counsel, Thomas Wood, wrote the following:

> [Buchanan's] May 2012 production included approximately 895 documents that [Buchanan] withheld for over four years based on claims that the documents were either irrelevant or privileged.... [Buchanan] then produced documents that are not even arguably privileged and are critical to [Safrin's] claims and defenses.... [Buchanan's] decision to withhold documents identified by Bates Nos. BIRFR0004777–80, BIRFR0004794–4796, BIRFR0004830–4832, which are the emails from Mark Stern to Stephen Friedman forwarding emails sent from wizzy bizzy to Mark Stern containing signature pages with Safrin's forged signature, for over four years is incomprehensible. It is even more troubling in light of the fact that between August and October 2009, David Miller ... objected to [Buchanan's] assertion of privilege over documents identified in [Buchanan's] privilege log as involving 'Safrin' and asked [Buchanan] to review all the documents identified on its privilege log.... [Buchanan] claimed that Egert, The Safrin Group and Safrin were on a 'fishing expedition' and refused to review the documents or revise

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 128 of 238
Amusement Industry, Inc. v. Stern, Not Reported in F.Supp.3d (2014)

2014 WL 4460393

the privilege log.... By refusing to revise the log, [Buchanan's counsel] essentially concealed the nature of many of the documents identified on the privilege log and prevented Safrin from being able to properly assess [Buchanan's] assertion of privilege. The result is that Safrin had to wait two more years to receive critical emails that are in no way privileged.... The law is quite clear that as a party to this case, [Buchanan] is responsible for its discovery responses.

*Id.* at 8–9. In another letter dated November 16, 2012, Wood further contended:

> [Buchanan] has an affirmative obligation under Federal Rules of Civil Procedure 26(e) to correct any erroneous assertions of privilege.... Contemporaneous communications in 2008 demonstrate it was [Buchanan] *not* Mark Stern or [Hoffinger] that reviewed the responsive documents, determined which documents to withhold as privileged, and prepared the privilege log with no apparent input from Stern or [Hoffinger].... It was [Buchanan's] in-house counsel that made the initial determination of which documents were subject to a valid claim of privilege and then certified that they had a reasonable basis for withholding the documents based on claims of privilege. Having done so, [Buchanan] remains responsible to supplement or correct those assertions.

*Id.* at 17–18. In the same letter, Wood asserted that Buchanan "was obligated to provide sufficient information about the documents being withheld to allow the other parties to assess [Buchanan's] assertion of privilege" and that Buchanan's "description of BIRFR0004777 through BIRFR0004793 is more than incomplete; it is misleading." *Id.* at 20.

Wood continued, "[b]y providing inaccurate information, [Buchanan] concealed the true nature of the documents making it impossible for others to challenge the assertion of privilege. If [Buchanan] had identified [these] Email Messages ... on its May 2008 privilege log, Mr. Safrin would have challenged the assertion of privilege and discovered these critical communications." *Id.* In May 2013, Buchanan still had not produced the metadata or native copies of the documents, so the parties brought this issue to the attention of the Court. *See generally* Letters to the Honorable Gabriel W. Gorenstein, dated May 2013 (annexed as Exs. 15–16 to Wood Supp. Decl .).

**\*8** Meanwhile, Amusement, together with several other parties, filed a motion to compel Buchanan and other parties to produce certain documents pursuant to the crime-fraud exception to the attorney-client privilege. *See* Notice of Motion and Motion to Compel, filed June 6, 2012 (Docket # 649). On February 11, 2013, this Court granted the motion to compel and identified certain categories of documents that were to be produced. *See Amusement Indus., Inc. v. Stern,* 293 F.R.D. 420, 440–41 (S.D.N.Y.2013). In compliance with the order, in July 2013 Buchanan produced, among other documents, the "June 29, 2007 3:21 p.m. email from Stephen Friedman to Mark Stern," which was bates-numbered BIRFR0005908. Bayne Decl. ¶ 4(b). [3]

[3]    This document was the cover email to the attachment documents that had been produced in October 2009.

At the same time, Buchanan produced "[t]he June 29, 2008 3:18 p.m. email from Stephen Friedman to Mark Stern bates-numbered BIRFR0047204–0047227." *Id.* ¶ 4(a). When producing it, Buchanan's counsel explained that it had not previously been produced because it was "saved in a folder for a different client which is why it was not part of [Buchanan's] document production in this case." July 11 Baynes Email, dated July 11, 2013 (annexed as Ex. 18 to Wood Supp. Decl.), at 4. However, the Moving Parties allege, "when [Buchanan] produced the files for that deal, the email was missing form those files as well." *See* Mov. Reply at 8; see also Declaration of Craig H. Missakian in Support of Moving Parties' Memorandum in Further Support of Their Joint Motion to Amend Their Pleadings, filed June 16, 2014 (Docket # 766) ("Missakian Decl."), ¶¶ 3–5.

### D. *The Filing of the Instant Motion*

Soon after the July 2013 production, the Court approved an amended discovery schedule, which set the following deadlines: February 18, 2014, as the close of all fact discovery; July 11, 2014, as the close of all expert discovery; and August 15, 2014, as the date by which all premotion letters for dispositive motions must be filed. *See* Endorsed Letter, filed Aug. 20, 2013 (Docket # 708). On November 26, 2013, the Court granted the parties' request to stay discovery pending a mediation scheduled for February 4, 2014. *See* Endorsed Letter, Nov. 26, 2013 (Docket # 733). On December 11, 2013, Stephen Stern was permitted to withdraw as Moses Stern's counsel. *See* Stipulation and Order, filed Dec. 11, 2013 (Docket # 736). Meanwhile, the stay of discovery was extended to March 10, 2014. *See* Order, filed Jan. 28, 2014 (Docket # 737). After receiving notification that the parties failed to reach a settlement, the Court lifted the discovery stay on March 17, 2014. *See* Endorsed Letter, filed Mar. 17, 2014 (Docket # 739). On March 28, 2014, the Court approved a new discovery schedule setting the fact discovery deadline for June 30, 2014, expert discovery deadline for October 17, 2014, and the deadline for filing pre-motion letters for dispositive motions for October 17, 2014. *See* Amended Schedules, filed Mar. 28, 2014 (Docket # 741) ("March 2014 Schedule").[4]

[4]    Thus, fact discovery is now closed, with the exception of some residual matters. However, the expert discovery and pre-motion letter deadlines have been extended by several months.

 **\*9** On May 6, 2014, the Moving Parties sought permission to make the instant motion to amend the pleadings, which was granted. *See* Order, filed May 7, 2014 (Docket # 750). They filed their joint motion to amend their pleadings three days later. *See* Plaintiffs, Third–Party Plaintiff Joshua Safrin, Defendant Avery Egert and Fourth Party Defendant The Safrin Group, LLC's Notice of Joint Motion to Amend Their Pleadings, filed May 9, 2014 (Docket # 755). In support of their motion, the Moving Parties have submitted legal memoranda, declarations, accompanying exhibits, and copies of the proposed amended pleadings.[5] Buchanan and Friedman have submitted legal memoranda as well as declarations and exhibits in opposition to the joint motion to amend.[6]

[5]    *See* Moving Parties' Memorandum in Support of Their Joint Motion to Amend Their Pleadings, filed May 9, 2014 (Docket # 756) ("Mov.Mem.");

Declaration of Michael C. Rakower in Support of Joint Motion to Amend Pleadings, filed May 9, 2014 (Docket # 757) ("Rakower Decl."); Avery Egert's Proposed Answer to Plaintiffs' Proposed Fourth Amended Complaint (annexed as Ex. 1 to Rakower Decl.); Wood Decl.; Safrin Prop. Pl.; Aguilar Decl.; Prop. Compl.; Mov. Reply; Missakian Decl.; Wood Supp. Decl.

[6]    *See* Buchanan Ingersoll & Rooney PC's Memorandum of Law in Opposition to Moving Parties' Motion to Amend Their Pleadings, filed May 30, 2014 (Docket # 761) ("Buchanan Mem."); Zaiger Decl.; Bayne Decl.; Memorandum of Stephen Friedman in Opposition to Motion to Amend, filed May 30, 2014 (Docket # 764) ("Friedman Mem.").

## II. *LAW GOVERNING MOTIONS TO AMEND*

Federal Rule of Civil Procedure 15(a)(2) instructs courts to "freely give leave [to amend] when justice so requires." Nonetheless, leave to amend may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, ... undue prejudice to the opposing party ... [or] futility of amendment." *Foman v. Davis,* 371 U.S. 178, 182 (1962); *accord Jin v. Metro. Life Ins. Co.,* 310 F.3d 84, 101 (2d Cir.2002). The Second Circuit has characterized Rule 15 as encompassing a "liberal" amendment policy. See, e.g., *Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir.2008). A motion to amend under Rule 15(a)(2) may be made at any stage of the litigation, see, e.g., *Laurent v. PricewaterhouseCoopers LLP,* 2012 WL 3614043, at \*3 (S.D.N.Y. Aug. 15, 2012), and " '[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith,' " *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.,* 626 F.3d 699, 725 (2d Cir.2010) (quoting *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993)). Under Rule 15(a)(2), the "nonmovant bears the burden of showing prejudice, bad faith and futility of the amendment." *Grant v. Citibank (S.D.), N.A.,* 2010 WL 5187754, at \*6 (S.D.N.Y. Dec. 6, 2010) (citations omitted).[7]

[7]    In circumstances where a scheduling order sets a deadline for amending a complaint, however, the more onerous "good cause" standard under Rule 16(b) applies. *See Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 339–40 (2d Cir.2000); *accord Grochowski v. Phoenix Constr.,* 318 F.3d 80, 86

(2d Cir.2003); *Lincoln v. Potter,* 418 F.Supp.2d 443, 453 (S.D.N.Y.2006) ("When a party moves to amend the pleadings after the deadline to do so in the court's scheduling order has passed, he must satisfy the good cause requirement of Fed.R.Civ.P. 16(b)...."). That is, a court can properly "deny[ ] leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." *Parker,* 204 F.3d at 340. The "primary consideration" in determining whether good cause has been shown "is whether the moving party can demonstrate diligence." *Kassner v. 2nd Avenue Delicatessen Inc,* 496 F.3d 229, 244 (2d Cir.2007). Here, the Moving Parties appear to concede that the Court's deadline to amend passed years before the filing of their motion and thus that the Rule 16's "good cause" standard applies. *See* Mov. Reply at 32. Nevertheless, we do not consider the applicability of the "good cause" standard because the motion fails under the more liberal Rule 15(a)(2) standard.

III. *DISCUSSION*

As noted, the Moving Parties seek to add claims against current parties, Buchanan and Friedman, and non-parties, Stephen Stern and Hoffinger, for violation of section 487 of the New York Judiciary Law based on their claim that these parties wrongfully omitted key documents from their document production and instead improperly misleadingly listed them on the privilege log. *See* Prop. Compl. ¶ 150. Section 487 provides that "[a]n attorney or counselor who ... [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party" is liable to "the party injured [for] treble damages, to be recovered in a civil action." N.Y. Jud. Law § 487(1); *accord Polanco v. NCO Portfolio Mgmt.,* Inc., 2014 WL 2483180, at *9 (S.D.N.Y. June 3, 2014) ("Section 487(1) ... allows for claims against attorneys who engage in acts of deceit or collusion that are directed at a court or that occur during the course of a pending judicial proceeding.") (internal quotation marks and citation omitted). The Attorneys have raised various grounds in opposition to the motion, including futility and prejudice. We focus our attention exclusively on the issue of delay and prejudice as it is sufficient to dispose of the motion.

**\*10** The Second Circuit has held that an amendment prejudices a non-moving party when, among other things, "the assertion of the new claim or defense would (i) require

the opponent to expend significant additional resources to conduct discovery and prepare for trial [or] (ii) significantly delay the resolution of the dispute." *Monahan v. N.Y.C. Dep't of Corr.,* 214 F.3d 275, 284 (2d Cir.2000). Case law further explains that " '[o]ne of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action.' " *MHANY Mgmt. Inc. v. Cnty. of Nassau,* 843 F.Supp.2d 287, 341 (E.D.N.Y.2012) (quoting *H.L. Hayden Co. v. Siemens Med. Sys.,* 112 F.R.D. 417, 419 (S.D.N.Y.1986) (collecting cases)).

With these principles in mind, we believe several circumstances weigh against granting leave to amend. First, while not dispositive, the Moving Parties waited for a significant period after becoming aware of the Attorneys' wrongful discovery conduct before filing the instant motion to amend. While it is well-established that "delay, standing alone, is an insufficient basis to deny leave to amend," *U.S. for and on Behalf of Mar. Admin. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.,* 889 F.2d 1248, 1254 (2d Cir.1989) (citations omitted), a court "plainly has discretion ... to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice" the nonmovant, *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990). In general, " '[t]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice.' " *Evans v. Syracuse City Sch. Dist.,* 704 F.2d 44, 47 (2d Cir.1983) (quoting *Advocat v. Nexus Indus., Inc.,* 497 F.Supp. 328, 331 (D.Del.1980)).

While the alleged wrongful discovery conduct occurred in 2008, *see* Prop. Compl. ¶¶ 63–64, we measure the delay from the time the Moving Parties became aware of the facts that serve as the basis for their proposed claims, *see, e.g., Bader v. Special Metals Corp.,* 985 F.Supp.2d 291, 304 (N.D.N.Y.2013) (denying motion to amend where "despite being aware, even before she commenced this action, of the protected activity she now seeks to add to her Complaint, Plaintiff failed to move to amend in a timely fashion"); *Suro v. United States,* 107 F.Supp.2d 206, 210 (E.D .N.Y.2010) (denying motion to amend where "Plaintiffs have long had notice of a potential claim against [the party that they wish to join]"). The Moving Parties explain that they "discovered [some of the wrongfully withheld] emails in May 2012, when [Buchanan] released documents from its privilege log" and that they then "took immediate steps to determine the extent of [Buchanan's] concealment." Mov. Reply at 33–34.

2014 WL 4460393

They contend that "any 'delay' in bringing their claims is attributable to [Buchanan] and Friedman," because Buchanan refused "to do anything more until after the Court ruled on the crime-fraud motion" in February 2013. *Id.* at 34–35. They also note that they did not receive one of the documents—the "Let's talk" email, dated June 29, 2007, at 3:18 p.m.—until June 6, 2013. *Id.* at 34. Additionally, the Moving Parties suggest that they did not file the motion sooner because "[i]n late July [2013], the parties began discussing settlement and worked to find an acceptable mediator." *Id.* at 34.

 **\*11** Notwithstanding these explanations for their conduct, we believe that the Moving Parties' delay in bringing the instant motion was to some extent unjustified. The Moving Parties implicitly admit that they were put on notice of the Attorneys' discovery misconduct in May 2012 when they received a number of the emails at issue. *See* Mov. Reply at 33–34. Moreover, it is clear from the documents submitted in support of the instant motion that the Moving Parties were aware of the essentials of the offending conduct by at least November 2012, about 18 months before the motion to amend was eventually filed. In a series of communications between counsel for Safrin and Buchanan in Fall 2012, Safrin's counsel accused Buchanan of engaging in the same discovery misconduct alleged in the proposed claims. *See* Metadata Emails at 8–9 ("Safrin had to wait two more years to receive critical emails that are in no way privileged .... The law is quite clear that as a party to this case, [Buchanan] is responsible for its discovery response.").

On November 16, 2012, Safrin's counsel asserted that Buchanan "was obligated to provide sufficient information about the documents being withheld to allow the other parties to assess [Buchanan's] assertion of privilege" and that Buchanan's "description of BIRFR0004777 through BIRFR0004793 is more than incomplete; it is misleading," and that "[b]y providing inaccurate information, [Buchanan] concealed the true nature of the documents making it impossible for others to challenge the assertion of privilege." *Id.* at 20. These accusations track the allegations in the Moving Parties' proposed claims that Buchanan "intentionally withheld certain key documents from the May 2008 Production that should have been produced in response to the subpoenas" and "listed some, but not all, of those documents on the May 2008 Privilege Log knowing that no good faith basis existed to assert a privilege over the documents in a further effort to conceal the documents from Plaintiffs." Prop. Compl. ¶ 63.

Additionally, the Fall 2012 correspondence indicates that the Moving Parties realized the significance of these "critical" emails in that they knew the emails "contain[ed] signature pages with Safrin's forged signature." Metadata Emails at 9–10. Thus, the letters suggest that, at that time, the Moving Parties believed not only that the Attorneys had concealed the emails but also that the Attorneys had acted intentionally to hide evidence that was damaging to themselves and their clients. Furthermore, by November 2012, the Moving Parties were aware of Hoffinger and Stephen Stern's role in the withholding of these documents as Buchanan's counsel had noted their involvement in a letter to Safrin's counsel as early as September 8, 2009. *See* Bayne Letter; see also Prop. Compl. ¶ 64 ("[Buchanan] permitted [Hoffinger] and Attorney Stern to participate in the document review process....").

Given the fact that the Moving Parties were aware of the essential elements of their proposed section 487 claims by November 2012, we believe there was unjustified delay in bringing the instant motion. We do not give great weight to the Moving Parties's assertions regarding Buchanan's alleged refusal to produce the metadata or native files as the Moving Parties have not shown why this prevented them from understanding the scope of the conduct at issue. Also, while we do not believe that settlement discussions would necessarily justify delay, we note that they did not begin until July 2013 and thus they do not explain the failure to act during the previous eight month period when the Moving Parties had all the information they needed to bring the claim. Also, it is of no moment that the Moving Parties did not receive two of the documents at issue until July 2013 as the conduct amounting to deceit was represented in the documents released in the previous productions. Finally, even under the Moving Parties' view of the facts, they had all the emails as of July 2013 and yet took no action until May 2014. The stay of discovery was not put into effect until November 2013, and thus, four months elapsed during the critical fact discovery phase without any effort made to pursue these claims.

 **\*12** But we need not dwell on the question of whether the Moving Parties acted with alacrity in bringing this motion. Even if the Moving Parties had been able to justify their delay, other circumstances would lead us to conclude that allowing the amendment would be prejudicial and inappropriate. We begin by noting this litigation is in its final stages. The initial scheduling order in March 2008 set October 1, 2008, as the deadline for the "completion of all discovery." *See* Scheduling Order, filed Mar. 5, 2008 (Docket # 41). It took

2014 WL 4460393

the ensuing six years for the parties to actually complete—
or nearly complete—the fact discovery in this case, during
which discovery deadlines were repeatedly extended as more
parties and claims were added to the case. As noted by
Buchanan, the parties have taken 59 days of testimony
from 39 witnesses. *See* Buchanan Mem. at 6. The Moving
Parties did not seek to file the instant motion to amend until
less than 60 days before fact discovery was set to close.
Granting the instant motion to amend risks unduly delaying
the case by requiring the Court to reopen fact discovery to
allow the parties to take depositions and obtain documentary
evidence concerning the Attorneys' alleged wrongful conduct.
Courts have commonly denied motions to amend in such
circumstances. *See, e.g., iMedicor, Inc v. Access Pharm.,
Inc.,* 290 F.R.D. 50, 53 (S.D.N.Y.2013) ("[A]ssertion of
plaintiff's new claims would both require defendant to expend
significant additional resources to conduct discovery and
prepare for trial, and significantly delay resolution of the
dispute."); *Suro,* 107 F.Supp.2d at 209–10 (allowing the
amendment would require the court to "re-open discovery"
which would "cause substantial and unnecessary delay in a
case that already has been litigated for almost five years");
*accord Equal Rights Ctr. v. Niles Bolton Assocs.,* 602 F.3d
597, 603–04 (4th Cir.2010) (non-moving party would be
prejudiced by reopening of discovery where motion to amend
was filed at the "close of a three-year long discovery process
and on the eve of the deadline for dispositive motions");
*Mercantile Trust Co. Nat'l Ass'n v. Inland Marine Prods.
Corp.,* 542 F.2d 1010, 1013 (8th Cir.1976) (non-moving party
had already "completed extensive discovery based upon the
numerous defenses previously asserted" and where "[n]ew
theories of defense and a new counterclaim advanced at this
late date would necessarily reopen much of the discovery").

The Moving Parties respond that the amendment "will
not require the parties to expend additional resources
or significantly delay resolution of the dispute because
discovery pertinent to the claim is already in process." Mov.
Mem. at 6. They assert that "[t]he parties have all but
confirmed the deposition schedule for the witnesses most
likely to have information regarding the Section 487 Claim"
and that "Safrin has already served a request for production
of documents on Buchanan and subpoenas duces tecum on
Kaye Scholer, [Hoffinger], the Law Offices of Stephen R.
Stern, and Attorney Stern requesting documents relevant to
the proposed Section 487 Claim." *Id.* But these statements fall
far short of assuring the Court that the amendments would not
further prolong this already six-year-old case. The reality is
that the proposed claims have nothing to do with the existing

claims in this case, and thus, the Moving Parties are seeking
to fold an entirely new litigation into the current one. The new
claims alleging deceit by the Attorneys relate to the Attorneys'
failure to produce particular documents in discovery during
the course of the litigation of this case. Those actions are
not factually similar in the least to the existing claims in
this case, which revolve exclusively around a real estate
transaction and the subsequent dealings between Amusement
and the other parties to effectuate that transaction, all of which
occurred in 2007. Additionally, the damages that resulted
from these two courses of conduct have nothing to do with
each other. Accordingly, the discovery to determine what the
Attorneys and the proposed non-parties did and what damages
resulted from such conduct will be entirely different from the
discovery that has been pursued to date. There is no common
ground between these two sets of claims other than some
overlap in parties.

**\*13** Furthermore, given the prior history of this case, there
will inevitably be motions to dismiss (aspects of which
would require serious consideration based on the parties'
briefing of the "futility" issue) and myriad discovery disputes
regarding these collateral claims, all of which will likely
cause further delays. Additionally, as the Moving Parties
themselves concede, they "may seek leave to amend again
to add [other Buchanan] attorneys as additional defendants
to their respective Section 487 claims" depending on "the
outcome of discovery" regarding the proposed claims. Mov.
Mem. at 2 n. 1. Finally, there would be nothing to stop the
proposed defendants from asserting claims of their own once
joined to the case.

Courts regularly deny motions to amend where the moving
party seeks to add claims involving collateral matters, based
on different factual allegations and distinct legal theories,
from the claims already at issue in a case. These courts
have recognized that the addition of such collateral claims
in amended pleadings can easily delay resolution of the case
due to the need to engage in substantial additional discovery
regarding the new factual contentions. *See Ansam Assocs.,
Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir.1985)
(upholding denial of motion to amend where the plaintiff's
"new claims concerned a different period of time and were
derived from a different statute" given that "discovery had
already been completed and [the defendant] had already
filed a motion for summary judgment"); *Briarpatch Ltd.
L.P. v. Geisler Roberdeau, Inc.,* 148 F.Supp.2d 321, 327
(S.D.N.Y .2001) ("Prejudice is particularly likely where the
amendment raises new theories of recovery or would require

2014 WL 4460393

additional discovery.") (citation omitted); *accord Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1428–29 (7th Cir.1993) ("[T]he district judge acted within the bounds of reason in refusing to allow the suit to be expanded to take in ... an entirely new and separate claim."); *Morongo Band of Mission Indians v. Rose,* 893 F.2d 1074, 1079 (9th Cir.1990) (no abuse in discretion in district court's denial of motion to file amended complaint where "[t]he new claims set forth in the amended complaint would have greatly altered the nature of the litigation and would have required defendants to have undertaken, at a late hour, an entirely new course of defense"); *Vonage Holdings Corp. v. SBC Internet Servs., Inc.,* 2007 WL 3169167, at *3 (N.D.Tex. Oct. 30, 2007) (refusing motion to add new claims in patent dispute case because the new claims were "completely unrelated to the voice-compression technology that is at issue in this litigation ... [and would] undoubtedly further delay the resolution of this case, require additional discovery, and further complicate an already complex case"); *Lover v. District of Columbia,* 248 F.R.D. 319, 322 (D.D.C.2008) ("Prejudice is likely if the amended complaint contains new complex and serious charges which would undoubtedly require additional discovery for the defendants to rebut.") (internal quotation marks, brackets, and citation omitted); *see generally* 6 Wright, Miller & Kane Fed. Prac. & Proc. Civ. § 1487 (3d ed. 2014) ("[I]f the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation, the court may deem it prejudicial.").

**\*14** Prejudice is particularly likely to result where, as in this case, the moving party seeks to add collateral claims at a late stage in the litigation process. *See, e.g., In re Am. Int'l Grp., Inc. Sec. Litig.,* 2008 WL 2795141, at *3 (S.D.N.Y. July 18, 2008)* ("[A] proposed amendment causes undue prejudice if, at an advanced stage of litigation, the amendment concerns 'an entirely new set of operative facts of which it cannot be said that the original complaint provided fair notice.' ") (quoting *Ansam,* 760 F.2d at 446); *Seymour/Jones v. Lefebvre,* 1991 WL 165203, at *1 (E.D.Pa. Aug. 22, 1991) (denying motion to amend on grounds of prejudice because proposed additional claims "concern only one of the three defendants, ... are entirely new and separate claims based on unrelated facts and events[,] ... [and] they would involve additional discovery at a point when the discovery period has almost expired"). We thus conclude that the potential for delay and resulting prejudice strongly favors denial of the motion to amend.

The cases the Moving Parties cite on the issue of prejudice do not change our view. *See* Mov. Mem. at 5–6; Mov. Reply at 36–37. These cases simply recognize that a motion to amend should not be denied on the ground that it would require the opposing party to "expend significant additional time and money" on additional discovery where circumstances otherwise suggest that granting the amendment would be fair, such as where the case is in an early stage of litigation. *Hahn v. Domy Rooms, Inc.,* 2008 WL 3874313, at *3 (S.D.N.Y. Aug. 18, 2008)* (granting motion to amend when the parties had "only exchanged initial disclosures" and where there was no allegation that plaintiff did not timely file motion to amend); *see also Block,* 988 F.2d at 351 (upholding district court's grant of motion to amend because the non-moving parties' allegations that "they were prejudiced solely because of the time, effort and money they expended in litigating this matter ... do not arise to ... 'substantial prejudice.' "); *Am. Med. Ass'n v. United Healthcare Corp.,* 2006 WL 3833440, at *6–7 (S.D.N.Y. Dec. 29, 2006)* (no "undue prejudice" where "the parties have completed only preliminary discovery as to the 'proper parties in this action' and have not yet engaged in any significant discovery on the merits" and where the proposed claims "are based on 'substantially similar' allegations of misconduct" as the earlier claims); *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.,* 795 F.Supp. 639, 644 (S.D.N.Y.1992) (finding joinder of additional parties to be appropriate where "discovery relating to the counterclaims began only recently" because the case "would encompass essentially the same issues regardless of whether or not [the proposed parties] were added as counter-defendants"). Here, by contrast, the Court's concern is not simply that additional discovery will be required but that numerous depositions have already been taken, extensive document production has been made, the parties are at the final stage of the litigation, and the proposed claims have nothing to do with the claims currently being litigated. *Cf. Interpublic Grp. of Cos., Inc. v. Fratarcangelo,* 2002 WL 31720355, at *2 (S.D.N.Y. Dec. 4, 2002)* ("Although the burden of undertaking additional discovery, standing alone, does not warrant a denial of a motion to amend a pleading on the grounds of prejudice, ... when that discovery addresses what is essentially a collateral matter-as it does in this action-denial is warranted.") (internal citation omitted); *see also Grace v. Rosenstock,* 228 F.3d 40, 53–54 (2d Cir.2000) ("The court also has discretion to deny leave to amend ... where the belated motion would unduly delay the course of proceedings by, for example, introducing new issues for discovery.") (internal citations omitted); *Ansam,* 760 F.2d at 446 (upholding denial of motion to amend where the proposed

Amusement Industry, Inc. v. Stern, Not Reported in F.Supp.3d (2014)

2014 WL 4460393

claims "concerned a different period of time and were derived from a different statute" and where "discovery had already been completed and [defendant] had already filed a motion for summary judgment").

 **\*15**  Finally, the addition of the collateral claims regarding the alleged discovery misconduct would further muddle this already complex case. When parties move to add claims involving completely different factual allegations and legal theories from the underlying suit, courts may exercise their discretion to deny amendment "in order to avoid unnecessary complexity and confusion." *Robinson v. Buffaloe & Assocs., PLC,* 2013 WL 4017045, at \*2 (M.D.Tenn. Aug. 6, 2013); *see also Harris v. Armstrong,* 2005 WL 756523, at \*1 (D .Conn. Mar. 31, 2005) ("Underlying [Rule 15(a) ] is an assumption that the amended complaint will clarify or amplify the original cause of action. The proposed amendments would not serve these purposes but instead would add numerous unrelated parties and claims. Accordingly, the motion for leave to amend is denied."); *Trilithic, Inc. v. Wavetek U.S. Inc.,* 6 F.Supp.2d 803, 809 (S.D.Ind.1998) (denying motion to file supplemental pleading under Rule 15(d) because "the [proposed] breach of contract claim is so unrelated to the underlying patent infringement action that it constitutes extraneous matter that will likely protract and complicate the litigation"); *Triangle Indus., Inc. v. Kennecott Copper Corp.,* 402 F.Supp. 210, 212 (S.D.N.Y.1975) (rejecting addition of certain claims where they "raise[ ] the question [of] whether amendments (and supplementation) of the complaint would not add to the complications of an already over-complicated case to the extent that no jury could reasonably be expected to assimilate the facts or render and [sic] intelligent or just verdict"); *United States v. Eight Tracts of Land in Town of Brookhaven, Suffolk Cnty., State of N.Y.,* 270 F.Supp. 160, 164 (E.D.N.Y.1967) ("While amendments are as a general rule, freely granted as justice may require, they should be denied when their allowance prevents an equitable determination of the main suit and confuses the real issues involved."); see generally 6 Wright, Miller & Kane Fed. Prac. & Proc. Civ. § 1487 ("[I]f the court determines that ... the issues raised by the amendment are remote from the other issues in the case and might confuse or mislead the jury, leave to amend may be denied."). We do not think it appropriate to burden a jury with both unraveling the complexities of the original real estate transaction and judging the actions of attorneys in conducting document production during the course of the litigation.

In a case involving analogous circumstances, *Stiller v. Colangelo,* 221 F.R.D. 316 (D.Conn.2004), the court denied the plaintiff's motion to amend a complaint to add claims involving the defendant's "hand[ling] of this litigation since the filing of the Complaint" because it would prejudice the defendant by "add[ing] claims different in character and purpose from those articulated in the initial complaint" that would "require additional discovery ... and undue delay in the resolution of the case." 221 F.R.D. at 317. *Stiller* denied the motion also on grounds that the proposed claims were "sufficiently remote from the initial complaint ... [that] [t]he jury is likely to be confused when asked to consider both [the defendant's] behavior as [the plaintiff's] legal representative and his behavior as [the plaintiff's] legal adversary. Moreover, exposing the jury to allegations of wrongful conduct during the course of this litigation could easily prejudice the jury against [the defendant]." *Id.* Here too the addition of the new claims would unnecessarily confuse a jury as it would be asked to simultaneously consider Buchanan and Friedman's alleged wrongful conduct both as negotiators representing Moses Stern in the underlying real estate transaction and as litigators responding to document subpoenas in the ensuing legal proceedings. Given the factual and legal dissimilarities between the underlying lawsuit and the proposed claims, any such claim is best brought as a separate suit and not as part of this case. [8]

[8]     Nothing herein should be construed as addressing the question of whether the Moving Parties may move for sanctions in this litigation based on the conduct alleged in the proposed complaint —whether against parties or attorneys, including former attorneys. *See Hakim v. Leonhardt,* 126 F. App'x 25, 26 (2d Cir.2005) ("[A] court may hold an attorney responsible for discovery noncompliance even after he or she has been relieved as counsel.") (citations omitted).

IV. *CONCLUSION*

 **\*16**  For the foregoing reasons, the Moving Parties' motion to amend their pleadings (Docket # 755) is denied.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4460393

---

                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

## Filings (100)

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Answer of Mark Stern to Cross-Claims of Bankers Capital Realty Advisors LLC and Steven Alevy and Cross-Claim Against Bankers Realty Advisors LLC and Steven Alevy** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, First Republic Group Corp., Land Title Associates Agency, LLC (aka Land Title Associates), and Avery Egert, Defendants. Joshua Safrin, Defendant/Third Parry-Crossclaim-Counterclaim Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, <br> 2010 WL 3971584 | PDF | S.D.N.Y. | Aug. 27, 2010 | Pleading |
| **2. Answer of Ephraim Frenkel and Land Title Associates Escrow to Cross-Claims of Bankers Capital Realty Advisors LLC and Steven Alevy and Cross-Claim Against Bankers Realty Advisors LLC and Steven Alevy** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, First Republic Group Corp., Land Title Associates Agency, LLC (aka Land Title Associates), and Avery Egert, Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, <br> 2010 WL 3971585 | PDF | S.D.N.Y. | Aug. 27, 2010 | Pleading |
| **3. Third Party Defendants Bankers Capital Realty Advisors LLC's and Steven Alevy's Third Amended Third Party Complaint of Defendant Safrin, Counterclaims Against Safrin, and Cross Claims Against Stern, Egert, First Republic, Frenkel, Land Title, Stephen Friedman and Buchanan Ingersoll & Rooney** <br> AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Avery Egert and Land Title Associates Escrow, Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, Third Party Defendants/Third <br> 2010 WL 3971583 | PDF | S.D.N.Y. | July 20, 2010 | Pleading |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **4.  Buchanan Ingersoll & Rooney PC's First Amended Fourth Party Complaint Against Fourth Party Defendants Avrahom Egert a/k/a Avery Egert and the Safrin Group, LLC a/k/a the Sovereign Group** <br> AMUSEMENT INDUSTRY, INC. (dba Westland Industries) and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, First Republic Group Corp., Land Title Associates Agency, LLC (aka Land Title Associates), and Avery Egert, Defendants. Joshua SAFRIN, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney <br> 2010 WL 1625644 | PDF | S.D.N.Y. | Jan. 29, 2010 | Pleading |
| **5.  Second Amended Complaint** <br> AMUSEMENT INDUSTRY, INC., (dba Westland Industries) and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, (aka Mark Stern); Joshua Safrin; First Republic Group Realty, LLC; Ephraim Frenkel; First Republic Group Corp.; Land Title Associates Agency, LLC (aka Land Title Associates); and Avery Egert, Defendants. Joshua SAFRIN, Defendant/Third Party Crossclaim-Counterclaim Plaintiff, v. Stephen FRIEDMAN; Steven Alevy; Buchanan Ingersoll & Rooney, <br> 2010 WL 1625645 | PDF | S.D.N.Y. | Jan. 28, 2010 | Pleading |
| **6.  Corrected First Amended Complaint** <br> AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, First Republic Group, Corp., Land Title Associates Escrow and Avery Egert, Defendants. Joshua Safrin, Defendant/ Third Party Crossclaim- Counterclaim Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First <br> 2009 WL 2459667 | — | S.D.N.Y. | May 12, 2009 | Pleading |
| **7.  Third Party Defendants Bankers Capital Realty Advisors Llc's and Steven Alevy's Answer to the Cross Claims of Defendant Safrin, Counterclaims Against Safrin, and Cross Claims Against Stern, First Republic, Frenkel, Land Title, Stephen Friedman and Bu chanan Ingersoll & Rooney** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries, and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty Llc, Ephraim Frenkel, and Land Title Associates Escrow, Defendants. <br> 2008 WL 4521829 | PDF | S.D.N.Y. | Aug. 11, 2008 | Pleading |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **8. Defendant Joshua Safrin's Answer to Plaintiffs' Complaint, Affirmative Defenses, Counterclaims and Crossclaims**<br>AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants; Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First<br>2008 WL 4521820 | PDF | S.D.N.Y. | July 18, 2008 | Pleading |
| **9. Answer of Ephraim Frenkel and Land Title Associates Escrow to Cross-Claims of Steven Alevy and Bankers Capital Realty Advisors LLC and Cross-Claims Against Steven Alevy and Bankers Capital Realty Advisors LLC**<br>AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Joshua SAFRIN, Defendant/Third party-Crossclaim- counterclaim plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors, LLC, and First Republic Group Corp., Third<br>2008 WL 2974909 | PDF | S.D.N.Y. | June 16, 2008 | Pleading |
| **10. Defendants Stern and First Republic's Answer to and Cross-Claims Against Third Party Defendants Steven Alevy and Bankers Capital Realty Advisors LLC**<br>AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Joshua SAFRIN, Defendant/Third party-Crossclaim-Counterclaim-Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First<br>2008 WL 2974908 | PDF | S.D.N.Y. | June 11, 2008 | Pleading |
| **11. Third Party Defendants Bankers Capital Realty Advisors LLC's and Steven Alevy's Answer to the Amended Third Party Complaint of Defendant Safrin, Counterclaims Against Safrin, and Cross Claims Against Stern, First Republic Frenkel, Land Title, Stephen Friedman and Buchanan Ingersoll & Rooney**<br>AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel and Land Title Associates Escrow, Defendants.<br>2008 WL 2974907 | PDF | S.D.N.Y. | June 06, 2008 | Pleading |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **12. Complaint**<br>AMUSEMENT INDUSTRY, INC., a California corporation dba Westland Industries; Practical Finance Co., Inc., a California corporation, Plaintiffs., v. Moses STERN, an individual aka Mark Stern; Joshua Safrin, an individual; First Republic Group Realty LLC, a Delaware limited liability company; Ephraim Frenkel, an individual; Land Title Associates Escrow, a New York limited liability company, Defendants.<br>2007 WL 5041969 | — | S.D.N.Y. | Dec. 27, 2007 | Pleading |
| **13. Supplemental Memorandum in Support of Motion to Compel; Declaration of Craig H. Missakian in Support Thereof**<br>AMUSEMENT INDUSTRY, INC., et. al., Plaintiffs, v. Moses STERN, et. al., Defendants. And Related Cross-Actions.<br>2012 WL 7656057 | PDF | S.D.N.Y. | Nov. 27, 2012 | Motion |
| **14. Reply in Support of Motion to Compel**<br>AMUSEMENT INDUSTRY, INC., d/b/a Westland Industries; and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN aka Mark Stern, Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, and Avery Egert, Defendants; And Related Cross Actions.<br>2012 WL 3929442 | PDF | S.D.N.Y. | July 26, 2012 | Motion |
| **15. Memorandum of Law on Behalf of Defendants Mark Stern and First Republic Group Corp. in Opposition to Plaintiffs' Motion to Compel**<br>AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, First Republic Group Corp., Land Title Associates Agency, LLC (aka Land Title Associates), and Avery Egert, Defendants; And Related Cross-Actions.<br>2012 WL 3929418 | PDF | S.D.N.Y. | July 11, 2012 | Motion |
| **16. Memorandum of Stephen Friedman in Response to Plaintiffs' Motion to Compel**<br>AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, First Republic Group Corp., Land Title Associates Escrow, and Avery Egert, Defendants; Joshua Safrin, Defendant/Third Party-Cross-claim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, First<br>2012 WL 3929421 | PDF | S.D.N.Y. | July 11, 2012 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **17. Memorandum of Law in Support of Motion to Compel** <br> AMUSEMENT INDUSTRY, INC. dba Westland Industries; and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, Avery Egert, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. <br> 2012 WL 3625077 | PDF | S.D.N.Y. | June 06, 2012 | Motion |
| **18. Reply Memorandum of Law in Support of Motion to Dismiss Mark Stern and First Republic Group Corp.'s Counterclaims Against Plaintiffs** <br> AMUSEMENT INDUSTRY, INC. dba Westland Industries; and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, Avery Egert, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. And Related Cross-Actions. <br> 2011 WL 8194468 | PDF | S.D.N.Y. | Aug. 29, 2011 | Motion |
| **19. Memorandum of Law in Opposition to Plaintiffs' Motion to Dismiss the Counterclaims of Mark Stern and First Republic Group Corp.** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, First Republic Group Corp., Land Title Associates Agency, LLC (aka Land Title Associates), and Avery Egert, Defendants; Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, <br> 2011 WL 9523105 | PDF | S.D.N.Y. | July 29, 2011 | Motion |
| **20. Joshua Safrin's Supplemental Memorandum in Support of His Motion to Compel and in Response to the Withholding Parties Supplemental Memorandum in Opposition to Motion to Compel** <br> AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, First Republic Group Corp., Land Title Associates Agency Escrow, LLC (aka Land Title Associates), and Avery Egert, Defendants. Joshua SAFRIN, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, <br> 2010 WL 5886082 | PDF | S.D.N.Y. | Nov. 18, 2010 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **21.** **Supplemental Memorandum of Law in Opposition to Motion to Compel of Joshua Safrin Concerning Documents Disclosed to Robert Friedman** AMUSEMENT INDUSTRY, INC. dba Westland Industries; and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, Avery Egert, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. 2010 WL 5886081 | [PDF] | S.D.N.Y. | Nov. 03, 2010 | Motion |
| **22.** **Third-Party Defendant Buchanan Ingersoll & Rooney PC's Reply Memorandum of Law in Further Support of Its Motion to Dismiss Count V of Bankers Capital and Steven Alevy's Cross-Claim for Indemnification** AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, First 2010 WL 4898828 | [PDF] | S.D.N.Y. | Oct. 28, 2010 | Motion |
| **23.** **Third-Party Defendant Buchanan Ingersoll & Rooney PC's Memorandum of Law in Support of Its Motion to Dismiss Count V of Bankers Capital and Steven Alevy's Cross-Claim for Indemnification** AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, First 2010 WL 4898826 | [PDF] | S.D.N.Y. | Oct. 05, 2010 | Motion |
| **24.** **Joshua Safrin's Reply in Support of His Supplemental Memorandum and in Response to the Withholding Parties' Opposition to Safrin's Motion to Compel** AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, First Republic Group Corp., Land Title Associates Agency Escrow, LLC (aka Land Title Associates), and Avery Egert, Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim- Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, 2010 WL 4898825 | [PDF] | S.D.N.Y. | Sep. 01, 2010 | Motion |

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **25.** **Third-Party Defendant Buchanan Ingersoll & Rooney Pc's Memorandum of Law in Support of Its Motion to Dismiss Bankers Capital and Steven Alevy's Cross-Claims** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, First <br> 2010 WL 3971710 | | S.D.N.Y. | Aug. 24, 2010 | Motion |
| **26.** **Reply Memorandum of Law in Further Support of Motion to Dismiss the Third Amended Complaint Against Mark Stern, First Republic Group Corp., Ephraim Frenkel and Land Title Associates Escrow** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, First Republic Group Corp., Land Title Associates Agency, LLC (aka Land Title Associates), and Avery Egert, Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, <br> 2010 WL 3971708 | | S.D.N.Y. | Aug. 06, 2010 | Motion |
| **27.** **Third-Party Defendant Buchanan Ingersoll & Rooney PC's Reply Memorandum of Law in Support of Its Motion to Dismiss Counts One, Two, Four and Five of Defendant Joshua Safrin's Third Amended Third-Party Complaint** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, First <br> 2010 WL 3971707 | | S.D.N.Y. | July 29, 2010 | Motion |

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **28.  Plaintiffs' Memorandum of Law in Opposition to Defendants Mark Stern, First Republic Group Realty, LLC, First Republic Group Corp., Ephraim Frenkel and Land Title Associates Escrow's Motion to Dismiss Plaintiffs' Third Amended Complaint** AMUSEMENT INDUSTRY, INC., et al., Plaintiffs, v. Moses STERN (aka Mark Stern), et al., Defendants. Joshua Safrin, Defendant/Third Party Crossclaim-Counterclaim Plaintiff, v. Stephen Friedman, et al., Third Party Defendants, Moses Stern (aka Mark Stern), et al., Defendants/Crossclaim Defendants, Amusement Industry, Inc., et al., Plaintiffs/Counterclaim Defendants. 2010 WL 3971706 | [PDF] | S.D.N.Y. | July 14, 2010 | Motion |
| **29.  Memorandum of Law in Opposition to the Motion to Dismiss Safrin's Cross Claims Filed by Mark Stern, First Republic Group Corp., Ephraim Frenkel and Land Title Associates Escrow** AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, First Republic Group Corp., Land Title Associates Agency Escrow, LLC (aka Land Title Associates), and Avery Egert, Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., and 2010 WL 3971705 | [PDF] | S.D.N.Y. | July 13, 2010 | Motion |
| **30.  Joshua Safrin's Memorandum of Law in Opposition to Buchanan Ingersoll & Rooney's and Stephen Friedman's Motions to Dismiss Safrin's Third Party Claims** AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, First Republic Group Corp., Land Title Associates Agency Escrow, LLC (aka Land Title Associates), and Avery Egert, Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., and 2010 WL 3971704 | [PDF] | S.D.N.Y. | July 08, 2010 | Motion |
| **31.  Reply Memorandum of Law in Further Support of Motion to Dismiss Avery Egert's Cross-Claims Against Mark Stern, Ephraim Frenkel and Land Title Associates Escrow** AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. 2010 WL 3031219 | [PDF] | S.D.N.Y. | June 30, 2010 | Motion |
| **32.  Joshua Safrin's Memorandum of Law in Opposition to Steven Alevy's and Bankers Capital Realty Advisor LLC's Motion to Dismiss Safrin's Third Party Claims** AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. 2010 WL 3031217 | [PDF] | S.D.N.Y. | June 23, 2010 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **33.  Reply Memorandum of Law in Support of Motion to Dismiss the Cross Claims of Defendant Avery Egert** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031218 | PDF | S.D.N.Y. | June 23, 2010 | Motion |
| **34.  Reply Memorandum of Law By Third-Party Defendant Buchanan Ingersoll & Rooney PC in Support of Its Motion to Dismiss Egert's Cross-Claims** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031215 | PDF | S.D.N.Y. | June 11, 2010 | Motion |
| **35.  Memorandum of Law in Opposition to Mark Stern's, Ephraim Frenkel's and Land Title Associates Escrow's Motion to Dismiss Avery Egert's Cross-Claims** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031216 | PDF | S.D.N.Y. | June 11, 2010 | Motion |
| **36.  Memorandum of Law in Support of Motion to Dismiss the Third Amended Complaint Against Mark Stern, First Republic Group Corp., Frenkel and Land Title Associates Escrow** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031214 | PDF | S.D.N.Y. | June 09, 2010 | Motion |
| **37.  Joshua Safrin's Supplemental Memorandum in Support of Motion to Compel and in Response to Declarations and Documents Submitted for in Camera Review** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031213 | PDF | S.D.N.Y. | June 08, 2010 | Motion |
| **38.  Memorandum of Law in Opposition to Steven Alevy's and Bankers Capital Realty Advisor LLC's Motion to Dismiss Avery Egert's Cross-Claims** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031212 | PDF | S.D.N.Y. | June 04, 2010 | Motion |
| **39.  Memorandum of Law in Support of Motion to Dismiss Joshua Safrin's Cross-Claims Against Mark Stern, First Republic Group Corp., Ephraim Frenkel and Land Title Associates Escrow** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031211 | PDF | S.D.N.Y. | June 02, 2010 | Motion |
| **40.  Memorandum of Law in Support of Motion to Dismiss the Third Amended Third Party Complaint of Defendant Joshua Safrin** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031210 | PDF | S.D.N.Y. | June 01, 2010 | Motion |
| **41.  Memorandum of Law in Opposition to Buchanan Ingersoll & Rooney, PC's and Stephen Friedman's Motion to Dismiss Avery Egert's Cross-Claims** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031209 | PDF | S.D.N.Y. | May 28, 2010 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **42. Memorandum of Law by Third-Party Defendant Buchanan Ingersoll & Rooney PC in Support of Motion to Dismiss Safrin's Third Amended Third-Party Complaint** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031208 | PDF | S.D.N.Y. | May 27, 2010 | Motion |
| **43. Reply Memorandum of Law in Support of Motion to Dismiss First Amended Third Party Complaint of Mark Stern Against Avery Egert** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031207 | PDF | S.D.N.Y. | May 19, 2010 | Motion |
| **44. Memorandum of Law in Support of Motion to Dismiss Avery Egert's Cross-Claims Against Mark Stern, Ephraim Frenkel and Land Title Associates Escrow** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031206 | PDF | S.D.N.Y. | May 10, 2010 | Motion |
| **45. Memorandum of Law in Opposition to Third Party Defendant Avery Egert's Motion to Dismiss Mark Stern's First Amended Third Party Complaint** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031205 | PDF | S.D.N.Y. | May 06, 2010 | Motion |
| **46. Third-Party Defendant Buchanan Ingersoll & Rooney PC's Memorandum of Law in Support of its Motion to Dismiss Egert's Cross-Claims** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031203 | PDF | S.D.N.Y. | Apr. 30, 2010 | Motion |
| **47. Memorandum of Law in Support of Motion to Dismiss the Cross Claims of Defendant Avery Egert** <br> AMUSEMENT INDUSTRY, INC., et al, v. STERN, et al. <br> 2010 WL 3031204 | PDF | S.D.N.Y. | Apr. 30, 2010 | Motion |
| **48. Memorandum of Law in Support of Motion to Dismiss First Amended Fourth Party Complaint of Buchanan Ingersoll & Rooney, P.C. Against Avery Egert and the Safrin Group** <br> AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow and Avery Egert, Defendants., Joshua SAFRIN, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First <br> 2010 WL 1625647 | PDF | S.D.N.Y. | Feb. 22, 2010 | Motion |

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **49. Supplemental Memorandum of Law in Further Support of Motion to Dismiss Mark Stern's Cross Claims Against Bankers Capital and Steven Alevy and Third Party Complaint Against Allen Alevy, Allen P.sragow, and Robert Friedman** <br> AMUSEMENT INDUSTRY, INC. dba Westland Industries; and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, Avery Egert, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. <br> 2010 WL 1625646 | PDF | S.D.N.Y. | Feb. 11, 2010 | Motion |
| **50. Reply Memorandum of Law in Support of Motion to Dismiss Fourth Party Complaint of Buchanan Ingersoll & Rooney, P.C. Against Avery Egert and the Safrin Group** <br> AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow and Avery Egert, Defendants. Joshua SAFRIN, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C, Bankers Capital Realty Advisors LLC, and First <br> 2009 WL 4838730 | PDF | S.D.N.Y. | Oct. 23, 2009 | Motion |
| **51. Third-Party Defendant/fourth-Party Plaintiff Buchanan Ingersoll & Rooney PC's Memorandum of Law in Opposition to Fourth-Party Defendants Avrahom Egert and the Safrin Group, LLC's Motion to Dismiss the Fourth Party Complaint** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephrai, Frenkel, Land Title Associates Escrow, Defendants. Joshua SAFRIN, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, First <br> 2009 WL 4838729 | PDF | S.D.N.Y. | Oct. 02, 2009 | Motion |
| **52. Reply Memorandum of Law in Support of Motion to Dismiss Third Party Complaint of Mark Stern and First Republic Group Realty, LLC Against Allen Alevy, Allen P. Sragow, and Robert Friedman** <br> AMUSEMENT INDUSTRY, INC. dba Westland Industries; and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, Avery Egert, First Republic Group Realty LLC, Title Associates Escrow, Defendnts. <br> 2009 WL 3191752 | PDF | S.D.N.Y. | Aug. 21, 2009 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **53. Reply Memorandum of Law in Support of Motion to Dismiss Third Party Complaint of Mark Stern and First Republic Group Realty, LLC Against Avery Egert** AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow and Avery Egert, Defendants. Joshua SAFRIN, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. STEPHEN FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First 2009 WL 3191751 | PDF | S.D.N.Y. | Aug. 17, 2009 | Motion |
| **54. Memorandum of Law in Support of Motion to Dismiss Fourth Party Complaint of Buchanan Ingersoll & Rooney, P.C. Against Avery Egert and the Safrin Group** AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow and Avery Egert, Defendants, Joshua SAFRIN, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First 2009 WL 3191750 | PDF | S.D.N.Y. | Aug. 14, 2009 | Motion |
| **55. Memorandum of Law in Support of Motion to Dismiss Third Party Complaint of Mark Stern and First Republic Group Realty, LLC Against Avery Egert** AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow and Avery Egert, Defendants., Joshua SAFRIN, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First 2009 WL 3191748 | PDF | S.D.N.Y. | July 14, 2009 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **56.  Memorandum of Law in Opposition to Motion of Third Party Defendants Allen Alevy, Allen P. Sragow and Robert Friedman to Dismiss Third Party Complaint of Mark Stern and First Republic Group Realty LLC** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, Land Title Associates Escrow, and Avery Egert, Defendants. Joshua SAFRIN, Defendant/Third Party-Crossclaim-Counterclaim Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors, LLC, First Repblic Group Corp., and Herrick, <br> 2009 WL 3191749 | PDF | S.D.N.Y. | July 14, 2009 | Motion |
| **57.  Memorandum of Law in Support of Motion to Dismiss Third Party Complaint of Mark Stern and First Republic Group Realty, LLC Against Allen Alevy, Allen P. Sragow and Robert Friedman** <br> AMUSEMENT INDUSTRY, INC. dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, Land Title Associates Escrow, and Avery Egert, Defendants. Related Cross-Actions. <br> 2009 WL 2459685 | PDF | S.D.N.Y. | June 29, 2009 | Motion |
| **58.  Reply Memorandum of Law in Support of Defendants Joshua Safrin's and Avery Egert's Consolidated Motion to Dismiss** <br> AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow and Avery Egert, Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C, Bankers Capital Realty Advisors LLC, and First <br> 2009 WL 2459684 | PDF | S.D.N.Y. | June 19, 2009 | Motion |
| **59.  Third Party Plaintiff Joshua Safrin's Sur-Reply to Herrick, Feinstein LLP's Motion to Dismiss the Second Amended Third Party Complaint** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, First <br> 2009 WL 2459683 | PDF | S.D.N.Y. | June 10, 2009 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **60. Plaintiffs' Memorandum of Law in Opposition to Defendants Mark Stern, First Republic Group Realty, LLC, First Republic Group Corp., Ephraim Frenkel and Land Title Associates Escrow's Motion to Dismiss** AMUSEMENT INDUSTRY, INC., et al., Plaintiffs, v. Moses STERN (aka Mark Stern), et al., Defendants. Joshua Safrin, Defendant/Third Party Crossclaim - Counterclaim Plaintiff, v. Stephen Friedman, et al., Third Party Defendants, Moses Stern (aka Mark Stern), et al., Defendants/Crossclaim Defendants, Amusement Industry, Inc., et al., Plaintiffs/Counterclaim Defendants. 2009 WL 2459682 | PDF | S.D.N.Y. | June 08, 2009 | Motion |
| **61. Plaintiffs' Memorandum of Law in Opposition to Defendants Joshua Safrin and Avery Egert's Consolidated Motion to Dismiss** AMUSEMENT INDUSTRY, INC., et al., Plaintiffs, v. Moses STERN (aka Mark Stern), et al., Defendants. Joshua Safrin, Defendant/Third Party Crossclaim - Counterclaim Plaintiff, v. Stephen Friedman, et al., Third Party Defendants, Moses Stern (aka Mark Stern), et al., Defendants/Crossclaim Defendants, Amusement Industry, Inc., et al., Plaintiffs/Counterclaim Defendants. 2009 WL 2459681 | PDF | S.D.N.Y. | June 02, 2009 | Motion |
| **62. Defendant Joshua Safrin's Reply Memorandum of Law in Support of Motion to Compel Plaintiffs, Amusement Industry, Inc. and Practical Finance Co., Inc., Third-Party Defendants, Steven Alevy and Bankers Capital Realty Advisors LLC, and Non-Party Sragow & Sragow to Produce Documents Claimed As Privileged or for in Camera Review** AMUSEMENT INDUSTRY, INC., et al., Plaintiffs, v. Moses STERN, et al., Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, et al., Third Party Defendants, Moses Stern, et al., Defendants/Crossclaim Defendants, Amusement Industry, Inc., et al., Plaintiffs/Counterclaim Defendants. 2009 WL 2459679 | PDF | S.D.N.Y. | May 08, 2009 | Motion |
| **63. Reply Memorandum of Law in Further Support of Third Party Defendant Herrick, Feinstein LLP's Motion to Dismiss Safrin's Second Amended Third-Party Complaint** AMUSEMENT INDUSTRY INC., d/b/a Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, a/k/a Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Joshua Safrin, Defendant/Third-Party Crossclaim-Counterclaim-Plaintiff, v. Stephen Freidman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, First 2009 WL 2459680 | PDF | S.D.N.Y. | May 08, 2009 | Motion |

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **64. Memorandum of Law in Support of Motion of Defendants Mark Stern, First Republic Group Realty, LLC, First Republic Group Corp., Ephraim Frenkel and Land Title Associates Escrow to Dismiss the First Amended Complaint**<br>AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, Land Title Associates Escrow and Avery Egert, Defendants. Joshua Safrin, Defendant/Third Party Cross-claim-Counterclaim Plaintiff, v. Stephen Friedman, et al., Third Party Defendants, and Moses Stern, et al., Defendants/Crossclaim Defendants, and Amusement<br>2009 WL 2459426 | PDF | S.D.N.Y. | May 06, 2009 | Motion |
| **65. Memorandum of Law in Support of Consolidated Motion to Dismiss by Defendants Joshua Safrin and Avery Egert**<br>AMUSEMENT INDUSTRY, INC. (dba Westland Industries), and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN (aka Mark Stern), Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow and Avery Egert, Defendants. Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First<br>2009 WL 2459425 | — | S.D.N.Y. | May 01, 2009 | Motion |
| **66. Reply Memorandum of Law in Further Support of Third Party Defendants Buchanan Ingersoll & Rooney, PC and Stephen Friedman's Motion to Dismiss Safrin's Amended Third Party Complaint**<br>AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty Llc, Ephraim Frenkel, Land Title Associates Escrow, Defendants; Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Et Al.,Bankers Capital Realty Advisors LLC, and<br>2008 WL 4521830 | PDF | S.D.N.Y. | Aug. 22, 2008 | Motion |
| **67. Reply Memorandum of Law in Support of Third Party Defendants Buchanan Ingersoll & Rooney, PC and Stephen Friedman's Motion to Dismiss Third Party Defendants Bankers Capital Realty Advisors LLC and Steven Alevy's Cross Claim for Indemnification**<br>AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty Llc, Ephraim Frenkel, Land Title Associates Escrow, Defendants.<br>2008 WL 4521831 | PDF | S.D.N.Y. | Aug. 22, 2008 | Motion |

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **68. Memorandum of Law in Support of Motion to Dismiss the Cross Claims of Defendants Stern and First Republic** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries, and Practical Finance Co., Inc., Plaintiffs, v. Mses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, and Land Title Associates Escrow, Defendants. <br> 2008 WL 4521828 | PDF | S.D.N.Y. | Aug. 04, 2008 | Motion |
| **69. Reply Memorandum of Law in Support of Motion to Disqualify Plaintiffs' California Co-Counsel Sragow & Sragow** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Pratical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants; Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.c., Bankers Capital Realty Advisors, Llc, and First Republic Group Corp., Third <br> 2008 WL 4521825 | PDF | S.D.N.Y. | Aug. 01, 2008 | Motion |
| **70. Defendant Joshua Safrin's Memorandum of Law in Opposition To Crossclaim Defendants' Motions to Partially Dismiss the Crossclaims** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty Llc, Ephraim Frenkel, Land Title Associates Escrow, Defendants; Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.c., Bankers Capital Realty Advisors Llc, and First <br> 2008 WL 4521826 | PDF | S.D.N.Y. | Aug. 01, 2008 | Motion |
| **71. Defendant Joshua Safrin's Memorandum of Law in Opposition to Third Party Defendant First Republic Corp.'s Motion to Dismiss the Amended Third Party Complaint** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty Llc, Ephraim Frenkel, Land Title Associates Escrow, Defendants; Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors Llc, and First <br> 2008 WL 4521827 | PDF | S.D.N.Y. | Aug. 01, 2008 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **72. Third Party Plaintiff Joshua Safrin's Memorandum of Law in Opposition to Friedman and Buchanan, Ingersoll & Rooney, P.C.'s Motion to Dismiss the Amended Third Party Complaint** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants; Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First <br> 2008 WL 4521824 | PDF | S.D.N.Y. | July 31, 2008 | Motion |
| **73. Memorandum of Law in Opposition to Motion to Dismiss Cross Claim for Indemnification By Third Party Defendants Buchanan Ingersoll and Stephen Friedman** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries, and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, and Land Title Associates Escrow, Defendants. <br> 2008 WL 4521823 | PDF | S.D.N.Y. | July 29, 2008 | Motion |
| **74. Declaration of Michael A. Lynn in Support of Stern Defendants' Motion to Dismiss Cross-Claims Asserted By Defendant Joshua Safrin** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants; Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First <br> 2008 WL 4521821 | PDF | S.D.N.Y. | July 28, 2008 | Motion |
| **75. Declaration of Stephen R. Stern in Support of Motion By Defendants Ephraim Frenkel And Land Title Associates Escrow to Dismiss Cross-Claims Asserted By Defendant Joshua Safrin** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants; Joshua Safrin, Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff, v. Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First <br> 2008 WL 4521822 | PDF | S.D.N.Y. | July 28, 2008 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **76.  Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Disqualify the Sragow Firm** AMUSEMENT INDUSTRY, INC., dba Westland Industries, and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, and Land Title Associates Escrow, Defendants. 2008 WL 4521819 | [PDF] | S.D.N.Y. | July 11, 2008 | Motion |
| **77.  Memorandum of Law in Support of Third Party Defendants Buchanan Ingersoll & Roney, PC and Stephe Friedman's Motion to Dismiss Third Party Defendants Bankers Capital Realty Advisors LLC and Steven Alevy's Cross Claim for Indemnification** AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka mark stern; joshua safrin, first republic group realty LLC, ephraim frenkel, land title associates escrow, defendants. 2008 WL 3154384 | [PDF] | S.D.N.Y. | June 30, 2008 | Motion |
| **78.  Memorandum of Law in Support of Third Party Defendants Buchanan Ingersoll & Rooney, PC and Stephen Friedman's Motion to Dismiss Safrin's Amended Third Party Complaint** AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Joshua SAFRIN, Defendant/Third party-Crossclaim-Counterclaim-Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., et al.,Bankers Capital Realty Advisors LLC, and 2008 WL 3154383 | [PDF] | S.D.N.Y. | June 17, 2008 | Motion |
| **79.  Memorandum of Law In Support of Motion to Disqualify Plaintiffs' California Co-counsel Sragow & Sragow** AMUSEMENT INDUSTRY, INC., dba Westland Industries; Pratical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Joshua SAFRIN, Defendant/Third party-Crossclaim-Counterclaim plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors, LLC, and First Republic Group Corp., Third 2008 WL 3154382 | [PDF] | S.D.N.Y. | June 11, 2008 | Motion |

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **80.  Plaintiffs' Motion to Compel Jones Lang Lasalle to Produce Documents and Certification In Support Thereof** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries, and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Sarin, First Republic Group Realty LLC, Ephraim Frenkel, and Land Title Associates Escrow, Defendants. <br> 2008 WL 3154371 | [PDF] | S.D.N.Y. | June 09, 2008 | Motion |
| **81.  Plaintiffs' Motion to Compel Burr & Forman LLP to Produce Documents and Certification in Support Thereof** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries, and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, and Land Title Associates Escrow, Defendants. <br> 2008 WL 3154373 | [PDF] | S.D.N.Y. | June 09, 2008 | Motion |
| **82.  Plaintiffs' Motion to Compel all Risk Insurance Agency, Inc. To Produce Documents and Certification in Support Thereof** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries, and Practical Finance Co., Inc., Plaintiffs, v. MOSES STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, and Land Title Associates Escrow, Defendants. <br> 2008 WL 3154374 | [PDF] | S.D.N.Y. | June 09, 2008 | Motion |
| **83.  Plaintiffs' Motion to Compel Ace Capital Group to Produce Documents and Certification In Support Therof** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries, and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Roup Realty LLC, Ephraim Frenkel, and Land Title Associates Escrow, Defendants. <br> 2008 WL 3154375 | [PDF] | S.D.N.Y. | June 09, 2008 | Motion |
| **84.  Plaintiffs' Motion to Compel Latham & Watkins LLP to Produce Documents and Certification In Support Thereof** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries, and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, and Land Title Associates Escrow, Defendants. <br> 2008 WL 3154376 | [PDF] | S.D.N.Y. | June 09, 2008 | Motion |

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **85.  Memorandum of Law On Behalf of Third Party Defendant First Republic Group Corp. To Dismiss Amended Third Party Complaint of Joshua Safrin** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Pratical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Joshua SAFRIN, Defendant/Third party-Crossclaim-Counterclaim plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors, LLC, and First Republic Group Corp., Third <br> 2008 WL 3154377 | PDF | S.D.N.Y. | June 09, 2008 | Motion |
| **86.  Memorandum of Law in Support of Defendants Ephraim Frenkel and Land Title Associates Escrows Motion to Dismiss the Claims Asserted Them in Safrin's Amended Third Party Complaint** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Joshua SAFRIN, Defendant/Third party-Crossclaim-Counterclaim-Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First <br> 2008 WL 3154380 | PDF | S.D.N.Y. | June 09, 2008 | Motion |
| **87.  Memorandum of Law in Support of Defendant Stern and First Republic's Motion to Dismiss the Claims Asserted Against Them in Safrin's Amended Third Party Complaint** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Epharaim Frenkel, Land Title Associates Escrow, Defendants. Joshua SAFRIN, Defendant/Third Party-Crossclaim-Counterclaim-, Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First Republic Group Corp., Third <br> 2008 WL 3154381 | PDF | S.D.N.Y. | June 09, 2008 | Motion |
| **88.  Plaintiffs' Opposition to Defendant Frenkel's Motion to Quash Plaintiffs' North Fork Bank/capital One Subpena and Certification In Support Thereof** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries, and Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, and Land Title Associates Escrow, Defendants. <br> 2008 WL 3154369 | PDF | S.D.N.Y. | June 06, 2008 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **89.** **Defendant Joshua Safrin's Memorandum of Law in Opposition to Defendants/Crossclaim Defendants' Motions to Dismiss** AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Joshua SAFRIN, Defendant/Third party-Crossclaim-Counterclaim-Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First 2008 WL 3154391 | [PDF] | S.D.N.Y. | June 05, 2008 | Motion |
| **90.** **Memorandum of Law in Support of Defendant Stern and First Republic's Motion to Dismiss the Claims Asserted Against Them in Safrin's Third Party Complaint** AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. Johsua SAFRIN, Defendant/Third counterclaim-Plaintiff, v. Stephen FRIEDMAN, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First Republic Group Corp., Third party defendants , -, -, 2008 WL 3154390 | [PDF] | S.D.N.Y. | May 21, 2008 | Motion |
| **91.** **Affidavit of Stephen R. Stern In Opposition to Plaintiffs Motion to Compel Production** AMUSEMENT INDUSTRY, INC., dba Westland Industries; Pratical Inance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Group Realty,LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. 2008 WL 3154388 | [PDF] | S.D.N.Y. | May 01, 2008 | Motion |
| **92.** **Affidavit of Stephen R. Stern In Response to Defendant Joshua Safrin's Motion to Compel Production** AMUSEMENT INDUSTRY, INC., dba Westland Pratical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, Land Associates Escrow, Defendants. 2008 WL 3154389 | [PDF] | S.D.N.Y. | May 01, 2008 | Motion |

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **93.  Plaintiffs' Motion to Compel the Stern Defendants to Produce Documents and Certification in Support Thereof**<br>AMUSEMENT INDUSTRY, Inc., a California corporation dba Westland Industries; Practical Finance Co., Inc., a California corporation, Plaintiffs, v. Moses STERN, an individual aka Mark Stern; Joshua Safrin, an individual; First Republic Group Realty LLC, a Delaware limited liability company; Ephraim Frenkel, an individual; Land Title Associates Escrow, a New York limited liability company, Defendants.<br>2008 WL 3154386 | PDF | S.D.N.Y. | Apr. 29, 2008 | Motion |
| **94.  Defendant Joshua Safrin's Motion to Compel the Stern Defendants to Produce Documents**<br>AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin First Republic Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants.<br>2008 WL 3154387 | PDF | S.D.N.Y. | Apr. 29, 2008 | Motion |
| **95.  Reply Memorandum of Law in Further Support of Motion By Defendants Moses Stern First Republic Group Realty, LLC, Ephrim Frenkel and Land Title Associates Escrow to Dismiss the Complaint**<br>AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance CO., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants.<br>2008 WL 2295875 | PDF | S.D.N.Y. | Apr. 11, 2008 | Motion |
| **96.  Reply Memorandum of Law in Support of Defendant Joshua Safrin's Motion to Dismiss the Complaint**<br>AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants.<br>2008 WL 2295876 | PDF | S.D.N.Y. | Apr. 11, 2008 | Motion |
| **97.  Plaintiffs' Memorandum of Law in Opposition to Defendant Stern, First Republic, Frenkel and Land Title's Motion to Dismiss**<br>AMUSEMENT INDUSTRY, INC., a California corporation, dba Westland Finance Co., Inc., a California corporation, Plaintiffs, v. Moses STERN, an individual aka Mark Stern; Joshua Sfrin, an individual; First Republic Group Realty LLC, a Delaware limited liability Company; Ephraim Frenkel, an individual; Land Title Associates Escrow, a New York limited liability company, Defendants.<br>2008 WL 2295867 | PDF | S.D.N.Y. | Mar. 28, 2008 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **98.** **Plaintiffs' Memorandum of Law in Opposition to Defendant Safrin's Motion to Disimss** <br> AMUSEMENT INDUSTRY, INC., a California corporation, dba Westland Industries; Practical Finance Co., Inc., a California corporation, Plaintiffs, v. Moses STERN, an individual aka Mark Stern; Joshua Safrin, an individual; First Republic Group Realty LLC, a Delaware limited liability company; Ephraim Frankel, an individual; Land Title Associates Escrow, a New York limited liability company, Defendants. <br> 2008 WL 2295873 | PDF | S.D.N.Y. | Mar. 28, 2008 | Motion |
| **99.** **Memorandum of Law in Support of Defendant Joshua Safrin's Motion to Dismiss the Complaint** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Practical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern; Joshua Safrin, First Republic Realty LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. <br> 2008 WL 886327 | PDF | S.D.N.Y. | Feb. 28, 2008 | Motion |
| **100.** **Memorandum of Law in Support of Motion by Defendants Moses Stern, First Republic Group Realty, LLC, Ephraim Frenkel and Land Title Associates Escrow to Dismiss the Complaint** <br> AMUSEMENT INDUSTRY, INC., dba Westland Industries; Pratical Finance Co., Inc., Plaintiffs, v. Moses STERN, aka Mark Stern, Joshua Safrin, First Republic Group Realty, LLC, Ephraim Frenkel, Land Title Associates Escrow, Defendants. <br> 2008 WL 886328 | — | S.D.N.Y. | Feb. 28, 2008 | Motion |

## History (23)

### Direct History (1)

1. Amusement Industry, Inc. v. Stern
   2014 WL 4460393 , S.D.N.Y. , Sep. 11, 2014

### Related References (22)

2. Amusement Industry, Inc. v. Stern
   657 F.Supp.2d 458 , S.D.N.Y. , Sep. 28, 2009

3. Amusement Industry, Inc. v. Stern
   2010 WL 276464 , S.D.N.Y. , Jan. 22, 2010

4. Amusement Industry, Inc. v. Stern
   2010 WL 445898 , S.D.N.Y. , Feb. 09, 2010

5. Amusement Industry, Inc. v. Stern
   693 F.Supp.2d 301 , S.D.N.Y. , Mar. 01, 2010

6. Amusement Industry, Inc. v. Stern
   693 F.Supp.2d 319 , S.D.N.Y. , Mar. 01, 2010

7. Amusement Industry, Inc. v. Stern
   693 F.Supp.2d 327 , S.D.N.Y. , Mar. 01, 2010

8. Amusement Industry, Inc. v. Stern
   2010 WL 2976199 , S.D.N.Y. , July 26, 2010

9. Amusement Industry, Inc. v. Stern
   2010 WL 2976204 , S.D.N.Y. , July 26, 2010

10. Amusement Industry, Inc. v. Stern
    786 F.Supp.2d 741 , S.D.N.Y. , Mar. 11, 2011

⚑ 11. Amusement Industry, Inc. v. Stern
786 F.Supp.2d 758 , S.D.N.Y. , Mar. 11, 2011

12. Amusement Industry, Inc. v. Stern
786 F.Supp.2d 789 , S.D.N.Y. , Mar. 15, 2011

13. Amusement Industry, Inc. v. Stern
2011 WL 6811018 , S.D.N.Y. , Dec. 28, 2011

⚑ 14. Amusement Industry, Inc. v. Stern
293 F.R.D. 420 , S.D.N.Y. , Feb. 11, 2013

15. Amusement Industry, Inc. v. Stern
2016 WL 4249965 , S.D.N.Y. , Aug. 11, 2016

*Report and Recommendation Adopted by*

16. Amusement Industry, Inc. v. Stern
2016 WL 6820744 , S.D.N.Y. , Nov. 10, 2016

*Affirmed by*

17. Amusement Industry, Inc. v. Stern
721 Fed.Appx. 9 , 2nd Cir.(N.Y.) , Jan. 05, 2018

18. Amusement Industry, Inc. v. Stern
2016 WL 7009194 , S.D.N.Y. , Nov. 30, 2016

*Report and Recommendation Adopted by*

19. Amusement Industry, Inc. v. Stern
2017 WL 57851 , S.D.N.Y. , Jan. 04, 2017

*Affirmed by*

20. Amusement Industry, Inc. v. Stern
721 Fed.Appx. 9 , 2nd Cir.(N.Y.) , Jan. 05, 2018

21.  Amusement Industry, Inc. v. Stern
2016 WL 7016855 , S.D.N.Y. , Nov. 30, 2016


*Report and Recommendation Adopted by*

22.  Amusement Industry, Inc. v. Stern
2017 WL 57851 , S.D.N.Y. , Jan. 04, 2017


*Affirmed by*

23.  Amusement Industry, Inc. v. Stern
721 Fed.Appx. 9 , 2nd Cir.(N.Y.) , Jan. 05, 2018

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 161 of 238

Mitchell v. Cuomo, Not Reported in Fed. Supp. (2019)

2019 WL 1397195

2019 WL 1397195
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dontie S. MITCHELL, Plaintiff,

v.

Andrew M. CUOMO, Governor, Anthony Annucci,
Commissioner of Department of Corrections, John Miller,
Correction Lieutenant, R. Wood, Corrections Sergeant,
Robert J. Mahuta, Correction Officer, Napper, Correction
Officer, and Wells, Correction Officer, Defendants.

9:17-CV-0892 (TJM/DJS)
|
Signed 03/28/2019

**Attorneys and Law Firms**

Dontie S. Mitchell, Comstock, NY, pro se.

David A. Rosenberg, New York State Attorney General,
Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred to the Hon. Daniel J. Stewart, United
States Magistrate Judge, for a report and recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). In
his Report-Recommendation and Order (Dkt. No. 95) ("Rep.
Rec. & Ord."), Magistrate Judge Stewart recommends that
Defendants' Motion to Dismiss (Dkt. No. 57) be granted in
part and denied in part, and that Plaintiff's Fifth, Sixth, and
Seventh Motions for Preliminary Injunctions (Dkt. Nos. 61,
70, and 74) be denied. In addition, Magistrate Judge Stewart
ordered, *inter alia*, that Plaintiff's Motion to Amend (Dkt. No.
61), and Plaintiff's Third Motion for Counsel (Dkt. No. 61),
be denied. Plaintiff objects to Magistrate Judge Stewart's orders
denying amendment and the appointment of counsel, and to
various recommendations as addressed below.

**II. STANDARDS OF REVIEW**

**a. Objection to Magistrate Judge Non-Dispositive
Order**

A district court judge reviewing an objection to a magistrate
judge's non-dispositive pretrial order, as is in issue with
Magistrate Judge Stewart's orders denying amendment and
the appointment of counsel, [1] may not modify or set aside
any part of that order unless it is clearly erroneous or contrary
to law. *See* FED. R. CIV. P. 72(a); 28 U.S.C. § 636(b)(1)
(A); *Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007)
("[T]he district court to whom the case is assigned shall
consider ... objections and shall modify or set aside any
portion of the magistrate judge's order found to be clearly
erroneous or contrary to law.")(quoting Fed. R. Civ. P. 72(a)).
An order is clearly erroneous if, based on all the evidence, a
reviewing court "is left with the definite and firm conviction
that a mistake has been committed." *In re Gordon*, 780 F.3d
156, 158 (2d Cir. 2015) (internal quotation marks omitted)
(quoting *United States v. Murphy*, 703 F.3d 182, 188 (2d Cir.
2012)). "An order is contrary to law when it fails to apply or
misapplies relevant statutes, case law, or rules of procedure."
*Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*,
No. 15-CV-8459, 2017 WL 3142072, at \*1 (S.D.N.Y. July 24,
2017)(citation and internal quotation marks omitted).

---

[1]     *See* 28 U.S.C. § 636(b)(1)(A)(enumerating
dispositive matters subject to *de novo* review
and not including motions to amend); *Franke v.
ARUP Laboratories, Inc.*, 390 Fed. App'x 822,
828 (10th Cir. 2010) ("Mr. Franke's motion to
amend was a nondispositive pretrial matter that
the magistrate judge was authorized to decide
pursuant to 28 U.S.C. § 636(b)(1)(A)."); *Hall v.
Norfolk Southern Ry. Co.*, 469 F.3d 590, 595 (7th
Cir. 2006) ("The district judge correctly held that
the magistrate judge's denial of Hall's motion to
amend his complaint [to add a defendant] was
nondispositive, subject only to review for clear
error."); *Pagano v. Frank*, 983 F.2d 343, 346
(1st Cir. 1993) ("Under ordinary circumstances
a motion to amend a complaint is 'a pretrial matter
not dispositive of a claim or defense of a party'
within the purview of Fed. R. Civ. P. 72(a)."); 
*Palacio v. City of New York*, 489 F. Supp. 2d 335,
344 (S.D.N.Y. 2007)(reviewing magistrate judge's
denial of the appointment of *pro bono* counsel
under the clearly erroneous standard used for non-
dispositive pre-trial orders)

**b. Objection to Magistrate Judge Recommendation**
**\*2** When objections to a magistrate judge's recommendation
on a dispositive matter are made, the district court makes

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 162 of 238
Mitchell v. Cuomo, Not Reported in Fed. Supp. (2019)
2019 WL 1397195

a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997) (The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings.). When no objection is made to a report and recommendation, or to a portion thereof, the Court subjects the report and recommendation, or the portion to which no objection is made, to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. In performing such a review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*

After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b).

## III. DISCUSSION

### a. Motion to Amend

Magistrate Judge Stewart's decision to deny Plaintiff's motion to file a Second Amended Complaint, *see* Rep-Rec. & Ord., at 19-23, is not clearly erroneous or contrary to law. Proposed claims related to Plaintiff's confinement at Elmira C.F., Wende C.F., and Collins C.F. were already pled in this matter, severed from the action, and transferred to the Western District of New York. *See* Dkt. No. 13. It would be futile to amend to add these claims again. "[I]t is well established that leave to amend a [pleading] need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).

It would also be futile to reassert claims identical to those in the Complaint and Amended Complaint that the Court previously found to have been insufficiently pled to withstand a motion under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. Nos. 13 & 24. "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Ramos v. Dep't of Correction*, No. 3:15-CV-1444 (VAB), 2017 WL 855897, at *3 (D. Conn. Mar. 3, 2017)(citing *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)).

Regarding Plaintiff's proposed claims related to his confinement at Great Meadow C.F. asserting his First

Amendment right to (1) wear "cornrows;" (2) promote the Ujamaa Fraternal Dynasty ("UFD"), a non-profit organization which he founded as an alternative to gangs; and (3) receive daily mail without excessive delay, the Court previously denied Plaintiff's motion to amend to add these claims because Plaintiff was "attempting to add new defendants and claims that are completely unrelated to the central issues in the Amended Complaint." 01/29/18 Dec. & Ord., Dkt. No. 48, at 9. As the Court stated in its January 29, 2018 Decision and Order,

> Plaintiff's claims related to alleged violations of his First Amendment rights at Great Meadow C.F. in 2017 are wholly unrelated to the allegations set forth in his Amended Complaint that he was assaulted at Clinton C.F. in 2014, and that his First Amendment rights were violated at Clinton C.F. in 2014. *Compare* Dkt. No. 28-1 *with* Am. Compl. Thus, the new allegations against the new defendants do not pertain to the operative pleading. Indeed, the proposed new claims involve events which occurred, if at all, years after the alleged wrongdoing set forth in the Amended Complaint, and were allegedly perpetrated by individuals not named in the Amended Complaint.

*Id.* Magistrate Judge Stewart correctly concluded at "[t]he allegations in the Proposed Second Amended Complaint do not cure the deficiencies previously identified." Rep-Rec. & Ord. at 23. [2]

[2]    For the reasons discussed in the text, Plaintiff's attempt to cure a deficiency in his proposed Second Amended Complaint through his objections, *see* Obj. at 2 ("Although I do not specifically state in my Proposed Second Amended Complaint that Superintendent Miller was personally involved in the denial of my request to form a prison chapter of UFD, I declare under penalty of perjury that he was."), is insufficient to reverse the decision to deny the motion to amend.

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 163 of 238

Mitchell v. Cuomo, Not Reported in Fed. Supp. (2019)

2019 WL 1397195

**\*3** Magistrate Judge Stewart's decision to rely on the Court's previous Decision, and on Fed. R. Civ. P. 15(d),[3] to deny Plaintiff's motion to amend to add First Amendment claims allegedly occurring at Great Meadow C.F. is not clearly erroneous or contrary to law. The proposed First Amendment claims are neither related to nor pertain to the allegations in the operative pleading, thus providing a basis to deny amendment under Rule 15(d). *See Girard v. Hickey*, No. 9:15-CV-0187, 2016 WL 915253, at \*5 (N.D.N.Y. Mar. 4, 2016)(" 'Courts regularly deny motions to amend where the moving party seeks to add claims involving collateral matters, based on different factual allegations and distinct legal theories, from the claims already at issue in a case.' ")(quoting *Amusement Indus., Inc. v. Stern*, No. 07 Civ. 11586, 2014 WL 4460393, at \*13 (S.D.N.Y. Sept. 11, 2014)(collecting cases)); *McKenzie v. Obertean*, No. 17-CV-441W, 2019 WL 441593, at \*1 (W.D.N.Y. Feb. 5, 2019)(" 'A supplemental pleading is designed to cover matters that occur subsequent to the filing of the complaint, but pertain to the original pleadings. Thus, under Rule 15(d), a party may supplement the original pleading to include subsequent occurrences which are related to the claim presented in the original complaint, absent prejudice to the nonmoving party.' ")(quoting *Albrecht v. Long Island R.R.*, 134 F.R.D. 40, 41 (E.D.N.Y. 1991)(citations omitted)); *Stepney v. Rochester Hous. Auth.*, No. 16-CV-6173-FPG, 2018 WL 3110225, at \*6 (W.D.N.Y. June 25, 2018)("[C]ourts may ... decline to permit supplemental pleadings if the new claims are not adequately 'related to the originally stated claims.' ") (quoting *Webster v. Himmelbach*, 271 F. Supp. 3d 458, 472 (W.D.N.Y. 2017), and citing Wright *et al.*, 6 Fed. Prac. & Proc. Civ. §§ 1510 and 1506 (3d ed.)(explaining that courts have denied supplemental pleadings when "the claim or defense asserted in the supplemental pleading bore little or no relationship to the original pleading" and that "refusal to allow the supplemental pleading is entirely justified when" the new "matters alleged have no relation to the" original claim)); *Beckett v. Inc. Vill. of Freeport*, No. CV 11-2163 LDW AKT, 2014 WL 1330557, at \*6 (E.D.N.Y. Mar. 31, 2014)("Supplemental pleadings are 'limited to subsequent events related to the claim or defense presented in the original pleading.' ")(quoting 3 Moore Federal Practice § 15.30 (3d ed. 2010)); *see also Webster*, 271 F. Supp. 3d at 472–73 (W.D.N.Y. 2017)(Denying amendment under Rule 15(d) because "Plaintiff does not seek to bolster, amplify, or clarify the two claims alleged in his amended complaint; rather, he seeks to raise an entirely new constitutional claim under the First Amendment.").

3    Rule 15(d) provides: "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time." Fed. R. Civ. P. 15(d).

Furthermore, denial of the motion to amend to add the First Amendment claims was proper because the addition of the claims would not promote the economic and speedy disposition of the controversy between the parties as framed in the operative pleading. *See Grace v. Rosenstock*, 228 F.3d 40, 53-54 (2d Cir. 2000) (Leave to amend is properly denied "where the belated motion would unduly delay the course of proceedings by, for example, introducing new issues for discovery.")(internal citation omitted); *Girard*, 2016 WL 915253, at \*6 ("In considering plaintiff's motion [to amend], the Court is mindful of the fact that discovery has not been completed. However, because this case presently includes multiple causes of action asserted against multiple defendants, the Court finds that the addition of numerous other defendants and unrelated claims arising at entirely distinct locations will necessarily prolong this action and impose additional expense on defendants. Moreover, the Court finds that adding these new claims would not aid in the efficient resolution of this action."); *Andino v. Fischer*, 698 F. Supp. 2d 362, 374 (S.D.N.Y. 2010) (denying motion to supplement because "such a supplementation does not aid in the efficient resolution of the instant action" and would prejudice the existing defendants); *Stepney*, 2018 WL 3110225, at \*6 ("[C]ourts may deny supplemental pleadings that would not 'promote the economic and speedy disposition of the entire controversy between the parties.' ")(quoting Wright et al., 6 Fed. Prac. & Proc. Civ. § 1504 and citing *Sai v. Transp. Sec. Admin.*, 155 F. Supp. 3d 1 (D.D.C. 2016)). Magistrate Judge Stewart did not abuse his discretion in denying Plaintiff's motion to amend to add proposed First Amendment claims (including Plaintiff's proposed First Amendment claim against Gov. Cuomo). *See Girard*, 2016 WL 915253, at \*2 (N.D.N.Y. Mar. 4, 2016)("The decision to grant or deny a motion to amend or supplement is committed to the sound discretion of the trial court, and the court's decision is not subject to review on appeal except for abuse of discretion.")(citing *Fielding v. Tollaksen*, 510 F.3d 175, 179 (2d Cir. 2007)). Because the statute of limitations does not appear to have run on Plaintiff's proposed First Amendment

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 164 of 238

Mitchell v. Cuomo, Not Reported in Fed. Supp. (2019)

2019 WL 1397195

claims, Plaintiff is free to assert these claims in a separate action. For the reasons set forth above, Plaintiff's objection to Magistrate Judge Stewart's decision to deny Plaintiff's motion to amend is overruled.

### b. Motion for Appointment of Counsel.

**\*4** For the reasons discussed by Magistrate Judge Stewart at pages 25-26 of the Report-Recommendation and Order, his decision to deny without prejudice Plaintiff's third motion for the appointment of counsel is not clearly erroneous or contrary to law. Plaintiff's objection on this issue is overruled.

### c. Plaintiff's Fifth, Sixth, and Seventh Motions for Preliminary Injunctions

Plaintiff's objection to Magistrate Judge Stewart's recommendation to deny Plaintiff's Fifth, Sixth, and Seventh motions for preliminary injunctions is that "[his] current motions for preliminary injunctive relief are inextricably intertwined with and predicated upon [the] motion for leave to amend [the] Amended Complaint.... [The] motion to amend should have been granted, thereby establishing a basis for [the] current motions for preliminary injunctive relief." Obj., at p. 4. However, because the Court finds that Magistrate Judge Stewart properly denied the motion to amend, Plaintiff presents no meritorious reason to reject Magistrate Judge Stewart's recommendation to deny Plaintiff's Fifth, Sixth, and Seventh motions for preliminary injunctions. Furthermore, upon conducting a *de novo* review of these motions, the Court adopts Magistrate Judge Stewart's conclusions for the reason stated in the Report-Recommendation and Order at pages 23-25. Plaintiff's objection on this issue is overruled.

### d. Recommendation on "Blanket Ban" to Social Media Printed Content

Magistrate Judge Stewart recommends dismissal of Plaintiff's claim that DOCCS promulgated a policy with a "blanket ban" on printed materials from social media, emails, and text messages. In this regard, Magistrate Judge Stewart wrote:

> While Plaintiff alleges that Directive 4422 imposes such a blanket ban, *see* Am. Compl. at ¶ 129, a review of the Directive fails to bear out his assertions. As Defendants' Motion makes clear, the Directive expressly allows inmates to receive printed

material with correspondence. Defs.' Mem. of Law at p. 13 (citing Directive 4422). The Directive itself does not appear to contain the ban on social media materials alleged by Plaintiff and nothing in his opposition papers refutes Defendants' contention to the contrary or points to anything in the Directive specifically barring complete access to such materials. *See* Dkt. Nos. 61-1 & 61-2. Given the information now available, Plaintiff's conclusory allegation regarding this policy is insufficient to withstand the Motion to Dismiss. *Salgado v. NYS Dep't of Corr. & Cmty. Supervision*, 2016 WL 6311296, at \*10 (W.D.N.Y. Sept. 15, 2016), report and recommendation adopted, 2016 WL 6298517 (W.D.N.Y. Oct. 27, 2016); *Odom v. Poirier*, 2004 WL 2884409, at \*13 (S.D.N.Y. Dec. 10, 2004).

Rep.-Rec. & Ord., at 15-16.

In objecting to this recommendation, Plaintiff points to an allegation in the Amended Complaint that he did not receive social media materials sent to him "because they were third-party mail in violation of Directive #4422," Am. Compl. ¶ 140, and asserts in his objections that "in truth, the 'blanket ban' on social media materials, emails, and text messages is an unwritten policy and how directive #4422 is being applied state-wide." Obj. at 3. Plaintiff's allegation in the Amended Complaint that he did not receive social media materials sent to him by a third-party does not establish that Directive 4422 imposes a blanket ban on social media printed content. Furthermore, his allegation in his objections of a unwritten policy in applying Directive 4422 is insufficient to modify the allegations contained in the Amended Complaint. Plaintiff is free to move to amend the Amended Complaint to include this allegation of an unwritten policy, but the absence of this allegation in the Amended Complaint provides a sufficient basis to adopt Magistrate Judge Stewart's recommendation on this issue. Accordingly, Plaintiff's objection in this regard is overruled.

### e. Recommendation on constitutionality of Rule 105.14

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 165 of 238

Mitchell v. Cuomo, Not Reported in Fed. Supp. (2019)

2019 WL 1397195

**\*5** Magistrate Judge Stewart concluded that Plaintiff lacks standing to challenge the constitutionality of Rule 105.14 because Plaintiff fails to allege that he suffered any actual injury due to the application of this rule. *See* Rep. Rec. & Ord., at 18-19. While Magistrate Judge Stewart noted that Plaintiff was previously found not guilty of violating this rule, he concluded that Plaintiff lacked standing because " '[a] plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future.' " Rep. Rec. & Ord., at 18 (quoting *Peck v. Baldwinsville Cent. Sch. Dist.*, 351 Fed. Appx. 477, 479 (2d Cir. 2009) (summary order) (in turn quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d at 344)). Plaintiff argues in his objections that "[b]ecause DOCCS denied my request to form a prison chapter of UFD, I can be disciplined for violating Prison Rule 105.14 and placed in solitary confinement for nine months if I continue to promote and organize UFD. Hence, I have standing to challenge the constitutionality of Prison Rule 105.14 as applied here." Obj., at 3. Plaintiff's allegation of possible future injury is insufficient to confer standing. As the Supreme Court has held:

> To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, ——, 130 S.Ct. 2743, 2752, 177 L.Ed.2d 461 (2010); *see also* [*Summers v. Earth Island Institute*, 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L.Ed.2d 1 (2009)]; [*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992)]. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.*, at 565, n. 2, 112 S. Ct. 2130 (internal quotation marks omitted). Thus, we have repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient. *Whitmore*, 495 U.S., at 158, 110 S. Ct. 1717 (emphasis added; internal quotation marks omitted); *see also Defenders of Wildlife, supra*, at 565, n. 2, 567, n. 3, 112 S. Ct. 2130; *see* [*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006)]; *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 190, 120 S. Ct. 693, 145 L.Ed.2d 610 (2000); *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L.Ed.2d 895 (1979).

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 1147, 185 L.Ed. 2d 264 (2013)(emphases added in *Clapper*).

Plaintiff's possible future injury from the application of Rule 105.14 is not "*certainly* impending," and therefore insufficient to confer standing. Accordingly, Plaintiff's objection on this issue is overruled.

### f. Recommendations without Objections.

The Court has reviewed Magistrate Judge Stewart's recommendation to which no objections have been filed, and finds no clear error on the face of the record in relation thereto.

## IV. CONCLUSION

For the reasons discussed above, Plaintiff's objections to Magistrate Judge Stewart's orders denying Plaintiff's motion to amend [Dkt. No. 61], and for the appointment of counsel [Dkt. No. 61], are **OVERRULED**, and Magistrate Judge Stewart's orders in the regard are **AFFIRMED**.

Also for the reasons discussed above, the Court **ACCEPTS and ADOPTS** the recommendations in the Report-Recommendation and Order, Dkt. No. 95, for the reasons stated therein. Thus, it is hereby

**ORDERED** that Defendants' Motion to Dismiss (Dkt. No. 57) is **GRANTED** in part and **DENIED** in part.

> The motion is **GRANTED** (1) Insofar as it seeks dismissal of the claim asserting the existence of a blanket policy barring access to social media material, and (2) Insofar as it seeks dismissal of Plaintiff's claim related to the constitutionality of Rule 105.14, and these claims are **DISMISSED without prejudice**.

**\*6** The motion is **DENIED** (1) Insofar as Defendants Miller and Mahuta move to dismiss Plaintiff's Amended Complaint against them based upon qualified immunity; and (2) Insofar as Defendant Annucci seeks dismissal of Plaintiff's claims alleging that his First Amendment rights were violated by the arbitrary imposition of a mail watch,

and it is further,

**ORDERED** that Plaintiff's Fifth, Sixth, and Seventh Motions for Preliminary Injunctions (Dkt. Nos. 61, 70, and 74) are **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1397195

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

## Filings (8)

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment** <br> Dontie S. MITCHELL, Plaintiff, v. Andrew M. CUOMO, et al., Defendants. <br> 2020 WL 11647753 | — | N.D.N.Y. | July 02, 2020 | Motion |
| **2.  Memorandum of Law in Support of Defendants' Motion for Summary Judgment** <br> Dontie MITCHELL, Plaintiff, v. Andrew CUOMO, et al., Defendants. <br> 2019 WL 13077057 | — | N.D.N.Y. | Dec. 03, 2019 | Motion |
| **3.  Memorandum of Law in Opposition to Plaintiff's Motions for Preliminary Injunctive Relief** <br> Dontie MITCHELL, Plaintiff, v. Andrew CUOMO, et al., Defendants. <br> 2018 WL 11363186 | — | N.D.N.Y. | Sep. 28, 2018 | Motion |
| **4.  Memorandum of Law in Support of Defendants' Motion to Dismiss Pursuant to FRCP Rule 12(b)(6)** <br> Dontie MITCHELL, Plaintiff, v. Andrew CUOMO, et al., Defendants. <br> 2018 WL 11363185 | — | N.D.N.Y. | Mar. 19, 2018 | Motion |
| **5.  Memorandum of Law** <br> Dontie S. MITCHELL, Plaintiff, v. Andrew M. CUOMO, et al., Defendants. <br> 2017 WL 11639353 | — | N.D.N.Y. | Nov. 20, 2017 | Motion |
| **6.  Defendants' Proposed Voir Dire Questions** <br> Dontie S. MITCHELL, Plaintiff, v. Ronald WOOD, Neil Napper, and Nicholas Wells, Defendants. <br> 2021 WL 4768361 | — | N.D.N.Y. | June 28, 2021 | Filing |
| **7.  Defendants' Proposed Jury Instructions** <br> Dontie S. MITCHELL, Plaintiff, v. Ronald WOOD, Neil Napper, and Nicholas Wells, Defendants. <br> 2021 WL 4768360 | — | N.D.N.Y. | June 28, 2021 | Jury Instruction |
| **8.  Docket 9:17-CV-00892** <br> Mitchell v. Cuomo et al | — | N.D.N.Y. | Aug. 14, 2017 | Docket |

## History (8)

**Direct History (2)**

1. Mitchell v. Cuomo
2019 WL 2479611 , N.D.N.Y. , Jan. 03, 2019

*Report and Recommendation Adopted by*

2. Mitchell v. Cuomo 🐾
2019 WL 1397195 , N.D.N.Y. , Mar. 28, 2019

**Related References (6)**

3. Mitchell v. Cuomo
2017 WL 8780773 , N.D.N.Y. , Dec. 06, 2017

*Appeal Dismissed by*

4. Mitchell v. Cuomo
2018 WL 11301572 , 2nd Cir. , May 31, 2018

*Motion to Recall Mandate Denied by*

5. Mitchell v. Cuomo
2018 WL 11301571 , 2nd Cir. , Oct. 15, 2018

*Certiorari Denied by*

6. Mitchell v. Cuomo
587 U.S. 963 , U.S. , Apr. 22, 2019

7. Mitchell v. Annucci
2020 WL 7029136 , N.D.N.Y. , Sep. 03, 2020

*Report and Recommendation Adopted by*

8. Mitchell v. Annucci
2020 WL 6375468 , N.D.N.Y. , Oct. 30, 2020

KeyCite Yellow Flag

Declined to Follow by    Desio v. State Farm Mutual Automobile Insurance
Company,    D.Nev., November 16, 2021

2014 WL 1330557
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Leonard BECKETT, Plaintiff,

v.

The INCORPORATED VILLAGE OF FREEPORT,
The Incorporated Village of Freeport Police Department,
Police Officer Timothy P. Seaman, The Incorporated
Village of Freeport, Police Officer William Luikart,
The Incorporated Village of Freeport Police Detective
Edward S. Martin, III, The Incorporated Village of
Freeport, Police Officer John Doe, The Incorporated
Village of Freeport, Individually and in their capacities as
Village of Freeport Police Officers, Police Officer Diane
Peress, The Incorporated Village of Freeport, Police
Officer Donetta Cumberbatch, The Incorporated Village
of Freeport, Nassau County, Nassau County Police
Department, Donald Meese, Nassau County Detective,
Diane Peress, Nassau County Police Officer, John Doe,
Nassau County Police Officer, Individually and in Their
Capacities as Nassau County Police Officers, Defendants.

No. CV 11–2163(LDW)(AKT).
|
Signed March 31, 2014.

**Attorneys and Law Firms**

Valerie A. Hawkins, Hempstead, NY, for Plaintiff.

John L. Marsigliano, Chesney & Nicholas, LLP, Baldwin, NY,
Sal F. Deluca, Simmons Jannace, LLP, Syosset, NY, Liora M.
Ben–Sorek, Mineola, NY, for Defendants.

**MEMORANDUM AND ORDER**

A. KATHLEEN TOMLINSON, United States Magistrate
Judge.

**\*1** Plaintiff Leonard Beckett ("Plaintiff" or "Beckett")
brought this civil rights action claiming that his constitutional

rights were violated by the Defendants in connection with
their arresting him on February 6, 2010. Specifically, Plaintiff
asserts that he was walking along the street in Freeport, New
York at approximately 7:50 p.m. on February 6, 2010 when
an individual slowed down his vehicle in the street and then
exited the vehicle and pursued the Plaintiff. Second Amended
Complaint ("SAC") ¶¶ 28–29 [DE 34]. Plaintiff maintains
that he was wrongfully pursued on foot by several individuals,
was unreasonably seized and detained, and was assaulted and
battered. SAC ¶¶ 33–34.

Before the Court is Plaintiff Beckett's motion to amend the
Complaint for a third time to include facts which he states
occurred after the filing of the SAC and which stem from
his recent acquittal on burglary and petit larceny charges.
This motion is brought pursuant to Federal Rules of Civil
Procedure 15(a), 15(d) and 21. DE 54. In particular, Plaintiff's
counsel points out that shortly after filing the SAC on
February 8, 2013, Plaintiff went on trial for a 2007 burglary
which took place at 11 Weberfield Avenue in the Village of
Freeport. Plaintiff was acquitted of all charges arising from
the burglary on June 17, 2013. On August 23, 2013, Plaintiff
moved to amend to supplement his pleading to include these
"transactions, occurrences, and events" which post-date the
SAC. Plaintiff purportedly does not seek to add any new
causes of action.

Nassau County, the Nassau County Police Department,
and Detective Donald Meese (collectively, the "County
Defendants") oppose Plaintiff's third motion to amend,
contending that Plaintiff's acquittal on the burglary charges
has no connection to the instant action. The Nassau County
Defendants maintain that the motion should be denied by the
Court as a futility.

The Village of Freeport and the Freeport Police Department
(collectively, the "Village Defendants") and the individual
Freeport Police Officer defendants are represented by
separate counsel. The Village Defendants have also filed
opposition to Plaintiff's motion, arguing that there is no
basis to amend to add these new factual allegations. Finally,
individual Freeport Police Officers Timothy P. Seaman,
William Luikart, Thomas D. Seaman, Donetta Cumberbatch,
and Detective Edward S. Martin (the "Freeport Police
Officer Defendants") also oppose the motion for leave to amend,
proffering that Plaintiff's effort to insert new facts constitutes
a misguided attempt to restart the discovery process for
his eventual assertion of a malicious prosecution claim
concerning the 2007 burglary.

For the reasons that follow, Plaintiff's motion for leave to file a Third Amended Complaint is DENIED.

## I. *BACKGROUND*

### A. The Allegations

Plaintiff filed his original Complaint on May 4, 2011. DE 1. Before Defendants answered, Plaintiff filed an Amended Complaint on August 20, 2011. DE 2. In an Order dated January 25, 2013, this Court granted, in part, and denied, in part, Plaintiff's motion to file a SAC. DE 33. Pertinent to the matter presently before the Court, Plaintiff in that motion sought leave to add a malicious prosecution claim for the 2007 Weberfield Burglary. *Id.* at 46. However, the Court found that the claim was not ripe at that time, holding that:

> **\*2** It is axiomatic that ... a claim for malicious prosecution does not arise until the underlying charges are dismissed in the plaintiff's favor. According to the [Proposed SAC], Plaintiff remains incarcerated on the Weberfield Burglary charges. Consequently, a malicious prosecution claim in connection with the Weberfield Burglary charges cannot stand and Plaintiff is DENIED leave to amend to add a malicious prosecution claim at this time.

*Id.* (internal citations omitted). In accordance with the directives set forth in the Court's January 25, 2013 Order, Plaintiff filed the SAC on February 8, 2013. *See generally* SAC.

The SAC alleges that on February 6, 2010, Police Officer Timothy Seaman ("Officer Seaman") received a radio report of a robbery at a liquor store in the Village of Freeport (the "Liquor Store Robbery"). SAC ¶¶ 20–23. The alleged perpetrator was described as a black male wearing a black jacket. *Id.* ¶ 24. Police Officer Seaman, who was in plain clothes and driving an unmarked vehicle, observed Plaintiff Beckett wearing a red and white jacket over a black jacket. *Id.* ¶¶ 22, 27. Officer Seamen alleged that as he slowed down his vehicle, Beckett began to run southbound. *Id.* ¶ 28. After

getting out of the car, Officer Seaman pursued Beckett on foot. *Id.* ¶ 29. Beckett asserts that Seaman did not identify himself as a police officer. *Id.* After a chase, Beckett was apprehended by Officer Seaman with the assistance of other Freeport Police Officers and was arrested *Id* . ¶ 32.

At the Village police station, Plaintiff found himself, "bruised, battered, bleeding from the mouth, and drifting in and out of consciousness." SAC ¶ 64. Plaintiff "spat his blood into a cup" and the cup was then "recovered by defendant Nassau County Police Detective Donald Meese and held as evidence along with Beckett's clothing." *Id.* ¶ 39. Detective Meese then forwarded the evidence to the Nassau County Medical Examiner's Office for DNA analysis. *Id.*

Plaintiff has set forth numerous claims arising out of his arrest in connection with the Liquor Store Robbery. The civil rights claims under [42 U.S.C. § 1983](https://) are based on Defendants' alleged unlawful search and seizure, unreasonable detention, assault, battery, use of excessive force, brutality, and unlawful punishment, all in violation of Plaintiff's rights protected under the Fourth and Fourteenth Amendments to the Constitution. Plaintiff also sets forth state law causes of action, including violations of the New York State Constitution, false arrest, false imprisonment, assault, and battery.

Beckett was incarcerated after having been convicted upon a plea of guilty to the Liquor Store Robbery. SAC ¶ 46. He was sentenced to five years in prison and five years post-release supervision. *Id.* On October 8, 2011, however, the New York State Supreme Court, Appellate Division, Second Department ("Second Department") reversed Beckett's conviction on the grounds that the Freeport police had unlawfully pursued and seized Plaintiff, rendering all evidence against him "fruit of the poisonous tree." *Id.* ¶ 49. In reaching that decision, the Appellate Division held that "the pursuit of the defendant and his seizure were unlawful" and "[c]onsequently, the physical evidence, identification testimony, and the defendant's statement to law enforcement officials should have been suppressed as 'fruit of the poisonous tree.' " *People v. Beckett,* [88 A.D.3d 898, 899–900, 931 N.Y.S.2d 126 (2d Dep't 2011)](https://) (internal citations omitted).

**\*3** On November 18, 2011, the Liquor Store Robbery charges against Plaintiff were dismissed. SAC ¶ 51. However, while Plaintiff was in custody at the Village Police Department, "[d]efendants collected the blood that Beckett

expelled from his mouth and subjected it to DNA analysis by the New York State police." *Id.* ¶ 52, 931 N.Y.S.2d 126. The blood taken from Plaintiff was "allegedly found to match DNA that was recovered on February 14, 2007 from 11 Weberfield Avenue in the defendant Village, the scene of an alleged burglary. ¶ 53. In light of this evidence, Plaintiff alleges, Nassau County Police Detective Michelle A. Clifford filed a felony complaint against the Plaintiff. SAC ¶ 54.

On June 20, 2011, a grand jury sitting in Nassau County "handed down a sealed indictment that charged Beckett with one count of burglary in the second degree in violation of New York State Penal Law § 140.25(2) and one count of petit larceny in violation of New York State Penal Law § 155.25." SAC ¶ 55. Plaintiff's bail was originally set at $100,000 in cash by a Nassau County court. *Id.* ¶ 56, 931 N.Y.S.2d 126. However, since Plaintiff "lacked the means to post bail in the said amount," he remained incarcerated in the Nassau County Correctional Facility until bail was reduced to $5,000 cash in July of 2012. *Id.* After posting bail, Plaintiff was released from custody July 14, 2012 following nineteen months of incarceration. *Id.*

**B. Acquittal of Weberfield Burglary Charges**

On June 17, 2013, a Nassau County jury acquitted the Plaintiff on the burglary and petit larceny charges from the 2007 Weberfield Burglary. DE 50 at 1. Two days later, on June 19, 2013, Plaintiff's counsel filed a letter notifying the Court of the acquittal and requesting leave to amend a third time, explaining that

[t]he reason for this request is that all New York state court criminal proceedings against Mr. Beckett have finally terminated. On June 17, 2013, a jury acquitted Mr. Beckett of all of the charges pending against him pursuant to Nassau County Court Indictment No. 376–12.

As a result of the acquittal, Mr. Beckett wants to amend his complaint in this action to allege that the unlawful and malicious acts and/or omissions of the defendants resulted in the said state court prosecution. In response to Mr. Beckett's prior motion to amend his complaint to include the claims arising from the aforementioned state court prosecution, Your Honor ruled that these claims were not ripe for adjudication.

It is respectfully submitted that, with the termination of the state court proceeding in favor of Mr. Beckett, these claims are now ripe for adjudication. Therefore, Mr. Beckett

would like to include those claims in this action and litigate all of his claims against the defendants in this action.

*Id.* at 1–2, 931 N.Y.S.2d 126. Plaintiff's counsel also argues that she has put the Court and all defendants on notice that the state criminal proceedings would have a bearing on the instant civil action throughout the pendency of the instant federal civil rights action. *Id.* at. 2. Counsel stated that she has, moreover, requested the Court to "delay the prosecution of this action to await the outcome of the criminal proceeding" at multiple points during the pendency of this litigation, most recently on May 10, 2013. *Id.*

**\*4** On July 18, 2013, the parties participated in a Telephone Status Conference before this Court. *See* DE 53. The Court addressed Plaintiff's request for leave to amend the SAC, which the Court noted, is uniformly opposed by the Defendants. *Id.* ¶ 1, 931 N.Y.S.2d 126. The Court ultimately granted Plaintiff leave to file the requested motion and set a briefing schedule with the parties. *Id.* ¶ 2, 931 N.Y.S.2d 126.

In her motion, Plaintiff's counsel argues that: (1) Plaintiff acted promptly in notifying the Court and Defendants of his desire to amend; (2) the amended pleading is not futile; (3) the amendments will not require Defendants to expend additional resources in discovery or trial preparation; and (4) granting leave to amend to add the new allegations would serve judicial economy. *See* Memorandum of Law in Support of Motion to Amend Complaint ("Pl.'s Mem.") at 2–6 [DE 54–2].

In opposition, the County Defendants argue that Plaintiff's proposed amendments are futile because no "nexus" exists between the DNA retrieved by the Village Police after the February 2010 Liquor Store Robbery and the DNA used in the June 2013 prosecution of Plaintiff for the 2007 Weberfield Burglary. *See* Memorandum of Law in Opposition to Plaintiff's Motion to Amend His Complaint a Third Time ("County Defs.' Opp.") at 6–7 [DE 59]. Moreover, the County Defendants assert that Plaintiff has set forth no facts that Detective Meese or any other individually named County Defendant was involved in the "allegedly prolonged incarceration" or the prosecution for the 2007 Weberfield Burglary. *Id.* at 7, 931 N.Y.S.2d 126.

Counsel for the Village Defendants also opposes the motion, arguing that the proposed Third Amended Complaint ("TAC") is futile for reasons similar to those raised by the County Defendants. *See* TAC annexed as Ex. "A" to the Declaration of Valerie A. Hawkins in Support of Motion to Amend Complaint ("Hawkins Decl.") [DE 54–3].

Further, the Village Defendants claim that the amendments are an attempt by Plaintiff to "lay the foundation" for a future malicious prosecution claim concerning the Weberfield Burglary. *See* Village Defendants' Memorandum of Law in Opposition ("Village Defs.' Opp.") at 6–9 [DE 56–9]. Finally, the Freeport Police Officer Defendants argue in their opposition that: (1) the proposed TAC is futile because no contemplated malicious prosecution claim stemming from the 2007 Weberfield Burglary can be asserted against the Village Police Officer Defendants; (2) Plaintiff cannot amend a Notice of Claim in federal court, and, thus, the Supplemental Notice of Claim is deficient; and, in any event, (3) the Supplemental Notice of Claim is a futility. *See* Freeport Police Officer Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Amend ("Freeport Police Officers' Opp.") at 9–13.

## II. *LEGAL STANDARD*

### A. Federal Rule of Civil Procedure 16(b)(4)—"Good Cause"

To the extent that Plaintiff seeks leave to amend the Complaint pursuant to Rule 15(a), he must demonstrate "good cause" since the current motion comes after the deadline to amend pleadings has expired. According to Rule 16(b), the court must enter a scheduling order setting deadlines for subsequent proceedings in the case, including "the time to join other parties [and] amend the pleadings ." FED. R. CIV. P. 16(b). "By limiting the time for amendments, the rule is designed to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed." *See Parker v. Columbia Pictures Industries,* 204 F.3d at 339–40 (2d Cir.2000) (internal quotations omitted); *accord Ricciardi v. Kimco Facilities Servs. Corp.,* No. 10 Civ. 5371, 2012 WL 6761533, at *1 (E.D.N.Y. Jun. 12, 2012). In certain cases, however, the Court may determine that a deadline "cannot reasonably be met despite the diligence of the party seeking the extension." *Parker,* 204 F.3d at 339 (internal quotations omitted). "In such cases, where the moving party has demonstrated good cause, the court may grant leave to amend the scheduling order to extend the deadline." *Id.; see 246 Sears Road Realty Corp. v. Exxon Mobil Corp.,* No. 99 Civ. 889, 2012 WL 4174862, at *9 (E.D.N.Y. Sept.18, 2012). "[I]n allowing modifications of scheduling orders only for good cause, [Rule 16(b) ] provides the district courts discretion to ensure that limits on time to amend pleadings do not result in prejudice or hardship to either side." *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 243–44 (2d

Cir.2007); *Erdogan v. Nassau County,* No. 10 Civ. 5837, 2014 WL 1236679, at *5 (E.D.N.Y. Mar.25, 2014).

**\*5** "Good cause in this context depends on the diligence of the moving party, and, to satisfy the standard, the movant must demonstrate that it is has been diligent in its effort to meet the Court's deadlines." *Sokol Holdings, Inc. v. BMD Munai, Inc.,* No. 05 Civ. 3749, 2009 WL 2524611, at *7 (S.D.N.Y. Aug. 14, 2009) (internal citations and quotations omitted); *see Enzymotec Ltd. V. NBTY, Inc.,* 754 F.Supp.2d 527, 536 (E.D.N.Y.2011). "In other words, the party must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met." *Sokol,* 2009 WL 2524611 at *7 (citing *Rent–A–Center Inc. v. 47 Mamaroneck Ave. Corp.,* 215 F.R.D. 100, 104 (S.D.N.Y.2003)); *Erdogan,* 2014 WL 1236679, at *4. In determining whether the good cause standard is met, "the primary consideration is whether the moving party can demonstrate diligence[,]" but that is not the only consideration. *Kassner,* 496 F.3d at 244. "The district court, in the exercise of its discretion under Rule 16(b), also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Id.; see Ritchie Risk Limited Strategies Trading (Ireland), Ltd. v. Coventry First LLC,* 282 F.R.D. 76, 79 n. 2 (S.D.N.Y.2012).

### B. Federal Rule of Civil Procedure 15(a)—Motion to Amend

Once Plaintiff has established "good cause" to modify the scheduling order under Rule 16(b)(4), Plaintiff must then satisfy the requirements of Rule 15(a) to be granted leave to amend. Rule 15(a) of the Federal Rules of Civil Procedure provides that in cases where a party cannot amend as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave." *Accord Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir.2002); *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991); *Barber v. Hornbeck Offshore Operators, LLC,* No. 11 Civ. 5520, 2014 WL 1010993, at *5 (E.D.N.Y. Mar. 17, 2014); *M.E.S., Inc. v. Liberty Mut. Sur. Group,* No. 10 Civ. 2798, 2014 WL 46622, at *8 (E.D.N.Y. Jan.6, 2014). A court "should freely give leave when justice so requires" and leave is in the court's discretion. *See* FED. R. CIV. P. 15(a); *see also Krupski v. Costa Crociere S. p. A.,* 560 U.S. 538, 130 S.Ct. 2485, 2489, 177 L.Ed.2d 48 (2010) (Rule 15(a) "gives a district court discretion to decide whether to grant a motion to amend a pleading before trial."); *Grace v. Rosenstock,* 228 F.3d 40, 56 (2d Cir.2000); *MHANY Mgmt. v. County of Nassau,* 843 F.Supp.2d 287, 340 (E.D.N.Y.2012) (noting

that "it is ultimately within the sound discretion of the court whether to grant leave to amend").

Notwithstanding the foregoing principles, leave to amend may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Williams v. Citigroup Inc.,* 659 F.3d 208, 213–14 (2d Cir.2011) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *SCS Commc'n, Inc. v. Herrick Co.,* 360 F.3d 329, 345 (2d Cir.2004) ("[U]nder Rule 15(a), leave to amend a pleading may *only* be given when factors such as undue delay or undue prejudice to the opposing party are absent.") (emphasis in original). " 'The party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial.' " *Pasternack v. Lab. Corp. of Am.,* 892 F.Supp.2d 540, 529 (S.D.N.Y.2012) (quoting *Fariello v. Campbell,* 860 F.Supp. 54, 70 (E.D.N.Y.1994)); *accord Allstate Ins. Co. v. Elzanaty,* 916 F.Supp.2d 273, 304 (E.D.N.Y.2013). The opposing party likewise bears the burden of establishing that an amendment would be futile. *See Cummings–Fowler v. Suffolk Community Coll.,* 282 F.R.D. 292, 296 (E.D.N.Y.2012) (citing *Blaskiewicz v. County of Suffolk,* 29 F.Supp.2d 134, 137–38 (E.D.N.Y.1998)).

### B. Federal Rule of Civil Procedure 15(d)-Motion to Supplement Pleadings

**\*6** Federal Rule of Civil Procedure 15(d) provides that on motion, "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." The same standard for motions to amend under Rule 15(a) applies to motions to supplement under Rule 15(d). *See Salazar v. Bowne Realty Assocs., LLC,* 796 F.Supp.2d 378, 383 (E.D.N.Y.2011); *Petrello v. White,* No. 01 Civ. 3082, 2011 WL 4793172, at \*4 (E.D.N.Y. Feb. 23, 2011). Supplemental pleadings are "limited to subsequent events related to the claim or defense presented in the original pleading." 3 MOORE FEDERAL PRACTICE § 15.30 (3d ed.2010); *see Fair Housing in Huntington Committee v. Town of Huntington, N.Y.,* No. 02 Civ. 2787, 2010 WL 4791787, at \*7 (E.D.N.Y. Nov. 18, 2010). Significantly, a party seeking to supplement pleadings under Rule 15(d) is not required to demonstrate "good cause" under Rule 16(b)(4) since this latter provision pertains solely to motions to *amend*—not motions to *supplement* pleadings. *See Watson v. Wright,* No. 08 Civ. 960, 2011 WL 1118608, at \*5 (W.D.N.Y. Jan. 11,

2011) *adopted by* 2011 WL 1099981 (W.D.N.Y. Mar 24, 2011) ("Unlike motions to amend ... Rule 16's plain language does not require courts to set a deadline for filing a motion to supplement and the parties in this case did not set such a deadline in their Scheduling Order.") (internal citation and quotations omitted).

### III. *DISCUSSION*

#### A. Good Cause

To the extent that Plaintiff seeks leave to amend under Rule 15(a), the Court finds that Plaintiff has demonstrated "good cause" to modify the scheduling order pursuant to Rule 16(b)(4). In the present matter, the final deadline to join parties or amend the pleadings expired on March 19, 2012. *See* Feb. 9, 2012 Electronic Order. In that Electronic Order, the Court stated that:

> The Court will grant an extension of the deadline for the joinder of parties and amendment of pleadings set forth in the Case Management and Scheduling Order. If counsel wishes to amend the Complaint, she must do so by stipulation or by formal motion pursuant to the Federal Rules of Civil Procedure. The stipulation or motion is due by March 19, 2012.

*Id.* Here, Plaintiff's counsel accurately represents that she notified the Court of her intention to amend and file the proposed TAC just two days following Plaintiff's acquittal on the charges stemming from the 2007 Weberfield Burglary. *See* DE 50. In her June 19, 2013 letter, Plaintiff's counsel reported that Plaintiff was acquitted by a Nassau County jury on June 17, 2013. *Id.* at 1. Furthermore, Plaintiff's counsel specifically cited this Court's January 25, 2013 Order in which the Court denied Plaintiff leave to amend a malicious prosecution claim arising from the Weberfield Burglary since it had not yet been adjudicated. *Id.;* DE 33 at 46. The Court reasoned, in light of the pending state prosecution, that any malicious prosecution claim arising from the Weberfield Burglary was not ripe for adjudication. *See* DE 33 at 46. However, following the June 17, 2013 acquittal on these charges, Plaintiff's counsel maintained that "with the termination of the state court

2014 WL 1330557

proceeding in favor of Mr. Beckett, these claims are now ripe for adjudication." DE 50 at 2.

**\*7** Approximately one month after Plaintiff filed the June 19, 2013 letter, the Court presided over a Status Conference where a briefing schedule for the motion to amend was established and entered. *See* DE 53 ¶ 2. Plaintiff's counsel ultimately filed her initial moving papers on August 23, 2013. *See* DE 54. In light of the multiple times Plaintiff brought the circumstances of her client's criminal prosecution to the attention of the Court, and considering the diligence of Plaintiff's counsel in advising the Court of her anticipated motion to amend only two days following her client's acquittal, the Court finds that Plaintiff has demonstrated good cause warranting the modification of the March 19, 2012 deadline to amend pleadings. *See Sokol,* 2009 WL 2524611 at \*7 (citing *Rent–A–Center Inc.,* 215 F.R.D. at 104); *Erdogan,* 2014 WL 1236679, at \*7 (finding that "the applicable deadline could not have reasonably been met and Plaintiff acted with diligence under Rule 16(b)").

### B. Undue Delay and Prejudice

Preliminarily, the Court points out that Plaintiff's motion papers do not clearly articulate whether the instant motion is brought solely under Rule 15(a) or pursuant to both Rule 15(a) and 15(d). For example, Plaintiff's counsel refers to the "new causes of action" and, at the same time, asks for leave "to allege the facts that have transpired since" the filing of the SAC to "develop his claims." *See* Pl.'s Mem. at 3; *see also* Plaintiff's Reply Memorandum of Law in Support of Motion to Amend Complaint ("Pl.'s Reply Mem.") at 5. According to counsel, Plaintiff "has not advanced any malicious prosecution or retaliation claims against any of the defendants" but rather "seeks to set forth the transactions, occurrences, and events that happened after he filed his second amended complaint in this action." Pl.'s Reply Mem. at 2–3. However, in her June 19, 2013 letter, Plaintiff's counsel states that she seeks to amend the action "to allege that the unlawful and malicious acts and/or omissions of the defendants resulted in the said state court prosecution" for the Weberfield Burglary. DE 50 at 1. Despite the seeming dissonance of these representations, it appears that Plaintiff is seeking leave under Rule 15(a) to assert a malicious prosecution claim arising out of the Weberfield Burglary *and* to supplement the pleading under Rule 15(d) with facts that arose after the February 8, 2013 SAC was filed. As such, the Court will construe the motion under both Rule 15(a) and Rule 15(d).

Since courts apply the same factors when assessing motions to amend under Rule 15(a) and motions to supplement under Rule 15(d), the Court will simultaneously analyze whether Plaintiff should be granted leave to amend under these provisions. *See Riverhead Park Corp. v. Cardinale,* 881 F.Supp.2d 376, 379 (E.D.N.Y.2012) ("Where, as here, the Plaintiffs seek to add related claims against the same defendants, the analysis under Rule 15(a) and Rule 15(d) is the same.") (internal citations omitted). "A court should deny leave to amend or to serve a supplemental pleading only upon undue delay, bad faith or dilatory motive on the part of the [moving party], ... undue prejudice to the [nonmoving party,] ... [or] futility." *Cummings–Fowler,* 282 F.R.D. at 296 (internal citations and quotations omitted); *Williams,* 659 F.3d at 213–14. "The party opposing the motion bears the burden of establishing that an amendment would be prejudicial or futile." *Cummings–Fowler,* 282 F.R.D. at 296 (internal citation omitted). "Ultimately, it is within the sound discretion of the court whether to grant leave to amend." *Id.* (internal citation and quotations omitted).

**\*8** Here, the Court finds no undue delay in the filing of Plaintiff's motion for leave to amend the pleading a third time. The claims and events sought to be added in the proposed TAC had not yet occurred and were not yet cognizable at the time the SAC was filed on February 8, 2013. *See* TAC. The steadfastness of Plaintiff's counsel in pursuing civil rights claims originating from the Weberfield Burglary is borne out by her multiple attempts at amending the pleading. In its January 25, 2013 Order, this Court held that any malicious prosecution claim arising out of the 2007 Weberfield Burglary was not yet ripe for review because that criminal matter was still pending in state court. *See* DE 33 at 46. As soon as those charges were terminated on June 17, 2013, Plaintiff's counsel wasted no time notifying the Court of those developments and renewing her request to amend the SAC in her letter of June 19, 2013. DE 50. Given this timeline, the Court finds that Plaintiff did not unduly delay bringing the instant motion.

However, the Court disagrees with Plaintiff's representation that "[t]his action remains in its early stages" and, as such, will not unduly prejudice the Defendants. *See* Pl.'s Mem. at 5–6. Judge Wexler has twice placed the parties on notice of jury selection in this action. First, on July 31, 2013, the parties were advised that jury selection was set for June 2, 2014. *See* Jul. 31, 2013 Electronic Order. Again, on January 28, 2014, Judge Wexler reminded the parties that the new jury selection date of June 2, 2014 remained in effect and

there would be no adjournments. *See* Jan. 28, 2014 Electronic Order. As acknowledged by Plaintiff's counsel,

> [t]his matter was scheduled for jury selection on June 10, 2013; however, jury selection did not commence as Beckett was actually engaged in jury selection and trial in the Nassau County Court on the aforementioned burglary and petite (*sic*) larceny charges against him.

Hawkins Decl. ¶ 22; *see also* DE 53 ¶ 3.

The Court also points out that discovery was closed on September 28, 2012, when Judge Wexler originally marked this case ready for trial. *See* DE 32. Plaintiff's counsel alludes to a possible fourth amended pleading (potentially adding a claim of malicious prosecution arising from the burglary acquittal) which would undoubtedly delay the resolution of this action further in contravention of Judge Wexler's directives. As the County Defendants argue, Plaintiff's supplemental pleading "foreshadows a future request—a fourth amended complaint—to add new claims (malicious prosecution)" at this late stage of the litigation. County Defs.' Opp. at 5–6. The Freeport Police Officer Defendants submit that Plaintiff's instant motion is prejudicial to them on grounds similar to those asserted by the County Defendants. *See* Freeport Police Officers' Opp. at 9. The Freeport Police Officers argue that the TAC constitutes "nothing more than an attempt to 're-start' the case to obtain long waived discovery." *Id.* According to Plaintiff's counsel, Defendants will not be required to "expend additional resources to conduct discovery and prepare for trial and would not significantly delay the resolution of this dispute." Pl.'s Mem. at 5–6. However, this conclusory statement is not reflective of the facts presently before the Court. As set forth by counsel, Plaintiff "should be permitted to amend and supplement his complaint to allege the facts that have transpired since he filed his second amended complaint" and he should further ***"be permitted to complete discovery to develop his claims against the defendants."*** Pl.'s Reply Mem. at 5 (emphasis added). As gleaned from the declarations of Plaintiff's counsel, discovery does, in fact, remain to be completed in this action. *See* Hawkins Decl. ¶¶ 23–24. Plaintiff's counsel points out that:

**\*9** 23. The original parties in this action, Beckett and the Village defendants, have served and responded to interrogatories and document requests. The Village defendants deposed Beckett on April 9 and 10, 2013. Counsel for the County defendants was present at the deposition.

24. Beckett and the County defendants have served interrogatories and document requests; however, they have not been responded to the same.

*Id.* Given that discovery is concededly incomplete with respect to the current claims, permitting a further amendment to allow Plaintiff to explore allegations of malicious prosecution concerning the Weberfield Burglary will substantially extend the time this matter is litigated. Moreover, the 2007 Weberfield Burglary concerns a completely different incident from the one at issue in this litigation—the 2010 Liquor Store Robbery. As such, the Court finds that granting leave for a third time would, contrary to counsel's assertions, "significantly delay" resolution of this action.

Finally, the Court notes that finding the TAC prejudicial does not foreclose Plaintiff's ability to bring a separate lawsuit in connection with the Weberfield Burglary. Plaintiff, in conjunction with the instant pleading, filed a Second Supplemental Notice of Claim, dated September 13, 2013, which included, *inter alia,* a claim of malicious prosecution against all Defendants. *See* Second Supplemental Notice of Claim annexed to the Declaration of Deputy County Attorney Liora Ben–Sorek, Esq. ("Ben–Sorek Decl.") as Ex. "D" [DE 58–4]. In its January 25, 2013 Order, the Court found Plaintiff's filing of the Supplemental Notice of Claim appropriate. DE 33 at 17. Here, too, the Court finds that the filing of the Second Supplemental Notice of Claim was appropriate. As previously explained by this Court, "several courts, without directly addressing the issue, have permitted plaintiffs to serve additional notices of claim which include facts that developed after the original notice was filed." DE 33 at 17 (citing *Rotundo v. Vill. of Yorkville,* No. 09 Civ. 1262, 2011 WL 838892, at \*3 (N.D.N .Y. March 4, 2011); *Rivera v. Comm. Sch. Dist. Nine,* No. 00 Civ. 8208, 2002 WL 1461407, at \*2 (S.D.N.Y. July 8, 2002); *Blue Water Envtl., Inc. v. Inc. Vill. of Bayville, New York,* 12 Misc.3d 1169(A), 820 N.Y.S.2d 841 (N.Y. Sup.Ct. Nassau Co.2006)). Since Plaintiff filed the Second Supplemental Notice of Claim within the ninety day statute of limitations set forth in General Municipal Law § 50–e(1), Plaintiff is not precluded from bringing an independent

2014 WL 1330557

action for malicious prosecution arising out of the June 17, 2013 acquittal on the Weberfield Burglary charges.

## C. Whether Supplemental Facts in the TAC Connect to the SAC Under Rule 15(d)

Plaintiff contends that the proposed TAC would "buttress judicial economy." Pl.'s Mem. at 6 (citing *State Farm Mut. Auto. Ins. Co. v. Grafman,* No. 04 CV. 2609, 2007 WL 7704666 (E.D.N.Y. May 22, 2007)). As a general matter, Rule 15(d) "reflects a liberal policy favoring a merit-based resolution of the entire controversy between the parties." *Witkowich v. Gonzales,* 541 F.Supp.2d 572, 590 (S.D.N.Y.2008) (internal quotation marks and citations omitted); *Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted). However, this "liberal policy" under Rule 15(d) is predicated on whether "the supplemental facts connect [the supplemental pleading] to the original." *Id.* (internal citations and quotations omitted). Here, the central dispute is whether the 2007 Weberfield Burglary is connected to the 2010 Liquor Store Robbery for which this case was originally brought. Under Rule 15(d), "[t]he threshold consideration for the district court is whether the supplemental facts connect [the supplemental pleading] to the original pleading." *Fair Housing in Huntington Committee,* 2010 WL 4791787, at *9 (internal citation and quotations omitted); *LaBarbera v. Audax Const. Corp.,* No. 02 Civ. 582, —— F.Supp.2d ——, 2013 WL 5295493, at *8 (E.D.N.Y.2013) ("Rule 15(d) allows a party to supplement the complaint in order to present subsequent material that is related to the claims presented in the original complaint."). "If there is a relationship, then leave to supplement should be freely permitted absent undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility." *Fair Housing in Huntington Committee,* 2010 WL 4791787, at *9 (internal citation and quotations omitted).

**\*10** The Court finds that Plaintiff has failed to meet the threshold requirement establishing a connection between the claims in the operative pleading (SAC) and the new facts asserted in the proposed supplemental pleading (TAC) concerning the Weberfield Burglary. The County Defendants argue that "Plaintiff's proposed amendment[ ] attempts to link the DNA recovered at [Freeport Police Department] on February 6, 2010 with his continued incarceration on burglary charges (until July 2012) and the prosecution on those burglary charges which were resolved in June 2013." County Defs.' Opp. at 6. The County Defendants maintain that "neither Beckett's 2011 indictment on charges of burglary

(stemming from a 2007 crime), nor his June 2013 trial was based at all upon the DNA retrieved at [Freeport Police Department] in February 2010." *Id.* at 7. In support of this position, the County Defendants have annexed the Affidavit of Assistant District Attorney Anthony Perri ("ADA Perri") to the Declaration of Deputy County Attorney Liora Ben–Sorek, Esq. filed in support of their opposition to Plaintiff's motion. *See* Ben–Sorek Decl., Ex. "E" ("Perri Aff."). ADA Perri explains that:

2. In June 2013, I was assigned to prosecute the case captioned: *People of the State of New York v. Leonard Beckett;* Indictment # 376N–12, in which the defendant was charged with having committed burglary in the second degree in violation of New York State Penal Law § 140.25(2).

3. The burglary at issue occurred on February 14, 2007 in Freeport, County of Nassau, State of New York.

4. The DNA left at the burglary scene was compared with a buccal sample taken from defendant Beckett, which he was required to give as a result of a prior conviction for endangering the welfare of a minor from May 16, 2003. Beckett's indictment on the burglary charge was, in part, based upon a comparison of those samples. The forensic evidence left at the crime scene and DNA obtained from the aforementioned mandatory buccal swabbing were the only DNA evidence utilized in connection with Beckett's indictment.

5. On or about February 27, 2013, another buccal swab was taken from Beckett pursuant to a discovery order signed by Acting New York Supreme Court Justice Hon. Alan L. Honorof under New York State Criminal Procedure Law § 240.40. The February 27, 2013 buccal sample also matched the same DNA previously analyzed from the burglary scene.

6. Trial on the burglary charge was conducted in June 2013. The only DNA evidence presented during the trial was from the buccal sample taken in February 2013 and that which was recovered from the scene of the 2007 burglary.

*Id.* ¶¶ 2–6. Given this record, the County Defendants submit that "there is no nexus between the Defendants in this case and the actions sought to be alleged in the new pleading." County Defs.' Opp. at 7.

Similarly, the Village Defendants refer to ADA Perri's affidavit and argue that "the indictment of the plaintiff for that

[Weberfield] burglary that resulted in his acquittal was based in part upon comparison of DNA that was left at the scene of the 2007 burglary in Freeport, New York with DNA obtained from the plaintiff from a buccal swab sample that plaintiff was required to give the Nassau County District Attorney as a result of his prior conviction in 2003 for endangering the welfare of a minor." Village Defs.' Opp. at 7. As such, the Village Defendants contend, the "DNA left at the scene of the burglary in 2007 was not obtained from his blood obtained on February 6, 2010 after his arrest for the robbery committed at the Freeport Wine & Liquor Store." *Id.* at 8. The Freeport Police Officer Defendants likewise state "it is undisputed that plaintiff's DNA from the 2010 robbery was not used in connection with plaintiff's prosecution for the 2007 burglary." Freeport Police Officers' Opp. at 11.

**\*11** In reply, Plaintiff argues that the "illegally obtained evidence was the foundation for both the 2010 robbery charges and the 2011 burglary charges against which Beckett had to defend himself." *See* Reply Declaration of Valerie A. Hawkins, Esq. in Support of Motion to Amend Complaint ("Hawkins Reply Decl."). In tying these two charges together, Plaintiff attempts to develop linkage between the SAC and the TAC which is necessary to add new allegations in a supplemental pleading under Rule 15(d). Citing a March 9, 2010 internal Nassau County Police Department memorandum from Sergeant Michael Cole of the Forensic Evidence Bureau to Defendant Meese, Plaintiff contends that Defendant Meese was "informed of a match between Beckett's DNA and the DNA found at the scene of the alleged robbery." Hawkins Reply Decl., Ex. "A." In that March 9, 2010 memorandum, submitted for the first time in reply, Sergeant Cole wrote that:

> The evidence submitted to the **Forensic Evidence Bureau** for *DNA* analysis (10CR0010747, L10000698,)defendants gloves, jacket, cup and victims buccal swab kit have been accepted by the *Medical Examiner / Department of Forensic Genetics* for *immediate* analysis. The evidence has been transferred to the *ME/DoFG.* Should you need clarification or have any questions please, contact the Evidence Assessment Section at Ext. 7800.

*Id.* (emphasis in original). In citing this inter-departmental memorandum, Plaintiff concludes that the County Defendants had custody of the evidence secured from the 2010 Liquor Store Robbery arrest and later matched it with the earlier 2007 Weberfield Burglary. Hawkins Reply Decl. ¶ 5. Plaintiff submits that the County Defendants were "informed of a match between Beckett's DNA found at the scene of the alleged 2007 burglary" on May 28, 2010 as reflected in Detective Buokowski's case notes for the Office of the Medical Examiner. Pl.'s Reply. at 3; *see* Nassau County Office of the Medical Examiner Dep't of Forensic Genetics Case Contact Form, annexed as Exhibit "B" ("Forensic Notes") to the Hawkins Reply Decl. [DE 61–3]. As such, the assertion that "the illegal arrest by Beckett by the defendants had nothing to do with the 2011 burglary prosecution is false.'" Pl.'s Reply at 3. The inter-departmental memorandum and Forensic Notes are particularly troubling, according to Plaintiff's counsel, because all evidence from the pursuit and seizure of Plaintiff's person following the 2010 Liquor Store Robbery were declared unlawful by the Appellate Division in *Beckett,* 88 A.D.3d at 931, 931 N.Y.S.2d 667, by the time Plaintiff's burglary trial commenced in 2013. Hawkins Reply Decl. ¶ 4. As such, the DNA sample, which Plaintiff claims was seized during the February 2010 arrest, also lays the foundation for his motion to supplement and, counsel argues, the Court should allow Plaintiff to "develop his claims against the defendants." Pl.'s Reply Mem. at 5.

Based on a review of the record, the Court is not persuaded by Plaintiff's conclusion that the Weberfield Burglary is connected to the claims in the SAC for purposes of amending under Rule 15(d). Although Plaintiff's counsel refers to the evidentiary decision of Justice Honorof which was issued on June 22, 2012 in connection with the Weberfield Burglary prosecution, counsel neglects to cite a critical segment of that decision, specifically, that the court denied Plaintiff's motion to suppress DNA evidence. *See* Hawkins Reply Decl., Ex. "C." The issue before Justice Honorof was not unlike the one currently before the Court, namely, whether the DNA used by the prosecution against the Plaintiff on the Weberfield Burglary constituted the same sample that was suppressed by the Appellate Division. *Id.* at 1, 931 N.Y.S.2d 667. In the Weberfield Burglary prosecution, Plaintiff moved to suppress the DNA as "fruit of the poisonous tree" whereas the state argued that "the DNA to which the DNA in this case was matched was not the DNA obtained which was ultimately suppressed, but rather came from the defendant's 'convicted defendant specimen', lawfully taken and maintained by the New York State DNA Index System after plea in that matter."

*Id.* (internal citation omitted). However, Justice Honorof held that

> **\*12** [t]he defendant's motion to suppress the instant DNA evidence is denied. Though the DNA in the initial robbery case was illegally obtained, the defendant's subsequent plea and the DNA sample was legally obtained pursuant to a voluntary plea. As the Second Department held in *People v. King,* 232 AD3d 111, 117 "once a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to use of that sample", lv. denied 91 NY3d 875 (1997).

*Id.* The County Defendants asserted in their opposition papers that "[a]s part of pre-trial discovery in the burglary prosecution, Nassau County Acting Supreme Court Justice Hon. Alan Honorof ordered Beckett to provide a buccal sample." County Defs.' Opp. at 4. As referenced in the County defendants' opposition and in the affidavit of ADA Perri, "[t]hat sample was taken on or about February 27, 2013 and matched the DNA found at the burglary scene." *Id.* In contrast to the arguments set forth by the Defendants, Plaintiff has set forth only conclusory, circular arguments proffering that the DNA sample used by the state to prosecute the Weberfield Burglary was unlawfully obtained. Moreover, as seen above, Plaintiff's contentions are predicated on an incomplete recitation of the facts from the underlying burglary proceeding. Given this record, the Court finds that the facts to be added in Plaintiff's supplemental pleading are not connected to the civil rights claims stemming from the 2010 Liquor Store Robbery.

This case is distinguishable from *Witkowich,* 541 F.Supp.2d at 590, where, for example, the court *sua sponte* granted plaintiffs leave to supplement a retaliation claim pursuant to Rule 15(d) because plaintiff's new allegations in opposing defendants' summary judgment motion were "closely related to those raised" in the pleading. The court reasoned that the supplemental allegations involved the "same subject matter," "many of the same people," and events which took place around the same time as the original discrimination claim. *Witkowich,* 541 F.Supp.2d at 590. By contrast here, the series of events Plaintiff seeks to bring within the supplemented pleading (1) arise from totally different charges, (2) took place three years prior to the 2010 Liquor Store Robbery at issue, (3) involve different parties, and, (4) unlike the interconnectedness of a discrimination and retaliation claim, are not closely related but rather, represent two entirely different transactions.

Similarly, the facts in the present matter are dissimilar to those presented to the court in *Alexandre v. Town of Hempstead,* 275 F.R.D. 94, 98 (E.D.N.Y.2011) in which plaintiff's motion to supplement was granted pursuant to Rule 15(d). There, the plaintiff did not seek to add any new causes of action, but rather to add further facts to his original cause of action. As a result, the court found that only limited additional discovery would be necessary. *Alexandre,* 275 F.R.D. at 98; *see also Andino v. Fischer,* 698 F.Supp.2d 362, 374 (S.D.N.Y.2010) (denying motion to supplement under Rule 15(d)). Here, by contrast, the Plaintiff is admittedly using the unrelated acquittal of charges from the Weberfield Burglary to explore a potential new claim, not yet realized, against the Defendants. Unlike *Alexandre* and *Andino,* Plaintiff does not show how the contemplated malicious prosecution claim stemming from the Weberfield Burglary would connect to the original claims such that there is no undue prejudice or delay in the resolution of this action.

### D. Futility

**\*13** Assuming Plaintiff also seeks to set forth a new claim of malicious prosecution, the Court must assess whether that new cause of action would be a futility under Rule 15(a). In addition to causing undue prejudice, the Court finds that the purported new claim, namely, malicious prosecution for the Weberfield Burglary, fails to state a plausible claim upon which relief can be granted. "An amendment is futile if the claim would be unable to withstand a Rule 12(b)(6) motion to dismiss ... and the court applies the same analysis in determining futility as it does in deciding Rule 12(b)(6) motions." *Wade v. Rosenthal,* No. 11 Civ. 5672, 2012 WL 3764291, at \*1 (E.D.N.Y. Aug. 29, 2012) (internal citations and quotations omitted). "As a result, mere labels, conclusions, and a 'formulaic recitation of the elements of a cause of action' do not suffice to state a plausible claim." *Id.* (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,555 (2007)). All Defendants in this action contend that any putative malicious prosecution claim originating from the burglary charges would be unsustainable. The County Defendants argue the general principle that a plaintiff must allege personal involvement of a defendant in a Section 1983 lawsuit. County Defs.' Opp. at 7. Here, the County Defendants maintain, "Plaintiff makes no direct allegation that Detective Meese or any of the other individual defendants caused Plaintiff's allegedly prolonged incarceration or was in any way involved in the prosecution against him of the burglary charges." *Id.*

The Freeport Police Officer Defendants contend that, as an initial matter, Plaintiff's counsel concedes that no new claim is being asserted in the TAC. Freeport Police Officers' Opp. at 9. As such, they argue that Plaintiff's counsel has "chosen to waste the time of the defendants and this court with the instant motion." *Id.* Assuming that Plaintiff *is* setting forth such a claim, the Freeport Police Officer Defendants assert that any such malicious prosecution claim would be futile against them because they "undisputedly had no role in commencing or continuing the prosecution of plaintiff in connection with the 2007 burglary." *Id.* at 10. Further, the Freeport Police Officer Defendants submit that Plaintiff cannot establish the "requisite element of malice" necessary to set forth a *prima facie* malicious prosecution claim against any of the Defendants. *Id.*

The Village Defendants likewise oppose the motion, arguing that a malicious prosecution claim associated with the Weberfeld Burglary is futile because (1) contrary to Plaintiff, the DNA evidence used in the burglary trial was not unlawfully obtained, and (2) Plaintiff's counsel acknowledged at trial that the blood obtained at the scene of the burglary was, concededly, from the Plaintiff. Village Defs.' Opp. at 7–8.

A claim for malicious prosecution under New York law requires the plaintiff to prove: (1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) the termination of the proceeding in the plaintiff's favor; (3) a lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's action. *Anilao,* 774 F.Supp.2d at 504. "The absence of probable cause is, therefore, 'an essential element of a claim for malicious prosecution.' " *Perez v. City of New York,* No. 01 Civ. 5384, 2007 WL 14486, at *11 (E.D.N.Y.2007) (quoting *McClellan v. Smith,* 439 F.3d 137, 145 (2d Cir.2006)); *Gem Financial Service, Inc. v. City of New York,* No. 13 Civ. 1686, 2014 WL 1010408, at *9 (E.D.N.Y. Mar. 17, 2014) (listing the elements of a *prima facie* malicious prosecution claim). Furthermore, "[a]n indictment by a grand jury creates a presumption of probable cause." *Perez,* 2007 WL 14486, at *11. "The presumption may be overcome only by evidence establishing that the [defendants] have not made a complete and full statement of facts either to the Grand Jury or to the [prosecutor], that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith...." *Colon v. City of New York,* 60 N.Y.2d 78, 82–83, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983); *accord Faison v. Maccarone,* No. 11 Civ. 137, 2012 WL 681812, at *7 n. 11 (E.D.N.Y. Mar. 1, 2012) (holding that a plaintiff

may only overcome the presumption by establishing that the indictment was procured by fraud, perjury, suppression of evidence or other police conduct undertaken in bad faith); *Perez,* 2007 WL 14486, at *11. A plaintiff must allege specific facts that rebut the presumption of probable cause which arises from a grand jury indictment. *Rhodes v. Tevens,* No. 07 Civ. 471 S, 2012 WL 777421, at *9 (W.D.N.Y. Mar.7, 2012).

**\*14** Here, to the extent that Plaintiff is attempting to set forth a malicious prosecution claim arising out of the Weberfield Burglary, the claim is not plausible. Preliminarily, the Court notes that such a claim suffers from some of the same infirmities identified in Plaintiff's assertion of a malicious prosecution claim stemming from the 2010 Liquor Store Robbery. As explained in the Court's January 25, 2013 Order:

> The [Proposed SAC] alleges that "[o]n May 5, 2010, a Nassau County grand jury handed down an indictment that charged Beckett" with various counts of robbery, assault, criminal possession of a weapon, and resisting arrest. Therefore, a presumption arises that Defendants acted with probable cause and Plaintiff must allege wrongdoing by the Defendants with respect to the grand jury proceedings. Plaintiff has not done so. Thus, the claim is unsustainable.

> Notably, the Liquor Store Robbery malicious prosecution claim would also be subject to dismissal on other grounds. First, Plaintiff does not allege which Defendants were responsible for initiating or continuing the criminal prosecution. Nor does Plaintiff plead malice, which requires allegations of wrong or improper motive.

DE 33 at 45–46 (internal citations omitted). The Court finds that any putative malicious prosecution claim originating from the Weberfield Burglary is similarly deficient. In her proposed TAC, Plaintiff has not clearly set forth which of the defendants she seeks to recover against under a theory of malicious prosecution for the Weberfield Burglary. Moreover, Plaintiff has again failed to plead any facts which show a lack of probable cause or actual malice. As described in the affidavit of ADA Perri, the Weberfield Burglary prosecution was initiated pursuant to Indictment # 376N–12 in the *People of the State of New York v. Leonard Beckett,* charging Plaintiff with burglary in the second degree in violation of New York State Penal Law § 140.25(2). *See* Ben–Sorek Decl., Ex. "E" ¶ 2. Plaintiff has not rebutted the "presumption of probable cause" created by this grand jury indictment and, as such, fails to state a claim for relief that is plausible on its face. *See Hendrix v. City of New York,* No. 12 Civ. 5011, 2013 WL 6835168, at *8 (E.D.N.Y. Dec.20, 2013) (quoting *Twombly,*

550 U.S. at 547); *Brown v. City of New York,* No. 08 Civ. 5095, 2013 WL 5329356, at *1 (E.D.N.Y. Sept. 20, 2013) ("A grand jury indictment creates a rebuttable presumption of probable cause, which is fatal to a claim of malicious prosecution.") (citing *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003)).

As noted above, Plaintiff cannot show that "his indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " *Hendrix,* 2013 WL 6835168, at *8. Plaintiff's attempt to link the unlawfully seized DNA evidence from the 2010 Liquor Store Robbery with the 2007 Weberfield Burglary prosecution is mere conjecture unsupported by a plausible basis in fact. The DNA sample left at the scene of the 2007 Weberfield Burglary was compared with a buccal sample taken from the Plaintiff as a result of prior conviction for endangering the welfare of a minor. *See* Ben Sorek Decl., Ex. "E" ¶ 4. As ADA Perri noted, Plaintiff's indictment on the Weberfield Burglary charges was "in part" predicated upon a comparison of the foregoing two DNA samples. *Id.* These were the only two items used in connection with Plaintiff's indictment.

 **\*15** Moreover, in addition to the lack of probable cause, Plaintiff fails to show any malice by any of the Defendants. Actual malice under New York law "means that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Stansbury v. Wertman,* No. 09 Civ. 4638, 2012 WL 183849, at *8 (S.D.N.Y. Jan. 24, 2012) (quoting *Rounseville v. Zahl,* 13 F.3d 625, 630 (2d Cir.1994)). "However, it is also the case that 'New York courts recognize that actual malice can rarely be established through direct evidence and thus may be proven though circumstantial evidence.' " *Id.* (quoting *Rounseville,* 13 F.3d at 630). "Further, New York law considers the lack of probable cause and the presence of malice closely related," *Rounseville,* 13

F.3d at 631, and "[a] lack of probable cause generally creates an inference of malice." *Id.* at *9 (citing *Boyd v. City of New York,* 336 F.3d 72, 78 (2d Cir.2003); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996)). Here, the Court finds that Plaintiff has not set forth any facts in the TAC to suggest that any of the Defendants were motivated by actual malice. This conclusion is further supported by the lack of probable cause reflected in the TAC. The prosecution of the Weberfield Burglary was based on a lawful indictment. Moreover, a buccal swab of Plaintiff's DNA evidence was ordered to be produced in pre-trial discovery by a state court judge, the results of which confirmed a match with the specimen recovered at the Weberfield Burglary.

Finally, the Court notes that, although not pleaded in the TAC, Plaintiff has again set forth state law causes of action for intentional infliction of emotional distress, negligence, false arrest, false imprisonment, assault, battery, and *prima facie* tort in the Second Supplemental Notice of Claim. *See* Ben–Sorek Decl., Ex. "D" ¶ 18. To the extent Plaintiff attempts to re-plead these allegations, the Court reminds Plaintiff of its decision in the Order of January 25, 2013 finding these claims futile. DE 33 at 18–19. As such, any of the foregoing putative state law claims would also constitute a futility.

## IV. *CONCLUSION*

For all of the foregoing reasons, the Court DENIES Plaintiff's motion to amend the Complaint for a third time. The parties are directed to appear for an in-person status conference before this Court on April 24, 2014 at 12 p.m.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1330557

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Complaint**<br>Leonard BECKETT, Plaintiff, v. VILLAGE OF FREEPORT VILLAGE OF FREEPORT POLICE DEPARTMENT, Village of Freeport Police Officer Timothy P. Seaman, Village of Freeport Police Officer William Luikart, Village of Freeport Police Office Thomas D. Seaman, Village of Freeport Police Detective Edward S. Martin, III, Village of Freeport Police Officers John Doe and Jane Doe, Individually and in Their Capacities as Village of Freeport Police Officers, Defendants.<br>2011 WL 9172100 | PDF | E.D.N.Y. | May 04, 2011 | Pleading |

**History**

There are no History results for this citation.

2014 WL 1292232
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Emanuel M. BROOKS Jr., Plaintiff,

v.

P. ROCK et al., Defendants.

No. 9:11–cv–1171 (GLS/ATB).
|
Signed March 28, 2014.

**Attorneys and Law Firms**

Emanuel M. Brooks Jr., Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Stephen M. Kerwin, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Emanuel M. Brooks Jr. commenced this action against defendants P. Rock, P. Chase,[1] T. LaValley, R. Paquette–Monthie,[2] and Eric Gutwein[3] alleging a host of civil rights violations pursuant to 42 U.S.C. § 1983. (*See generally* Compl., Dkt. No. 1.) Following the dismissal of some claims, (Dkt. No. 17), defendants moved for summary judgment dismissing the complaint in its entirety. (Dkt. No. 42). Brooks also moved for preliminary injunctions and the appointment of counsel. (Dkt.Nos.54, 58.) In a Report–Recommendation (R & R) dated January 17, 2014, Magistrate Judge Andrew T. Baxter recommended that defendants' motion be granted, and that Brooks' motions be denied. (Dkt. No. 60.) Pending is Brooks' "Motion of Appeal and Objection to [Decision]," which, as explained below, is liberally construed as both an objection to the R & R and request for leave to amend. (Dkt. No. 62.) For the reasons that follow, the R & R is adopted in its entirety, and leave to amend is denied.

[1]  Brooks named "P. Chaste" in his complaint, (Compl. at 1, 2), but it is apparent that the proper spelling of that individual's name is Chase, (Dkt. No. 42, Attach.3).

[2]  While the complaint names "R. Paquette" and "Monthie" as separate defendants, (Compl. at 1, 2), they are one in the same: Roberta PaquetteMonthie. (Dkt. No. 42, Attach.12.)

[3]  Brooks named "Eric Mutuein" as a defendant in his complaint. (Compl. at 1, 2.) It is clear, however, that he intended to name Eric Gutwein as a party defendant. (Dkt. No. 42, Attach.14.)

### II. *Background*

Brooks, an inmate in the custody of the New York Department of Corrections and Community Supervision (DOCCS), was housed at Clinton Correctional Facility for the first time period relevant to his complaint. (Dkt. No. 42, Attach. 5 at 4; Compl. at 5.) While at Clinton, Brooks contends that Rock opened a door, which hit him extremely hard in the forehead, refused him speedy medical attention for his head injury, and falsely charged him with misbehavior. (Compl. at 5.) Chase, who found Brooks not guilty of the charges lodged by Rock, (Defs.' Statement of Material Facts (SMF) ¶ 39, Dkt. No. 42, Attach. 16), allegedly threatened Brooks that he was "going to get [him] at the next [correctional facility]," (Compl. at 5).

Thereafter, Brooks was transferred to Coxsackie Correctional Facility. (Dkt. No. 42, Attach. 5 at 4.) Brooks claims that LaValley arranged for his transfer to Coxsackie, despite his request to be transferred to Sing Sing Correctional Facility, in retaliation for filing a grievance regarding Rock. (Compl. at 6.) While at Coxsackie, Brooks was cited for misbehavior by Paquette–Monthie, (Dkt. No. 42, Attach. 13 at 8); Brooks claims that the misbehavior report was filed in retaliation for his complaint about Rock while at Clinton, (Compl. at 7.) According to Brooks, Gutwein, who presided at Brooks' disciplinary hearing on the Coxsackie misbehavior report, (Dkt. No. 42, Attach. 14 ¶ 5), improperly denied Brooks' requests to produce certain witnesses and evidence, found him guilty of the charged conduct, and sentenced him to six months in the special housing unit along with six months loss of good time, (Compl. at 7–8.)

This action was filed on September 30, 2011. (*See generally* Compl.) In October 2012, following several delays

2014 WL 1292232

attributable to Brooks before service of process occurred, (Dkt No. 7 at 7–10; Dkts. Nos. 9, 12, 13, 15, 16, 17), defendants moved to dismiss pursuant to Rule 12(b)(6), (Dkt. No. 31). In response, Brooks sought leave to amend. (Dkt. No. 36.) The court converted defendants' motion to dismiss to a motion seeking summary judgment and denied Brooks' motion for leave to amend for failure to comply with the Local Rules of Practice, but explained that "[i]f, after resolution of the summary judgment motion, [he] still wish[ed] to amend his complaint, he [could do so] in the proper form." (Dkt. No. 38 at 9–10.) In May 2013, defendants filed their motion for summary judgment consistent with the court's conversion of their earlier-filed motion to dismiss. (Dkt. No. 42.) Before that motion for summary judgment was considered by the court, Brooks filed the aforementioned motions for appointment of counsel and preliminary injunctions. (Dkt.Nos.54, 58.)

**\*2** In a January 17, 2014 R & R, Judge Baxter recommended that defendants' motion for summary judgment be granted. [4] (Dkt. No. 60 at 60.) As pertinent here, Judge Baxter determined that: (1) issues of fact precluded summary judgment regarding Brooks' exhaustion of administrative remedies with respect to his claims against Rock; (2) Brooks failed to exhaust his administrative remedies with respect to his claims against Chase and LaValley; and (3) despite his failure to exhaust with respect to Chase and LaValley, all claims, against all defendants, were subject to dismissal on the merits. (*Id.* at 7.)

[4]  Notably, Judge Baxter considered new facts that were first submitted by Brooks in his motion seeking leave to amend even though they were "not technically part of the complaint." (Dkt. No. 60 at 51–60.)

### III. *Standard of Review*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo.* See *Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at \*6–7 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of the magistrate judge for clear error. [5] *See id.*

[5]  "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Almonte,* 2006 WL 149049, at \*6.

### IV. *Discussion*

As an initial matter, the court must make sense of Brooks' submission, which he has titled "Motion of Appeal and Objection to [Decision]." (Dkt. No. 62.) The only references made to the R & R in that filing concern Brooks' contention that defendants "[l]ied in the summary [j]udg[ ]ment [when] they all testified and stated that ... plaintiff never file[d] a grievance or at[tempted] to exhaus[t] his [administrative remedies]." (*Id.* at 1–2, 10.) The balance of Brooks' submission contains allegations, made for the first time, that defendants, DOCCS, and potentially other unnamed individuals, [6] failed and/or refused to protect him from a conspiracy-related to an incident that occurred on December 2, 2013 at Clinton-to murder him "in further [retaliation]." (*Id.* at 2–13.) In light of the new allegations, Brooks requests a "Motion of discover," "Motion for permanent order of restrain," "Motion for chain of custody," and a "Tellephone an commer emergency Confrence." (*Id.* at 8, 9.) Bearing in mind Brooks' *pro se* status, the court treats his assertion that defendants were dishonest regarding his exhaustion of administrative remedies as an objection to the R & R, and it considers the remainder of Brooks' submission as a motion seeking leave to amend his complaint. [7]

[6]  Brooks writes "I'am adding defendant to my existing prior civil suit," yet he seems to assert new wrongdoing only on the part of DOCCS for "fail[ing] to protect and refus[ing] to put [him] in midstate A.P.P.U. under federal [p]rotection." (Dkt. No. 62 at 3.) Elsewhere, Brooks refers to "new defendants added." (*Id.* at 5 .)

[7]  Buried within his submission, Brooks "request[s] to fill Amendent Complaint have discovery In new defendants added." (Dkt. No. 62 at 5.) Construing this statement liberally, as the court must, *see Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006), it can safely be assumed that Brooks seeks leave to amend.

**A.** *Objection*

While it appears that Brooks' objection is specific, and, thus, is deserving of *de novo* review, *see Almonte,* 2006 WL 149049, at *6–7, even if the court accepts as true his allegation that defendants "lied" in support of their argument that he failed to exhaust his administrative remedies, (Dkt. No. 62 at 1–2, 10), that fact would not impact Judge Baxter's ultimate recommendation of dismissal. Indeed, despite the finding that Brooks failed to exhaust with respect to some of his claims, the R & R recommends dismissal of all claims on the merits, (Dkt. No. 60 at 7, 60), a reality that Brooks overlooks entirely. Nonetheless, the court has carefully reviewed the R & R for clear error and finds none. As such, the R & R is adopted in its entirety.

**B. *Leave to Amend***

**\*3** Defendants argue that leave to amend should be denied because: (1) the new allegations "have absolutely nothing to do with the incidents in [Brooks' c]omplaint, or the named defendants"; (2) Brooks failed to submit a proposed amended pleading in compliance with Local Rule 7.1(a)(4); and (3) a late amendment "would prejudice the right of the current defendants to a speedy conclusion of this action." (Dkt. No. 63 at 2.) The court agrees that Brooks should not be granted leave to amend.

At the outset, the court is cognizant of the fact that Brooks has had no prior opportunity to file an amended pleading. This is so despite the fact that this action has been pending for well over two years. Indeed, the posture of this case is somewhat peculiar in that the summons and complaint were not served upon defendants until nearly one year after commencement. (Dkt.Nos.17–20, 23–25.) The wheels of justice have churned at an admirable pace since; nonetheless, given the natural progression of this litigation, a significant amount of time has elapsed. Before filing an answer, defendants moved to dismiss, and later, after the court's conversion of that motion, augmented the record and filed a summary judgment motion. (Dkt.Nos.31, 38, 42.) The court is also mindful that discovery has not commenced.

Brooks was previously informed that if, after resolution of the summary judgment motion, he still wished to amend his complaint, he had to do so by making "a motion to amend in the proper form." (Dkt. No. 38 at 10.) Despite the explicit nature of the court's prior order, Brooks' latest request, which is based on facts that did not occur until December 2013, (Dkt. No. 62 at 5, 6), is not in proper form. *See* N.D.N.Y. L.R. 7.1(a)(4) (requiring, among other things, that a party seeking leave to amend "must attach an unsigned copy of the proposed amended pleading to its motion papers").

More fundamentally, however, Brooks' latest allegations are not sufficiently related to his underlying claims to warrant amendment under Fed.R.Civ.P. 15. *See Jolley v. Meachum,* 210 F.3d 354, 2000 WL 427276, at *1 (2d Cir.2000) ( "As for the claims that were unknown to [the plaintiff] at the time he filed his original complaint, we agree with the district court's determination that these claims were not sufficiently related to [the plaintiff]'s original claim, and therefore they could not be added to his original complaint."); *Smith v. Yonkers Police Dep't,* 152 F.3d 920, 1998 WL 433005, at *1 (2d Cir.1998) (holding that the district court did not abuse its discretion in denying a motion to amend made five years after commencement of the action that sought to allege "a claim wholly unrelated to [the original pleading]"); *Jones v. Fischer,* No. 9:11–cv–774, 2013 WL 4039377, at *2 n. 6 (N.D.N.Y. Aug. 7, 2013) (explaining that new factual allegations, raised for the first time along with objections, would be disregarded where those "allegations have nothing whatsoever to do with claims that were asserted in the [operative pleading]"). Indeed, the only link between the new allegations that DOCCS has failed to protect Brooks from a murder conspiracy and defendants is his wispy assertion that defendants are participating in that failure or refusal to protect Brooks "in *further* [retaliation]." (Dkt. No. 62 at 3 (emphasis added).) Liberally read, this suggests that defendants' new alleged failure to protect Brooks is because of the same grievances that were at the center of his original retaliation claims. The highly tenuous relationship between the new and original allegations is insufficient to serve as a basis for leave to amend, particularly when coupled with the significant lapse of time between the facts alleged in the complaint, which occurred in 2011, (Compl. at 5, 12–20), and Brooks' claim about an incident that occurred in December 2013, (Dkt. No. 62 at 5–6). *See Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574, at *10 (W.D.N.Y. June 25, 2012). Accordingly, leave to amend is denied.

**V. *Conclusion***

**\*4 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's ReportRecommendation (Dkt. No. 60) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 42) is **GRANTED;** and it is further

**ORDERED** that Brooks' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that Brooks' motion for the appointment of counsel (Dkt. No. 58) is **DENIED;** and it is further

**ORDERED** that Brooks' motions for preliminary injunctions (Dkt.Nos.54, 58) are **DENIED** as moot; and it is further

**ORDERED** that Brooks' motion for leave to amend his complaint (Dkt. No. 62) is **DENIED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 42). This matter was referred for Report and Recommendation on May 22, 2013 by Chief U.S. District Judge Gary L. Sharpe, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

On October 31, 2012, defendants filed a motion to dismiss plaintiff's civil rights action for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 31). Plaintiff responded (Dkt. No. 36) and defendants filed a reply (Dkt. No. 37). By Decision and Order dated March 29, 2013, this court converted the Rule 12(b)(6) motion to one for summary judgment, and provided the parties with an opportunity to file supplemental papers. (Dkt. No 38). On May 20, 2013, defendants filed a complete motion for summary judgment (Dkt.Nos.42, 43), but also continued to rely on papers submitted in connection with the prior Rule 12(b)(6) motion. Plaintiff has opposed the motion for summary judgment (Dkt. No. 52); he has also filed two motions for preliminary injunctions, one of which included a motion for appointment of counsel (Dkt.Nos.54, 58), to which defendants have responded (Dkt.Nos.57, 59).

For the reasons set forth below, this court recommends that defendants' motion for summary judgment be granted on most of the grounds raised therein, and that plaintiff's complaint be dismissed in its entirety. In light of this recommendation, this court also recommends that plaintiff's motion for appointment of counsel be denied and his motions for preliminary injunctions be found moot.

### BACKGROUND

On and before June 15, 2011, plaintiff was confined by the New York Department of Corrections and Community Supervision ("DOCCS") at the Clinton Correctional Facility ("Clinton") in Danemora, in the northeastern corner of New York. Plaintiff alleges that, on that date, Correction Officer ("C.O.") P. Rock "bust open" the door to the bathroom that plaintiff was using, causing the door to hit him extremely hard in the forehead. (Compl., Dkt. No. 1 at 5). [1] Although plaintiff was injured, defendant Rock refused to take plaintiff for immediate medical attention; and plaintiff did not receive any medical care until two days later. (*Id.*).

[1]   Because plaintiff's complaint does not have consecutive pagination or consistent paragraph numbering, the court will refer to the page numbers assigned by the CM–ECF system in the document header.

**\*5**   C.O. Rock prepared a misbehavior report, charging plaintiff with smoking in the bathroom, a copy of which was served on plaintiff at 7:00 a.m. on June 16th. (*Id.;* Dkt. No. 36 at 67). Plaintiff attached to his complaint a letter, dated June 15th, addressed to Superintendent LaValley, complaining about C.O. Rock's conduct earlier that day. (Dkt. No. 1 at 12). Plaintiff claims that he also filed a formal grievance with respect to the incident involving defendant Rock and later submitted appeals when he received no response to his initial grievance. (Compl., Dkt. No. 1 at 3–4, 13–20).

Lt. Chase [2] conducted a disciplinary hearing and found plaintiff not guilty on the misbehavior report filed by C.O. Rock. Plaintiff alleges that defendant Chase stated that, although he could not "get me at this facility [,] ... he was going to get me at the next one." (Compl., Dkt. No. 1 at 5). Plaintiff further alleges that, although he had requested a transfer to the Sing Sing Correctional Facility ("Sing Sing"), Supt. LaValley had plaintiff promptly transferred to

Coxsackie Correctional Facility (Coxsackie), in retaliation for the complaint against C.O. Rock, which plaintiff submitted to defendant LaValley. (Compl., Dkt. No. 1 at 6, 7; Dkt. No. 36 at 40).

[2]      Plaintiff incorrectly refers to defendant Peter **Chase** as "P. **Chaste.**" The court will use this defendant's correct name.

On July 7, 2011, shortly after his arrival at Coxsackie, Counselor PaquetteMonthie issued plaintiff a misbehavior report for placing telephone calls to his wife from other facilities, in violation of an order of protection issued in connection with an earlier prosecution of plaintiff. (Compl., Dkt. No. 1 at 7; Dkt. No. 31–2 at 2). Plaintiff alleges that defendant Paquette–Monthie wrote the misbehavior report in retaliation for plaintiff's complaint about C.O. Rock at Clinton. (Compl., Dkt. No. 1 at 7). In exhibits attached to his response to the Rule 12(b)(6) motion, plaintiff claimed that Counselor Paquette–Monthie told him that she initiated the disciplinary charges against him at Coxsackie because he filed a complaint against a friend of hers at Clinton Annex. (Dkt. No. 36 at 31, 37, 40).

Defendant Eric Gutwein[3] presided over plaintiff's disciplinary hearing at Coxsackie. (Disc. Hrg. Tr. at 1, Dkt. No. 42–15). Plaintiff alleges that Hearing Officer Gutwein, participating in the retaliatory conspiracy against plaintiff because of his complaints at Clinton, denied plaintiff's many requests for witnesses and additional evidence, found plaintiff guilty of the charges, and sentenced him to six months in the Special Housing Unit ("SHU") and a six-month loss of good time. (Compl., Dkt. No. 1 at 7–8).

[3]      The complaint lists the hearing officer as Eric Mutuein (Compl., Dkt. No. 1 at 2), but this court will use his correct name herein.

Liberally construed, plaintiff's complaint alleges that his constitutional rights under the First, Eighth, and Fourteenth Amendments were violated because (1) he was subjected to cruel and unusual punishment by defendant Rock when she allegedly hit him in the head with the bathroom door; (2) he was improperly denied prompt medical care by defendant Rock; (3) he was retaliated against for filing complaints and grievances by defendants Rock, Chase, LaValley, Paquette–Monthie,[4] and Gutwein in connection with the initiation and adjudication of disciplinary charges at Clinton, his transfer to Coxsackie, and the initiation and adjudication of disciplinary

charges at Coxsackie; and (4) he was denied due process in connection with the adjudication of the disciplinary charges at Coxsackie.[5] Plaintiff demands damages, as well as injunctive relief, including the termination of the defendants by DOCCS, a formal apology from the defendants, a transfer to the prison of his choice, and protection from further retaliation at DOCCS. (Compl., Dkt. No. 1 at 10–11).

[4]      The complaint names as defendants R. Paquette, Counselor and Monthie, "Councelor [sic] Supervisor." As noted, the counselor who initiated the disciplinary charges against plaintiff is named Roberta Paquette–Monthie. Ms. Paquette–Monthie's supervisor, who testified at plaintiff's disciplinary hearing, but was not at work the day the misbehavior report was issued, is Supervising Correction Counselor Chenel. (Disc. Hrg. Tr. at 8, 52). Supervising Correction Counselor Chenel has not been served in this action.

[5]      To avoid dismissal of his due process claims under *Heck v. Humphrey,* 512 U.S. 477 (1994), plaintiff filed a *Peralta* waiver relinquishing any due process claims with respect to his loss of good time. (Dkt.Nos.7, 9, 12, 13, 15–17). See *Peralta v. Vasquez,* 467 F.3d 98, 105–106 (2d Cir.2006).

**\*6** Defendants have challenged each of plaintiff's claims and have filed numerous declarations contesting many of plaintiff's factual allegations. In moving for summary judgment with respect to the claims against defendants Rock, Chase, and LaValley, defendants contend that plaintiff failed to exhaust his administrative remedies because, *inter alia,* he never filed a formal grievance with respect to any of these defendants at Clinton. (Defs.' Mem. of Law at 14–16, Dkt. No. 42–17).

Defendant Rock denies that she hit the plaintiff with a bathroom door on June 15, 2011, and she alleges that plaintiff did not request medical attention on that date, nor did he appear to require medical attention. (Rock Decl. ¶¶ 8–12, Dkt. No. 42–2). Plaintiff was seen by the medical staff at Clinton on June 17th and complained of a headache relating to being hit on the head by a mess hall door two days earlier. There was no evidence of a bump, swelling, or bruising, and was treated with Ibuprofen and given a bag of ice. (Michalek Decl. ¶ 5, Dkt. No. 42–9). C.O. Rock was unaware of any complaint or grievance filed against her by plaintiff, and denies knowing defendant Paquette–Monthie or causing her

2014 WL 1292232

to issue a misbehavior report against plaintiff at Coxsackie. (Rock Decl. ¶¶ 14–17).

Defendant Chase, who found plaintiff not guilty on the disciplinary charges filed by C.O. Rock, denies ever threatening plaintiff, and had no knowledge that he filed any complaint or grievance against defendant Rock. Lt. Chase asserts that he did nothing to cause defendant Paquette–Monthie–whom he does not know-or anyone else, to retaliate against plaintiff. (Chase Decl. ¶¶ 7–14, Dkt. No. 42–3). Clinton Supt. LaValley also denies knowing defendant Paquette–Monthie or doing anything to induce her to file a misbehavior report against plaintiff at Coxsackie. Defendant LaValley asserts that he had no involvement in plaintiff's transfer to Coxsackie; that transfer was handled by the DOCCS Deputy Superintendent for Programs pursuant to a prior request by plaintiff for an "area of preference" transfer. (LaValley Decl. ¶¶ 7–15, Dkt. No. 42–4).

DOCCS Counselor Paquette–Monthie filed a misbehavior report against plaintiff at Coxsackie after learning, through her intake interview of plaintiff and information in his file, that he had been contacting his wife by telephone. Such contact violated an order-of-protection issued against plaintiff and contravened prior direct orders from the staff at Sing Sing that plaintiff should stop calling his wife. Defendant Paquette–Monthie denies knowing defendants Rock, Chase, or LaValley at Clinton, and states that she did not file the misbehavior report for retaliatory purposes. (Paquette–Monthie Decl. ¶¶ 6–15, Dkt. No. 42–12).

Defendant Gutwein, who presided over the disciplinary hearing at Coxsackie also denied knowing defendant Rock, or knowing that she had been the target of a prior complaint by plaintiff. Defendant Gutwein claims that he made his documented decisions regarding the evidence allowed at the hearing, the ultimate determination of plaintiff's guilt, and the punishment imposed, based on the merits, and not because of any retaliatory motive. (Gutwein Decl. ¶¶ 5–34, Dkt. No. 42–14).

**\*7** The court concludes that there are material issues of fact as to whether plaintiff exhausted his administrative remedies relating to his claims against defendant Rock, but no issues of fact as to whether he failed to properly exhaust claims with respect to defendants Chase and LaValley. However, this court recommends dismissal of all of plaintiff's claims on the merits, because no rational fact finder could conclude that the

defendants violated plaintiff's various constitutional rights, as he alleges.

## DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

### II. Exhaustion of Administrative Remedies

Defendants contend that, notwithstanding plaintiff's claims to the contrary, he failed to initiate the grievance process, in a timely and proper manner, with respect to his complaints against defendants Rock, Chase, and LaValley of Clinton Correctional Facility. Defense counsel argues that, even if plaintiff had filed a timely grievance with respect to these defendants, he failed to exhaust his administrative remedies by not pursuing an appeal to the Central Office Review Committee (CORC). (Defs.' Mem. of Law at 14–16).

The court concludes that there are issues of fact material to whether plaintiff has exhausted his administrative remedies with respect to the claims against defendant Rock, which may not be resolved on summary judgment. However, no reasonable fact finder could conclude that the plaintiff filed timely grievances relating to his claims against defendants Chase regarding the disciplinary charges initiated at Clinton, or against defendant LaValle with respect to plaintiff's transfer from Clinton to Coxsackie. Accordingly I will recommend that those claims be dismissed on summary judgment based, *inter alia,* on plaintiff's failure to exhaust administrative remedies.

### A. Applicable Law

**\*8** The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse

decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano,* it also decided four related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused. [6] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. [7] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g., Messa v. Goord,* 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009).

6    *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

7    *See, e.g., Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009).

**B. Analysis**

**\*9**  Defense counsel attempts to rebut plaintiff's allegation that he filed a timely initial grievance with respect to his claims against defendants Rock, Chase, and LaValley, purported copies of which are attached to the complaint. (Defs.' Mem. of Law at 14–16). Clinton Superintendent LaValley declared that his office had no record of receiving any letter from plaintiff raising the allegations contained in the complaint in this action, including those attached to the complaint. (LaValley Decl. ¶ 5–6). Tara Brousseau, the Inmate Grievance Program ("IGP") Supervisor at Clinton, found no documentation in her files indicating that plaintiff ever submitted a formal grievance at Clinton regarding plaintiff's allegations against defendants Rock, Chase, and LaValley. (Brousseau Decl. ¶¶ 8–11, Dkt. No. 42–6). Defense counsel contends that the documentation provided by plaintiff in his complaint contained no "acknowledg[ ]ment from any recipient that his document was received in a timely manner so as to comply with DOCCS grievance procedures." (Defs.' Mem. of Law at 14). Counsel also points out inconsistencies in plaintiff's claims regarding the submission of his initial grievance, including the fact that the "Affidavit of Service," attached to his complaint (Dkt. No. 1 at 18) swears that he placed a grievance regarding defendant Rock in a mailbox at Clinton on June 26, 2011–two days after plaintiff was transferred out of that facility, according to DOCCS transfer records. (Defs.' Mem. of Law at 16).[8]

8    According to DOCCS records, plaintiff was moved from Clinton Annex to Downstate Correctional Facility on June 24, 2011; then to Coxsackie on June 27, 2011; and on to Upstate Correctional Facility on July 22, 2011. (LaValley Decl. ¶ 11 & Ex. B, Dkt. No. 42–5 at 4; Brousseau Decl. ¶ 8).

In his response to defendants' summary judgment motion, plaintiff has filed additional documentation regarding some of his complaints to DOCCS about the alleged violations of his constitutional rights by defendant Rock at Clinton. (Dkt. No. 52–11 at 4, 7, 13, 21). The newly-disclosed records include a memorandum, purportedly signed by Supt. LaValley, acknowledging receipt of a communication from plaintiff on June 17, 2011–two days after plaintiff claims he

submitted his original letter of complaint about defendant Rock to the Clinton Superintendent (Dkt. No. 52–11 at 4–5). In the absence of any reply from defendants questioning the authenticity of the memorandum, this would seem to confirm plaintiff's allegation that he sent the letter dated June 15th to defendant LaValley, even if that complaint about defendant Rock would not qualify as a formal grievance for exhaustion purposes.[9]

9    As plaintiff appears to acknowledge, a letter of complaint to the facility superintendent would not qualify as a formal grievance required to exhaust administrative remedies, unless the informal complaint produced a resolution favoring the inmate. *See, e.g., Goodson v. Silver,* 9:09–CV–494 (GTS/DRH), 2012 WL 4449937 at \*9 & n. 20 (N.D.N.Y. Sept. 25, 2012) (district courts have interpreted *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001), to mean that an inmate's efforts to resolve a matter through informal channels satisfies the exhaustion requirement only if the efforts resulted in the matter being concluded in the inmate's favor) (collecting cases); *Shomo v. Goord,* 9:04–CV–707 (LEK/DEP), 2007 WL 2693526, at \*9 (N.D.N.Y. Sept. 11, 2007) (courts have repeatedly held that complaint letters to the DOCCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements) (collecting cases).

Plaintiff also filed a July 18, 2011 memorandum from N. Ratliff, then the IGP Supervisor at Clinton, acknowledging receipt, from plaintiff, of a "complaint dated 7/14/11/6/24/11," which would appear to refer, in part, to plaintiff's "Affidavit of Service," notarized July 14, 2011 and addressed, *inter alia,* to Ratliff, regarding a grievance about defendant Rock. (Dkt. No. 52–11 at 7, 14).[10] Plaintiff's papers in opposition to the summary judgment motions include two slightly different complaints directed to N. Ratliff and the Inmate Grievance Committee regarding defendant Rock, each dated June 26, 2011. (Dkt. No. 52–11 at 8–9, 15–16). Given that N. Ratliff's memorandum reference a "complaint" dated, *inter alia,* June 24–the day plaintiff was th moved out of Clinton-it is not entirely clear which version of plaintiff's "complaint" Ratliff received or how and when she received it. However, a rational fact finder could conclude that, contrary to the assertion by Tara Brousseau, a complaint against defendant Rock from plaintiff was received at Clinton, notwithstanding the uncertainty regarding the dates. The

memorandum from N. Ratliff returned plaintiff's "complaint" because he was no longer housed at Clinton and because an inmate is supposed to file grievances in the facility where he is confined, even if it relates to conduct at another institution. Neither party has submitted any information as to whether plaintiff thereafter submitted a grievance regarding the earlier events at Clinton to officials at the DOCCS institutions to which he was transferred or that he sought an extension of the deadline for submitting an initial grievance.

10    The copy of the July 14th Affidavit of Service has two receipt stamps from DOCCS-one dated 9/1/2011 and the other of which has the date obscured. It appears that a copy of the Affidavit of Service was sent to other DOCCS officials in Albany in September 2011. In the absence of a reply from defendants questioning the authenticity of the document, and construing the facts in favor of the non-movant, as I must, the court will assume that N. Ratliff at Clinton received a copy of the Affidavit of Service at some time between July 14, when the affidavit was notarized, and July 18, 2011, when N. Ratliff sent the confirming memorandum to plaintiff.

**\*10** There are some discrepancies in plaintiff's various claims about his submission(s), to DOCCS, of a grievance about the alleged violations of his rights at Clinton. In some statements, including his recent response to the declaration of Tara Brousseau, plaintiff claims that he submitted a grievance about defendant Rock to the IGP supervisor at Clinton on June 15, 2011, and that the letter that he sent to Supt. LaValley on the same date was a copy of the grievance. (Dkt. No. 52–9 at 2).[11] In other statements, including his "Affidavit of Service," plaintiff asserts that he filed an initial grievance at Clinton on or about June 26, 2011, which is also the date on several versions of the complaints against defendant Rock that plaintiff filed with his complaint and his response to the summary judgment motion. (Dkt. No. 52–11 at 8–9, 14–18). However, there are also discrepancies between the documents recently filed by plaintiff and some of the statements of DOCCS witnesses regarding plaintiff's submission of complaints-i.e., Supt. LaValley's claim that his office never received any of the letters attached to plaintiff's complaint and Tara Brousseau's declaration that Clinton IGP never received a grievance from plaintiff about defendant Rock.

11    Nothing on the face of plaintiff's June 15, 2011 letter to Supt. LaValley indicates that a copy was submitted to grievance officials. (Dkt. No. 52–11 at 5).

Under applicable regulations,[12] an inmate must file a formal grievance within 21 days of an alleged occurrence, although he may make a request for additional time within 45 days of the occurrence, which may be granted in the discretion of the IGP supervisor upon a showing of mitigating circumstances. If the plaintiff properly submitted an initial grievance on June 15, June 24, or June 26, 2011, it would have timely-i.e., within 21 days of the alleged incident involving defendant Rock. If the first grievance was submitted around July 14, 2011, it would have been beyond the 21–day deadline, but within the 45–day period during which the plaintiff could have requested additional time to file, based upon mitigating circumstances. Even if, after his transfer from Clinton, plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly, the failure of the IGP Supervisor to advise plaintiff of his ability to ask for an extension suggests the possibility that the grievance procedures were not made reasonably available to plaintiff. *See, e.g., Mandell v. Goord,* 9:06–CV–1478 (GTS/DEP), 2009 WL 3123029, at \*10–11 (N.D.N.Y. Sept. 29, 2009) (where DOCCS officials tersely rejected plaintiff's grievance as untimely, without advising the plaintiff that he should request an exception to the time limit from the IGP supervisor based on mitigating circumstances, or that additional information regarding his delay in filing the grievance was needed, it is arguable that material questions of fact exist as to whether administrative remedies were available to the plaintiff or whether the defendants should be estopped by their conduct from relying on the non-exhaustion defense).

12    *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a) ("[a]n inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence"), 701.6(g)(1)(b) ("[t]he IGP supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances[;] ... [a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence).

**\*11** It is entirely possible that a finder of fact tasked with weighing the relative credibility of plaintiff and the DOCCS witnesses might conclude, in the face of the inconclusive documentary evidence, that plaintiff did not properly submit

a timely initial grievance regarding defendant Rock's alleged violation of plaintiff's rights at Clinton. However, given that the court should not make credibility determinations in connection with a summary judgment motion, and that the defendants have the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance about defendant Rock or whether his failure to do so should be excused under *Hemphill* standards.

Defendants contend that, even if plaintiff properly filed a timely initial grievance against defendant Rock that was ignored by DOCCS officials, he failed to exhaust his administrative remedies because he never filed an appeal with CORC. (Defs.' Mem. of Law at 15). The Assistant Director of the DOCCS IGP program states, in his declaration, that he found no evidence in the CORC files indicating that plaintiff ever filed a grievance appeal with CORC concerning the alleged events at Clinton Annex. (Hale Decl. ¶¶ 8–11, Dkt. No. 42–7).

Courts have consistently held that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement. *See e.g. Veloz v. New York,* 339 F.Supp.2d 505, 516 (S.D.N.Y.2004) (plaintiff's allegations that his grievances were misplaced or destroyed by corrections officers ultimately does not relieve him of the requirement to appeal those claims to the next level once it became clear that no response was forthcoming) (citing *Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (same). "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA." *Croswell v. McCoy,* 01–CV–547, 2003 WL 962534, at *4 (N.D.N.Y. Mar. 11, 2003) (Sharpe, M.J.). [13]

[13]    The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.6(g)(1)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20 (GTS/GHL), 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan. 11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level(s), including the CORC, in order to properly complete the grievance process. *Accord, Murray*

*v. Palmer,* 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, *2 & nn. 4, 6 (N.D.N.Y. Mar. 31, 2010).

Plaintiff, however, has submitted documentation indicating that, after receiving no response to the initial grievance he claimed to have filed, he submitted "appeals" to the Superintendent at Clinton and to the IGP Supervisor and the Director of the IGP in Albany. A copy of plaintiff's purported "appeal" to Supt. LaValley, dated July 26, 2011, was attached to his complaint (Dkt. No. 1 at 13), although he has filed no additional documents acknowledging receipt of this "appeal." Copies of a further "appeal" addressed to the Director of the IGP in Albany and an IGP supervisor, part of which is dated "6–26–11" and part of which was dated 8–26–11," were also appended to the complaint (Dkt. No. 1 at 14–17), along with the "Affidavit of Service" notarized on July 14, 2011 (Dkt. No. 1 at 18). Plaintiff submitted, with his response to the summary judgment motion, a letter dated September 6, 2011, from the offices of the Director of IGP in Albany (Karen Bellamy), acknowledging receipt of correspondence from plaintiff dated July 14, 2011. (Dkt. No. 52–11 at 13). As noted earlier, plaintiff's "Affidavit of Service" notarized on July 14th has receipt stamps indicating that DOCCS received a copy of it on September 1, 2011. The letter from Karen Bellamy's office returns plaintiff's correspondence, advising him that "you must submit your grievance or appeal directly to IGRC at the facility." (Dkt. No. 52–11 at 13).

**\*12** Plaintiff's response to the summary judgment motion also attaches a memorandum from the IGP Supervisor at Upstate dated September 14, 2011, acknowledging receipt of "complaints/letters of appeal ... with written dates of 6/26/2011 and 7/27/2011." (Dkt. No. 52–11 at 21). As noted above, one of plaintiff's alleged grievance appeals is dated June 26, 2011; there does not appear to be any submission from plaintiff dated July 27, 2011 in the record. The letter from Upstate, where plaintiff was confined at the time, returned plaintiff's documents as "untimely" because they related to alleged occurrences on "6/14/11 [and] 6/15/11"- the dates of the incident with defendant Rock at Clinton. (*Id.*). The Upstate IGP Supervisor relied on the regulations summarized in note 12 above, which require an initial complaint to be filed within 21 days of the alleged occurrence unless an extension request is made within 45 days of the occurrence and is granted by the IGP supervisor. (*Id.*).

While the documentation with respect to plaintiff's alleged "appeals" is far from conclusive, it supports his claim that, when he received no response to his purported initial grievance, he properly mailed an "appeal" to the

2014 WL 1292232

Superintendent of the facility where the grievance was allegedly ignored. [14] When his appeal to the Superintendent was also allegedly ignored, plaintiff attempted to file an appeal with CORC by sending it to the Director of IGP in Albany. When the Director's Office advised plaintiff that his complaint or appeal needed to be filed with the IGRC at the facility where he was confined, plaintiff apparently did so. However, the IGP supervisor at Upstate treated his submission as an original complaint-not an appeal that should be forwarded to CORC-and found that it was untimely based on the deadlines applicable to initial complaints.

[14] N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.6(h)(2) provides:

> An inmate transferred to another facility may continue an appeal of any grievance. If the grievant wishes to appeal, **he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed** within seven calendar days after receipt. The IGP supervisor will refer it to the facility grievance clerk for processing.
>
> (emphasis supplied).

While the applicable regulations set time limits for filing appeals based on receipt of the written decision at an earlier stage, they do not set definitive deadlines for filing appeals when no response is ever received. See N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(c)(1) (an appeal to the Superintendent must be filed within seven calendar days **after the receipt of the IGRC's written response"**) (emphasis added); 701.5(d)(1)(I) (an appeal to CORC must be submitted, through the grievance clerk, **"within seven calendar days after receipt of the superintendent's written response")** (emphasis added); 701.6(h)(2) (quoted in note 14 above). Plaintiff's "appeals" could not, as a matter of law, be deemed untimely; or at least, the uncertainty with respect to the deadlines might excuse a late appeal under the *Hemphill* standards. [15] The court concludes that there are issues of fact that are material to the question of whether plaintiff properly pursued the administrative appeals necessary to exhaust his claims with respect to defendant Rock.

[15] Absent an extension, which would require the written consent of the grievant, N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.6(g)(1) (b)(ii)(2), the IGRC is required, during the first step of the grievance process, to schedule a hearing within 16 calendar days after receipt of the grievance.

N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(b)(2)(ii). At the second step of the process, the Superintendent is supposed to render a decision within 20 calendar days from the receipt of an appeal. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(c)(3)(I), (ii). Arguably, if an inmate has not consented to an extension and the IGRC has not scheduled a hearing within 16 days, or a superintendent has not rendered a decision within 20 days, the inmate would then have only seven days to appeal to the next level, unless he requested an extension supported by mitigating circumstances. *See, e.g., Goodson v. Silver,* 2012 WL 4449937, at *6 (discussing how to calculate the deadline for filing an appeal to CORC in a case where the Superintendent failed to respond to a harassment grievance). However, a number of contingencies, other than an inmate-approved extension, could alter such deadlines. In this case, the plaintiff was transferred from Clinton less than 16 days after the "occurrence" which was the subject of the alleged grievance. When an inmate's confinement status precludes his timely appearance at an IGRC hearing, an unspecified delay in the resolution of the first stage of the grievance process is contemplated-to determine whether the inmate wants to postpone his hearing or have it proceed in his absence. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(b)(2)(ii)(a). If a grievance against a DOCCS employee is determined by a superintendent to be a "harassment" grievance, the process and the deadlines change. *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.8. Given the uncertainty of the deadlines for filing appeals when an inmate, particularly one who is transferred to another facility, receives no response to a grievance, this court cannot conclude, in the context of a summary judgment motion, that plaintiff's appeals were untimely for exhaustion purposes or that any untimeliness should not be excused under *Hemphill* and its progeny.

The various documents filed by plaintiff do not reflect that he made any written complaints about retaliation in connection with the adjudication of his disciplinary charges at Clinton by defendant Chase, or his transfer to Coxsackie, for which plaintiff blames defendant LaValley, until his submission to IGP in Albany—part of which was dated "6–26–11" and part of which was dated "8–26–2011." (Dkt. No. 52–11 at 17–20). It is clear that the portion of the submission dated

2014 WL 1292232

June 26th is backdated because it purports to be an appeal of
the grievance plaintiff states that he filed on approximately
the same date and it references events, including plaintiff's
misconduct charge at Coxsackie on July 7, 2013 (Paquette–
Monthie Decl. ¶¶ 6–7, 11–12), which occurred well after June
26th. As noted above, the documents submitted by plaintiff
indicate that his submission was not received in the office of
the IGP Director in Albany until early September 2011. The
court concludes that no reasonable fact finder could conclude
that plaintiff filed an initial grievance with respect to the
conduct of defendants Chase and LaValley until August 26,
2011, which is considerably longer than 21 or 45 days after the
relevant "occurrences"-the adjudication of the misbehavior
report at Clinton on June 22, 2011 (Chase Decl. ¶ 5) or
plaintiff's transfer out of Clinton, which occurred on or about
June 24, 2011 (LaValley Decl. ¶ 7 & Ex. B). Accordingly, the
court concludes that these claims against defendants Carr and
LaValley may be dismissed, on summary judgment, because
of plaintiff's failure to exhaust his administrative remedies by
filing a timely initial grievance.

### III. Eighth Amendment Claims

**\*13** Plaintiff alleges that defendant Rock violated his Eighth
Amendment rights in two ways on June 15, 2011, by inflicting
cruel and unusual punishment when she hit him in the head
with the bathroom door, and by refusing to allow him to
get immediate medical treatment for his purported injuries.
As discussed above, C.O. Rock denies that she opened the
bathroom door or caused it to hit plaintiff in the head, and she
alleges that plaintiff did not request medical care or appear to
require it. Plaintiff was seen, at his request, two days later by
the Clinton medical staff, who found no evidence of bruising
or swelling on plaintiff's head and treated him with Ibuprofen
and a bag of ice.

Notwithstanding these factual disputes, the court concludes
that, even accepting plaintiff's version of the relevant
events, no reasonable fact finder could conclude that
his Eighth Amendment rights were violated by defendant
Rock. Accordingly, for the following reasons, this court
recommends dismissal of those claims.

### A. Excessive Force

#### 1. Applicable Law
Inmates enjoy Eighth Amendment protection against the use
of excessive force, and may recover damages under 42 U.S.C.
§ 1983 for a violation of those rights. *Hudson v. McMillian,*

503 U.S. 1, 9–10 (1992). The Eighth Amendment's
prohibition against cruel and unusual punishment precludes
the "unnecessary and wanton infliction of pain." *Gregg v.
Georgia,* 428 U.S. 153, 173 (1976); *Sims v.. Artuz,* 230 F.3d
14, 20 (2d Cir.2000). To sustain a claim of excessive force
under the Eighth Amendment, a plaintiff must establish both
objective and subjective elements. *Blyden v. Mancusi,* 186
F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional
standard for excessive force, the defendants' conduct must be
" 'inconsistent with the contemporary standards of decency.' "
*Whitely v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted);
*Hudson,* 503 U.S. at 9. "[T]he malicious use of force to
cause harm constitute[s][an] Eighth Amendment violation per
se [,]" regardless of the seriousness of the injuries. *Blyden,*
186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth
Amendment's prohibition of 'cruel and unusual' punishments
necessarily excludes from constitutional recognition *de
minimis* uses of physical force, provided that the use of force
is not of a sort repugnant to the conscience of mankind."
*Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every
push or shove, even if it may later seem unnecessary in
the peace of a judge's chambers, violates a prisoner's
constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate
the "necessary level of culpability, shown by actions
characterized by wantonness." *Id.* at 21 (citation omitted).
The wantonness inquiry "turns on 'whether force was applied
in a good-faith effort to maintain or restore discipline, or
maliciously and sadistically to cause harm.' " *Id.* (quoting
*Hudson,* 503 U.S. at 7). In determining whether defendants
acted in a malicious or wanton manner, the Second Circuit has
identified five factors to consider: the extent of the injury and
the mental state of the defendant; the need for the application
of force; the correlation between that need and the amount of
force used; the threat reasonably perceived by the defendants;
and any efforts made by the defendants to temper the severity
of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291
(2d Cir.2003).

#### 2. Analysis
**\*14** In connection with defendants' summary judgment
motion, plaintiff and C.O. Rock present very different
versions of the events of June 15th. Plaintiff alleges that, on
the day before the incident, C.O. Rock threatened to "put her
size 7 shoe up my Muslim ass." (Compl ., Dkt. No. 1 at 5;
Pl.'s Reply to Rock Decl. ¶ 7, Dkt. No. 52–6). Defendant

2014 WL 1292232

Rock denies ever threatening plaintiff. (Rock Decl. ¶ 13). Defendant Rock alleges that, on June 15th, plaintiff had been in the bathroom for approximately 15 minutes, and that other inmates needed to use the bathroom. (Rock Decl. ¶ 6). Plaintiff states that he obtained permission from C.O. Rock to use the bathroom and had been in the room for only five minutes. (Pl.'s Reply to Rock Decl. ¶ 9). Plaintiff claims that C.O. Rock "bust open" the door to the single male bathroom in the mess hall, hitting him extremely hard in the forehead. (Compl., Dkt. No. 1 at 5; Pl.'s Reply to Rock Decl. ¶ 7). C.O. Rock states that she knocked on the door and directed plaintiff to come out; she denies that she opened the door or hit plaintiff with the door. (Rock Decl. ¶¶ 6, 8–9).

In support of defendants' initial Rule 12(b)(6) motion, counsel contended that plaintiff's allegations regarding the June 15, 2011 incident in the Clinton mess hall established, at worst, that defendant Rock was negligent in causing a bathroom door to strike plaintiff in the head. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 13, Dkt. No. 31–4). A correction officer who negligently causes an unintended injury to an inmate has not engaged in the type of wanton or malicious conduct necessary to support an Eighth Amendment excessive force claim. (*Id.,* citing *Daniels v. Williams,* 474 U.S. 327 (1986) (a state official's negligent act causing unintended loss of or injury to life, liberty, or property does not support a Section 1983 claim)). *See also Epps v. City of Schenectady,* 1:10–CV–1101 (MAD/CFH), 2013 WL 717915, at *6 (N.D.N.Y. Feb. 27, 2013) (negligence cannot be a basis for liability for constitutional torts); *Cicio v. Graham,* 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at * 13 (N.D.N.Y. Mar. 15, 2010) (citing *Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (liability in a § 1983 excessive force action cannot be founded on mere negligence) (collecting cases)).

The court concludes that, even under plaintiff's version of the relevant events, a reasonable fact finder could not conclude that defendant Rock used force against plaintiff maliciously and sadistically, to cause harm. Whether plaintiff was in the bathroom for five minutes or 15 minutes, C.O. Rock had a good-faith penological basis to investigate why plaintiff had stayed in the bathroom long enough to deny access to other inmates who needed to use the facilities. Because plaintiff was on the other side of the bathroom door, defendant Rock could not have known that he was positioned in such a way that the door would hurt plaintiff if she opened it forcefully. While "busting open" the door may have created some risk that the person inside might be hit by the door, this is, at most, negligence that clearly does not rise to the level of wanton

or malicious conduct. *See, e.g., White v. Drake,* 9:10–CV–1034 (GTS/DRH), 2011 WL 4478921, at *1, 9 (N.D.N.Y. Sept. 26, 2011) (the allegation that defendant kicked plaintiff's cell door from the outside while plaintiff was inside his cell, causing injury to plaintiff nose and jaw, are insufficient to establish an intentional or malicious effort to injure plaintiff, as necessary to state an excessive force claim under the Eighth Amendment); *Bilan v. Davis,* 11 Civ. 5509, 2013 WL 3940562, at *6 (S.D.N.Y. July 31, 2013) (an officer struck plaintiff only after the conflict between the officers and a non-party inmate spilled over to where plaintiff was standing; in the absence of allegations that the force used against him was intentional and wanton, plaintiff's excessive force claim must fail) (Rept. & Recommendation), *adopted,* 2013 WL 4455408 (S.D.N.Y. Aug 20, 2013).

## B. Denial of Medical Care

### 1. Applicable Law

**\*15** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation

or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

**\*16** A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

**2. Analysis**

While plaintiff claims that defendant Rock violated his Eighth Amendment rights by failing to allow him to obtain immediate medical care after the incident on June 15th, he acknowledges that he was seen by the prison medical staff

two days later. (Compl., Dkt. No. 1 at 5). [16] In connection with defendants' initial Rule 12(b)(6) motion, counsel argued, *inter alia,* that plaintiff failed to allege that the brief delay in his treatment caused any significant harm to him, thus failing to satisfy the objective prong of the deliberate indifference standard. (Mem. in Support of Rule 12(b) (6) Mot. at 22–23). It is clear from the parties' submissions relating to defendants' summary judgment motion that C.O. Rock and plaintiff disagree as to whether he requested and/or required medical attention on June 15th. However, no reasonable fact finder could conclude, based on the irrefutable facts, that the brief delay in plaintiff's treatment significantly increased the risk of serious adverse health consequences to him, as required to establish a deliberate indifference claim.

[16]    In support of the summary judgment motion, defendants document that plaintiff could have sought and obtained medical attention prior to June 17th by taking advantage of sick call procedures from his cell. (Devlin–Varin Decl., Dkt. No. 42–10). Plaintiff responded, in conclusory fashion, that prior efforts to get medical attention were thwarted by the Clinton staff. (Pl.'s Reply to Devlin–Varin Decl. ¶¶ 5, 6, Dkt. No. 52–5; Pl.'s Reply to Michalek Decl. ¶ 4, Dkt. No. 52–4). In any event, because plaintiff could seek prompt, necessary medical treatment once he returned to his cell, C.O. Rock would not have been subjectively aware that her failure to send plaintiff for immediate medical attention would subject him to a risk of serious harm from a prolonged delay in care, even if she had known that the bathroom door had struck plaintiff in the head. *Farmer v. Brennan,* 511 U.S. at 844; *Salahuddin v. Goord,* 467 F.3d at 281. Thus, no reasonable fact finder would conclude that plaintiff could establish the subjective prong of the deliberate indifference standard.

*Evans v. Manos* cogently summarizes how a prison inmate's claim for a delay in medical treatment should be evaluated under the Eighth Amendment:

    "Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where 'the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "

*Evans v. Manos,* 336 F.Supp.2d 255, 262 (W.D.N.Y.2004) (citations omitted). The Second Circuit has not resolved whether actual adverse medical effects are required, as a threshold matter, to state a viable Eighth Amendment claim relating to delayed medical care; but has indicated that a plaintiff must at least show that the delay significantly increased the risk for medical injury or similar serious adverse consequences. *Smith v. Carpenter,* 316 F.3d at 188–89, n. 14, n. 15. The Court in Smith also observed, in the post-trial context, that, "although demonstrable adverse medical effects may not be required under the Eighth Amendment, the absence of present physical injury will often be probative in assessing the risk of future harm." *Smith v. Carpenter,* 316 F.3d at 188.

**\*17** As noted, when plaintiff was examined by the Clinton medical staff on June 17th, they observed no visible bump, swelling, or bruising on his head, and he was treated with only Ibuprofen and a bag of ice. (Michalek Decl. ¶ 5; 6/17/11 Ambulatory Health Record ("AHR"), Dkt. No. 43 at 4). Plaintiff claims he did have a visible bruise and swelling, which is why the medical staff gave him ice. (Pl.'s Reply to Michalek Decl. ¶ 5). Subsequent medical records document only a few complaints by plaintiff of the lingering headaches, dizziness, shaking, and smelling odors, which he attributed to the blow to the head he allegedly received at Clinton on June 15, 2011. (Michalek Decl. ¶¶ 6, 11; 7/18/11 AHR, Dkt. No. 43 at 6; 8/16/11 AHR, Dkt. No. 43 at 9). The medical staff found no follow-up treatment was necessary with respect to his complaints about a head injury, other than dispensing Tylenol to plaintiff on August 16, 2011. (*Id.*).

Plaintiff apparently contests the accuracy of subsequent medical records at several DOCCS facilities, which reflect no evidence of any significant long-term effects of the alleged incident on June 15th, claiming that "he has expressed to medical staff in each facility of all the ongoing pain and suffering he has been force [sic] to live with to all of the injuries he sustained from past and present incident...." (Pl.'s Reply to Michalek Decl. ¶ 6) .[17] He also challenges the quality of his medical care after leaving Clinton.[18] As noted above, differences of opinion between a prisoner and prison officials regarding appropriate medical treatment do not, as a matter of law, constitute deliberate indifference. Moreover, Plaintiff's conclusory claims of serious ongoing health problems that he attributes to the June 15th incident at Clinton do not create an issue of fact in the face of

the overwhelming documentary medical evidence to the contrary.[19]

[17]   Plaintiff has also filed copies of sick call requests that he purportedly submitted in August and September 2011, complaining of ongoing symptoms relating to the alleged blow to his head on June 15, 2011 at Clinton and a 2009 assault in Sing Sing. (Dkt. No. 52–11 at 45–51).

[18]   Plaintiff has filed documents relating to complaints and grievances regarding his medical care between September and November 2011. (Dkt. No. 52–11 at 52–54).

[19]   *See also Brown v. White,* 9:08–CV–200, 2010 WL 985184, at \*8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).

In any event, plaintiff still has offered no evidence to rebut defendants' well—documented position that the two-day delay before plaintiff saw the medical staff at Clinton about his very subjective and relatively minor medical complaints did not involve a significant risk of degeneration of his medical condition or require him to endure extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236. Thus, the court concludes that no reasonable fact finder could conclude that plaintiff can establish the objective element of a deliberate indifference claim. *See, e.g., Vansertima v. Department of Corrections,* 10 CV 3214, 2012 WL 4503412, at \*2, 6 (E.D.N.Y. Sept. 28, 2012) (plaintiff allegedly suffered a nose bleed and an injury to his head "causing sever[e] pain" as a result of hitting his face on the seat in front of him when the prison bus in which he was riding stopped suddenly; given that plaintiff was seen by the medical staff within one or two days after the incident and his subsequent complaints

involved relatively infrequent nose bleeds and intermittent headaches, plaintiff cannot show any "adverse medical effects or demonstrable physical injury" that resulted from what was in any case-at most—a two delay in treatment). [20]

[20]    *See also* *Brown v. White,* 2010 WL 985184, at *9–10 (inmate who suffered from chronic, but not acute, lower back pain and occasional headaches and dizziness during a three-month delay in requested medication and other treatment did not suffer a serious deprivation of medical care); *Evans v. Manos,* 336 F.Supp.2d at 260 (W.D.N.Y.2004) (subjective claims of pain, unaccompanied by substantial medical complications are not sufficient to create a factual issue as to whether he was suffering from a "serious," unmet need); *Hanrahan v. Menon,* 9:07–CV–610 (FJS/ATB), 2010 WL 6427650, at *8–9 (N.D.N.Y. Dec. 15, 2010) (plaintiff's complaints of primarily subjective mental health symptoms do not rise to the level that would make the two-month delay in plaintiff's medication a serious deprivation) (ReportRecommendation), *adopted,* 2011 WL 1213171 (N.D.N.Y. Mar. 31, 2011), *aff'd,* 470 F. App'x 32 (2d Cir. May 18, 2012).

## IV. Retaliation

**\*18**   Plaintiff's theory is that, in response to plaintiff's complaint against defendant Rock for hitting plaintiff with a bathroom door and then denying him medical care, five DOCCS employees from two separate and geographically distant prisons conspired to retaliate against him in various ways. This court recommends the dismissal of plaintiff's retaliation/conspiracy claims against each defendant, based on the lack of a causal connection between plaintiff's protected conduct and any "adverse action" taken against him, the absence of "personal involvement," and/or, as previously discussed, plaintiff's failure to exhaust his administrative remedies.

### A. Applicable Law

#### 1. Retaliation
In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett*

*v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also* *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. [21] *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or

verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at *3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

21    Conclusory allegations, lacking any factual foundation, are also insufficient to support a claimed conspiracy to violate another's civil rights. *See, e.g., Jackson v. County of Rockland,* 450 F. App'x 15, 19 (2d Cir.2011) (citing *Gallop v. Cheney,* 642 F.3d 364, 369 (2d Cir.2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators")); *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002). Plaintiffs alleging a civil rights conspiracy must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

**\*19** A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

### 2. Personal Involvement

For retaliation claims, as for other section 1983 claims, a plaintiff "must show some tangible connection between the constitutional violation alleged and [a] particular defendant." *Toole v. Connell,* 9:04–CV–724 (LEK/DEP), 2008 WL 4186334, at *6 (N.D.N.Y. Sept. 10, 2008). Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability. A supervisory official is personally involved if the supervisor directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* 556 U.S. 662 (2009).

### B. Analysis

Defense counsel argues that the retaliation claims should be dismissed because there was no causal connection between plaintiff's protected conduct and the alleged adverse actions against him, and because some defendants were not personally involved in any retaliation action against plaintiff. Those arguments require a close examination of the record regarding each defendant. *Toole v. Connell,* 2008 WL 4186334, at *6 (analysis of retaliation claims requires careful, case-specific, consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two).

### 1. Defendant Rock

**\*20** To the extent plaintiff alleges that defendant Rock retaliated against him by filing a false misbehavior report because he submitted a complaint to Supt. LaValley about the June 15, 2011 incident in the Clinton mess hall, plaintiff clearly cannot establish the required causal connection between his protected conduct and C.O. Rock's alleged adverse action. Plaintiff's initial complaint to Supt. LaValley (Dkt. No. 52–11 at 5), explicitly refers to the misbehavior report written by defendant Rock, and so was clearly written after the correction officer made clear to plaintiff that she intended to initiate disciplinary action against him. The letter which purportedly confirms that Supt. LaValley's office received plaintiff's letter of complaint states that the communication was not received until June 17, 2011 (Dkt. No. 52–11 at 4), after plaintiff was served with the

misbehavior report, on June 16th at 7:00 a.m. (Dkt. No. 36 at 67). Clearly, plaintiff's complaint to the Superintendent about C.O. Rock could not have been "a substantial or motivating factor" that caused her to issue the misbehavior report, as would be necessary to support a retaliation claim. *Bennett v. Goord,* 343 F.3d at 137.

Plaintiff also alleges that, because of the complaint he wrote against defendant Rock, she caused others to retaliate against him-defendant Chase, in connection with the June 22, 2011 adjudication of the disciplinary charges she filed at Clinton; Supt. LaValle, in connection with plaintiff's transfer to Coxsackie on June 24th; defendant Paquette–Monthie, in connection with the misbehavior report she filed against plaintiff at Coxsackie on July 7, 2011; and defendant Gutwein, in connection with the adjudication of the disciplinary charges at Coxsackie later in July 2011. As discussed elsewhere herein, plaintiff's retaliation claims with respect to the adjudication of the misbehavior report at Clinton (on which plaintiff was acquitted), and his transfer from Clinton (which plaintiff initiated), clearly lack merit and should also be dismissed because plaintiff did not exhaust his administrative remedies.

Plaintiff's retaliation claim with respect to the misbehavior report at Coxsackie are also not viable. Although he did not make this allegation in his original complaint, plaintiff claimed, in response to the defendants' initial Rule 12(b)(6) motion and their later summary judgment motion, that C.O. Rock bragged to him, on June 14, 2011, that she would not suffer any consequences if plaintiff 'wr[o]te her up" because she had "family" in Clinton and at DOCCS—presumably in the central office-in Albany. (Dkt. No. 36 at 29; Dkt. No. 52 at 6). However, plaintiff does not otherwise counter defendant Rock's sworn declaration that she was not aware of any complaint plaintiff wrote about her conduct on June 15th, which plaintiff admits was never investigated by DOCCS (Dkt. No. 52–11 at 6, 19). (Rock Decl. ¶¶ 13–14). And, for the reasons set forth below, no reasonable fact finder could conclude that plaintiff can overcome C.O. Rock's sworn statements that she did not know, or communicate with, defendant Paquette–Monthie, or otherwise direct anyone at Coxsackie to pursue a false misbehavior report against plaintiff. (Rock Decl. ¶¶ 14–17).

### 2. Defendant Chase

**\*21** As noted above, plaintiff failed to exhaust his administrative remedies with respect to any retaliation claims relating to Lt. Chase's adjudication of the disciplinary charges

at Clinton or plaintiff's transfer from Clinton. In any event, defendant Chase's acquittal of defendant on the misbehavior report clearly is not an "adverse action" which could support a retaliation charge.

The complaint alleges that, when he could not "get" plaintiff at Clinton, C.O. Chase threatened to "get," *i.e.,* retaliate against, plaintiff at the next facility. In response to the defendants' Rule 12(b)(6) motion and/or the instant summary judgment motion, plaintiff attributed further damaging admissions to Lt. Chase: first, that he talked about the order of protection against plaintiff, which was the impetus for the later disciplinary charges at Coxsackie (Dkt. No. 36 at 30; Pl.'s Reply to Chase Decl. ¶¶ 6–7, 9–10, Dkt. No. 52–7); and second, that he threatened to block plaintiff's transfer to Coxsackie (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 113, Dkt. No. 52 at 9; Pl.'s Reply to Chase Decl. ¶ 12).

Plaintiff's claims about Lt. Chase's admissions, which became more selfserving from the time plaintiff filed the initial complaint to the times he was defending his complaint against substantive defense motions, are, in the court's view, inherently implausible. It seems unlikely that defendant Chase would retaliate against an inmate based on a complaint against another officer in which he was not implicated.[22] Lt. Chase acquitted plaintiff of disciplinary charges that he was smoking in the bathroom at Clinton because C.O. Rock did not actually see plaintiff smoking; she only smelled cigarette smoke on his person and in the room as he was leaving. (Chase Decl. ¶ 7; Dkt. No. 52–11 at 1–3). Given that the circumstantial evidence presented by C.O. Rock probably constituted "some" "reliable evidence" sufficient to uphold a conviction on a prison disciplinary charge,[23] it seems highly likely that defendant Chase would have convicted plaintiff had he truly wanted to retaliate against him for his complaints against defendant Rock. Moreover, if, as plaintiff suggests in response to the Rule 12(b)(6) motion, Lt. Chase knew about plaintiff's violations of the order of protection and intended to extract revenge against plaintiff, he could have initiated additional disciplinary charges before plaintiff was transferred. If Lt. Chase had the power and the retaliatory motivation to block plaintiff's transfer from Clinton to Coxsackie, then why did that transfer actually take place?

22    *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish

one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff has failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in).

23    *See Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) and other cases cited below with respect to the due process standards applying to disciplinary proceedings.

In his sworn declaration, Lt. Chase states that he never threatened plaintiff; he had no knowledge of any complaints by plaintiff against C.O. Rock; and he had no knowledge as to why or when plaintiff was to be transferred out of Clinton (where Lt. Chase worked). Defendant Chase further alleges that he did not personally know, or have any contact with defendant Paquette–Monthie; he never gave any direction to anyone else regarding a misbehavior report issued to plaintiff at Coxsackie; and he did not otherwise take any action to retaliate against plaintiff. (Chase Decl. ¶¶ 8–14).

*22  The only support for plaintiff's allegation that Lt. Chase harbored a retaliatory motive because of plaintiff's complaints against C.O. Rock and played some role in the later filing of disciplinary charges against plaintiff in a different prison are the purported admissions which plaintiff attributes to defendant Chase. As noted, those supposed admissions are inherently implausible and have become increasingly elaborate and self serving as this case has progressed. Plaintiff's unsupported and highly improbable claims about Lt. Chase's admissions are not sufficient to overcome defendant Chase's sworn declaration, and no reasonable fact finder could conclude that he retaliated against the plaintiff. *See, e.g .,  Allah v. Greiner,* 03 Civ. 3789, 2006 WL 357824, at * 1, 3, 5–6, 7, 9 (S.D.N.Y. Feb. 15, 2006) (prisoner's allegations that virtually all of the defendants made specific admissions that they retaliated against him, were implausible and discredited by the defendants' sworn affidavits, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims) [24]; *Jeffreys v. City of New York,* 426 F.3d at 554 ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.") (citation omitted)).

24    The district court in *Allah v. Greiner* found that plaintiff's allegations were sufficient to create issues of fact with regard to the prisoner's claim of retaliation against one defendant because the defendant (Totten) had a plausible motive to retaliate against the plaintiff for a grievance specifically naming Totten and because Totten's explanation for the allegedly retaliatory act was internally inconsistent and in conflict with other evidence. *Id.* at *4.

### 3. Defendant LaValley

The complaint alleges that plaintiff sent Clinton Superintendent LaValley an initial complaint about defendant Rock; but that, rather than investigate, defendant LaValley worked with C.O. Rock and Lt. Chase to retaliate against plaintiff. Plaintiff also appears to allege that defendant LaValley caused him to be transferred to Coxsackie, where he would be subjected to further retaliation by Counselor PaquetteMonthie. (Dkt. No. 1 at 6). In response to the defendants' summary judgment motion, plaintiff filed a letter apparently acknowledging receipt, by Supt. LaValley's office, of plaintiff's initial complaint, which, according to the letter, was "referred to Captain D. Holdridge for review and appropriate action ." (Dkt. No. 52–11 at 4).

As discussed above, plaintiff failed to administratively exhaust any retaliation claim involving the adjudication of the disciplinary charges at Clinton or his transfer from Clinton. Furthermore, plaintiff's claims that defendants Rock and Chase retaliated against him in connection with the misbehavior report at Clinton are devoid of merit for the reasons set forth above. In any event, if defendant LaValley failed to follow up on plaintiff's complaint about C.O. Rock or he delegated responsibility for addressing the complaint to a subordinate, he would not have been "personally involved" in any violation of plaintiff's rights by defendant Rock. *See, e.g.,  Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y .2006) (the failure of a supervisory official to respond to a letter of complaint is insufficient to create personal responsibility); *Sealey v. Giltner,* 116 F.3d 47, 51

(2d Cir.1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response to the prisoners to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official).

**\*23** With respect to plaintiff's transfer out of Clinton, plaintiff admittedly initiated the process by requesting an "area of preference" transfer. (LaValley Decl. ¶ 7 & Ex. A, Dkt. No. 42–5 at 2; Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 115). Plaintiff complains, however, that he should have been transferred from Clinton, in far Northern New York, to Sing Sing, near plaintiff's family in Westchester County, rather than to Coxsackie, which is south of Albany-much closer to Westchester County than Clinton, but not as close as Sing Sing. (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶¶ 115–16). While "prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights[,]" "[a] prisoner has no liberty interest in remaining at a particular correctional facility...." *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir.1998). In any event, Supt. LaValley's declaration states, and plaintiff has not rebutted, that he had no personal involvement in plaintiff's transfer to Coxsackie, because transfers of prisoners from Clinton were overseen, in the normal course of business, by the Deputy Superintendent for Programs. (LaValley Decl. ¶¶ 8–13; Pl.'s Reply to LaValley Decl., Dkt. No. 52–8).

Finally, to the extent the complaint suggests that defendant LaValley conspired with others at Coxsackie to retaliate against him, plaintiff provides no evidence whatsoever to counter Supt. LaValley's declaration that he did not know Counselor Paquette–Monthie, and that he did nothing to retaliate against plaintiff in connection with the filing of disciplinary charges against him at that separate facility. (LaValley Decl. ¶¶ 13–15; Pl.'s Reply to LaValley Decl., Dkt. No. 52–8). Based on the authority cited above, it is clear that a claim of retaliation based on mere speculation by an inmate that a particular defendant was somehow involved in allegedly retaliatory action by others at a separate facility cannot survive summary judgment. In any event, as discussed below, plaintiff's claims of retaliation against the Coxsackie defendants are subject to dismissal on other grounds.

### 4. Defendants Paquette–Monthie and Gutwein

Defendants' initial Rule 12(b)(6) motion plaintiff's retaliation claims against Counselor Paquette–Monthie and Hearing Officer Gutwein argued that plaintiff did not plead any specific facts to support his bald speculation that the Clinton

defendants enlisted the Coxsackie defendants to pursue retaliatory disciplinary charges against him. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 12). Plaintiff responded to this motion with the self-serving claim that defendant Paquette–Monthie told him that she issued the misbehavior report against him because he "filed a complaint against her friend at Clinton Annex." (Dkt. No. 36 at 31, 37, 40).[25] During the July 2011 disciplinary hearing, plaintiff tried to cross-examine defendant Paquette–Monthie about her allegedly biased and vengeful motivation for filing the misbehavior report against him, and asked questions about statements she supposedly made during prior interviews of plaintiff; but, he never made any reference to the counselor's alleged statement that she was initiated the charges because plaintiff had filed a complaint against a friend of hers. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, Dkt. No. 42–15). Nor did plaintiff claim that Counselor Paquette–Monthie made this admission in the various complaints and grievance "appeals" he purportedly submitted in August 2011 (Dkt. No. 52–11 at 6, 17–20, 22–23, 27–28), or in his original complaint filed in this action in September 2011 (Dkt. No. 1).[26]

[25]    Plaintiff speculated that Counselor Paquette–Monthie previously worked in the sex offender program at Clinton Annex, and presumably met C.O. Rock while at Clinton. (Dkt. No. 36 at 36, 37).

[26]    Plaintiff attached, to his response to the Rule 12(b)(6) motion, documents purportedly submitted in state court proceedings in October 2011, one of which referenced Counselor Paquette–Monthie's alleged statement that she filed the misbehavior report against plaintiff because he filed a complaint against a friend of hers. (Dkt. No. 36 at 19). Even if this document is authentic and was not backdated, as some of plaintiff's submissions clearly are, it is apparent from the record that plaintiff belatedly claimed that Counselor Paquette–Monthie made this admission in furtherance of self-serving legal tactics, well after the disciplinary hearing at Coxsackie and after plaintiff filed his complaint in this action.

**\*24** In her sworn declaration, defendant Paquette–Monthie states that she did not personally know, and never had any contact with, defendants Rock and Chase at Clinton. She insists that she issued the misbehavior report against plaintiff, not to retaliate against him, but in good faith, based on the evidence. (Paquette–Monthie Decl. ¶¶ 11–15).

2014 WL 1292232

Defendant Gutwein similarly denies any effort to retaliate against plaintiff, and swears that he was not directed by anyone to find plaintiff guilty of the disciplinary charges against him at Coxsackie. Hearing Officer Gutwein also states that he did not know C.O. Rock from Clinton, and was unaware of any complaint or grievance plaintiff may have filed against her. (Gutwein Decl. ¶¶ 24–33).

Based on the authority cited in note 22 above, it is unlikely that defendants Paquette–Monthie and Gutwein would be motivated to retaliate against plaintiff for a complaint or grievance in which they were not implicated, particularly when the target of the complaint worked at a separate and geographically distant correctional facility. The sworn declarations establishing that the Clinton and Coxsackie defendants did not know each other or have any contact, utterly refute plaintiff's speculation that they colluded to initiate false disciplinary charges against him. The only support plaintiff offers for the implausible conspiracy theory underlying the retaliation claim against the Coxsackie defendants is the alleged admission of Counselor Paquette–Monthie that she issued the misbehavior report because plaintiff had complained about a friend of hers at Clinton Annex. Given that plaintiff did not offer this self-serving alleged admission while confronting Counselor Paquette–Monthie at the disciplinary hearing, or in his grievance appeals which referenced the Coxsackie defendants, or even in his initial complaint in this action, the court finds that the purported admission does not create an issue of fact that could lead any reasonable fact finder to conclude that defendants Paquette–Monthie and Gutwein conspired to retaliate against plaintiff. *See, e.g., Allah v. Greiner,* 2006 WL 357824, at * 1, 3, 5–6, 7, 9; *Jeffreys v. City of New York,* 426 F.3d at 554.

In any event, the court concludes that plaintiff's retaliation claims against defendants Paquette–Monthie and Gutwein would be subject to dismissal because they would have taken the same actions with respect to the misbehavior report against plaintiff even if they had known of complaints or grievances filed by plaintiff against defendant Rock. See, e.g., *Lowrance v. Achtyl,* 20 F.3d 529, 534–35 (2d Cir.1994) (defendants met their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct because the plaintiff had admitted to engaging in the misconduct that formed the basis of the misbehavior report; plaintiff's retaliation claim was properly dismissed under *Mt. Healthy* and its progeny); *Smith v. Woods,* 2006 WL 1133247, at * 10 (the record evidence establishes that the hearing officer could, and indeed would, have reached the same disciplinary

hearing decision (and imposed the same penalties) despite any such complaints or grievances by plaintiff-*i.e.,* based upon the evidence as presented to him at plaintiff's disciplinary hearing decision).

**\*25** The basis of the disciplinary charge against plaintiff was that he violated an order of protection that precluded him from, *inter alia,* all communications and contact, including by "telephone[,]" with his wife and daughters, "except for visits to state correctional facility and correspondence." (Gutwein Decl. ¶ 6 & Ex. A, Dkt. No. 14–15 at 3). Based on the order of protection, plaintiff had been directed to stop calling his wife by DOCCS staff at Sing Sing, and was not allowed to add his wife to his authorized call list (Dkt. No. 42–15 at 4–5); but plaintiff apparently circumvented that limitation by listing, under the name of an aunt, the telephone number at the home where his wife came to reside. (Disc. Hrg. Tr. at 2, 7, 9, 21–22, 56–58).

During his initial interview with Counselor Paquette–Monthie at Coxsackie, and during the disciplinary hearing, plaintiff acknowledged that he had telephonic contact with his wife from other DOCCS facilities before he was transferred to Coxsackie, at the number listed under his aunt's name on his emergency contact list.[27] (Disc. Hrg. Tr. at 7, 9, 12, 18, 19–20). He disputed the disciplinary charges because he believed that he should not be charged with misconduct by Coxsackie officials for calls he made to his wife from other institutions. (Disc. Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 52–53, 56). Plaintiff also asserted that the exception for "correspondence" in the order of protection should be interpreted to include telephonic contact, notwithstanding the explicit, prior prohibition in the order against communications by telephone. (Disc. Hrg. Tr. at 17, 18, 20, 23, 44–45, 49). Plaintiff claimed that his wife, who was willing to speak with him by phone, and the District Attorney and Judge who caused the order of protection to be entered, would agree that telephonic contact was permissible, notwithstanding the clear language of the order of protection.[28] (Disc. Hrg. Tr. at 6–7, 23, 39, 57–58, 61).

27      Defendant Paquette–Monthie and her supervisor testified at the disciplinary hearing that DOCCS phone records confirmed that plaintiff had, indeed, made calls to the number at which plaintiff admitted his wife could be reached. (Disc. Hrg. Tr. at 19, 59–60; Dkt. No. 42–15 at 6–13). Plaintiff was

allowed to inspect those phone records during the hearing. (Disc. Hrg. Tr. at 67, 69).

28    The Order of Protection was apparently modified, on October 28, 2011, after the disciplinary hearing, to allow telephonic contact. (Dkt. No. 36 at 66). However, this reinforces that the Order of Protection in place at the time of the telephonic contact that resulted in the misbehavior report against plaintiff clearly did not authorize contact by phone.

The court finds that, although plaintiff made several frivolous arguments that he should be found not guilty, "he admitted to engaging in the conduct that formed the basis of the misbehavior report." *Lowrance v. Achtyl,* 20 F.3d at 534–35. Accordingly, I would recommend that summary judgment be granted in favor of the Coxsackie defendants on plaintiff's retaliation claim, based, *inter alia,* on *Mt. Healthy* and its progeny.

**V. Due Process**

   **A. Legal Standards**
To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

   **\*26**   The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some" "reliable

evidence." *Id.* (*citing, inter alia, Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim,* 590 F.Supp.2d 426, 429 (W.D.N.Y.2008) (citing, *inter alia, Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

   **B. Analysis**
The complaint alleges that, in conducting the disciplinary hearing at Coxsackie and finding plaintiff guilty, defendant Gutwein was motivated by a desire to retaliate against plaintiff for his complaint against defendant Rock at Clinton. Plaintiff also alleges that Hearing Officer Gutwein also improperly denied plaintiff's requests to call key witnesses or obtain documents that would have established his innocence. (Dkt. No. 1 at 7). In plaintiff's prior motion to amend his complaint, which this court denied (Dkt. No. 38 at 7, 9–10), he attempted to supplement his due process claim by alleging that (1) the misbehavior report was deficient because it did not specify the institution from which plaintiff made the offending phone calls to his wife (Dkt. No. 36 at 34); (2) defendant Gutwein improperly disallowed certain questions plaintiff wanted hearing witnesses to answer (Dkt. No. 36 at 33); and (3) plaintiff's assistant was not allowed to contact certain witnesses on his behalf (Dkt. No. 36 at 36). Although not technically part of the complaint, the court will address these allegations.

Defendants, apparently conceding that the disciplinary sanctions imposed on plaintiff at Coxsackie implicated a liberty interest, argue that the plaintiff was afforded all of the process to which he was due at the hearing conducted by defendant Gutwein. (Defs.' Mem. in Support of Rule 12(b)

(6) Mot. at 16–20). The court agrees that, based on the record of the disciplinary hearing, no reasonable fact finder could conclude that plaintiff's due process rights were violated or that the outcome of the proceeding would have been any different if he had been allowed to call and question the witnesses and present the documents that he requested.

### 1. Misbehavior Report

**\*27** The July 7, 2011 misbehavior report charged plaintiff with violating prison rules 107.20 (False Statements or Information); 106 .10 (Refusing Direct Order); and 121.12 (Phone Program Violation) for making telephone calls to his wife in violation of an order of protection and contrary to direct orders from an officer at Sing Sing, which he managed to do by misleadingly listing his aunt's name as an emergency contact, but at an address and phone number where his wife resided. (Dkt. No. 42–15 at 2). Plaintiff alleges that defendant Paquette–Monthie's misbehavior report provided inadequate notice of the charges because it did not specify the facility from which he made telephone calls to his wife.

The notice required by due process serves to "compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (citation omitted)). However, the Constitution does not demand notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct. *Sira v. Morton,* 380 F.3d at 72.

Counselor Paquette–Monthie's misbehavior report was based on plaintiff's admissions that he had previously been calling his wife, and the report noted the date in 2009 when plaintiff changed his emergency contact information so he could reach his wife by phone, despite prior orders that he not do so. (Dkt. No. 42–15 at 2). The misbehavior report includes considerable factual detail, and the charges contained therein could certainly not be considered impermissibly vague or conclusory. *Taylor v. Rodriguez,* 238 F.3d at 193 (due process requires more than a conclusory charge). The fact that the misbehavior report did not specify the institution(s) from which he impermissibly called his wife did not impede him from establishing that he made no such calls from Coxsackie and pursuing the defense, albeit a frivolous one, that he could not be charged at Coxsackie for conduct

committed at prior facilities. (Disc. Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 53, 56).

### 2. Witnesses and Exhibits

During the hearing, plaintiff requested the following witnesses on his behalf: defendant Paquette–Monthie; her supervisor; plaintiff's wife; the District Attorney and the judge who were involved with the Order of Protection; plaintiff's wife's lawyer; plaintiff's criminal defense lawyer; and a staff member from the Office of Mental Health. (Gutwein Decl. ¶ 8; Disc. Hrg. Tr. at 4–8). The hearing officer called only Counselor Paquette–Monthie and Supervising Counselor Chenel to testify, and both were questioned extensively by plaintiff, although defendant Gutwein screened many of plaintiff's questions. (Gutwein Decl. ¶¶ 9–10; Disc. Hrg. at 8–43, 43–61).

**\*28** Plaintiff, in his motion to amend the complaint, alleged that Hearing Officer Gutwein "would not allow me to question witnesses with questions that proved I was being ret[a]liated for no reasons but for[ ] filing a complaint against the coun[s]elor['s] friend C.O. P. Rock." (Dkt. No. 36 at 33). Hearing Officer Gutwein allowed the witnesses to answer some, but not all questions by which plaintiff tried to establish that Counselor Paquette–Monthie filed the misbehavior report against him because of her "bias" and motive for "revenge." But, plaintiff never sought to ask any question as to whether the counselor initiated the charges because plaintiff had filed a prior complaint against C.O. Rock or any other friend at Clinton. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, 54, 55).[29]

29   Plaintiff asked Supervising Counselor Chenel, with respect to the misbehavior report against him, "was there any complaint initially by any outside services ... or was there anything written from another facility, uh,—retaliate or anything like that?" Hearing Officer rephrased the questions: "to you knowledge was there any outside contact with regard to the Order of Protection being violated?" and Supervising Counselor Chenel answered "No." (Disc. Hrg. Tr. at 54).

The mere fact that plaintiff's questions for witnesses had to be filtered through the hearing officer did not violate due process. *See Baxter v. Palmigiano,* 425 U.S. 308, 322–23 & n. 5 (1976) (inmates are not entitled to the right to confront and crossexamine witnesses at a disciplinary hearing). The plaintiff's tone during the entire disciplinary

2014 WL 1292232

hearing was argumentative, and many of his proposed questions reflected a dogged, but unfocused effort to induce Counselor Paquette–Monthie to admit she was, for whatever reason, biased against the plaintiff. During the disciplinary hearing, defendant Paquette–Monthie clearly testified that she initiated the charges against plaintiff because of the perceived seriousness of his misconduct, and "was not playing any dirty politics ... behind the scenes." (Disc. Hrg. Tr. at 26, 28). The hearing officer reasonably denied many of the plaintiff's other questions about the counselor's alleged bias because they were repetitive and bordered on harassment. In any event, it is clear from defendant Paquette–Monthie's declaration (¶¶ 12–17, Dkt. No. 42–12), that if plaintiff had actually tried to ask her at the hearing whether she was retaliating against him at the behest of C.O. Rock or others from Clinton, she would have flatly denied it. Thus, plaintiff cannot establish prejudice, because even if defendant Gutwein had disallowed such questions (which, again, plaintiff never asked), allowing Counselor Paquette–Monthie to answer would have not favored plaintiff or changed the outcome of the hearing. [30]

[30]    See *Clark v. Dannheim,* 590 F.Supp.2d at 429–31 (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases). Toward the end of the hearing, plaintiff requested that witnesses Paquette–Monthie and Chenel be recalled for further questioning; but he would not explain what new questions he wanted to ask these witnesses. (Disc. Hrg. Tr. at 63–66). Hearing Officer Gutwein denied plaintiff's request to recall these witnesses because plaintiff failed to articulate any additional information that they could provide that would not be redundant of their lengthy, prior testimony. (Disc. Hrg. Tr. at 66, 71–72; Dkt. No. 42–15 at 93). Defendant Gutwein's stated reasons for not recalling these witnesses were reasonably related to a correctional goal and did not, based on the authority cited below, violate due process. In any event, because plaintiff never articulated how recalling these two witnesses would have helped him or changed the outcome of the disciplinary hearing, he cannot establish that he was prejudiced by the hearing officer's ruling.

Plaintiff's request to call his wife and a number of people involved in the prior case that resulted in the order of protection, was premised on his claim that these witnesses would put the order in "context" and clarify that plaintiff was, in fact, allowed to speak with his wife by telephone. (Disc. Hrg. Tr. at 6–7, 22, 23, 39, 57–58, 61). Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell,* 387 F.Supp.2d 227, 234 (W.D.N.Y.2005) (citing *Ponte v. Real,* 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia, Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence). An inmate's due process rights are violated when a prison hearing officer refuses to interview witnesses without assigning a reason "logically related to preventing undue hazards to 'institutional safety or correctional goals.' " *Ponte v. Real,* 471 U.S. at 497.

**\*29** Hearing Officer Gutwein denied plaintiff's request to call his wife as a witness, because to do so would violate the order of protection. Defendant Gutwein also declined to call the other witnesses involved with the prior order of protection because their testimony would not be relevant. (Disc. Hrg. Tr. at 61–63; Dkt. No. 42–15 at 95–96). [31] As noted above, the order of protection explicitly precluded plaintiff from having telephonic or other communications with his wife, and created an exception that allowed only prison visits and "correspondence." (Dkt. No. 42–15 at 3). Given the clarity of the order of protection, and the prior order of a DOCCS official that plaintiff refrain from telephone contact with his wife, calling other witnesses to "explain" or put into "context" the order of protection would have been unnecessary and irrelevant. Accordingly, Hearing Officer Gutwein did not violate plaintiff's due process rights by refusing to call these witnesses. [32]

[31]    On July 20, 2011, Hearing Officer Gutwein provided plaintiff with copies of form 2176 explaining, in writing, the reasons for his refusal to call each witness. Plaintiff demanded that the hearing officer state on the record his reasons for refusing to call the District Attorney involved with the prior order of protection, and defendant Gutwein did not due so. (Disc. Hrg. Tr. at 62–63). On July 21, 2011, when the hearing resumed, plaintiff complained that he could not read script,

and the hearing officer orally explained his reasons to deny plaintiff's new request to recall witnesses Paquette–Monthie and Chenel on the record, apparently because the 2176 forms prepared that morning were handwritten in script. (Disc. Hrg. Tr. at 70–72). Once he announced his problems with reading script, plaintiff did not renew his request that the hearing officer orally explain the reasons for not calling the District Attorney, which were written in script on form 2176 the day before. (*Id.*). In his prior rulings on various questions plaintiff posed to the witnesses, the hearing officer made clear that the various persons involved in the prior order of protection had nothing relevant to offer with respect to the pending charges. (*See, e.g.,* Disc. Hrg. Tr. at 23, 40, 49). In any event, as long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing, even if state law requires a contemporaneous finding. *Duffy v. Selsky,* 95 CIV. 0474, 1996 WL 407225, at * 10 (S.D.N.Y. Jul. 18, 1996) (the Supreme Court has held that the proffer of the explanation for not calling a witness need not be contemporaneous with the hearing) (citing *Ponte v. Real,* 471 U.S. at 497).

32      Given that these witnesses had no relevant information to offer, plaintiff's complaint that his assistant was not allowed to interview these witnesses also fails to support a due process claim.

Plaintiff requested that his medical and mental health records be produced at the hearing, claiming they would indicate that his wife was listed as his emergency contact and that, therefore, he had permission from DOCCS staff at Clinton to call his wife. [33] (Disc. Hrg. Tr. at 7, 59). In fact, plaintiff's position that his emergency contact information contained the address and phone number where his wife could be reached was repeatedly placed on the record during the hearing, and was accepted by the witnesses and the hearing officer. (Disc. Hrg. Tr. at 9, 12, 18–19, 29, 36, 37, 56–57, 60, 72–73). However, the DOCCS witnesses and hearing officer documented that the name plaintiff associated with that emergency contact information was that of his aunt, not his wife, and viewed this as evidence that plaintiff was misleading DOCCS staff so he could make calls to his wife, despite orders to the contrary. (*Id* .)

33      Plaintiff initially requested witnesses from the health units, but he did not persist in that request after Counselor Paquette–Monthie and Supervising Counselor Chenel testified. (Disc. Hrg. Tr. at 7, 61). Hearing Officer Gutwein nonetheless prepared copies of form 2176 explaining that these witnesses would not be called because the proposed testimony would not be relevant. (Dkt. No. 42–15 at 94–95).

Plaintiff, while apparently conceding that he used his wife's address and phone number, but not her name, in his emergency contact information (Disc. Hrg. Tr. at 7; Dkt. No. 36 at 35), argued that he disclosed, to Counselor Paquette–Monthie at Coxsackie, that his aunt subsequently moved from that residence and his wife moved in. (Disc. Hrg. at 12–13, 37, 56–57, 60). However, plaintiff was charged, not with misleading defendant Paquette–Monthie at Coxsackie, but with misleading staff at other DOCCS facilities by listing his wife's contact information under his aunt's name. (Disc. Hrg. Tr. at 2; Inmate Misbehavior Report, Dkt. No. 48–15 at 2). Plaintiff's position on this point is a variation on his frivolous defense that he could not be charged at Coxsackie for misconduct he previously committed at a prior institution. (Disc. Hrg. Tr. at 37). Accordingly, when Hearing Officer Gutwein ruled that documentary or testimonial evidence from DOCCS health units about plaintiff's emergency contact information was not relevant (Disc. Hrg. Tr. at 10; Dkt. No. 42–15 at 94–95), he was pursuing a legitimate correctional goal of avoiding redundant and irrelevant evidence, and did not violate plaintiff's due process rights. *See, e.g., Clyde v. Bellnier,* 9:08–CV–909 (JKS), 2010 WL 1489897, at *6 (N.D.N.Y. April 13, 2010) (no due process violation arose when the hearing officer failed to provide documents that did not exist or that were not relevant to the defense). [34]

34      The court notes that Hearing Officer Gutwein provided plaintiff with copies of requested documents discussed during the hearing, and once adjourned the hearing so plaintiff could get a copy of a document he claimed he needed to continue questioning a witness. (Disc. Hrg. Tr. at 31, 66–71).

**3. Sufficiency of the Evidence**

**\*30**  As discussed in section IV B 4. above, plaintiff essentially admitted all of the conduct which formed the basis of the disciplinary charges against him, and his "defenses" were frivolous. The testimony of Counselor Paquette–Monthie (*see, e.g.,* Disc. Hrg. Tr. at 9, 18–19, 21–22) and

Supervising Counselor Chenel (*see, e.g.,* Disc. Hrg. Tr. at 46, 49, 56–57, 59–60), along with the supporting documents (Dkt. No. 42–15 at 2–14), provided far more support for defendant Gutwein's guilty finding than the "some" "reliable evidence" standard requires to satisfy due process. (Disc. Hrg. Tr. at 72–73; Dkt. No. 42–15 at 98–99). [35]

[35]    The hearing office stated the basis for his finding on the disciplinary charges both in writing and on the record at the hearing. (*Id.*).

### 4. Hearing Officer Bias

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d at 253, 259 (2d Cir.1996). An impartial hearing officer is "one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v.. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The unsupported allegations that defendant Gutwein conspired with the other defendants to retaliate against plaintiff in connection with the disciplinary proceedings at Coxsackie (discussed above) are insufficient to establish that he was a biased hearing officer. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 460–61 (S.D.N.Y.2006) (in order to defeat a motion for summary judgment, a plaintiff-inmate must "be armed with [something] more than conclusory allegations of

bias and prejudgment" of the disciplinary hearing officer) (quoting *Francis v. Coughlin,* 891 F.2d at 47). The transcript of the disciplinary hearing demonstrates that Hearing Officer Gutwein displayed great patience in dealing with plaintiff's argumentative demeanor and his persistence in pursuing frivolous lines of witness questioning. Given the weight of the evidence supporting plaintiff's guilt and the fact that defendant Gutwein's various rulings regarding witnesses and documentary evidence clearly comported with due process, no reasonable fact finder could conclude that he was an unconstitutionally biased hearing officer.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 42) be **GRANTED** on the grounds stated herein, and that plaintiff's complaint be **DISMISSED** in its entirety; and it is further

**\*31   RECOMMENDED,** that plaintiff's motions for preliminary injunctions (Dkt. Nos.54, 58) be **DENIED AS MOOT;** and it is further

**ORDERED,** that plaintiff's motion for appointment of counsel (Dkt. No. 58) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b) (1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed Jan. 17, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1292232

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 9:11cv01171**<br>BROOKS v. ROCK ET AL | — | N.D.N.Y. | Sep. 30, 2011 | Docket |

**WESTLAW**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History**

There are no History results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 211 of 238
Tutora v. Gessner, Not Reported in Fed. Supp. (2019)

2019 WL 1382812

2019 WL 1382812
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jeremy L. TUTORA, Plaintiff,

v.

Sgt. GESSNER #138, et al., Defendants.

No. 17-CV-9517 (KMK)
|
Signed 03/27/2019

**Attorneys and Law Firms**

Jeremy L. Tutora, Endwell, NY, Pro Se Plaintiff.

Kellie E. Lagitch, Esq., Office of the Orange County Attorney, Goshen, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

*1 Jeremy L. Tutora ("Plaintiff") brings this pro se Action, pursuant to 42 U.S.C. § 1983, against numerous prison officials at the Orange County Jail (collectively, "Defendants"), alleging that Defendants harassed him in violation of his First Amendment rights while incarcerated at the jail. (*See* Am. Compl. (Dkt. No. 9).)[1] Before the Court is Defendants' Motion To Dismiss. (Not. of Mot. (Dkt. No. 35).) For the following reasons, the Motion is granted.

---

[1]    Defendants are: Sgt. Gessner #138 ("Gessner"); Sgt. Kiszka #134 ("Kiszka"); Sgt. Platt #499 ("Platt"); Sgt. Hernandez #131 ("Hernandez"); Sgt. DeGennaro #110 ("DeGennaro"); Sgt. Maiorino ("Maiorino"); Sgt. Kahmar ("Kahmar"); Sgt. Conroy #117 ("Sgt. Conroy"); Correction Officer ("C.O.") Conroy #174 ("C.O. Conroy"); C.O. Wixon #409 ("Wixon"); C.O. Smith #511 ("Smith"); C.O. Manuel ("Manuel"); C.O. Czubak #307 ("Czubak"); C.O. Muller #376 ("Muller"); and C.O. Colon #196 ("Colon"). The Court uses the corrected spellings of Defendants' names as provided by Defendants.
     The Court notes that Hernandez has not been served and counsel has not appeared on his behalf. It

appears that Hernandez was not included on the Court's March 12, 2018 Order directing service through the U.S. Marshals Service. (Dkt. No. 12.) The Court has issued a revised Order directing service on Hernandez. (Dkt. No. 46.) The Court lacks personal jurisdiction as to Hernandez and, in any event, concludes that Plaintiff fails to state a claim against Hernandez.

Finally, the Court notes that, although service was effected as to C.O. Morris ("Morris"), who was named as a Defendant in Plaintiff's initial Complaint, Morris was not named as a Defendant in the operative Amended Complaint, nor were any substantive allegations made against him. Accordingly, all claims against Morris are dismissed.

I. Background

A. Factual Background

The following facts are drawn from Plaintiff's Amended Complaint and are taken as true for the purpose of resolving the instant Motion.

On or about August 23, 2017, while incarcerated at Orange County Jail, Plaintiff approached Defendant Manuel about filing a grievance regarding insufficient food on his tray and being unable to consistently take his medications. (Am. Compl. 1.)[2] In response, Manuel "became vulgar and shouted threats" at Plaintiff about his grievance request. (*Id.*) Plaintiff filed a grievance against Manuel; it alleges that Manuel yelled, " 'I can take care guys like you, ask about me,' " causing Plaintiff to "fear for [his] safety." (*Id.* at 8.) The grievance was denied as "unfounded." (*Id.*)

---

[2]    Plaintiff's filings do not use consistent page numbering. For ease of reference, the Court cites to the ECF-generated page numbers stamped at the top of each page.

Plaintiff thereafter spoke with Defendant Hernandez. (*Id.* at 1.) Hernandez also "became vulgar and threatened" Plaintiff about " 'knowing his status' in the jail." (*Id.*) Hernandez eventually "gave [Plaintiff] two grievance[ ] [forms] ... and told [Plaintiff] [that he] could not write him up or else." (*Id.*) Plaintiff filed a grievance against Hernandez; it alleges that Hernandez was "very rude, disrespectful, impatient, forceful, and ... intimidat[ing]," causing Plaintiff to "fear for [his] safety." (*Id.* at 11.) The grievance was denied. (*Id.* at 12.)

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 212 of 238

Tutora v. Gessner, Not Reported in Fed. Supp. (2019)

2019 WL 1382812

**\*2** Following the incidents with Manuel and Hernandez, Plaintiff "continued to be harassed in different forms." (*Id.* at 1.) While in the "mental health dorm," on three occasions, Defendant Sgt. Conroy did "not pop [Plaintiff's] cell for chow run." (*Id.* at 2.) Plaintiff thereafter requested a grievance form from Defendant McCord, but was denied. (*Id.*) McCord "yell[ed] racist comments" at Plaintiff "for wanting to exercise [his] [First] Amendment right," including telling Plaintiff, " ' Get into the shower and shut up you monkey, next you will be screaming [I'm] violating your civil rights!' " (*Id.*) Defendant Wixon also "made threatening racist comments to [Plaintiff]," including stating, " 'I have a 16 inch rope with your name on it. I was a slave owner for Halloween.' " (*Id.*) Wixon additionally mocked Plaintiff's injuries by doing "fake limps, fake vomit noises, [and] stiff neck jokes." (*Id.*) Sgt. Conroy, McCord, and Wixon "push[ed] [Plaintiff] around not to write grievances." (*Id.*) Plaintiff does not indicate whether he filed a grievance against them; Plaintiff did, however, write multiple letters to the New York State Commission of Correction complaining about their harassment. (*Id.*; *see also id.* at 13–14 (letters).)

In September and October 2017, Defendant Smith "would bang on [Plaintiff's] cell door," refuse to "sign [his] law library slips," "mock [his] injuries," do searches of Plaintiff's cell, "yell in [Plaintiff's] speaker," and "deny [him] supplies." (*Id.* at 2.) Further, Smith "would threaten [Plaintiff] about grievances saying his dad was a sergeant." (*Id.*) Smith at least once "den[ied] [Plaintiff] access to [the] grievance program," (*id.*), as did Sgt. Conroy, Platt, and Gessner, (*id.* at 3). However, Plaintiff attaches grievances against Smith, Sgt. Conroy, Gessner, and Maiorino (but not Platt), alleging that he waited more than eight hours after requesting a grievance form before it was given to him, in violation of a jail handbook, and that he was "put through extreme stress to get grievances." (*Id.* at 15–17.) The grievances were denied as unfounded. (*Id.*)

On September 28, 2017, Defendant Cologne mocked Plaintiff about his neck injury. (*Id.* at 3.) Plaintiff wrote a grievance against Cologne, (*id.* at 20), which was denied, (*id.* at 21–22). That Plaintiff wrote a grievance on the issue caused Defendant Kiszka to become "outraged" and to "yell[ ]" and "scream[ ]" at Plaintiff. (*Id.* at 3.) Kiszka has also "intimidate[d]" Plaintiff by telling him that "nothing will help [Plaintiff] get them to leave [him] alone." (*Id.*) Plaintiff alleges that he did not file a grievance against Kiszka, (*id.*), yet, attaches a letter with an unknown addressee complaining about Kiszka, (*id.* at 23.)

In November 2017, Hernandez, DeGennaro, Maiorino, and Kahmar "block[ed]" Plaintiff's "access to [the] grievance program with threats, evasiveness, and direct knowledge of [his] issues." (*Id.* at 3.) However, Plaintiff attaches a grievance against them, which was denied. (*Id.* at 24–29.)

Defendant Muller, on three occasions, "open[ed] [Plaintiff's] mail" outside of his presence, in "direct retaliation for previous grievances." (*Id.* at 3–4.) Plaintiff filed letters of complaint to a captain at the jail and to the New York State Department of Corrections and Community Supervision, alleging that mail was "missing tape and open" and therefore "tampered" with by Muller. (*Id.* at 30–31.)

Defendant Czubak would "mock injuries, be a [deterrent], distract people, give out wrong info or outdated [info] and [would] use his position and seniority to hold [him] back and not allow[ ] [him] access to Westlaw." (*Id.* at 4.) After Plaintiff wrote a letter to Governor Cuomo, Czubak limited Plaintiff's law library access to once a week instead of three times a week, thereby "not allowing [Plaintiff] adequate time to research [his] case." (*Id.*) Plaintiff did not suffer any "direct injury," but he suffered "psychological" harm. (*Id.*) Plaintiff filed a grievance against Czubak, which was denied, (*id.* at 42–45), as well as a letter of complaint to Czubak himself, (*id.* at 46.)

### B. Procedural Background

Plaintiff filed his initial Complaint on December 1, 2017. (Dkt. No. 2.) On January 3, 2018, the Court issued an Order directing Plaintiff to amend his complaint to further detail his claims. (Dkt. No. 8.) On February 14, 2018, Plaintiff filed the instant Amended Complaint. (Dkt. No. 9.) On July 20, 2018, Defendants filed their Motion To Dismiss and accompanying papers. (Not. of Mot.; Decl. of Kellie E. Lagitch, Esq. in Supp. of Mot. (Dkt. No. 36); Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 37).) On August 23, 2018, Plaintiff filed his response in opposition to the Motion. (Pl.'s Resp. to Mot. ("Pl.'s Mem.") (Dkt. No. 39).) On August 31, 2018, Defendants filed a reply. (Decl. of Kellie E. Lagitch, Esq. in Further Supp. of Mot. ("Defs.' Reply") (Dkt. No. 42).)

### II. Discussion

**\*3** Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants argue

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 213 of 238
Tutora v. Gessner, Not Reported in Fed. Supp. (2019)
2019 WL 1382812

that Plaintiff fails to state a *Monell* claim, fails to state a claim regarding his access to the courts or access to the grievance program, and fails to state a First Amendment retaliation claim. (Defs.' Mem. 5–17.) [3] The Court addresses each issue separately.

[3]    Defendants also argue that Plaintiff's claim for compensatory damages is barred by the Prison Litigation Reform Act. (*See* Defs.' Mem. 17.) The Court need not address this argument.

A. Standard of Review

The Supreme Court has held that, although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alterations, and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations...." (quotation marks omitted). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the "complaint[ ] must be construed liberally and interpreted to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

**\*4** Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including, as relevant here, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted).

B. Analysis

1. *Monell* Liability

Plaintiff does not indicate whether he sues Defendants in their individual or official capacities. (*See generally* Am. Compl.) In such instances, courts often construe such claims as brought in both capacities. *See Jackson v. Ramirez*, No. 15-

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 214 of 238
Tutora v. Gessner, Not Reported in Fed. Supp. (2019)
2019 WL 1382812

CV-617, 2016 WL 796854, at *5 (S.D.N.Y. Feb. 22, 2016), *aff'd*, 691 F. App'x 45 (2d Cir. 2017). "A claim asserted against a [defendant] in his official capacity ... is in effect a claim against the governmental entity itself ... for 'official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.' " *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell*, 436 U.S. at 690–91). In other words, a municipality may not be held liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted). Rather, "municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right." *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008). A plaintiff may satisfy the fifth element by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). Moreover, a plaintiff

also must establish an "affirmative" causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985).

**\*5** Plaintiff fails entirely to allege the fifth element required to state a *Monell* claim. As Defendants argue, (*see* Defs.' Mem. 6–8), Plaintiff alleges no facts whatsoever suggesting that Defendants acted pursuant to a formal municipal policy or that Defendants are policymakers with authority to create or direct any relevant municipal policy. *See Joseph v. Doe*, No. 16-CV-2004, 2017 WL 4233024, at *4 (E.D.N.Y. Sept. 22, 2017) ("The mere assertion that the Lieutenant [defendant] was responsible for supervising the other [d]efendants is insufficient."). Nor does Plaintiff allege facts showing that similar alleged deprivations occurred as to other inmates, such that it could be said that Defendants acted pursuant to an informal municipal custom or practice. *See Perez v. Annucci*, No. 18-CV-147, 2019 WL 1227801, at *5 (S.D.N.Y. Mar. 15, 2019) ("The amended complaint does not ... specifically allege any other inmate ... suffered [the alleged deprivation]."); *see also Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 14 (2d Cir. 2015) (affirming dismissal of *Monell* claim and noting, "other than the plaintiff, the amended complaint provides only one additional example of a similar incident"). For the same reason, Plaintiff also does not plausibly suggest *Monell* liability on a failure-to-train or failure-to-supervise theory. *See Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 127 (2d Cir. 2004) (noting that, to establish a failure-to-supervise theory, the plaintiff must show the defendants' deliberate indifference "by showing that the need for more or better supervision to protect against constitutional violations was obvious, but that [the defendants] made no meaningful attempt to forestall or prevent the unconstitutional conduct" (citation and quotation marks omitted)); *Falls v. Campbell*, No. 17-CV-35, 2019 WL 1255768, at *5–6 (S.D.N.Y. Mar. 19, 2019) ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." (quoting *Connick*, 563 U.S. at 62)). Because Plaintiff fails to allege facts satisfying the fifth *Monell* element, Plaintiff's claims against Defendants in their official capacities must be dismissed. *See McKenzie v. City of Mount Vernon*, No. 18-CV-603, 2018 WL 6831157, at *7 (S.D.N.Y. Dec. 28, 2018) (dismissing *Monell* claim where the plaintiff did "not allege any facts suggesting a policy or custom that led to [the] alleged" constitutional deprivation).

Tutora v. Gessner, Not Reported in Fed. Supp. (2019)

2019 WL 1382812

## 2. Access to Courts

"To state a claim for denial of access to the courts — in this case due to interference with legal mail — a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citation and quotation marks omitted). "[A] plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in *actual injury* to the plaintiff such as the dismissal of an otherwise meritorious legal claim." *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (emphasis added) (citing *Lewis v. Casey*, 518 U.S. 343, 351 (1996)). Actual injury includes "claims that systemic official action frustrates a plaintiff ... in preparing and filing suits at the present time," and "claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter how official action may be in the future." *Christopher v. Harbury*, 536 U.S. 403, 413–14 (2002) (collecting specific examples within each category). "A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Amaker v. Haponik*, No. 98-CV-2663, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999).

Here, Plaintiff alleges that Muller opened his "confidential" and "legal" mail outside his presence on three occasions, and that Czubak reduced Plaintiff's law library and Westlaw access for several weeks. (Am. Compl. 3–4, 30–31, 42–46.) However, "[m]ere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Davis*, 320 F.3d at 352 (citation and quotation marks omitted). Plaintiff does not allege that he was prevented, or even delayed, from making legal filings. There is no indication that any Defendant "obstruct[ed] [Plaintiff's] legitimate efforts to seek judicial redress" or otherwise prejudiced Plaintiff's legal actions. *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 397 (2d Cir. 2008) (citation, alteration, and quotation marks omitted); *see also Christopher*, 536 U.S. at 413 (noting right-of-access concerns are implicated when "systemic official action frustrates a plaintiff ... in preparing and filing suits at the present time").[4] Indeed, Plaintiff admits that he suffered "no direct injury" from his reduced library access. (Am. Compl. 4.) Accordingly, Plaintiff's access-to-courts claim must fail. *See Matthews v. Barq*, No. 18-CV-855, 2019 WL 1025828, at *10 (N.D.N.Y. Mar. 4, 2019) (dismissing

access-to-courts claim alleging that the defendant "denied [the plaintiff] access to a legal bag prior to his transport to another facility, and that certain legal materials within the bag were subsequently removed," where no showing of actual injury was made); *Wisdom v. Griffin*, No. 17-CV-4837, 2019 WL 452057, at *4 (S.D.N.Y. Feb. 4, 2019) (dismissing access-to-courts claim where the plaintiff did "not allege he was prevented from bringing his habeas corpus petition — which plaintiff in fact successfully filed, and which remains pending — or that any existing legal claim would have succeeded but irreparably was harmed by a defendant's alleged conduct"); *Chavis v. Chappius*, No. 06-CV-543, 2015 WL 1472117, at *10 (W.D.N.Y. Mar. 31, 2015) (dismissing access-to-courts claim where the plaintiff failed to allege that he "was actually hindered or prejudiced by the denial of a legal advance"); *Simmons v. Adamy*, 987 F. Supp. 2d 302, 307–08 (W.D.N.Y. 2013) (dismissing access-to-courts claim where, "[b]y plaintiff's own reckoning, he received an average of at least one or two library call-outs per week," which is "inherently reasonable," and where he "offer[ed] no evidence that he was harmed by the lack of more frequent law library access"); *Rivera v. Pataki*, No. 04-CV-1286, 2005 WL 407710, at *18 (S.D.N.Y. Feb. 7, 2005) (dismissing access-to-courts claim where the "plaintiff [did] not specify any injury").

[4]     As Defendants point out, at the time Defendants filed their Motion To Dismiss Plaintiff had three pending cases in this district. (*See* Defs.' Mem. 13.)

## 3. Access to Grievance Program

**\*6** Plaintiff alleges that various Defendants denied him access to Orange County Jail's grievance program. (Am. Compl. 3–4.) As Plaintiff colorfully puts it, "writing a grievance in Orange County Jail was like 'squeezing blood out of a rock!' " (Pl.'s Mem. 5.) Yet, as an initial matter, it is unclear to what extent Plaintiff was denied access, as Plaintiff himself alleges that he filed numerous grievances, (Am. Compl. 1–4), and in fact appends numerous grievances and appeals to his Amended Complaint, (*id.* 8–12, 15–22, 24–25, 42–44). Indeed, the principal complaint in the grievances addressing Plaintiff's alleged denial of access to the grievance program appears to be that he was not timely provided with grievance forms. (*Id.* at 15–17.) However, even assuming Plaintiff was denied access, "inmate grievance programs created by state law are not required by the Constitution, and consequently allegations that prison officials violated

2019 WL 1382812

those procedures do not give rise to a cognizable Section 1983 claim." *Alvarado v. Westchester County*, 22 F. Supp. 3d 208, 214 (S.D.N.Y. 2014) (citations, alterations, and quotation marks omitted); *see also Hernandez v. Goord*, No. 01-CV-9585, 2013 WL 2355448, at *9 (S.D.N.Y. May 29, 2013) ("[The plaintiff] has a First Amendment right to access the courts, but the constitution does not similarly protect his right to access a prison grievance system." (citations omitted)); *Mimms v. Carr*, No. 09-CV-5740, 2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011) ("The First Amendment is not implicated ... where prison officials deny an inmate access to grievance procedures." (collecting cases)). Accordingly, Plaintiff's (unsubstantiated) claim that he was denied access to the Orange County Jail grievance program must be dismissed.

### 4. Retaliation

To state a First Amendment claim of retaliation, an inmate must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the [inmate], and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation, alteration, and quotation marks omitted). An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis*, 320 F.3d at 353 (citation omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." *Id.* (citation, alterations, and quotation marks omitted omitted). "[B]ecause virtually any adverse action taken against a prisoner by a prison official — even those otherwise not rising to the level of a constitutional violation — can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed that district courts must "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (citation and quotation marks omitted)). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations" and not stated in "wholly conclusory

terms." *Dolan*, 794 F.3d at 295 (citation and quotation marks omitted).

Plaintiff has, as Defendants concede, (*see* Defs.' Mem. 9), engaged in protected speech by filing (numerous) grievances and letters of complaint, thereby satisfying the first *Holland* requirement. *See Booth v. Comm'r of Corr.*, No. 19-CV-100, 2019 WL 919580, at *5 (D. Conn. Feb. 25, 2019) ("Filing complaints and grievances is protected activity." (citing *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004))).

As to the second and third *Holland* requirements, however, Plaintiff has not sufficiently alleged that any Defendant took adverse action against him that plausibly is causally connected to Plaintiff's protected conduct.

Plaintiff first alleges that Muller opened his "confidential" and "legal" mail outside his presence on three occasions. (Am. Compl. 3–4.) However, the Amended Complaint does not allege, and the grievances and complaints appended to the Amended Complaint do not show, that Plaintiff filed any grievances or complaints against (or otherwise engaged in protected conduct with respect to) Muller himself prior to Muller's alleged tampering. Nor does Plaintiff allege that Muller was involved in any of the other harassment alleged in the Amended Complaint. Indeed, Plaintiff does not allege any connection between Muller's alleged tampering and any of the other allegations in the Amended Complaint. Plaintiff thus fails to allege any facts plausibly suggesting that his grievances filed against numerous *other* Defendants were "a substantial or motivating factor" in Muller's conduct. *Hanner v. Westchester County*, No. 16-CV-7610, 2019 WL 1299462, at *8 (S.D.N.Y. Mar. 21, 2019) (quoting *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012)). Further, even assuming a causal connection, Plaintiff has not shown Muller's alleged mail tampering constitutes adverse action. To state a mail tampering claim, "the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." *Davis*, 320 F.3d at 351 (citations and quotation marks omitted). "[A]s few as two incidents of mail tampering could constitute an actionable violation," provided the incidents (1) "suggested an ongoing practice" of unwarranted censorship, or (2) "unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Id.* (citation omitted). Here, Plaintiff alleges three incidents of tampering. (*See* Am. Compl. 3–4.) Because "the incidents of tampering are few and thus the implication of an actionable violation is not obvious on its face," the case law "require[s] specific allegations of invidious intent or of actual harm."

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 217 of 238
Tutora v. Gessner, Not Reported in Fed. Supp. (2019)
2019 WL 1382812

*Davis*, 320 F.3d at 351. Plaintiff fails to allege facts suggesting either invidious intent or actual harm. The barebones facts as alleged do not indicate Muller was engaged in censorship, let alone intentional censorship, as Plaintiff only claims that mail was opened outside his presence and does not allege that incoming or outgoing mail was missing, restricted, or delayed. *See Mendez v. Quiros*, No. 16-CV-2097, 2017 WL 374462, at *2 (D. Conn. Jan. 25, 2017) (dismissing mail tampering claim where the plaintiff did "not allege ... that he suffered any injury or prejudice as a result of the opening of the mail outside of his presence and the withholding of the documents"); *Leniart v. Murphy*, No. 11-CV-1635, 2016 WL 1273166, at *13 (D. Conn. Mar. 31, 2016) (dismissing mail tampering claim where the plaintiff did "not claim that [his] mail ... was censored or confiscated, only that it was read"); *Battice v. Phillip*, No. 04-CV-669, 2006 WL 2190565, at *6 (E.D.N.Y. Aug. 2, 2006) ("[The defendant's] failure to deliver [the plaintiff's] mail on one occasion does not constitute the type of conduct that would deter an ordinary individual from exercising his constitutional rights [because the plaintiff did] not allege, much less present any evidence to show, that he suffered any injury as a result of the minor delay in receiving one piece of mail."); *Islam v. Goord*, No. 05-CV-7502, 2006 WL 2819651, at *8 (S.D.N.Y. Sept. 29, 2006) (dismissing mail tampering claim where the plaintiff "allege[d] only one instance in which his legal mail was tampered with, and one instance in which his family correspondence disappeared," because the allegations did "not demonstrate a continuing practice or pattern of interference or an actual legal injury," nor did they show "invidious intent or ... actual harm"); *Rivera*, 2005 WL 407710, at *19 (holding that several incidents of "actively prevent[ing] [the plaintiff] from mailing his documents ... did not constitute adverse action"). Nor does Plaintiff allege that the alleged tampering "unjustifiably chilled" his right of access to the courts, *Davis*, 320 F.3d at 351, as described *supra* Part II.B.2. Therefore, Plaintiff fails to state a First Amended retaliation claim against Muller.

**\*7** Plaintiff next alleges that, after he wrote a letter to Governor Cuomo, Czubak restricted Plaintiff's access to the law library from three times per week to once per week for several weeks. (Am. Compl. 4.) Yet, Plaintiff does not allege facts plausibly suggesting that his letter to Governor Cuomo was "a substantial or motivating factor" for Czubak's conduct; indeed, Plaintiff does not indicate how Czubak knew about Plaintiff's letter or what was in the letter that would cause Czubak to reduce Plaintiff's law library access. *Hanner*, 2019 WL 1299462, at *8. Further, assuming a causal connection, Plaintiff does not plausibly allege that Czubak took adverse

action against him, for, as noted *supra* Part II.B.2, Czubak did not "unjustifiably chill[ ]" Plaintiff's right of access to the courts. *Davis*, 320 F.3d at 351. Put differently, Plaintiff does not allege that Czubak engaged in "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," *id.* at 353, because Plaintiff was not deterred from making court filings and in fact admitted that he suffered no "direct injury," (Am. Compl. 4). Therefore, Plaintiff fails to state a First Amendment retaliation claim against Czubak.

Plaintiff also alleges that he was subjected to retaliatory cell searches. (*See id.* at 2, 13.) However, because "a prisoner has no reasonable expectation of privacy in his or her prison cell ... a search of an inmate's cell, even for retaliatory reasons, ... does not implicate a constitutional right." *Battice*, 2006 WL 2190565, at *7 (collecting cases); *Harnage v. Brighthaupt*, No. 12-CV-1521, 2016 WL 10100763, at *6 (D. Conn. June 3, 2016) (holding that "even if [the plaintiff] could demonstrate a retaliatory motive for the search, his claim would be legally insufficient," because a "retaliatory cell search is insufficient to support a First Amendment retaliation claim"), *aff'd*, 720 F. App'x 79 (2d Cir. 2018). Therefore, Plaintiff's First Amendment retaliation claim based on a cell search must fail.

Finally, Plaintiff alleges that Defendants Manuel, Hernandez, McCord, Wixon, Smith, Colon, Kiszka, and Czubak repeatedly verbally harassed him — by being vulgar, shouting threats and intimidating comments, making racist comments, mocking his injuries, and banging on his cell door — in retaliation for the grievances Plaintiff filed. (*See generally* Am. Compl.; *see also* Pl.'s Mem. 8–9.) The Court separates Plaintiff's allegations into two buckets. As to the allegations of harassing, mocking, and racist conduct, Plaintiff's claims do not rise to the level of a constitutional violation. *See Davis*, 320 F.3d at 353 (holding that "[i]nsulting or disrespectful comments directed at an inmate generally do not rise to this level"). Moreover, Plaintiff does not allege facts plausibly suggesting that this conduct was substantial enough to deter an inmate of ordinary firmness from filing grievances or otherwise engaging in protected conduct; indeed, as noted, the Amended Complaint shows that Plaintiff filed numerous grievances, appeals, and letters of complaint. *Davis*, 320 F.3d at 352. Therefore, although Defendants' alleged harassment was, to the say the least, "unprofessional, and caused Plaintiff to suffer legitimate embarrassment and even humiliation," they amount to insulting or disrespectful comments that without more are simply *de minimis* acts that fall outside

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 218 of 238

Tutora v. Gessner, Not Reported in Fed. Supp. (2019)

2019 WL 1382812

the ambit of constitutional protection." *White v. Westchester County*, No. 18-CV-730, 2018 WL 6726555, at *15 (S.D.N.Y. Dec. 21, 2018) (quotation marks and alterations omitted) (citing *Toliver v. City of New York*, 530 F. App'x 90, 92 (2d Cir. 2013)); *see also Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." (citation and quotation marks omitted)).

As to the allegations of threats, however, "[c]ourts have found that, while verbal threats may qualify as adverse actions, they must be 'sufficiently specific and direct' to be actionable." *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *11 (S.D.N.Y. Sept. 28, 2018); (quoting *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *5 (S.D.N.Y. July 16, 2013)). "The less threat and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010); *see also Hofelich v. Ercole*, No. 06-CV-13697, 2010 WL 1459740, at *2 (S.D.N.Y. Apr. 10, 2010) (concluding that "whether [verbal threats] constitute adverse action seems to depend on their specificity and the context in which they are uttered"); *Lunney v. Brureton*, No. 04-CV-2438, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) (collecting cases and noting that "verbal threats may constitute adverse action ... depend[ing] on their specificity and the context in which they are uttered"). Here, Plaintiff alleges that Manuel "became vulgar and shouted threats" at Plaintiff about his grievance request, (Am. Compl. 1); that Manuel later yelled, "I can take care guys like you, ask about me,' " causing Plaintiff to "fear for [his] safety," (*id.* at 8); that Hernandez "threatened" Plaintiff about " 'knowing his status' in the jail," (*id.* at 1); that Wixon stated to Plaintiff, " 'I have a 16 inch rope with your name on it. I was a slave owner for Halloween,' " (*id.* at 2); that Smith "would threaten [Plaintiff] about grievances saying his dad was a sergeant," (*id.*); and that Kiszka "intimidate[d]" Plaintiff by telling him that "nothing will help [Plaintiff] get them to leave [him] alone," (*id.* at 3). As reprehensible as these alleged threats are, they are insufficiently specific, direct, and detailed enough to state a First Amendment claim based on a verbal threat. *See Albritton v. Morris*, No. 13-CV-3708, 2016 WL 1267799, at *18 (S.D.N.Y. Mar. 30, 2016) (holding statement that officer "told [the plaintiff] that grievances were unlikely to succeed and said that he would handle things 'his way' " was insufficiently specific or direct); *Amaker v. Annucci*, No.

14-CV-9692, 2016 WL 5720798, at *5 n.8 (S.D.N.Y. Sept. 30, 2016) (holding statement that officer told the plaintiff "I would not grieve it if I were you" insufficient because it "amounts, at most, to a vague intimation of some unspecified harm which generally does not rise to the level of adverse action" (citation, alterations, and quotation marks omitted)); *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (finding that "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action"). Plaintiff does not allege that any Defendant seriously threatened him with physical harm. *Cf. White*, 2018 WL 6726555, at *18 (holding adverse action satisfied where a defendant "threatened physical harm to [the plaintiff], and did so with particularity, by pointing to ... who would harm [him] ... and explaining why they would harm him"). Nor does Plaintiff indicate that the Defendants' alleged threats were substantial enough to deter an inmate of ordinary firmness from filing grievances or otherwise engaging in protected conduct, *Davis*, 320 F.3d at 352, for Plaintiff filed numerous grievances, appeals, and letters of complaint during his time at Orange County Jail, and does not allege what further grievances or complaints he would have filed had Defendants not allegedly prevented him from doing so. Therefore, keeping in mind that this Court must "approach prisoner retaliation claims with skepticism and particular care," *Dolan*, 794 F.3d at 295, the Court concludes that the Amended Complaint contains insufficiently specific and detailed factual material to make out a First Amendment claim based on retaliatory threats.

 **\*8** Accordingly, Plaintiff's retaliation claims against all Defendants are dismissed.

### III. Conclusion

For the reasons stated above, Defendants' Motion To Dismiss is granted.

Plaintiff's claim that he was denied access to the grievance program is dismissed *with* prejudice, as are Plaintiff's claims against Defendant Morris. Plaintiff's remaining claims are dismissed *without* prejudice. If Plaintiff wishes to file a second amended complaint, Plaintiff must do so within 30 days of the date of this Opinion. Plaintiff should include within that second amended complaint all changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. Plaintiff is advised that the second amended complaint will replace, not supplement, all prior

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 219 of 238
**Tutora v. Gessner, Not Reported in Fed. Supp. (2019)**
2019 WL 1382812

complaints and filings. The second amended complaint must contain *all* of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1382812

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 7:17-CV-09517**<br>Tutora v. Sgt. Gessner #138 et al | — | S.D.N.Y. | Dec. 01, 2017 | Docket |

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (1)**

1. Tutora v. Gessner
2019 WL 1382812 , S.D.N.Y. , Mar. 27, 2019

**Related References (1)**

2. Tutora v. Gessner
2019 WL 6619496 , S.D.N.Y. , Dec. 04, 2019

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

KeyCite Yellow Flag

Distinguished by   White v. Westchester County,   S.D.N.Y.,   December 21, 2018

2018 WL 4682784
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joseph TERRY, Plaintiff,

v.

CO James HULSE Jr.; CO Matthew Burns; CO
Chad Esterbrook; CO Bruce Tucker; CO Alan
Hanson; Sergeant William Cole, Defendants.

16-CV-252 (KMK)
|
Signed 09/28/2018

**Attorneys and Law Firms**

Joseph Terry, Elmira, NY, Pro Se Plaintiff.

Bradley Gordon Wilson, Esq., New York State Office of the Attorney General, New York, NY, Counsel for Defendant.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge

*1 Plaintiff Joseph Terry ("Plaintiff"), currently an inmate at Elmira Correctional Facility Facility ("Elmira"), brings this pro se action under 42 U.S.C. § 1983 against Defendants Correction Officer ("CO") James Hulse Jr. ("Hulse"), CO Matthews Burns ("Burns"), CO Chad Estabrook ("Estabrook"), CO Bruce Tucker ("Tucker"), CO Alan Hanson ("Hanson"), and Sergeant William Cole ("Cole," and collectively with Hulse, Burns, Estabrook, Tucker, and Hanson, "Defendants"). (See Compl. (Dkt. No. 2).) [1] Plaintiff alleges that Defendants violated his constitutional rights by assaulting him and then retaliating against him after he reported the assault. (Id. ¶¶ 30–47.) Before the Court is Defendants' Motion for Summary Judgment (the "Motion"). (Notice of Motion (Dkt. No. 66).) For the reasons that follow, Defendants' Motion is granted in part and denied in part.

[1] Plaintiff's Complaint also named New York State Department of Corrections and Community Supervision ("DOCCS") as a Defendant. In

response to an Order to Show Cause as to why the claims against DOCCS should not be dismissed under the Eleventh Amendment, (Dkt. No. 8), Plaintiff consented to the dismissal of DOCCS as a Defendant, (Dkt. No. 11).

I. Background

A. Factual Background

The following facts are taken from Defendants' statement pursuant to Local Civil Rule 56.1, (Defs.' Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 68) ), the exhibits submitted by Defendants, (Decl. of Matthew Burns in Supp. of Mot. for Summ. J. ("Burns Decl.") (Dkt. No. 69); Decl. of William Cole in Supp. of Mot. for Summ. J. ("Cole Decl.") (Dkt. No. 70); Decl. of Chad Estabrook in Supp. of Mot. for Summ. J. ("Estabrook Decl.") (Dkt. No. 71); Decl. of Alan Hanson in Supp. of Mot. for Summ. J. ("Hanson Decl.") (Dkt. No. 72); Decl. of Bruce Tucker in Supp. of Mot. for Summ. J. ("Tucker Decl.") (Dkt. No. 73); Decl. of Cory Proscia in Supp. of Mot. for Summ. J. ("Proscia Decl.") (Dkt. No. 74); Decl. of Rachel Seguin in Supp. of Mot. for Summ. J. ("Seguin Decl.") (Dkt. No. 75); Decl. of Bradley G. Wilson, Esq. in Supp. of Mot. for Summ. J. ("Wilson Decl.") (Dkt. No. 76), as well as Plaintiff's Complaint, (Compl.), his Opposition and accompanying exhibits, (Pl.'s Opp'n to Defs.' Mot. for Summ J. ("Pl.'s Opp'n") (Dkt. No. 96) ), and Plaintiff's deposition transcript, (Letter from Barbara K. Hathaway, Esq. to Court, Ex. A ("Pl.'s Dep.") (Dkt. No. 100) ), and are recounted in the light most favorable to Plaintiff, the non-movant. See Wandering Dago, Inc. v. Destito, 879 F.3d 20, 30 (2d Cir. 2018).[2] The facts as described below are not in dispute, except where indicated.

[2] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). "A pro se litigant is not excused from this rule," Brandever v. Port Imperial Ferry

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 224 of 238

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

*Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (italics omitted), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the [C]ourt to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (same). Here, Defendants filed and served their statement pursuant to Rule 56.1, (Defs.' 56.1), and filed and served a statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (Notice to Pro Se Litigant (Dkt. No. 77) ). Despite this notice, Plaintiff failed to submit a response to Defendants' 56.1 Statement of Facts. Accordingly, the Court may conclude that the facts in Defendants' 56.1 Statement are uncontested and admissible. *See Brandever*, 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record," including Plaintiff's deposition testimony, when deciding the instant Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although [the] plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in [the] defendants' Rule 56.1 statement."); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) (italics omitted) ("[W]here a pro se plaintiff fails to submit a proper ...Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the

plaintiff's arguments, where actually supported by evidentiary submissions." (italics and internal quotation marks omitted) ); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response).

### 1. The January 13, 2013 Assault

**\*2** Plaintiff asserts that on January 13, 2013, he was working in the pantry at Sullivan Correctional Facility ("Sullivan") serving inmates food. (Compl. ¶ 20; Pl.'s Dep. 9.) Plaintiff alerted Burns, who then alerted Hulse, of a food shortage during the evening meal. (Pl.'s Dep. 9; Compl. ¶¶ 21–23.) Hulse allegedly told Plaintiff "I don't give a shit," (Compl. ¶ 24), and Plaintiff replied "that's fucked up," (*id.* ¶ 25). Hulse, however, "thought that [Plaintiff] said fuck him," which caused a verbal altercation between the two. (Pl.'s Dep. 9.) Plaintiff was then instructed to "lock into his cell," but Hulse blocked Plaintiff from doing so. (*Id.*) Hulse told Plaintiff to hit him and that he "need[ed] a vacation," and Plaintiff asked if he could move out of the way. (*Id.*) Hulse spit on and punched Plaintiff and then Hulse and Burns threw Plaintiff to the ground, and Plaintiff ended up on top of Hulse and Burns landed on top of Plaintiff. (Pl.'s Dep. 10; Compl. ¶¶ 30–31.) Both continued to punch and poke Plaintiff in the eye. (Pl.'s Dep. 10; Compl. ¶ 30.)

A response team arrived, consisting of Estabrook and Tucker, who also allegedly assaulted Plaintiff. (Compl. ¶ 32; Pl.'s Dep. 12.) Plaintiff alleges he was placed in mechanical restraints and Hulse grabbed Plaintiff by his hair and "starting banging [his] head against the ground." (Pl.'s Dep. 10.) The attack continued, despite Plaintiff being in mechanical restraints. (Pl.'s Opp'n ¶ 3.) Plaintiff further contends that as he was being escorted out of his housing unit, Estabrook and Tucker "bang[ed] ... [P]laintiff['s] head against the gate and choked [him]." (Compl. ¶ 34; Pl.'s Dep. 10.) However, "the other officers said there w[ere] cameras in the hallways" and to "stop hitting [Plaintiff] until [they] g[o]t to the dry cell area." (Pl.'s Dep. 11.) After Plaintiff was escorted to the dry cell area the "attacks started again." (*Id.*) One of the Defendants allegedly "thr[ew] [Plaintiff] to the floor and hit [him] with a nite [sic] stick/baton." (Compl. ¶ 37; Pl.'s Dep. 11.) Plaintiff alleges that Estabrook stated "I will kill you

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 225 of 238

nigger," (Compl. ¶ 37), and "put the nightstick ... between [the] crack of [his] ass" and threatened to "shove it in until it came out of [his] mouth," (Pl.'s Dep. 11); *see also id.* at 8 ("I had a nightstick placed between my ... buttocks ... and said it would be shoved in there if I didn't stop screaming until it came out of my mouth."). Cole came in, and Plaintiff asked him to "take it easy on [him];" however, Cole stepped out and Plaintiff was beat again. (Pl.'s Dep. 11.) [3]

[3]   Plaintiff testified at his deposition that Cole "didn't lay a hand on [him]" but that he saw the attack and "did nothing to prevent it." (Pl.'s Dep. 40.) Additionally, "[Cole] knew of the possible initial attack that was going to take place and he still did nothing to stop it." (*Id.*)

Following the incident, Plaintiff was ordered to strip down to his boxers so that Hanson could take photos of his injuries. (Compl. ¶ 39; Pl.'s Opp'n ¶ 7.) Hanson was not present during the use of force incident. (Defs.' 56.1 ¶ 11; *see also* Pl.'s Dep. 40.) According to Plaintiff, Cole allegedly told Hanson that "we can't let the superintendent see this," (Pl.'s Opp'n ¶ 7), and not to "show the close up ... [w]e can't let that register," (Pl.'s Dep. 11–12), so Hanson "made sure that out of all photos the close up facial photo didn't register," (Pl.'s Opp'n ¶ 7; Pl.'s Dep. 40 (testifying that Hanson made the first picture "not register[ ] intentionally after being instructed by Sergeant Cole").) According to Hanson, "one photograph was cut off because of a software glitch. This was unintentional, and [he] do[es] not even know if it is possible to intentionally create such a glitch. In any event, [he] did not do so." (Hanson Decl. ¶ 7; *see also id.* ¶ 9 ("The failure to register the close-up photographs was a software glitch. There was no conspiracy to cover up any of [Plaintiff's] injuries, as demonstrated by the other pictures and by the immediate attempts to rectify the situation after the glitch was discovered. [Hanson] never conspired with the other officers to cover up anything.").) Two or three days later, Officer Roser re-took the photos, (Pl.'s Opp'n ¶ 7), and they "revealed that [Plaintiff] had more injuries" than previously documented, (Pl.'s Dep. 12). [4]

[4]   As a result of the injuries sustained in the incident, Hulse went on medical leave until at least June 30, 2013. (Defs.'56.1 ¶ 9.)

### 2. Plaintiff's Grievances

**\*3** On or about January 13, 2013, Plaintiff "wrote to the superintendent and ... wrote numerous grievances all to no avail." (Pl.'s Opp'n ¶ 3; *see also id.* ¶ 5 (stating "[P]laintiff wrote a grievance multiple times").) In total, Plaintiff wrote around three or four grievances. (Pl.'s Dep. 33; *see also id.* at 34 (testifying that Plaintiff couldn't remember exactly how many he wrote, but it was somewhere between three and six).) At the time, Plaintiff was housed in the Special Housing Unit ("SHU"), and in accordance with prison procedures for filing grievances in SHU, Plaintiff gave his grievances to a corrections officer in SHU to be turned in and filed. (Pl.'s Opp'n ¶ 5; *see also* Pl.'s Dep. 34 (testifying that Plaintiff "can't go to the grievance department ... It's in the officers' hands to do that. The officers ... are supposed to turn them in and they didn't").) However, "[o]nce Plaintiff s[aw] that they weren't being turned in," he started writing letters to other people informing them of the assault. (Pl.'s Dep. 33; *see also* Seguin Decl. Ex. B (memorandum to Plaintiff regarding letter he sent to Superintendent Griffin regarding the January 2013 incident).) Between January and March 2013, Plaintiff also wrote the Inspector General; the Superintendent; the Commissioner of Corrections; the Department of Justice; the FBI; the New York State Trooper barracks at Liberty, New York; Senator Kirsten Gillibrand; and unnamed lawyers. (Pl.'s Dep. 33–34.) [5]

[5]   In response to his letter to the Inspector General, Plaintiff was interviewed by "Investigator Smith." (Pl.'s Opp'n ¶ 6; Pl.'s Dep. 33.) However, "instead of punishing the officers ... [P]aintiff was charged in Sullivan County Court with assault." (Pl.'s Opp'n ¶ 5; *see also* Pl.'s Dep. 12.) However, following a trial, Plaintiff was found not guilty. (Pl.'s Dep. 12.)

Plaintiff was transferred from Sullivan to Upstate Correctional Facility on February 24, 2013. (Defs.' 56.1 ¶ 14.) After numerous other transfers, (Pl.'s Dep. 36), Plaintiff was then transferred to Auburn Correctional Facility in 2014, and, having never received a response to the grievances filed at Sullivan, Plaintiff filed another grievance at Auburn complaining about the fact that he received no response to the grievance filed at Sullivan. (Pl.'s Opp'n ¶ 6; Pl.'s Compl. ¶ 45; Seguin Decl. ¶ 6.) Following an investigation, Plaintiff was told there was no record of a grievance at Sullivan regarding the January 2013 incident. (Pl.'s Compl. ¶ 45; Seguin Decl. ¶ 6; Seguin Decl. Ex. B (Auburn grievance forms).) Someone at Auburn allegedly informed Plaintiff "that staff assaults are

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

Case 9:25-cv-00216-LEK-MJK   Document 23   Filed 10/01/25   Page 226 of 238

not grievable" and according to "grievance [staff] at Auburn and Directive 4040," there was no "remedy." (Pl.'s Opp'n ¶ 6.)

There is no record of a grievance concerning the January 13, 2013 incident ever being filed in Sullivan records. (Defs.' 56.1 ¶ 15; Seguin Decl. ¶ 6; Proscia Decl. ¶ 4.) And, no record of an appeal exists with the Central Office Review Committee ("CORC"). (Defs.' 56.1 ¶ 16; Seguin Decl. ¶ 6.) The only grievance on record that Plaintiff filed and appealed as of May 2016 was related to his grievance at Sullivan going unanswered. (Seguin Decl. ¶ 6.)

### 3. Retaliation

Because he wrote a grievance, Plaintiff alleges he was "retaliated against," and "officers in the SHU area deprived [him] of his normal rations of food, [his] mail was not sent out," he was delayed in receiving his property and some of his property was lost, and he was denied callouts. (Pl.'s Opp'n ¶¶ 5, 7; *see also* Pl.'s Dep. 8 ("I was harassed, deprived of food, a whole bunch of things."); *id.* at 28 (testifying that he received empty food trays); *id.* at 29–30 (testifying he was denied callouts, was not receiving his mail, and his property was lost).) Plaintiff also claims he was "threaten[ed] repeatedly," (Pl.'s Opp'n ¶ 7), and told to "drop the lawsuit," and that "they [were] gonna [sic] kill [him]," (Pl.'s Dep. 30). In 2017, Plaintiff's jaw was broken by someone he does not know, and he believes corrections officers "put a hit out on [him]." (Pl.'s Opp'n ¶ 7). Plaintiff believes he was transferred to other prisons as a "tactic" to get the instant Action thrown out. (*Id.*) Plaintiff reported the retaliation, and "the Superintendent sent someone to investigate, but the [investigator] tr[i]ed to misconstrue and discredit [Plaintiff]." (*Id.*)

Defendants contend that they were not aware that Plaintiff filed a grievance, (Defs.' 56.1 ¶¶ 20–24); they had no practical ability to interfere with Plaintiff's meals or mail, (*id.* ¶¶ 25–29); and they did not arrange for or personally cause Plaintiff to be deprived of food or mail, nor did they retaliate against Plaintiff any other way, (*id.* ¶¶ 30–34).

### B. Procedural History

**\*4** Plaintiff filed the Complaint on January 12, 2016. (Compl.) After receiving two extensions, (Dkt. Nos. 31, 33), Defendants filed an Answer on July 6, 2016, (Dkt. No. 34). On October 13, 2016, the Court held an initial conference;

however, Plaintiff refused to come to the phone for the conference, (*see* Dkt. (entry for Oct. 13, 2016) ), and the Court adopted a discovery schedule, (Dkt. No. 37). [6] On August 24, 2017, Defendants filed a pre-motion letter indicating the grounds on which they would move for summary judgment. (Letter from Bradley G. Wilson, Esq. to Court (Aug. 24, 2017) (Dkt. No. 61).) The Court held a pre-motion conference on September 8, 2017 and set a briefing schedule. (Dkt. No. 64.)

[6]    On October 21, 2016, Plaintiff's first Application for Appointment of Counsel was docketed. (*See* Application for Appointment of Counsel (Dkt. No. 38).) In an Order dated November 4, 2016, the Court denied the request without prejudice. (Dkt. No. 39.) On October 16, 2017, Plaintiff's second Application for Appointment of Counsel was docketed. (*See* Second Application for Appointment of Counsel (Dkt. No. 65).) On February 6, 2018, the Court denied the second request without prejudice. (Dkt. No. 83.) Plaintiff again requested counsel on February 12, 2018, (Dkt. No. 87), which the Court again denied without prejudice, (Dkt. No. 88).

Defendants filed the instant Motion and accompanying papers on November 8, 2017. (Notice of Motion; Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Dkt. No. 67); Defs.' 56.1; Burns Decl.; Cole Decl.; Estabrook Decl.; Hanson Decl.; Tucker Decl.; Proscia Decl.; Seguin Decl.; Wilson Decl.) Plaintiff did not oppose the Motion by the January 5, 2018 deadline, and on January 17, 2018, counsel for Defendants wrote to the Court requesting the Motion be deemed fully submitted. (Dkt. No. 79.) The Court granted the request. (Dkt. No. 80.) In a letter dated January 14, 2018, Plaintiff wrote to the Court requesting an extension of time to respond to the Motion because he was in the hospital with a broken jaw, (Dkt. No. 81), which Defendants opposed, (Dkt. No. 82.) The Court granted Plaintiff an extension until March 8, 2018. (Dkt. No. 83.) In a letter dated February 4, 2018, Plaintiff wrote to the Court requesting another extension, (Dkt. No. 87), and the Court granted Plaintiff an extension until March 20, 2018, (Dkt. No. 88.) Plaintiff missed the March 20, 2018 deadline, and at Defendants' request, (Dkt. No. 89), the Court deemed the Motion fully submitted, (Dkt. No. 91). On April 20, 2018, Plaintiff filed an Opposition to the Motion, (Pl.'s Opp'n), and a letter explaining that he was transferred to other facilities and hindered from sending the Opposition, (Dkt. No. 93). Defendants requested the Court decline to consider the untimely Opposition or, in the

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

alternative, to grant Defendants an extension to reply. (Dkt. No. 97.) The Court granted the extension request. (Dkt. No. 98.) On May 11, 2018, Defendants filed their reply. (Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Reply") (Dkt. No. 99).)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry*, 137 F. Supp. at 521 (same).

 **\*5** "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion ..., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,' " *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) ), "and cannot rely on mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading....). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) ). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on [declarations] ... to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated.' " *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4) ).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham*, 848 F.2d at 344, and a court should construe "the submissions of a pro se litigant ... liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and internal quotation marks omitted). And, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vermont Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should ... be[ ] made in light of the opposing party's pro se status" (italics omitted) ). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence ... are insufficient

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 228 of 238

2018 WL 4682784

to overcome a motion for summary judgment." *Houston*, 27 F. Supp. 3d at 351 (alterations, italics, and internal quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

### B. Analysis

Defendants move for summary judgment as to all claims on the ground that Plaintiff has failed to exhaust his administrative remedies. Additionally, Defendants seek dismissal on the merits only of Plaintiff's (1) First Amendment retaliation claims against all Defendants and (2) all claims against Hanson. The Court will address each of these arguments in turn.

### 1. Exhaustion of Administrative Remedies

**\*6** As an initial matter, Defendants move for summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e *et seq.* (Defs.' Mem. 4–7.)

### a. Administrative Exhaustion

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement applies to all personal incidents while in prison, *see Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes"); *see also Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (per curiam) (same), and includes actions for monetary damages despite the fact that monetary damages are not available as an administrative remedy, *Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding exhaustion is required "regardless of the relief offered through administrative procedures"). Moreover, the PLRA mandates " 'proper exhaustion'—that is, 'using all steps that the agency holds out, and doing so properly,' ... [which] entails ... 'completing the administrative review process in accordance with the applicable procedural rules.' " *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (alteration and citations

omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 90 (2006)); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.").

As a general matter, the New York State Department of Corrections and Community Supervision ("DOCCS") Inmate Grievance Program ("IGP") outlines the procedures that apply to grievances filed by inmates in New York State correctional facilities. The IGP provides for a three-step grievance process. *See* 7 N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") § 701 *et seq.*; *see also Abdallah v. Ragner*, No. 12-CV-8840, 2013 WL 7118083, at *2 (S.D.N.Y. Nov. 22, 2013) (noting that "[DOCCS] provides an administrative remedy for many prisoners' claims," which is "a grievance system available to prisoners in custody at state prisons" (citing 7 N.Y.C.R.R. § 701.1(c) ) ). Under the framework used in typical cases, an inmate must first file a complaint at the facility where the inmate is housed within 21 calendar days of an alleged occurrence. *See* 7 N.Y.C.R.R. § 701.5(a)(1). That complaint must provide a specific description of the problem. *See id.* § 701.5(a)(2). The second step in the tripartite framework is for the grievant or any direct party to appeal the Inmate Grievance Resolution Committee's ("IGRC") decision to the prison superintendent within seven calendar days after receipt of the written response, although the appealing party can seek an exception to the time limit. *See id.* § 701.5(c)(1). The third and final step is to appeal the superintendent's decision to the CORC, which the prisoner must do within seven days of the superintendent's written response to the grievance. *See id.* § 701.5(d)(1)(i). Here, too, an inmate may request an exception to the time limit. *See id.* "[O]nly after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted." *Gardner v. Daddezio*, No. 07-CV-7201, 2008 WL 4826025, at *2 (S.D.N.Y. Nov. 5, 2008).

**\*7** Grievances claiming employee harassment "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent. 7 N.Y.C.R.R. § 701.8. [7] Although an inmate must still follow the procedures identified above and contained in 7 N.Y.C.R.R. § 701.5(a), the regulations also provide that "[a]n inmate who feels that he/she has been the victim of harassment should report such occurrences to the immediate supervisor of that employee," although "this is not a prerequisite for filing a grievance with the IGP." *Id.* § 701.9(a). Additionally, the framework provides that "[a]ll

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

Case 9:25-cv-00216-LEK-MJK   Document 23   Filed 10/01/25   Page 229 of 238

2018 WL 4682784

documents submitted with [a grievance alleging harassment] must be forwarded to the superintendent by close of business that day," *id.* § 701.8(b), and that the superintendent personally or through a designee "shall promptly determine whether the grievance, if true, would represent a bona fide case of harassment as defined in [§] 701.2," *id.* § 701.8(c), which defines "[h]arassment grievances" as "those grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate," *id.* § 701.2(e). If it is not, the grievance is returned to the IGRC for normal processing. *Id.* § 701.8(c). If it is a bona fide harassment issue, however, the superintendent must then (1) initiate an in-house investigation into the allegations by higher-ranking supervisory personnel, (2) request an investigation by the inspector general's office, or (3) if the superintendent determines that criminal activity may be involved, request an investigation by the New York State Police, Bureau of Criminal Investigation. *Id.* § 701.8(d). The superintendent then must render a decision within 25 calendar days of receipt of the grievance, *id.* § 701.8(f), and, if she does not, the grievant may appeal to the CORC, *id.* § 701.8(g). When a grievant wishes to appeal the superintendent's response to the CORC, the grievant must do so within seven days of the receipt of that response. *Id.* § 701.8(h).

7    Section 701.8 has been found applicable to claims of excessive force. *See, e.g., Torres v. Carry*, 691 F. Supp. 2d 366, 369–70 (S.D.N.Y. 2009).

A plaintiff must exhaust his administrative remedies *before* filing his initial complaint in federal court. Indeed, "[w]hen a prisoner does not properly exhaust his administrative remedies before filing suit, the action *must* be dismissed." *Mateo v. Alexander*, No. 08-CV-8797, 2010 WL 431718, at *3 (S.D.N.Y. Feb. 9, 2010); *see also Harris v. Gunsett*, No. 12-CV-3578, 2013 WL 3816590, at *6 (S.D.N.Y. July 22, 2013) (same). "This is so even if the claim has since been exhausted." *Mateo v. Ercole*, No. 08-CV-10450, 2010 WL 3629520, at *3 (S.D.N.Y. Sept. 17, 2010). Defendants bear the burden of proving that Plaintiff failed to exhaust available administrative remedies. *See Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) ("Because failure to exhaust is an affirmative defense, defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." (alteration, citations, and internal quotation marks omitted) ); *see also Powell v. Schriro*, No. 14-CV-6207, 2015 WL 7017516, at *6 (S.D.N.Y. Nov. 12, 2015) (same).

Here, it is undisputed that Plaintiff did not complete the requisite three-step grievance process before filing his lawsuit related to the January 2013 incident, and thus failed to exhaust his administrative remedies. (Proscia Decl. ¶ 4; Seguin Decl. ¶ 5.)

### b. Availability of Administrative Remedies

Failure to exhaust a technically available administrative remedy, however, does not end the inquiry. The PLRA "contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The Supreme Court recently explained in *Ross*:

> Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones. And that limitation on an inmate's duty to exhaust ... has real content.... [A]n inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of."

*Id.* at 1858–59 (quoting *Booth*, 532 U.S. at 738).

There are at least "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859; *see also Williams v. Priatno*, 829 F.3d 118, 123–24 & n.2 (2d Cir. 2016) (applying *Ross* but noting that "the three circumstances discussed in *Ross* do not appear to be exhaustive"). [8] First, an "administrative procedure is unavailable when ... it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859 (citing *Booth*, 532 U.S. at 736, 738). Second, a remedy is unavailable where "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. These three circumstances "do not appear to be exhaustive," *Williams*, 829 F.3d at 123 n.2, but they do "guide the Court's inquiry," *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 230 of 238

2018 WL 4682784

8      Because, as in *Williams*, the circumstances delineated in *Ross* are also relevant to the facts of this case, the Court "do[es] not opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use." *Williams*, 829 F.3d at 123 n.2.

**\*8** Shortly after *Ross*, the Second Circuit applied the *Ross* availability analysis in *Williams*. 829 F.3d 118. The question of availability addressed by the court in *Williams* governs this case as well. In *Williams*, the plaintiff alleged he was beaten by two correction officers. *Id.* at 120. On January 15, 2015, Williams claimed to have drafted a grievance while he was in SHU, and gave it to a corrections officer to forward to the grievance office as required by the grievance procedures that applied to inmates in SHU. *Id.* at 120–21. A week later, Williams asked the superintendent why he had not received a response and was told she knew nothing about it and would look into it. *Id.* at 121. Several days later, Williams was transferred to another facility. *Id.* He never received a response to his grievance and claimed that the correction officer never filed it for him. *Id.* He never appealed the grievance but commenced a § 1983 action, and the defendants moved to dismiss on the basis that Williams failed to exhaust his administrative remedies. *Id.* Accepting as true the allegation that the corrections officer never filed Williams' grievance, the *Williams* court determined that the governing regulations only contemplated appeals of grievances that are actually filed; the regulations did not specify a process to appeal or otherwise exhaust when a grievance by a prisoner housed in SHU is given to a corrections officer to file as per the specified procedure, but the officer fails to file it. *Id.* at 124. As "the regulations give no guidance whatsoever to an inmate whose grievance was never filed," the Second Circuit concluded that the regulations were " 'so opaque' and 'so confusing that ... no reasonable prisoner can use [them].' " *Id.* (quoting *Ross*, 136 S. Ct. at 1859.); *id.* at 126 (finding "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it"). In so concluding, the Second Circuit noted that the fact that the inmate in *Williams* was transferred between facilities approximately two weeks after handing off his grievance made the procedure even more obscure. *See id.* at 126. "At the heart of the Second Circuit's analysis was the inescapable quandary that inmates find themselves in when their grievances are not filed—namely, that current regulations do not guarantee recourse for an inmate whose grievance was never filed." *McRae v. Cordero*, No. 15-CV-4334, 2018 WL 3611964, at *6 (S.D.N.Y. July 26, 2018)

The Court in *Williams* analyzed the same regulations as the instant case. 829 F.3d at 125– 26 (citing 7 N.Y.C.R.R. §§ 701.5, 701.6, 701.8). As in *Williams*, Plaintiff here has similarly alleged that he gave his grievance to an officer while housed in SHU, and his grievance was never filed. (Pl.'s Dep. 26 (testifying "[m]y grievance was never turned in" and "[t]hey were never even submitted"); *id.* at 33 (testifying his grievances "weren't being turned in"); *id.* at 34 (testifying the officers were "supposed to turn [the grievances] in and they didn't"); Pl.'s Opp'n ¶ 5 (stating that Plaintiff "gave [the grievances] to the officers in the SHU area to be turned in and filed"); *id.* ¶ 7 (stating that an exception to exhaustion should apply because "the officer's [sic] are not filing [the grievances]").) Like the Plaintiff in *Williams*, Plaintiff was transferred from Sullivan to Upstate about a month and a half after allegedly filing his grievance. (Defs.' 56.1 ¶ 14 (stating Plaintiff was transferred from Sullivan to Upstate on February 24, 2013).)⁹ Plaintiff also argues that "Directive 4040 is confusing and [there] isn't any procedure[ ] in place ... that explains how to report when these types of misdeeds on behalf of staff happens if an officer throws your grievance in the trash." (Pl.'s Opp'n ¶ 7.)¹⁰ The Court agrees. Plaintiff was faced with the same "opaque" and "confusing" set of regulations the *Williams* court found "incapable of use." *Williams*, 829 F.3d at 126 (internal quotation marks omitted).¹¹ However, because the Motion before the Court is one for summary judgment, unlike in *Williams*, the Court need not accept as true the allegation that the corrections officer never filed Plaintiff's grievance. *See id.* at 124 (accepting as true the allegation that the correction officer never filed the plaintiff's grievance). Thus, the Court must determine whether the record adequately supports Plaintiff's contention that the corrections officer never filed Plaintiff's grievances.

9      It bears noting that the transfer was not itself determinative in *Williams*. The Court specifically noted that "if the regulations ... were not already so confusing that no ordinary prisoner can discern or navigate them, their obscurity was compounded by the fact that Williams was transferred to another facility approximately two weeks after giving his grievance to the correction officer." *Id.* at 126 (alteration, citation, and internal quotation marks omitted).

10     DOCCS Directive 4040 is the document given to inmates that outlines the DOCCS inmate grievance regulations. (Defs.' Reply Mem. 2.)

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 231 of 238

11    Although the Second Circuit in *Williams* addressed a motion to dismiss, the legal analysis for determining whether an exception to exhaustion applies is the same for a summary judgment motion. *McRae*, 2018 WL 3611964, at *5 n.7 (noting that '[the fact] that Williams was decided on a motion to dismiss and not on a summary judgment motion does not change the analysis.' " (quoting *Medina v. Napoli*, 725 F. App'x. 51, 54 (2d Cir. 2018) ).

**\*9** The Second Circuit has not yet provided published guidance regarding what record evidence is sufficient to find a genuine issue of material fact as to whether the grievance process was "available" under the *Ross* and *Williams* exhaustion analysis. However, in a recent unpublished opinion, the Second Circuit considered alleged actions that "b[ore] a strong similarity to those of the defendants in *Williams*." *Medina v. Napoli*, 725 F. App'x. 51, 53 (2d Cir. 2018). The plaintiff, Medina, like Williams, was an inmate in SHU who was required to rely on correction officers to file his grievances, and "both Medina and Williams alleged that those officers intentionally discarded the grievances or prevented them from being filed." *Id.* at 53–54. The Second Circuit concluded that "[t]he record establishes that Medina's allegations, supported by witness testimony, about defendants' actions to prevent the filing of Medina's grievances concerning the June 2007 incident are sufficient, when viewed in the light most favorable to Medina, to raise a genuine issue of material fact as to whether the grievance process was 'available' to Medina." *Id.* at 54. Although not in the context of a summary judgment motion, the Second Circuit in *Williams* considered the claim plausible that the correction officer never filed his grievance "given Williams's allegations that he asked superintendent Perez about his grievance one week after giving it to the correction officer and Perez said that she had no knowledge of it." 829 F.3d at 124 & n.3. Because it was a harassment grievance, had it been filed, it should have been forwarded to Perez the same day. *Id.* at 124 n.3. Thus, "[a]t the motion to dismiss stage, the allegation that she had no knowledge of the grievance support[ed] Williams's allegation that it was not filed." *Id.* In contrast, in *Hicks v. Adams*, 692 F. App'x 647 (2d Cir. 2017), the Second Circuit found the allegation "that prison staff did not transmit appeals [the plaintiff] attempted to submit" insufficient to plausibly allege that prison officials thwarted his attempt to appeal, because "he d[id] not state when he submitted the appeals, to whom, and what, if any, steps he took after the documents were not filed." *Id.* at 648.

Here, Plaintiff has consistently alleged in his Complaint, (Compl. ¶¶ 17, 42, 48), deposition testimony, (Pl.'s Dep. 26, 33–34), and Opposition to the Motion, (Pl.'s Opp'n ¶¶ 3, 5, 7), that around January 13, 2018, he wrote at least three grievances, and, as required by regulations for an inmate in SHU, gave those grievances to officers to file for him. Plaintiff testified that he kept a copy of the grievance; however, his property was either destroyed or taken by a corrections officer. (Pl.'s Dep. 32, 35.) After changing facilities multiple times, (Pl.'s Dep. 36), on February 7, 2014, Plaintiff filed another grievance regarding the unanswered grievances he had filed at Sullivan, (Compl. ¶ 17; Pl.'s Opp'n ¶ 6). Furthermore, deposition testimony, as well as the subsequent grievance from Auburn regarding the unanswered grievance from Sullivan, also work to create a genuine dispute of material fact regarding whether Plaintiff attempted to filed a timely grievance at Sullivan in January 2013. Viewing these facts in the light most favorable to Plaintiff, the Court finds the record evidence sufficient to raise a genuine issue of material fact as to whether the grievance process was "available" to Plaintiff. Although there is no witness testimony other than Plaintiff's to support the allegation, *Medina*, 725 F. App'x at 54 (finding additional witness testimony sufficient to create genuine dispute of material fact), the evidence in the record contains sufficient detail regarding when and how Plaintiff attempted to file his grievances. This holding is in accord with numerous other district courts in the Second Circuit that have denied summary judgment based on similar record evidence. *See, e.g., Jackson v. Downstate Corr. Facility*, No. 16-CV-0267, 2018 WL 3650136, at *8 (S.D.N.Y. July 31, 2018) (finding "[the] [d]efendants' argument that [the] [p]laintiff never actually filed his grievance ... of no moment," because the plaintiff's deposition "demonstrates that [the] [p]laintiff made attempts to file a grievance in October of 2015, though there is no record of such a grievance with the IGRC"); *McRae*, 2018 WL 3611964, at *6 (finding the plaintiff's deposition testimony, and a subsequent grievance concerning the superintendent's non-response to his grievance, sufficient to create a material dispute of fact regarding whether the plaintiff had filed a grievance); *Trahan v. Capozzola*, No. 12-CV-4353, 2017 WL 9512406, at *5–6 (E.D.N.Y. June 26, 2017) (denying summary judgment for two claims based on sworn testimony that the plaintiff filed his grievance by giving it to a corrections officer, but granting summary judgment for the one claim where the plaintiff did "not state when he filed the grievance and otherwise proffer[ed] no details regarding its submission"), *adopted by* 2017 WL 4286620 (E.D.N.Y. Sept. 27, 2017); *Carter v. Revine*, No. 14-CV-1553, 2017 WL 2111594, at *12 (D. Conn. May 15,

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

2017) the plaintiff's affidavit that he submitted to two named individuals, and "other available employees," six medical requests and a "written grievance in reference to the lack of response to [his] requests for medical care ... sufficient evidence for the [c]ourt to conclude he tried to submit the grievance by and through the assistance of correctional officers while he was housed in the [Restrictive Housing Unit]" (alterations and internal quotation marks omitted); *Reid v. Marzano*, No. 15-CV-761, 2017 WL 1040420, at *3 (N.D.N.Y. Mar. 17, 2017) (denying summary judgment based on the plaintiff's deposition testimony that his grievance was not filed); *Juarbe v. Carnegie*, No. 15-CV-1485, 2016 WL 6901277, at *4 (N.D.N.Y. Nov. 23, 2016) (concluding "questions of fact remain regarding the filing of the grievances, which precludes summary judgment," where the plaintiff alleged he filed grievances, but no record of the grievances being received or processed existed). *But see Hicks*, 692 F. App'x at 648 (approving dismissal where there was no assertion regarding when and to whom a grievance was filed, and what subsequent steps were taken after the grievance was not filed).

**\*10** Defendants argue that Plaintiff has to provide "something more than the general claims made in his deposition that his grievance was thrown away," and cite to cases from the Northern District holding that the "mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations." (Defs.' Mem. 6 (quoting *Rodriguez v. Cross*, No. 15-CV-1079, 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017), *adopted by* 2017 WL 2790530 (N.D.N.Y. June 27, 2017) ).) However, *Rodriguez* did not involve an inmate housed in SHU who was dependent on the officers to file a grievance for him, and the court explicitly distinguished its holding granting summary judgment from those cases "den[ying] a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU," because "[i]nmates not housed in the SHU are in a different position to SHU inmates when determining if grievance procedures are essentially unknowable or unavailable." *Rodriguez*, 2017 WL 2791063, at *7 (internal quotation marks omitted). And, as explained above, the Court agrees with the numerous courts that have denied summary judgment based on sworn deposition testimony from the Plaintiff creating a dispute of material fact regarding whether a Plaintiff's grievance was submitted. *See, e.g., Trahan*, 2017 WL 9512406, at *5 ("While [the] [d]efendants argue that there is no evidence to support [the] [p]laintiff's claim that he handed timely grievances to

corrections officers, [the] [p]laintiff's position is supported by his sworn testimony, which is sufficient to defeat summary judgment."); *Reid*, 2017 WL 1040420, at *3 (finding that the plaintiff could rely on his deposition testimony and rejecting the defendants' argument that "mere allegation of submitting a grievance, without supporting evidence" was insufficient to withstand summary judgment as "it [wa]s unclear what evidence [the] [d]efendants expect[ed] [the] [p]laintiff to produce of his grievances that were allegedly discarded by corrections officers") (italics and internal quotation marks omitted); *see also Icangelo v. Cty. of Suffolk*, No. 16-CV-1982, 2018 WL 1867108, at *6–7 (E.D.N.Y. Feb. 8, 2018) (finding that despite testimony from the plaintiff that was contradicted by his own deposition testimony regarding whether he did, in fact, write a grievance, and testimony from a Correction Sergeant with the Claim Investigation section at the jail who searched for and was unable to find the grievance, the court nonetheless, "drawing all inferences in the light most favorable to [the plaintiff]," concluded "the facts ... weigh against a finding of non-exhaustion"), *adopted by* 2018 WL 1115349 (E.D.N.Y. Feb. 28, 2018).

As such, drawing all inferences in Plaintiff's favor, there is a dispute of material fact regarding whether Plaintiff's grievance went unfiled. Because the grievance procedures were incapable of use, they are considered "unavailable" to Plaintiff, and Plaintiff "need not exhaust remedies if they are not 'available.' " *Ross*, 136 S. Ct. at 1855, 1858. Accordingly, Defendants' motion for summary judgment based upon lack of exhaustion is denied.

### 2. First Amendment Retaliation

Plaintiff also alleges First Amendment retaliation claims against Defendants, which fail as a matter of law. (Pl.'s Dep. 26.) "To state a First Amendment retaliation claim ..., a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) ); *see also Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5970355, at *19 (S.D.N.Y. Oct. 13, 2015) (same); *Ramrattan v. Fischer*, No. 13-CV-6890, 2015 WL 3604242, at *12 (S.D.N.Y. June 9, 2015) (same). The Second Circuit has made clear that courts are to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted); *see also Dolan*, 794 F.3d at 295 (same); *Corley v. City of New York*, No. 14-CV-3202, 2015 WL 5729985, at *8 (S.D.N.Y. Sept. 30, 2015) (same).

"It is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *4 (S.D.N.Y. July 16, 2013) (citing *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) ); *see also Andino v. Fischer*, 698 F. Supp. 2d 362, 382 (S.D.N.Y. 2010) (same). However, with respect to the second prong, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Davis*, 320 F.3d at 353 (internal quotation marks omitted). The "ordinary firmness" inquiry is not subjective, and a prisoner may still suffer adverse action even where undeterred. *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004); *see also id.* at 384 ("[T]he fact that a particular plaintiff ... responded to retaliation with greater than 'ordinary firmness' does not deprive him of a cause of action."); *Nelson v. McGrain*, No. 12-CV-6292, 2015 WL 7571911, at *1 (W.D.N.Y. Nov. 24, 2015) ("[A] prisoner can state a retaliation claim in the absence of actual deterrence." (quoting *Nelson v. McGrain*, 596 F. App'x 37, 38 (2d Cir. 2015) ) ). Plaintiff alleges he was subject to two types of adverse actions: first, verbal threats, (Pl.'s Dep. 30, 35; Pl.'s Opp'n ¶ 7), and second, harassing conduct, that included serving him empty food trays, tampering with his mail, and destroying and taking his property, (Pl.'s Dep. 8, 28–30; Pl.'s Opp'n ¶¶ 5, 7). The Court addresses each in turn.

**\*11** Courts have found that, while verbal threats may qualify as adverse actions, they must be "sufficiently specific and direct" to be actionable. *Mateo*, 2013 WL 3863865, at *5; *see also Quezada*, 2015 WL 5970355, at *21 ("The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." (internal quotation marks omitted) ); *Lunney v. Brureton*, No. 04-CV-2438, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) (noting that "verbal threats may constitute adverse action ... depend[ing] on their specificity and the context in which they are uttered"). Plaintiff does not know the names of the officers who threatened him. (Pl.'s Dep. 35 (responding to a question about which officers threatened him with, "[h]ow

am I supposed to know their names when I'm sitting in a cell, locked inside a cell. [They] [w]alk by and threaten me.").) The threats Plaintiff received including "telling him to drop the lawsuit," (*id.* at 30), and that they were "gonna kill [him]," (*id.* at 30– 31). The Court finds these threats to be lacking in specificity and directness. "[S]o long as the putative threat's directness and specificity matter, it is difficult to understand how Plaintiff's claims ... are sufficient." *Albritton v. Morris*, No. 13-CV-3708, 2016 WL 1267799, at *18 (S.D.N.Y. Mar. 30, 2016) (citation omitted) (holding statement that officer "told Plaintiff that grievances were unlikely to succeed and said that he would handle things 'his way' " was insufficiently specific or direct); *see also Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("The opacity of [the defendant's] threats to [the plaintiff]—that [the plaintiff] should 'wait till he put his hands on me,' and that 'one day he and I will party,'—softens the deterrent effect considerably." (citations omitted) ); *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (granting summary judgment in favor of a defendant who told an inmate that " 'me and my boys ... going to get you' while brandishing a copy of a grievance"); *Bilal v. N.Y. State Dep't of Corr.*, No. 09-CV-8433, 2010 WL 2506988, at *16 (S.D.N.Y. June 21, 2010) ("Neither [the defendant's] comment ... that [the plaintiff] was 'lucky' because correction officers 'usually fuck people up for writing a bunch of bullshit grievances' nor his ... comment that "[y]ou're not the only one who can write. I'm willing to bet you'll break or get broke up,' was a 'direct' nor 'specific' threat." (alterations and citations omitted) ), *aff'd sub nom. Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012). There is nothing in the record to indicate that any Defendant made a sufficiently direct or specific threat to Plaintiff to state a retaliation claim based on alleged verbal threats.

Defendants also argue that Plaintiff's other allegations of harassing conduct lack specificity, as "Plaintiff has provided minimal detail about the actual actions purportedly taken against him: no description of when they occurred, who did it, or how the Defendants were behind it." (Defs.' Mem. 8.) The Court agrees. Plaintiff testified that "a couple of times ... 'they' would send a tray in my cell, but then you open the top and it's only like a half a spoon of food inside the tray." (Pl.'s Dep. 27.) Plaintiff "wouldn't count" how many times this happened, because "nobody counts shit like this." (*Id.* at 28.) Also, Plaintiff speculates that he "could have 30, 40 letters sitting up in the mail room" because he "ha[s] people telling [him] that mail was written to [him] [but] [he] never received it." (*Id.* at 30.) Additionally, "property" of Plaintiff's "was lost," and he was getting items stolen from his cell by officers.

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 234 of 238

2018 WL 4682784

(*Id.* at 30; *see also id.* at 35 (testifying he was not able to keep a copy of the grievance because his "property [wa]s being destroyed").) As is true in response to any motion for summary judgment, Plaintiff is required to provide evidence sufficient to allow a jury to find in his favor, as "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Plaintiff's allegations regarding this harassing conduct are lacking in any specifics regarding how Defendants were involved in the alleged conduct and how frequently it occurred. Defendants provided sworn statements that they did not even know a grievance was filed, did not have the capacity to interfere with Plaintiff's food or mail, and did not arrange for or personally retaliate against Plaintiff, (Defs.' 56.1 ¶ 25–29), which Plaintiff does not contest. This fatally undercuts Plaintiff's claim. *See Mateo v. Dawn*, No. 14-CV-2620, 2016 WL 5478431, at *8 (S.D.N.Y. Sept. 28, 2016) ("Plaintiff's claim is similarly handicapped by its failure to allege or otherwise suggest that Defendants even knew of the complaints filed against other correction officers."); *Alston v. Pafumi*, No. 09-CV-1978, 2016 WL 81785, at *7 (D. Conn. Jan. 7, 2016) (granting partial summary judgment where the plaintiff identified "no record evidence from which a reasonable jury could infer that any other defendant was aware of [the plaintiff's] complaints"), *reconsideration denied*, 2016 WL 447423 (D. Conn. Feb. 4, 2016); *Tirado v. Shutt*, No. 13-CV-2848, 2015 WL 774982, at *10 (S.D.N.Y. Feb. 23, 2015) ("Absent evidence that any defendant knew about his ... grievance, [the plaintiff] has failed to provide any basis to believe that they retaliated against him for a grievance in which they were not named."), *adopted in relevant part by* 2015 WL 4476027 (S.D.N.Y. July 22, 2015); *Wesley v. Kalos*, No. 97-CV-1598, 1997 WL 767557, at *5 (S.D.N.Y. Dec. 11, 1997) ("To establish a claim of retaliatory transfer requires [the plaintiff], at a minimum, to assert facts to show that the [d]efendants knew of [the plaintiff's] complaints prior to the transfer.").

**\*12** To the extent Plaintiff alleges that other—unnamed—officers retaliated against him based on Plaintiff's attempt to grieve the January 2013 incident, Plaintiff has not established a nexus between his protected activity and the alleged retaliation. "Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer." *Jones v. Fischer*, No. 10-CV-1331, 2013 WL 5441353, at *21 (N.D.N.Y. Sept. 27, 2013); *see also Henson v. Gagnon*, No. 13-CV-590, 2015 WL 9809874, at *12 (N.D.N.Y. Dec. 10, 2015) ("The record is devoid

of evidence ... that supports [the] [p]laintiff's conclusory assertion that [the defendant] planted evidence and issued the [m]isbehavior [r]eport based upon evidence in retaliation for grievances [the] [p]laintiff had filed against other corrections officers."), *adopted by* 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (holding that the plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright*, 554 F.3d at 274) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was a complaint about a prior incident by another corrections officer). In this case, Plaintiff's speculation that unnamed individuals retaliated against Plaintiff based on his attempt to grieve the 2013 incident is not supported by the record. Therefore, Defendants' Motion is granted as to the First Amendment retaliation claims, and Plaintiff's retaliation claims against Defendants are dismissed.

### 3. Claims Against Hanson

Defendants argue the claims against Hanson should be dismissed, because there is no dispute that Hanson's only involvement in the alleged constitutional deprivations was taking photographs of Plaintiff after the alleged assault and Plaintiff has failed to allege a conspiracy to cover up the extent of Plaintiff's injuries. (Defs.' Mem. 9.)

A Section 1983 conspiracy claim requires "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) (same); *Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 464–65 (S.D.N.Y. 2012) (same). "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn*, 200 F.3d at 72 (internal quotation marks omitted). [12] To state a conspiracy claim, Plaintiff "must provide some factual basis supporting a meeting of the minds." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks omitted). Thus, Plaintiff must

**Terry v. Hulse, Not Reported in Fed. Supp. (2018)**

Case 9:25-cv-00216-LEK-MJK    Document 23    Filed 10/01/25    Page 235 of 238

2018 WL 4682784

"make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations and internal quotation marks omitted).

[12]      Defendants argue that Plaintiff's conspiracy claims should be dismissed according to the "intracorporate conspiracy doctrine," which provides that employees or agents of a single corporate entity, acting within the scope of their employment, are legally incapable of conspiring together. (Defs.' Mem. 9–10.) *Hill v. City of New York,* No. 03-CV-1283, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005) (citing *Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir. 1978) ). Although the Second Circuit has recognized the intracorporate conspiracy doctrine in the context of § 1985, *see Herrmann,* 576 F.2d at 459; *Girard v. 94th St. & Fifth Ave. Corp.,* 530 F.2d 66, 72 (2d Cir. 1976), it has not yet extended the doctrine to § 1983, *see Ali v. Connick,* 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015) (collecting cases). The Court therefore declines to grants summary judgment based on this argument. Regardless, Plaintiff's claims fit within the "personal stake" exception to the rule. "The intracorporate conspiracy doctrine does not apply to bar conspiracy claims against individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." *Id.* at 282 (internal quotation marks omitted). Construing the facts in the light most favorable to Plaintiff, Plaintiff has alleged facts which, if true, would show that Defendants acted in their own interests and outside the normal course of their duties for DOCCS if they did indeed attempt to cover up the use of force against Plaintiff. "This is consistent with cases from th[e] [Second] [C]ircuit in which district courts have found that the personal stake exception applied when police officers were alleged to have: covered up the use of excessive force, engaged in race-based false arrests to improve their chances of promotions and benefits, and assaulted a prisoner in retaliation for his participation in a federal lawsuit." *Id.* (collecting cases) (citations omitted).

 *13  Plaintiff alleges that Defendants, including Hanson, conspired to cover up the alleged use of excessive force against him. (Pl.'s Dep. 40.) As evidence, he points to the conversation between Cole and Hanson as the photographs were being taken on January 13, 2013 immediately following the assault. According to Plaintiff, Cole told Hanson to not let the superintendent see the close up photo, and that they "can't let [the close up] register." (Pl.'s Dep. 11; Pl.'s Opp'n ¶ 7.) Further, the close-up photos did not, in fact, register. (Pl.'s Dep. 12, 40; Pl.'s Opp'n ¶ 7.) Based on this evidence, Plaintiff has created a fact dispute regarding whether there was an agreement between Cole and Hanson. "[T]his is not a case where evidence shows that the defendants merely worked together, or communicated generally with each other." *Deskovic,* 894 F. Supp. 2d at 466 (collecting cases). Further, Plaintiff has also provided "details of time and place and the alleged effects of the conspiracy," *Warren,* 33 F. Supp. 2d at 177 (internal quotation marks omitted), as well as "overt acts which [D]efendants engaged in which were reasonably related to the promotion of the alleged conspiracy," *Mitchell v. Cty. of Nassau,* 786 F. Supp. 2d 545,565 (E.D.N.Y. 2011) (internal quotation marks omitted). *See also Hill v. City of New York,* No. 03-CV-1283, 2005 WL 3591719, at *5 (E.D.N.Y. Dec. 30, 2005) ("Given that a jury may rationally infer that the defendant officers participated in a conspiracy to cover-up unconstitutional acts, summary judgment is not appropriate on [the] plaintiff's conspiracy claim."). And, the fact that the close-up photo was, in fact, unable to be recovered serves as circumstantial evidence in further support of the conspiracy. *See DeMeo v. Kean,* 754 F. Supp. 2d 435,447 (N.D.N.Y. 2010) (finding that erased and destroyed video recordings in control of defendants was "sufficient circumstantial evidence to permit a jury to determine whether [the defendants] conspired ... to partially erase and/or destroy the video evidence."). Thus, the Court denies Defendants' motion for summary judgment as to the claims again Hanson.

### III. Conclusion

For the foregoing reasons, the Motion for Summary Judgment is granted as to the First Amendment retaliation claim, and denied as to the rest of Plaintiff's Claims. The Court will hold a conference on November 8, 2018 at 10:30 a.m. to discuss the status of the remaining claims. The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 66), and mail a copy of this Opinion to Plaintiff.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4682784

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 7:16-CV-00252**<br>Terry v. Hulse Jr. et al | — | S.D.N.Y. | Jan. 12, 2016 | Docket |

**WESTLAW**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History**

There are no History results for this citation.